1  Ramon K. Quichocho, Esq.
   LAW OFFICES OF RAMON K. QUICHOCHO, LLC
2  2ⁿᵈ Floor, V.S. Sablan Building, Chalan Piao
   P.O. Box 505621
3  Saipan, MP 96950
   Tel. No.: 670.234.8946
4  Fax: 670.234.8920
   Email: rayq@vzpacifica.net
5
6  *Attorney for Plaintiff Joaquin Q. Atalig*

7

8              IN THE SUPERIOR COURT
                      OF THE
9    COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

10  JOAQUIN Q. ATALIG,                    )  CIVIL ACTION NO. 06 -0119(R)
11                                        )
              Plaintiff,                  )
12                                        )
              vs.                         )
13                                        )
    OKP (CNMI) CORPORATION, AND DOES      )  VERIFIED COMPLAINT AND
14  1-10,                                 )  DEMAND FOR JURY TRIAL
                                          )
15                                        )
              Defendants.                 )
16                                        )

17      COMES NOW Plaintiff Joaquin Q. Atalig, by and through counsel, Ramon K.

18  Quichocho, Esq., and for his Complaint against Defendants OKP (CNMI) CORPORATION

19  ("OKP"), and Does 1-10, alleges as follows:

20                                   I.
21                            **INTRODUCTION**

22      1.  This case is about the destruction and desecration of several priceless and original

23  Latte Stones, other cultural and historical artifacts, and other things of value, in violation of a

24  Lease Agreement, and in violation of the laws of the Commonwealth of the Northern Mariana

25
    Islands.
26

27      2.  More than 3,000 years ago, the early Chamorros painstakingly carved out and created

28  the Latte Stone.

                                      *1*
                   *Verified Complaint and Demand for Jury Trial*

EXHIBIT
C

3. The Latte Stone is such an original art, symbol, and structure, that even with the advantage of modern technology, the modern Chamorros have not carved out a "modern" Latte Stone that even comes close to the original Latte Stones that are present throughout the Mariana Islands.

4. Today, the Latte Stone is so sacred that it has become a living symbol of Chamorro strength, peace, solidarity, pride, respect, dignity, and identity.

5. The Latte Stone has become a permanent and official image of our CNMI flag, crowned with a beautiful mwar which signifies the highest respect and dignity, and untirelessly waiving a friendly "Hafa Adai."

6. The Latte Stone has been used in numerous business logos, in official government and corporate seals, in construction designs, in storybooks, and in many other aspects of life in the CNMI.

7. The Latte Stone, however, has also been a bad experience for a few people who have intentionally or unintentionally disrespected and desecrated the sanctity of the place where a Latte Stone sits, causing some to suffer sicknesses that even modern science cannot cure, and in which the only cure is to "ask for forgiveness."

8. In short, the Latte Stone represents the Chamorro culture, tradition, and beliefs.

9. As of December 2005, several original Latte Stones lay on what is now the real property of Plaintiff Atalig, in Ginalangan, Rota, Lot No. 362 R 01 (sometimes referred to as "Plaintiff Atalig's land").

10. But, in January 2006, when Defendant OKP leased the improvements on Plaintiff Atalig's land, Defendant OKP wiped away a lot of the history, culture, and economic advantage that was on Plaintiff Atalig's land in Ginalangan, Rota, when Defendant OKP used heavy

2
*Verified Complaint and Demand for Jury Trial*

1    equipment to clear Plaintiff Atalig's land, to wit, Latte Stone clusters and Japanese structures and

2    other artifacts, without the required permits from the Historic Preservation Office, the Division

3    of Environmental Quality, and other regulatory agencies, and definitely, without the prior written

4    consent of Plaintiff Atalig. The destruction, desecration, and obliteration of the cultural and

5    historical artifacts and other things of value took less than three months into the Lease term.

6

7         11. Historically, the Spanish came and ruled the Chamorros, but the Spanish did not

8    destroy the Latte Stone clusters. They preserved and respected them.

