| | |
|---|---|
| 1<br>2<br>3<br>4<br>5 | Ramon K. Quichocho, Esq.<br>LAW OFFICES OF RAMON K. QUICHOCHO, LLC<br>2nd Floor, V.S. Sablan Building, Chalan Piao<br>P.O. Box 505621<br>Saipan, MP 96950<br>Tel. No.: 670.234.8946<br>Fax: 670.234.8920<br>Email: rayq@vzpacifica.net |



E-FILED
CNMI SUPERIOR COURT
E-filed: Jul 31 2006 12:40PM
Clerk Review: Jul 31 2006 2:52PM
Filing ID: 11929652
Case Number: 06-0119-CV
Elsa Duenas

*Attorney for Plaintiff Joaquin Q. Atalig*

IN THE SUPERIOR COURT
OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | | |
|---|---|---|
| JOAQUIN Q. ATALIG,<br><br>     Plaintiff,<br><br>vs.<br><br>OKP (CNMI) CORPORATION, OKP<br>HOLDINGS LIMITED, a foreign corporation,<br>KIM PEOW OR, TOH WAT OR, ERIC NAM<br>OH, HE KHENG SOH, BRIAN M. CHEN,<br>PRASADA REDDY GOLUGURI, PRAMUAN<br>JAIPHAKDEE, WILAI PROMCHAI,<br>COMMONWEALTH PORTS AUTHORITY,<br>AND REGINO M. CELIS, in his capacity as<br>Acting Executive Director of the<br>Commonwealth Ports Authority, AND<br>DOES 1-3,<br><br>     Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 06-0119(R)<br><br>VERIFIED FIRST<br>AMENDED COMPLAINT<br>FOR BREACH OF<br>CONTRACT<br>AND TORT<br>CLAIMS AND<br>FOR RELIEF UNDER<br>THE OPEN GOVERNMENT<br>MEETINGS AND RECORDS ACT<br>AND DEMAND FOR JURY TRIAL |

COMES NOW Plaintiff Joaquin Q. Atalig, by and through his counsel, Ramon K. Quichocho, Esq., and for his Verified First Amended Complaint for Breach of Contract and Tort Claims and for Relief Under the Open Government Meetings and Records Act and Demand for Jury Trial (the "Amended Complaint") against Defendants OKP (CNMI) Corporation, OKP Holdings Limited, Kim Peow Or, Toh Wat Or, Eric Nam Oh, He Kheng Soh, Brian M. Chen, Prasada Reddy Goluguri, Pramuan Jaiphakdee, Wilai Promchai, the Commonwealth Ports Authority, and Regino M. Celis, and Does 1-3, alleges as follows:


EXHIBIT D

# I.
# INTRODUCTION

1. This landmark case is about Defendants' destruction and desecration of several priceless and original Latte Stones, an ancient Chamorro grinding stone[1] other cultural and historical artifacts, and other things of value, in violation of the Lease Agreement, and in violation of the laws of the Commonwealth of the Northern Mariana Islands, despite being forewarned at least twice not to damage or destroy cultural and historical artifacts.

2. More than 300 years ago, the early Chamorros painstakingly carved out and created the Latte Stone. As a result, the Commonwealth of the Northern Mariana Islands, and the beautiful island of Rota in particular, is the Latte Stone capitol of the world.

3. The Latte Stone is such an original art, symbol, and structure, that even with the advantage of modern technology, the modern Chamorros have not carved out a "modern" Latte Stone that even comes close to the original Latte Stones that are present throughout the Mariana Islands.

4. Today, the Latte Stone is so sacred that it has become a living symbol of Chamorro strength, peace, solidarity, pride, respect, dignity, identity, and justice.

5. In fact, on March 24, 2006, the CNMI's Miss Marianas Teen 2006 stated it succinctly when she elegantly declared that the Latte Stone "represents the foundation in which our community was built upon, ...."[2]

---

[1] Mortar and pestal.

[2] This quote is from Miss Marianas Teen 2006, Miss Myana T. Welch. Miss Welch won the Miss Marianas Teen 2006 title and "got the loudest cheer when she responded to the following question: 'What single gift will you offer to the emperor and empress of Japan that will reflect the Marianas?' Welch replied: 'I would give them a replica of our latte stone made of limestone, the exact limestone that was used by our ancestors. It represents the foundation on which our community was built upon, and giving this to them speaks more than a thousand words about the Marianas.'"