9         12. Then, the Germans took over the Mariana Islands from Spain, but the Germans did

10

11   not destroy the Latte Stone clusters. They, too, preserved and respected them.

12        13. After the Germans, the Japanese took control of the Mariana Islands until the end of

13   World War II in 1945, but the Japanese did not destroy the Latte Stone clusters. Not only did

14   they preserve them, the Japanese erected more structures that have become historical artifacts.

15

16        14. As a result of the Japanese occupation, the Japanese built other structures on Plaintiff

17   Atalig's land, which leads to the Ginalangan Defensive Complex.

18        15. After World War II, the United Nations and the Unites States took over until the

19   Mariana Islands voted to be in political union with the United States, but the United Nations and

20   the United States did not destroy the Latte Stone clusters or the Japanese structures. They, too,

21   preserved and respected them.

22

23        16. For many decades, the Latte Stone clusters, and certain Japanese structures, including

24   but not limited to, a Japanese water tank, washing basin and frame, sat serenely on Plaintiff

25   Atalig's land in Rota.

26

27

28

17. Constitutionally, "[p]laces of importance to the culture, traditions and history of the people of the Northern Mariana Islands shall be protected and preserved...." N.M.I. Const. art. XIV, § 3.

18. Similarly, "[a]rtifacts and other things of cultural or historical significance shall be protected, preserved and maintained in the Commonwealth...." N.M.I. Const. art. XIV, § 3.

19. It is the Historic Preservation Office that must "issue or deny permits, after review by the Review Board, for use, access, and development of land containing cultural and historic properties, and for the taking of any artifact of historic or cultural significance from the Commonwealth for cultural exchange, scientific identification, or donation to a nonprofit organization recognized on the basis of its cultural significance to the Commonwealth[.]" 1 CMC § 2382(g).

20. Therefore, "[i]t is unlawful for any person, partnership, business, corporation or other entity to willfully remove or take any artifact that is of historic or cultural significance to the people of the Commonwealth, or knowingly destroy, remove, disturb, displace, or disfigure any cultural or historic property on public or private land or in the water surrounding the Commonwealth as designated by or eligible for designation by the Historic Preservation Office as a cultural or historic property, unless the activity is pursuant to a permit issued under 1 CMC § 2382(g) and 2 CMC § 4831." 2 CMC § 4841.

21. As such, "[a]ny person who, individually or acting for any business, corporation or other entity, knowingly and willfully violates any provision of this chapter or any valid rule or regulation promulgated under this chapter shall be fined not more than $10,000 per day or imprisoned not more than one year, or both." 2 CMC § 4842.

22. Unfortunately, some of the cultural and historical artifacts that once enjoyed the serenity on Plaintiff Atalig's land were unlawfully damaged, destroyed, and mutilated by Defendants, and are lost and gone forever.

23. Sadly, if only Defendant OKP followed the terms and provisions of the Lease Agreement, if only Defendant OKP obeyed the laws of the CNMI, if only Defendant OKP listened to warnings not to clear the areas where the cultural and historical artifacts lay, if only Defendant OKP had a little respect for the culture, heritage, race, and history of the Chamorro people, Defendant OKP could have avoided the despicable and disgraceful destruction and desecration of the priceless artifacts that were once part of who we are as Chamorros.

## II.
## JURISDICTION AND VENUE

24. This Court has jurisdiction over this matter pursuant to N.M.I. Const. art. IV, § 2, and 1 CMC § 3202.

25. Venue is proper in the Superior Court of the Commonwealth of the Northern Mariana Islands, in Rota.

## III.
## PARTIES

26. Plaintiff Joaquin Q. Atalig is a United States citizen and is residing in the Commonwealth of the Northern Mariana Islands.

27. Defendant OKP (CNMI) CORPORATION ("OKP") is a domestic corporation organized and existing under the laws of the Commonwealth of the Northern Mariana Islands, with its principal places of business located in Saipan and/or Rota, Commonwealth of the Northern Mariana Islands.