6. The Latte Stone has become a permanent and official image of our CNMI flag, crowned with a beautiful mwar which signifies the highest respect and dignity, and untirelessly waving a friendly "Hafa Adai."

7. The Latte Stone has been used in numerous business logos, in official government and corporate seals, in construction designs, in storybooks, and in many other aspects of life in the CNMI.

8. The Latte Stone, however, has also been a bad experience for a few people who have intentionally or unintentionally disrespected and desecrated the sanctity of the place where a Latte Stone sits, causing some to suffer sicknesses that even modern science cannot cure, and in which the only cure is to "ask for forgiveness."

9. Surely, the Latte Stone represents the Chamorro culture, tradition, and beliefs.

10. As of December 2005, several original Latte Stones lay on what is now the real property of Plaintiff Atalig, in Ginalangan, Rota, Lot No. 362 R 01 (sometimes referred to as "Plaintiff Atalig's land").

11. But, in late December 2005, Defendant OKP wiped away a lot of the history, culture, value, and economic advantage that was on Plaintiff Atalig's land in Ginalangan, Rota, when Defendant OKP used heavy equipment to clear Plaintiff Atalig's land, to wit, Latte Stone clusters, ancient Chamorro grinding stone, and Japanese structures and other artifacts, without the required permits from the Historic Preservation Office, the Division of Environmental Quality, and other regulatory agencies, and definitely, without the prior written consent of Plaintiff Atalig. The destruction, desecration, and obliteration of the cultural and historical artifacts and other things of value took less than two months into the Lease term.

12. Historically, the Spanish came and ruled the Chamorros, but the Spanish did not destroy the Latte Stone clusters. They preserved and respected them.

13. Then, the Germans took over the Mariana Islands from Spain, but the Germans did not destroy the Latte Stone clusters. They, too, preserved and respected them.

14. After the Germans, the Japanese took control of the Mariana Islands until the end of World War II in 1945, but the Japanese did not destroy the Latte Stone clusters. Not only did they preserve them, the Japanese erected more structures that have become historical artifacts.

15. As a result of the Japanese occupation, the Japanese built other structures on Plaintiff Atalig's land, which leads to the Ginalangan Defensive Complex.

16. After World War II, the United Nations and the Unites States took over until the Mariana Islands voted to be in political union with the United States, but the United Nations and the United States did not destroy the Latte Stone clusters or the Japanese structures. They, too, preserved and respected them.

17. For many decades, the Latte Stone clusters, the ancient Chamorro grinding stone, and certain Japanese structures, including but not limited to, a Japanese water tank, washing basin and frame, sat serenely on Plaintiff Atalig's land in Rota, under the watch of Plaintiff Atalig, who, in accordance with family tradition, was supposed to pass the "family treasure" to his children, who will then pass them on to their children, and their children's children. But now, it is IMPOSSIBLE to do that!

18. For many years, Plaintiff Atalig has held on to the Constitutional guarantee that, "[p]laces of importance to the culture, traditions and history of the people of the Northern Mariana Islands shall be protected and preserved…" and that "[a]rtifacts and other things of cultural or historical significance shall be protected, preserved and maintained in the Commonwealth…." N.M.I. Const.

art. XIV, § 3. Short of litigation, however, that Constitutional guarantee is only as good as the enforcement resolve of the Historic Preservation Office and others with the enforcement powers.

19. In the CNMI, it is the Historic Preservation Office that must "issue or deny permits, after review by the Review Board, for use, access, and development of land containing cultural and historic properties, and for the taking of any artifact of historic or cultural significance from the Commonwealth for cultural exchange, scientific identification, or donation to a nonprofit organization recognized on the basis of its cultural significance to the Commonwealth[.]" 1 CMC § 2382(g).

20. Therefore, "[i]t is unlawful for any person, partnership, business, corporation or other entity to willfully remove or take any artifact that is of historic or cultural significance to the people of the Commonwealth, or knowingly destroy, remove, disturb, displace, or disfigure any cultural or historic property on public or private land or in the water surrounding the Commonwealth as designated by or eligible for designation by the Historic Preservation Office as a cultural or historic property, unless the activity is pursuant to a permit issued under 1 CMC § 2382(g) and 2 CMC § 4831." 2 CMC § 4841.