28. On information and belief, Defendant OKP was awarded an $8,677,000.00 contract by the Commonwealth Ports Authority to improve the Rota Airport runway. As part of that operation, Defendant OKP leased Plaintiff Atalig's improvements in November 2005. Due to the magnitude of Defendant OKP's project in Rota, Defendant OKP knew that governmental permits are required before any land clearing activities are conducted.

29. Except as described herein, the true names of the defendants sued as Does 1 through 10, inclusive, are unascertained to Plaintiff Atalig which therefore sues these defendants by such fictitious names. Plaintiff Atalig will amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named defendants were involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. These defendants aided or abetted, or participated with the other defendants and others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and are responsible for the acts, occurrences and events alleged in this Complaint.

30. The named and Doe defendants in this action are sometimes collectively referred to herein as "Defendants."

## IV.
## OPERATIVE FACTS

31. On November 2, 2005, Plaintiff Atalig and Defendant OKP executed a Lease Agreement (the "Lease"), which was filed at the Commonwealth Recorder's Office, as File No. 05-3030, on November 3, 2005. Under the Lease, Plaintiff Atalig is the Lessor, and Defendant OKP is the Lessee. A true and correct copy of the Lease is attached hereto, labeled "Exhibit A," and incorporated herein by this reference as if set forth in full.

32. Plaintiff Atalig leased unto Defendant OKP, and Defendant OKP leased from Plaintiff Atalig, "the improvements described in Section 1" of the Lease. Emphasis added.

33. Pursuant to Section 1 of the Lease, the leased premises "consist of all improvements situated on the real property in Northern Part (Area No. 4) Ginalangan, Municipality of Rota, Commonwealth of the Northern Mariana Islands,..., together with the right to use Lessor's easements and appurtenances in adjoining and adjacent land, highways, roads, streets, lanes, whether public or private, reasonably required for the installation, maintenance, operation and service of sewer, water, gas, power and other utility lines and for driveways and approaches to and from abutting highways or streets for the use and benefit of the above-described improvements and the parcel of real property described below." Emphases added.

34. Defendant OKP also has the right to use the real property, described below, where the leased improvements are situated:

Lot No. 362 R 01, containing an area of 49,998 square meters, more or less, as more particularly described in Cadastral Plat No. 362 R 00, the original of which was registered with the Land Registry as Document No. 6503, on September 12, 1978.

35. The existing improvements and improvements subsequently erected on Lot 362 R 01 during the term of the Lease are collectively referred to in the Lease as the "Premises." See Section 1 of the Lease.

36. The Lease was for a term of thirteen (13) months, commencing on December 1, 2005, and ending on December 31, 2006, unless sooner terminated, with Lessee's option to extend for a period of one year at the monthly rent of $3,000.00. See Sections 2 and 5 of the Lease.

37. Pursuant to Section 6 of the Lease, Defendant OKP may use, improve and develop the Premises or any part thereof for any lawful use or purpose, provided that Defendant OKP does not commit waste, but primarily as office, barracks, equipment repair shop and workstation,

7

*Verified Complaint and Demand for Jury Trial*

heavy and lightweight equipment parking and storage, and as staging area related to Defendant OKP's business and operation on Rota. Emphases added.

38. Pursuant to Section 13.1 of the Lease, Defendant OKP "shall have the right during the term of this Lease, to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvement on the Premise[s], and correct and change the contour of the Premises pursuant to the plans and drawings attached [to the Lease] as Exhibits "A" and "B", ...only with the prior written consent of Lessor." Emphasis added.

39. Plaintiff Atalig never gave a written consent and Defendant OKP never asked for a written consent to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvement on the Premises, and correct and change the contour of the Premises pursuant to the plans and drawings attached [to the Lease] as Exhibits "A" and "B."

40. Furthermore, Section 13.1 of the Lease expressly states that "[a]ny other alterations and changes require Lessor's consent in writing."

41. Plaintiff Atalig never gave a written consent and Defendant OKP never asked for a written consent to make any other alterations and changes.

42. In or about January 2006, despite being warned not to clear the areas where the cultural and historical artifacts lay, Defendants used heavy equipment to clear the land, without the proper permits from the Government and without permission from Plaintiff Atalig, in order to erect other structures for the use and benefit of Defendant OKP.