21. As such, "[a]ny person who, individually or acting for any business, corporation or other entity, knowingly and willfully violates any provision of this chapter or any valid rule or regulation promulgated under this chapter shall be fined not more than $10,000 per day or imprisoned not more than one year, or both." 2 CMC § 4842.

22. Unfortunately, some of the cultural and historical artifacts that once enjoyed the serenity on Plaintiff Atalig's land were unlawfully damaged, destroyed, and mutilated by Defendants, and are LOST AND GONE FOREVER.

23. Sadly, if only Defendant OKP followed the terms and provisions of the Lease Agreement, if only Defendant OKP obeyed the laws of the CNMI, if only Defendant OKP listened to warnings not to clear the areas where the cultural and historical artifacts lay, if only Defendant OKP had a <u>little respect</u> for the culture, heritage, race, and history of the Chamorro people, Defendant OKP could have avoided the despicable and disgraceful destruction and desecration of the priceless artifacts that were once part of who we are as CNMI citizens and as Chamorros.

## II.
## JURISDICTION AND VENUE

24. This Court has jurisdiction over this matter pursuant to N.M.I. Const. art. IV, § 2, and 1 CMC § 3202, as well as the Open Government Meetings and Records Act, which is codified at 1 CMC § 9901, *et seq.*, as amended.

25. Venue is proper in the Superior Court of the Commonwealth of the Northern Mariana Islands, in Luta.

## III.
## PARTIES

26. Plaintiff Joaquin Q. Atalig is a United States citizen and is residing in the Commonwealth of the Northern Mariana Islands.

27. Defendant OKP (CNMI) Corporation ("OKP") is a domestic corporation organized and existing under the laws of the Commonwealth of the Northern Mariana Islands, with its principal places of business located in Saipan and/or Rota, Commonwealth of the Northern Mariana Islands. Defendant OKP was only incorporated on May 3, 2005. Defendant OKP is grossly undercapitalized for the project that Defendant OKP contracted with Defendant CPA, since Defendant OKP only has 100,003 shares at one dollar per share, and $25,003 paid-in shares.

28. Defendant OKP was awarded an $8,677,000.00 contract by the Commonwealth Ports Authority to improve the Rota Airport runway. As part of that operation, Defendant OKP leased Plaintiff Atalig's improvements in November 2005. Due to the magnitude of Defendant OKP's project in Rota, Defendant OKP knew that governmental permits are required before any land clearing activities are conducted.

29. On information and belief, Defendant OKP Holdings Limited ("OKP Singapore") is a foreign corporation organized and existing under the laws of Singapore, with its principal place of business located at No. 6 Tagore Drive #B1-06, Tagore Industrial Building, in Singapore. Defendant OKP Singapore owns 96,000 shares of Defendant OKP's stocks. At all relevant times, Defendant OKP is the alter ego of Defendant OKP Singapore. Defendant OKP Singapore was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.

30. On information and belief, Defendant Kim Peow Or is a citizen of Singapore. Defendant Kim Peow Or owns 1 share of Defendant OKP's stocks. At all relevant times, Defendant OKP is the alter ego of Defendant Kim Peow Or. Defendant Kim Peow Or was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.

31. On information and belief, Defendant Toh Wat Or is a citizen of Singapore. Defendant Toh Wat Or owns 1 share of Defendant OKP's stocks. At all relevant times, Defendant OKP is the alter ego of Defendant Toh Wat Or. Defendant Toh Wat Or was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.

32. On information and belief, Defendant Eric Nam Oh is a citizen of Singapore. Defendant Eric Nam Oh owns 1 share of Defendant OKP's stocks. At all relevant times, Defendant OKP is the alter ego of Defendant Eric Nam Oh. Defendant Eric Nam Oh was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.

33. On information and belief, Defendant He Kheng Soh is a citizen of Singapore. Defendant He Kheng Soh owns 2,000 shares of Defendant OKP's stocks. At all relevant times, Defendant OKP is the alter ego of Defendant He Kheng Soh. Defendant He Kheng Soh was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.