43. Similarly, in or about January 2006, despite not having a written consent from Plaintiff Atalig, Defendants tore down the kitchen, laundry, and storage facilities, and used the materials therefrom to build a *palapala*. In the process, Defendants damaged and destroyed the homemade cooking stove, *ifik* posts, and other valuable items that were stored.

44. Similarly, in or about January 2006, despite not having a written consent from Plaintiff Atalig, Defendants bull-dozed down valuable trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants.

45. Similarly, in or about January 2006, despite not having a written consent from Plaintiff Atalig or an earthmoving permit from the Division of Environmental Quality, Defendants removed soil and other rocks and minerals, including excavating Plaintiff Atalig's land, for Defendant OKP's parking lot.

46. On information and belief, Defendant OKP did not obtain and pay for a permit before clearing the land despite agreeing to "be responsible for the payment of all utilities, assessments, and other public charges arising by reason of the occupancy, use or possession of the Premises." See Section 11 of the Lease.

47. Pursuant to Section 15 of the Lease, Defendant OKP "shall be in default in the prompt and full performance of any other term, covenant, or condition of the Lease, (except as to payment of rent), if such default shall continue for a period of thirty (30) days after notice of such default is given by the Lessor to Lessee, unless the default is of such a nature that the same cannot be cured or corrected within said thirty (30) day period and the Lessee shall have promptly and diligently commenced to cure and correct such default and shall have thereafter continued therewith with reasonable diligence and in good faith, in a manner as to cure and correct the same as promptly and as reasonably practicable under the circumstances, and shall have continued therewith until the default shall have been cured or corrected."

48. On January 17, 2006, Plaintiff Atalig sent a Notice of Default and Violations to Defendant OKP. A true and correct copy of the January 17, 2006 Notice of Default and

Violations is attached hereto, labeled "Exhibit B," and incorporated herein by this reference as if set forth in full.

49. In a letter dated February 7, 2006, rather than commencing to cure the violations under the Lease, Defendant OKP, through counsel, argued that Defendant OKP "did not violate any of the terms of the lease agreement." A true and correct copy of the February 7, 2006 letter from Defendant OKP's counsel is attached hereto, labeled "Exhibit C," and incorporated herein by this reference as if set forth in full.

50. On February 21, 2006, Plaintiff Atalig, through counsel, responded to the February 7, 2006 letter from Defendant OKP's counsel. A true and correct copy of the February 21, 2006 letter from Plaintiff Atalig's counsel is attached hereto, labeled "Exhibit D," and incorporated herein by this reference as if set forth in full.

51. Defendant OKP, or its counsel, has not responded to the February 21, 2006 letter from Plaintiff Atalig's counsel.

## V.
## FIRST CAUSE OF ACTION
### (Breach of Contract)

52. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

53. Plaintiff Atalig has performed all the conditions and agreements required of Plaintiff Atalig under the terms of the Lease.

54. Defendant OKP had a duty to act with reasonable care and diligence in performing the Lease so as not to injure a person or property by its performance.

55. Defendants breached the Lease with Plaintiff Atalig in the following respects:

*10*
*Verified Complaint and Demand for Jury Trial*

03/24/2008  09:49 FAX  670 5324    UKP(CNMI) CORPORATION              ⌀013/054

a.  Defendants have committed waste by unlawfully damaging, destroying, and/or mutilating historical artifacts, structures, and other valuable relics, including but not limited to, Latte Stone clusters, Japanese structures, water tank, washing basin and frame, and areas surrounding Japanese building(s), in violation of Section 6 of the Lease and in violation of CNMI laws and regulations;

b.  Defendants have committed waste by damaging, destroying, and/or mutilating permanent trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants, in violation of Section 6 of the Lease;

c.  Defendants have committed waste by damaging, destroying, and/or mutilating preexisting buildings/improvements to the land, including but not limited to, laundry, storage, and kitchen facilities, and the stored contents therein, in violation of Section 6 of the Lease;

d.  Defendants have committed waste by placing a fuel tank station on Plaintiff's property without the proper permits, in violation of Section 6 of the Lease;

e.  Defendants have committed waste by moving and/or removing soil and other minerals without the proper permits, in violation of Section 6 of the Lease and in violation of CNMI laws and regulations;

f.  Defendants failed to obtain Plaintiff Atalig's written consent to erect, maintain, alter, remodel, reconstruct, rebuild, replace and remove building and other improvement on the Premises, and correct and change the contour of the Premises, in violation of Section 13.1 of the Lease.