34. On information and belief, Defendant Brian M. Chen is a U.S. citizen. Defendant Brian M. Chen owns 2,000 shares of Defendant OKP's stocks. At all relevant times, Defendant OKP is the alter ego of Defendant Brian M. Chen. Defendant Brian M. Chen was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. On information and belief, Defendant Brian M. Chen is the brother of Endymion M. Chen of E.M. Chen & Associates (CNMI), Inc., who is the Project Designer for the Rota Project.[3]

35. On information and belief, Defendant Prasada Reddy Goluguri is a citizen of Singapore. Defendant Goluguri is a non-resident worker employed by Defendant OKP as a "Project Engineer" for the CPA Project, yet he is not licensed to practice any branch of engineering in the CNMI.

---

[3] Although there is reason to belief that Defendant OKP had the benefit of an insider through the relationship of Defendant Brian M. Chen, who is a part owner of Defendant OKP, and E.M. Chen & Associates (CNMI), Inc., who is Defendant CPA's Project Designer for the Rota CPA Project, Plaintiff Atalig is still investigating this issue, but due to the unjustified and unlawful denial of access to public documents at CPA, it is hard to ascertain this fact without the Court's assistance to order Defendant CPA to provide access to public records.

Defendant Goluguri was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. Furthermore, Defendant Goluguri aided or abetted, or participated with the other defendants and/or others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and is responsible for the acts, occurrences and events alleged in this Amended Complaint.

36. On information and belief, Defendant Pramuan Jaiphakdee is a citizen of Singapore. Defendant Jaiphakdee is a non-resident worker employed by Defendant OKP as a Heavy Equipment Operator for the CPA Project. Defendant Jaiphakdee was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. Furthermore, Defendant Jaiphakdee aided or abetted, or participated with the other defendants and/or others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and is responsible for the acts, occurrences and events alleged in this Amended Complaint.

37. On information and belief, Defendant Wilai Promchai is a citizen of Singapore. Defendant Promchai is a non-resident worker employed by Defendant OKP as a Heavy Equipment Operator for the CPA Project. Defendant Promchai was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. Furthermore, Defendant Promchai aided or abetted, or participated with the other defendants and/or others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and is responsible for the acts, occurrences and events alleged in this Amended Complaint.

38. Defendant Commonwealth Ports Authority ("CPA") is a public corporation and a CNMI Government autonomous and self-sustaining agency created under 2 CMC § 2101, *et seq.*, whose

principal office is located in Saipan, Commonwealth of the Northern Mariana Islands. Under the Grant Agreement, Defendant CPA is the Sponsor and is responsible to carry out and complete the Project without undue delays and in accordance with the terms of the Grant Agreement. Under the Construction Agreement, however, Defendant CPA delegated all its responsibilities to Defendant OKP, thus, creating an agency relationship with Defendant OKP. Defendant CPA is the principal and Defendant OKP is the agent.

39. Defendant Regino M. Celis is a U.S. citizen and a resident of the CNMI and, on information and belief, is currently the Acting Executive Director for CPA. Defendant Celis is named as a Defendant in this lawsuit for purposes of the Open Government Meetings and Records Act violation only.

40. Except as described herein, the true names of the defendants sued as Does 1 through 3, inclusive, are unascertained to Plaintiff Atalig which therefore sues these defendants by such fictitious names. Plaintiff Atalig will further amend this Amended Complaint to allege their true names and capacities when ascertained. These fictitiously named defendants were involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. These defendants aided or abetted, or participated with the other defendants and others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and are responsible for the acts, occurrences and events alleged in this Amended Complaint.

41. Except Defendant Celis, the named and Doe defendants in this action are sometimes collectively referred to herein as "Defendants."

## IV.
## **OPERATIVE FACTS**

42. On or about May 4, 2005, Defendant CPA submitted to the Department of Transportation—Federal Aviation Administration ("FAA") an application for a grant of Federal funds for a project associated with the Rota International Airport Runway 09/27 Extension – Phase I (the "Project").

43. On August 24, 2005, the FAA offered and agreed to pay, as the United States share of the allowable costs incurred in accomplishing the Project, ninety-five per centum (95%) thereof. A true and correct copy of the Grant Agreement is attached hereto, labeled "Exhibit A," and incorporated herein by this reference as if set forth in full.

44. On August 30, 2005, Defendant CPA accepted the FAA's offer and agreed, among other things, to "carry out and complete the Project without undue delays and in accordance with the terms [of the Grant Agreement], and such regulations and procedures as the Secretary shall prescribe," and agreed to comply with the assurances which were made part of the Project application.