56. Notwithstanding demand to cure the violations, Defendants have failed, neglected, and refused, and still fail, neglect, and refuse to cure the violations and default.

57. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including property damages and loss of prospective economic advantages, and has been damaged in the amount of $5,000,000, or more, to be proven at trial.

58. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $2,000,000, or more, to be proven at trial.

59. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## VI.
## SECOND CAUSE OF ACTION
### (Waste)

60. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

61. At all relevant times, Plaintiff Atalig was the fee simple owner of Lot No. 362 R 01, on which are present priceless cultural and historical artifacts and other things of value.

62. Defendant OKP leased the improvements situated on Lot No. 362 R 01, and occupied Lot No. 362 R 01 since the commencement of the term of the Lease.

63. During the period of such occupation, Defendants greatly injured the improvements and the land, as follows:

    a. By unlawfully damaging and/or destroying historical artifacts, structures and other

       valuable relics, including but not limited to, Latte Stone clusters, Japanese structures,

water tank, washing basin and frame, and areas surrounding Japanese building(s), and removing them from Plaintiff Atalig's land;

   b. By damaging, destroying and/or cutting permanent trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants, and removing them from Plaintiff Atalig's land;

   c. By damaging and/or destroying preexisting buildings/improvements to the land, including but not limited to, the laundry, storage, and kitchen facilities, and leaving the stored items exposed;

   d. By placing a fuel tank on Plaintiff Atalig's land; and

   e. By moving and/or removing soil, and by digging up soil and other minerals (about 40' x 50' x 8' hole in the ground and lined by concrete, including other excavations), and removing them from Plaintiff Atalig's property.

64. On information and belief, Defendant OKP did not obtain the necessary permits from the Division of Environmental Quality and the Historic Preservation Office before conducting its wasteful and unlawful activities.

65. Although required under the Lease, Defendant OKP failed to obtain the prior written permission of Plaintiff Atalig before conducting its wasteful and unlawful activities.

66. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including but not limited to, diminution in property values and loss of prospective economic advantages, and has been damaged in an amount to be proven at trial.

OKP(CNMI) CORPORATION          ☑016/054

67. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $2,000,000, or more, to be proven at trial.

68. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## VII.
### THIRD CAUSE OF ACTION
(Conversion—Historical and Cultural Artifacts)

69. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

70. At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01, on which are present cultural and historical artifacts.

71. Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of historical and cultural artifacts, to wit, Latte Stones, Japanese structures, Japanese washing basin and frame, and Japanese water tank, located on Plaintiff Atalig's land, and converted them to Defendants' own use.

72. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including but not limited to, diminution in property values and loss of prospective economic advantages, and has been damaged in the amount of $2,000,000, or more, to be proven at trial.

73. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $1,000,000, or more, to be proven at trial.

*14*
*Verified Complaint and Demand for Jury Trial*

74. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## VIII.
## FOURTH CAUSE OF ACTION
### (Conversion—Soil and Other Minerals)

75. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

76. At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01, on which are present fertile top soil and minerals.

77. Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of soil and other minerals located on Plaintiff Atalig's land, and converted them to Defendants' own use.

78. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including but not limited to, diminution in property values and loss of prospective economic advantages, and has been damaged in the amount of $500,000, or more, to be proven at trial.

79. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $250,000, or more, to be proven at trial.

80. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## IX.
## FIFTH CAUSE OF ACTION
### (Conversion—Permanent Trees)

81. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.