45. As a result, Defendant CPA conducted a bid for the Project and ultimately selected Defendant OKP over other bidders. But, since Defendant OKP was newly incorporated and undercapitalized, Defendant CPA was concerned with the financial capabilities of Defendant OKP.

46. On September 30, 2005, Defendant OKP wrote a letter to Defendant CPA explaining, among other things, that the "Project will be funded from Singapore." A true and correct copy of the September 30, 2005 letter from Defendant OKP is attached hereto, labeled "Exhibit B," and incorporated herein by this reference as if set forth in full.

47. On October 19, 2005, Defendant OKP Singapore wrote an electronic mail to Defendant CPA emphasizing that Defendant OKP Singapore "has given a strong mandate and commitment to Defendant OKP the fullest assistance for this Rota project." A true and correct copy of the October

19, 2005 electronic mail from Defendant OKP Singapore is attached hereto, labeled "Exhibit C," and incorporated herein by this reference as if set forth in full.

48. On October 24, 2005, Defendant OKP Singapore wrote a letter to Defendant CPA to inform Defendant CPA that Defendant OKP Singapore will handle and finance the preparation and purchasing of all machinery and equipment and to give Defendant CPA assurance that Defendant OKP Singapore is financially capable of carrying out the Project. A true and correct copy of the October 24, 2005 letter from Defendant OKP Singapore is attached hereto, labeled "Exhibit D," and incorporated herein by this reference as if set forth in full.

49. Consequently, on October 28, 2005, Defendants CPA and OKP entered into a Construction Contract for Rota International Airport Runway 09/27 Extension—Phase I, Project No. CPA-RA-001-03. A true and correct copy of the Construction Contract is attached hereto, labeled "Exhibit E," and incorporated herein by this reference as if set forth in full.

50. Defendants CPA and OKP agreed that the Construction Contract and any interest therein shall not be assigned or transferred by Defendant OKP; provided that Defendant OKP with the express prior written approval of Defendant CPA, may secure subcontractors and suppliers that are necessary to carry out the work on the Project; and provided further that Defendant OKP "<u>shall remain fully responsible and accountable at all times for the Project and for complying with the terms and conditions of [the Construction] Contract</u>." Emphasis added.

51. In preparation for the Project, Defendant OKP negotiated with Plaintiff Atalig to lease Plaintiff Atalig's improvements for Defendant OKP's office, employees' barracks, etc., in Ginalangan, Rota.

52. On November 2, 2005, Plaintiff Atalig and Defendant OKP executed a Lease Agreement (the "Lease"), which was filed at the Commonwealth Recorder's Office, as File No. 05-3030, on

November 3, 2005. Under the Lease, Plaintiff Atalig is the Lessor, and Defendant OKP is the Lessee. A true and correct copy of the Lease is attached hereto, labeled "Exhibit F," and incorporated herein by this reference as if set forth in full.

53. Plaintiff Atalig leased unto Defendant OKP, and Defendant OKP leased from Plaintiff Atalig, "the <u>improvements</u> described in Section 1" of the Lease. Emphasis added.

54. Pursuant to Section 1 of the Lease, the leased premises "consist of all <u>improvements</u> situated on the real property in Northern Part (Area No. 4) Ginalangan, Municipality of Rota, Commonwealth of the Northern Mariana Islands,…, <u>together with the right to use Lessor's easements and appurtenances in adjoining and adjacent land, highways, roads, streets, lanes</u>, whether public or private, reasonably required for the installation, maintenance, operation and service of sewer, water, gas, power and other utility lines and for driveways and approaches to and from abutting highways or streets for the use and benefit of the above-described improvements and the parcel of real property described below." Emphases added.

55. Defendant OKP also has the right to use the real property, described below, where the leased improvements are situated:

>   Lot No. 362 R 01, containing an area of 49,998 square meters, more or less, as more particularly described in Cadastral Plat No. 362 R 00, the original of which was registered with the Land Registry as Document No. 6503, on September 12, 1978.

56. The existing improvements and improvements subsequently erected on Lot 362 R 01 during the term of the Lease are collectively referred to in the Lease as the "Premises." See Section 1 of the Lease.

57. Furthermore, Defendant OKP agreed to lease the furniture, fixtures, appliances, and tools, which were all itemized in the List of Inventory which was supposed to be verified and approved by both parties on or before November 30, 2005. Unfortunately, Defendant OKP reneged and Plaintiff

Atalig incurred additional storage and other costs for many of the items that Defendant OKP and its representatives refused to accept.

58. The Lease was for a term of thirteen (13) months, commencing on December 1, 2005, and ending on December 31, 2006, unless sooner terminated, with Lessee's option to extend for a period of one year at the monthly rent of $3,000.00.  See Sections 2 and 5 of the Lease.

59. Pursuant to Section 3 of the Lease, Defendant OKP agreed to pay the full-time salaries of Edita (Ms. Ludivina P. Carillo) and Esther (Ms. Ester M. Langit), at $4.50 per hour and $3.50 per hour, respectively.  On information and belief, Defendant OKP broke its promise.

60. Pursuant to Section 6 of the Lease, Defendant OKP may <u>use</u>, <u>improve</u> and <u>develop</u> the Premises or any part thereof for any <u>lawful</u> use or purpose, <u>provided that Defendant OKP does not commit waste</u>, but primarily as office, barracks, equipment repair shop and workstation, heavy and lightweight equipment parking and storage, and as staging area related to Defendant OKP's business and operation on Rota.  Emphases added.

61. Pursuant to Section 13.1 of the Lease, Defendant OKP "shall have the right during the term of this Lease, to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvement on the Premise[s], and correct and change the contour of the Premises pursuant to the plans and drawings attached [to the Lease] as Exhibits "A" and "B", …<u>only with the prior written consent of Lessor</u>."  Emphasis added.

62. Plaintiff Atalig never gave a written consent and Defendant OKP never asked for a written consent to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvement on the Premises, and correct and change the contour of the Premises pursuant to the plans and drawings attached [to the Lease] as Exhibits "A" and "B."

63. Furthermore, Section 13.1 of the Lease expressly states that "*[a]ny* other alterations and changes require Lessor's consent in writing."

64. Plaintiff Atalig never gave a written consent and Defendant OKP never asked for a written consent to make any other alterations and changes.

65. In or about December 2005 and/or January 2006, despite being warned not to clear the areas where the cultural and historical artifacts lay, Defendants used heavy equipment to clear the land, without the proper permits from the Government and without permission from Plaintiff Atalig, in order to erect other structures for the use and benefit of Defendant OKP.

66. Similarly, in or about December 2005 and/or January 2006, despite not having a written consent from Plaintiff Atalig, Defendants tore down the kitchen, laundry, and storage facilities, and used the materials therefrom to build a *palapala*. In the process, Defendants damaged and destroyed the homemade cooking stove, *ifik* posts, and other valuable items that were stored.

67. Similarly, in or about December 2005 and/or January 2006, despite not having a written consent from Plaintiff Atalig, Defendants bull-dozed down valuable trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants.

68. Similarly, in or about December 2005 and/or January 2006, despite not having a written consent from Plaintiff Atalig or an earthmoving permit from the Division of Environmental Quality, Defendants removed soil and other rocks and minerals, including excavating Plaintiff Atalig's land, for Defendant OKP's parking lot.

69. Defendant OKP did not obtain and pay for a permit before clearing the land despite agreeing to "be responsible for the payment of all utilities, assessments, and other public charges arising by reason of the occupancy, use or possession of the Premises." See Section 11 of the Lease.

70. Pursuant to Section 15 of the Lease, Defendant OKP "shall be in default in the prompt and full performance of any other term, covenant, or condition of the Lease, (except as to payment of rent), if such default shall continue for a period of thirty (30) days after notice of such default is given by the Lessor to Lessee, unless the default is of such a nature that the same cannot be cured or corrected within said thirty (30) day period and the Lessee shall have promptly and diligently commenced to cure and correct such default and shall have thereafter continued therewith with reasonable diligence and in good faith, in a manner as to cure and correct the same as promptly and as reasonably practicable under the circumstances, and shall have continued therewith until the default shall have been cured or corrected."

71. On January 17, 2006, Plaintiff Atalig sent a Notice of Default and Violations to Defendant OKP. A true and correct copy of the January 17, 2006 Notice of Default and Violations is attached hereto, labeled "Exhibit G," and incorporated herein by this reference as if set forth in full.

72. Defendant OKP is unable and unwilling to cure the default and violations.

## V.
## PRINCIPAL-AGENT LIABILITY
### (Piercing the Corporate Veil of Defendant OKP)

73. Defendant OKP's corporate form should be disregarded because:

a. Defendant OKP was organized and operated as a mere tool or business conduit of Defendants OKP Singapore, Kim Peow Or, Toh Wat Or, Eric Nam Oh, He Kheng Soh, and Brian M. Chen (collectively, the "Defendant Shareholders"). Defendant OKP is the alter ego of Defendant Shareholders.

b. Defendant OKP was incorporated to circumvent the procurement statute and regulations.

c. Defendant OKP was inadequately capitalized so as to work an injustice.

16
Amended Complaint

74. The Defendant Shareholders has some financial interest, ownership, or control over Defendant OKP.

75. There is such a unity between Defendant OKP and Defendant Shareholders that the separateness of Defendant OKP has ceased.

76. Holding only Defendant OKP liable would result in injustice.

77. Defendant OKP did not have enough capital for the type of business and project it was conducting.

## VI.
## FIRST CAUSE OF ACTION
### (Breach of Contract)

78. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

79. The Lease was a valid contract supported by bargained for consideration.

80. Plaintiff Atalig has performed all the conditions and agreements required of Plaintiff Atalig under the terms of the Lease.

81. Defendant OKP, including its agents, representatives, shareholders, principals, and employees, had a duty to act with reasonable care and diligence in performing the Lease so as not to injure a person or property by its performance.

82. Defendants breached the Lease with Plaintiff Atalig, to the detriment of Plaintiff Atalig, in the following respects:

   a. Defendant OKP reneged on the promise to lease furniture, fixtures, appliances, and tools, which forced Plaintiff Atalig to incur storage costs for the furniture, fixtures, appliances, and tools that were not leased by Defendant OKP, in violation of Section 1 of the Lease.

b. Defendant OKP has failed to pay the full-time salaries of Ms. Carillo and Ms. Langit at the rate of $4.50 per hour and $3.50 per hour, respectively, as agreed, in violation of Section 3 of the Lease;

c. Defendants have illegally hunted for deer and fruitbat on Plaintiff Atalig's land in violation of Section 6 of the Lease and in violation of the laws of the CNMI;

d. On information and belief, Defendants have stolen rocks and other materials from the Ginalangan Defensive Complex in their attempt to cover up the damage and destruction to the historical Japanese water tank. The stolen rocks are laid and stacked up on the Japanese water tank, which Defendant OKP has re-plastered to pretend that there is no damage. As a result, Defendant OKP violated Section 3 of the Lease, and the laws of the CNMI;

e. Defendants have committed waste by unlawfully damaging, destroying, and/or mutilating historical artifacts, structures, and other valuable relics, including but not limited to, Latte Stone clusters, ancient Chamorro grinding stone, Japanese structures, water tank, washing basin and frame, and areas surrounding Japanese building(s), in violation of Sections 1 and 6 of the Lease and in violation of CNMI laws and regulations;

f. Defendants have committed waste by damaging, destroying, and/or mutilating permanent trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, lemon trees, atis trees, and other plants, in violation of Sections 1 and 6 of the Lease;

g. Defendants have committed waste by damaging, destroying, and/or mutilating preexisting buildings/improvements to the land, including but not limited to, laundry,

storage, and kitchen facilities, and the stored contents therein, in violation of Sections 1 and 6 of the Lease;

   h. Defendants have committed waste by placing a fuel tank station on Plaintiff's property without the proper permits, in violation of Section 6 of the Lease;

   i. Defendants have committed waste by moving and/or removing soil and other minerals without the proper permits or authorization, in violation of Sections 1 and 6 of the Lease and in violation of CNMI laws and regulations;

   j. Defendants failed to obtain Plaintiff Atalig's written consent to erect, maintain, alter, remodel, reconstruct, rebuild, replace and remove building and other improvement on the Premises, and correct and change the contour of the Premises, in violation of Section 13.1 of the Lease.

83. Notwithstanding demand and/or notice to cure the violations, Defendants have failed, neglected, and refused, and still fail, neglect, and refuse to cure the violations and default.

84. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, property damages and loss of prospective economic advantages, and have been damaged in the amount of $11,000,000.00, or more, to be proven at trial.

85. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $5,000,000.00, or more, to be proven at trial.

86. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.