TABLE OF CONTENTS

MOTION FOR SUMMARY JUDGMENT                                    1

MEMORANDUM OF LAW                                             2

I. INTRODUCTION                                              2

II. UNDISPUTED FACTS                                         3

    A. The Rota airport expansion project                   3

    B. The Contractors All Risk Policy                     3

    C. The Automobile Liability Policy                     5

    D. The Underlying Lawsuit                              6

        1. The Lease                                     6

        2. The Underlying Lawsuit                        7

    E. OKP's defense of the underlying case                9

III. LEGAL STANDARD FOR SUMMARY JUDGMENT                    10

IV. ARGUMENT                                                11

    A. There is no duty to defend under the CAR policy    11

        1. There was no accident                         11

        2. Other terms also bar or limit coverage        17

    B. There is no duty to defend under the Auto policy   18

        1. There was no accident                         18

        2. Other terms also bar or limit coverage        20

V. CONCLUSION                                               21

TABLE OF AUTHORITIES

**CNMI Cases**
*Ito v. Macro energy, Inc.*, 4 N.M.I. 46, 68 (1993)                                          17, 19


**Other Cases**
*Allstate Ins. Co. v. LaPore* (N.D. Cal. 1991) 762 F.Supp. 268, 270                          16
*Argonaut Southwest Ins. Co. v. Maupin*,
    500 S.W.2d 633 (Tex. 1973)                                        12,13, 13fn6, 20
*CNA Casualty of California v. Seaboard Surety Co.*,
    176 Cal.App.3d 598, 606, 222 Cal.Rptr.276 (1986)                    11
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)                                      10
*City of Atlanta v. St. Paul Fire & Marine Ins.*,
    231 Ga. App. 206 (Ga. Ct. App. 1998)                                14, 15
*Colin v. Am Empire Ins. Co.*, 21 Cal. App. 4th 787,
    810-811 (Cal. Ct. App. 1994)                                        15, 16
*Collier v. Allstate County Mut. Ins. Co.*, 64 S.W.3d 54 (Tex. App. 2001)                    19, 20
*Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F 8d 734, 738 (2nd Cir. 1992)                    10
*Cowan*, 945 S.W.2d at 821-822                                                               13 fn6
*Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 83 (Tex. 1997)                20
*Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 275,
    54 Cal.Rptr. 104, 419 P.2d 168 (1966)                               11
*Heyward*, 536 S.W.2d at 555-56                                                              14 fn 6
*Hogan v. Midland national Ins. co.* (1970) 3 Cal.3d 553,
    559 [91 Cal.Rptr. 153, 476 P.2d 825]                                16
*Merced Mutual Ins. Co. v. Mendez*, 213 Cal.App.3d 41, 50 (1989)                             16
*Montrose Chemical Corp. v. Superior Court*,
    24 Cal Rptr.2d 467, 471, 861 P.2d 1153, 1157 (1993)                 10
*National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*,
    939 S.W.2d 139, 141 (Tex. 1997)                                     10
*Olympic Club v. Those Interested Underwriters at Lloyd's London*,
    991 F.2d 497, 500 (9th Cir. 1993)                                   11
*Property-Owners Ins. Co. v. Ted's Tavern, Inc.*,
    853 N.E. 2d 973, 977 (Ind. App. 2006)                               10
*Quan v. Truck Ins. Exch.*, 67 Cal.App.4th 583, 595 (Cal. Ct. App. 1998)                     16
*Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W.2d 549 (1976)                             13, 13 fn6
*Rose Construction Co. v. Gravatt*, 642 P.2d 569, 571 (Kansas 1982)                          21
*State Farm Fire & Casualty Co. v. Drasin* (1984)
    152 Cal.App.3d 864, 867 [199 Cal.Rptr. 749]                         16

*State Farm Fire & Casualty Co.v. Kohen*, 424 N.E.2d 992,
     995 (Ill.App. 1981)                                         21
*State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 377 (Tex 1993)    14 fn 6
*Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819
     (Tex. 1997)                                   13, 13fn6, 14fn6
*Waller v. Truck Ins. Exch.*, 11 Cal.4[th] 1, Cal.Rptr. 276 (1986)    11
*Wessinger v. Fire Ins. Exch.*, 949 S.W.2d 834 (Tex. App. 1997)    13, 20

**Other Authority**
Couch on Insurance 3rd , §119.2                          19

1
2
3
4

**Thomas E. Clifford**
**Attorney at Law**
**2nd Floor, Alexander Building, San Jose**
**P.O. Box 506514**
**Saipan, MP 96950**
**Tel: (670)235-8846**
**Fax: (670)235-8848**

5

**Attorney for Plainitff Dongbu Insurance Company, Ltd.**

6

7
8

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN MARIANA ISLANDS**

9

| | |
|---|---|
| **DONGBU INSURANCE COMPANY, LTD.,** | **Civil Action No. 08-0002** |
| **Plaintiff,** | **PLAINTIFF DONGBU INSURANCE COMPANY, LTD.'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW** |
| **v.** | |
| **OKP (CNMI) CORPORATION and JOAQUIN Q. ATALIG,** | <u>Notice of Hearing:</u> **July 10, 2008** **1:30 p.m.** |
| **Defendants.** | |

10
11
12
13
14
15
16

17

## <u>MOTION FOR SUMMARY JUDGMENT</u>

18

19

20

21

22

23

24

     Plaintiff Dongbu Insurance Co., Ltd. ("Dongbu") hereby moves this Court to enter Summary Judgment in its favor and against Defendants OKP (CNMI) Corporation ("OKP") and Joaquin Q. Atalig ("Mr. Atalig") pursuant to Federal Rules of Civil Procedure 56 and 57, and for such other and further relief to which Dongbu is entitled under law or in equity.

     In support thereof, Dongbu submits the following Memorandum of Law together with the attached exhibits, which are incorporated herein by reference as if set forth in full.

25

26

# MEMORANDUM OF LAW

## I.
## INTRODUCTION

This is an insurance coverage dispute. Dongbu issued certain insurance policies to OKP in conjunction with an airport expansion project that OKP was doing on Rota.

In preparation for the project, OKP had apparently leased certain real property from Mr. Atalig for use as a barracks and equipment staging area. Mr. Atalig sued OKP for breach of lease and other causes of action, all arising out of the lease of land to OKP. Mr. Atalig claimed that OKP had damaged his land, and in particular, that OKP ignored his warnings and destroyed various cultural artifacts on the land.

OKP did not inform Dongbu of Mr. Atalig's claims. Instead, OKP never reported any form of "accident" under the applicable policies at the time of the alleged damage, and OKP defended the lawsuit for months before finally requesting Dongbu to defend OKP pursuant to the insurance policies.

Dongbu has no duty to defend or indemnify OKP for the claims brought against OKP by Mr. Atalig. First, the alleged events are not any form of "accident" within the coverage of the policies. Instead, allegedly, OKP intentionally cleared the land in defiance of warnings not to do so. Second, as discussed below, a number of other policy terms bar or limit any obligation of Dongbu under the applicable policies.

## II.
## UNDISPUTED FACTS

**A. The Rota airport expansion project.**

The CNMI Commonwealth Ports Authority ("CPA") awarded the Rota Airport Runway Extension Project, CPA Contract No. CPA-RA-001-03 (the "Runway Expansion Project") to OKP.[1]

OKP obtained certain insurance policies from Dongbu in connection with that project. Two of those policies are at issue in this case: 1) a contractors all risk policy (to cover damage to contract works and third party liability claims in direct connection with OKP's construction work at the airport); and 2) an automobile liability policy (to cover automobile accidents).

**B. The Contractors All Risk Policy.**

OKP purchased contractors all risk insurance coverage for the work it contracted to do on Rota in January 2006. *See* Contractors' All Risk Policy, KMCR0015-S00 (the "CAR policy"), attached hereto as **Exhibit A**.[2]  The CAR policy was issued on January 19, 2006 and was in effect from January 16, 2006 to January 16, 2007 (or when work commenced on the construction project, pursuant to the Period of Cover set forth in the CAR policy form). The insured is OKP,[3] and the limit of liability for the third party liability coverage is $1,000,000 as stated more particularly in the

---

[1] OKP is a subsidiary of OKP Holdings Limited (Singapore), an international construction and maintenance company engaged in the construction of roads, expressways, vehicular bridges, flyovers and buildings, airports infrastructure. OKP's maintenance services includes; reconstruction of roads, road reserves, pavements, footpaths and curbs, guardrails, railings, drains, signboards as well as bus bays and shelters. The company operates primarily in Singapore and employs about 440 people. *See* Datamonitor, http://www.datamonitor.com/companies/company/?pid=61C54754-0934-47BE-9DC2-8EA5B1CFA7D1.

[2] Dongbu believes that there is no dispute regarding the contents of the two policies, and so they are not verified. If no agreement on this point is reached then Dongbu will file a separate affidavit attesting to the authenticity of the two policies.

[3] The named insured is OKP (CNMI) Corporation, and this arguably extends to work performed by employees of OKP, but not to any other named defendants.

1  CAR policy.

2      The CAR policy provided OKP with protection from earthquake, volcanism, tsunami,

3  storm, cyclone, flood inundation or landslide for all contract work it carried out on the International

4  Airport Project.  *Id.*, Schedule, Section I.   The CAR policy also provided OKP with Third Party

5  Liability coverage for personal injury and property damage.  *Id.*, Schedule, Section II.

6      Damages for third party liability are expressly "consequent upon **accidental loss** of or

7  damage to property belonging to third parties."  *Id.*, Third Party Liability (*emphasis added*).   The

8  policy also excludes from coverage loss, damage or liability directly or indirectly caused by or

9  raising out of or aggravated by any "willful act or willful negligence of the insured or his

10 representative."  *Id.*, General Exclusions, Section C (*emphasis added*).

11     A number of other terms also apply in this case:

12        1.  General Condition No. 5 requires immediate notice of claims, and expressly bars

13            any coverage under the CAR Policy where the insured does not provide notice to the

14            insurer within 14 days of the insured being aware of the claim.

15        2.  The third party liability coverage only applies to events "occurring in direct

16            connection with the construction" and that also occur on the site.

17        3.  Exclusion No. 4(b) to the Third Party Liability section excludes claims in

18            connection with property "held in the care, custody or control" of OKP.

19        4.  Exclusion No. 4(d) to the Third Party Liability section excludes claims in

20            connection with liability assumed under a contract.

21        5.  Endorsement No. 5 to Third Party Liability excludes punitive damages.

6. Endorsement No. 6 to the Terms and Conditions excludes loss or damage to "crop, forests and/or cultures."

## C. The Automobile Liability Policy

OKP purchased automobile insurance coverage for its vehicles on Rota in December 2005. *See* Automobile Liability Policy, 150230-150230 (KMA-09102-S00) (the "Auto policy"), attached hereto as **Exhibit B**. The named insured is OKP, and the Auto policy was issued on December 27, 2005 and was in effect from December 15, 2005 to December 15, 2006. Thirty-one vehicles are listed as covered under that policy with bodily injury limits of $1,000,000.00 per person and $2,000,000.00 per accident and with property damage limits for the scheduled vehicles set at $3,000,000.00 per accident. *Id.*, Declarations Page (*emphasis added*).

Under the insuring agreement, OKP is only covered for bodily injury or property damage "**caused by accident** and arising out of the ownership, maintenance or use of the automobile[s]." *Id.*, Insuring Agreement, page one, "Coverage A:  Bodily Injury Liability & Coverage B:  Property Damage Liability" (*emphasis added*).

A number of other terms also apply:

1. The Auto Policy's declarations page requires that "immediate" notice of claims be provided to the claims adjusting company indicated.  The Auto Policy's Condition 3 provides that "the insured shall immediately forward to the [insurer] every demand, notice, summons or other process" received.

2. Exclusion V(a) excludes claims in connection with "liability assumed by the insured under any contract or agreement."

3. Exclusion IX(a) applies to property damage claims  for "injury to or destruction of

property owned by, rented to, in charge of or transported by the insured."

**D. The Underlying Lawsuit.**

As noted above, the underlying lawsuit arises out of a real property lease entered into between Mr. Atalig and OKP.

1. <u>The Lease</u>.

OKP entered a real property lease agreement with Mr. Atalig in November 2005 (the "Lease"), a copy of which is attached hereto as **Exhibit C**. Under the Lease, OKP was given the right to build, alter, remodel, replace, remove buildings or other improvements on the property "and to correct and change the contour" land pursuant to plans attached to the lease and with written consent of Mr. Atalig.

The leased property is separate and distinct from the Rota airport and its expanded runway. The airport project is not referred to or mentioned in the Lease. The Runway Expansion Project contract, the Lease and the two insurance policies at issue in this case are all separate and distinct documents.

The term of the Lease was for thirteen months and the rental amount was $37,500.00. The Lease, Paragraph 2. As further consideration of the rent, OKP agreed to pay the full-time salaries of two full-time employees of Mr. Atalig's selection. The Lease, Paragraph 3.

OKP contractually agreed to indemnify Mr. Atalig against all liability, loss, cost, damage or expense of litigation arising out of OKP's possession or use of the property by its employees. The Lease, Paragraph 12. The Lease also contains a provisions regarding insurance:

> Lessee, at Lessee's option and its own expense, shall keep all improvements erected on the premises insured against loss or damage by fire or other casualty or calamity for the value of all improvements. Any insurance proceeds payable with respect to

any loss to any improvements on the Premises shall belong to Lessor and Lessee shall have no right, claim or interest therein.

The Lease, Paragraph 14.

There is no evidence that OKP ever purchased any insurance to cover the leased premises.

The Lease allowed OKP the full use of the premises and improvements which were as noted above to primarily be used as employee barracks, an office facility, an equipment repair shop, a workstation, a staging area and for parking for heavy and lightweight equipment. The Lease, Paragraph 6. The Lease also provided that OKP had the right to "erect, maintain, alter, remodel, reconstruct, rebuild, replace and remove buildings and other improvements on the Premises, and correct and change the contour of the Premises" pursuant to plans incorporated in the Lease. The Lease, Paragraph 13.1. The amount of land work contemplated and agreed to in the Lease agreement was expansive and varied, for example, under one explicit terms of the Lease, OKP enjoyed the right to "setup, build, or construct a soccer field on the premises." The Lease, Paragraph 13.5.

## 2. The Underlying Lawsuit.

In March 2006, Mr. Atalig filed a lawsuit against OKP and other defendants in the CNMI Superior Court. In July 2006, Mr. Atalig filed an amended complaint, which stated seventeen causes of action. The amended complaint alleged that OKP damaged Mr. Atalig's property by tearing down and altering improvements on the land and by clearing land that OKP had been warned not to clear, all without the written consent allegedly required by the lease, and all in violation of Commonwealth law. *See* amended complaint, Paragraphs 60 through 69, attached as Exhibit D to OKP's counterclaim, filed on or about March 18, 2008.

1    In April 2007, Mr. Atalig filed his Seconded Amended Complaint for Breach of

2 Contract and Tort Claims and for Relief under the Open Government Act (and Demand for

3 Jury Trial) (the "SAC") against OKP in CNMI Superior Court, attached hereto as **Exhibit D**

4 (without attachments).

5    In the SAC, Mr. Atalig alleges that OKP leased his property for employee barracks and

6 office facilities, an equipment repair shop, a workstation, for a staging area and for parking for

7
heavy and lightweight equipment – and for whatever reasons – breached the terms of that

8
contract and thereby *allegedly* caused damages to Mr. Atalig's property (and historical

9

10 artifacts on his property).[4]

11    As with the claims in the earlier complaints, **_all_** the causes of action and claims for

12 damages directed in the SAC are based on the contractual relationships and resulting duties

13
created in the Lease, *i.e.* contract. *See* SAC, Part VIII, First Cause of Action, Breach of

14
Contract (failed to rent certain fixtures in violation of Section 1 of the *lease*; failed to hire/pay

15

16 employees under Section 3 of the *lease*; illegally hunted on the property in violation of

17 Section 6 of the *lease*; damaged Japanese water tank on the property in violation of Section 3

18
of the *lease*; damaged and destroyed artifacts/relics in violation of Sections 1 and 6 of the

19
*lease*; destroyed trees and other plants on the property in violation of Sections 1 and 6 of the

20
*lease*; illegally located fuel tank on the property in violation of Section 6 of the *lease*;

21

22

23
[4]The specific damages complained of are found in paragraph 60 (cultural and historical artifacts); paragraph 61 (an
24 existing kitchen, laundry, storage facilities, and a stove et cetera); paragraph 62 (flame, coconut, bamboo, and beetle nut
trees and shrubs, flowers and other plants); paragraph 63 (soil, rocks and minerals); and finally, paragraph 90 (property
25 and other economic damages).

26

1  removed soil and minerals from the property in violation of Sections 1 and 6 of the *lease*;

2  changed the contour of the property in violation of Section 13.1 of the *lease*.[5]

3        The SAC repeats the underlying factual allegations set forth in the amended complaint.

4  *See* SAC, Paragraphs 55-64 (tracking Paragraph 60-69 of the amended complaint).  Hence, for

5  example, the SAC alleges that OKP contractually obligated itself not to commit waste (SAC,

6  Paragraph 55), and OKP cleared the land despite having been warned not to do so, without the

7

8  written consent required by the Lease and without the permits required by Commonwealth law

9  (SAC, Paragraph 60).

10 **E.  OKP's defense of the underlying case.**

11        It is undisputed that OKP never reported any "accident" or damage to the leased

12 premises to Dongbu at the time of such alleged damage.  The lawsuit was then filed in March

13 2006 and OKP actively defended the case for months without informing Dongbu of the

14 lawsuit.  Instead, as is also undisputed, OKP first informed Dongbu of the litigation in August

15

16

17 _____

18 [5]To be complete, in Part IX of the SAC, the second cause of action is under a real property theory of law for "Waste" under the same facts and claims for damage as contained in the first cause of action -- breach of contract, *i.e* the Lease. In Part X of the SAC, Mr. Atalig's lists as his Third Cause of Action the intentional tort of "Conversion of Historical and Cultural Artifacts" (found on the property under the Lease).  In Part XI of the SAC, the Fourth Cause of Action is "Conversion of Soil and Other Minerals" (found on the property under the Lease).  In Part XII of the SAC, the Fifth Cause of Action is again "Conversion of Permanent Trees" (claim limited to trees/plants on the property in the Lease). Part XIII of the Complaint lists Mr. Atalig's Sixth Cause of Action as again "Conversion" and this time for Preexisting Buildings and other Improvements (under the Lease).  In Part XIV, the Seventh Cause of Action is for Negligent Waste (i.e., claims that OKP failed to obtain permission and give notice as required in Section 13 the Lease) thereby destroying cultural and historical artifacts and other things of value.   Part XV of the SAC contains the Eighth Cause of Action in equity of "Unjust Enrichment."  Part XVI of the SAC contains the Ninth Cause of Action, "Indemnification" which directly relates to Sections 12 and 12B of the Lease. Part XVII, the Tenth Cause of Action is against CPA and one CPA employee only and relates to claims or violations of Open Government Meetings and Records Act.   And the final cause of action contained in the SAC is found in Part XVIII of that document and concerns an "Attorney's Fees" provision found in Section 23 of the Lease.

19

20

21

22

23

24

25

26

2006.

Dongbu and OKP then discussed any possibility of coverage, and eventually, when they were unable to resolve this matter without litigation, Dongbu brought this coverage action.

## III.
## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there are no material facts in dispute and the movant is entitled to judgment in its favor as a matter of law. Federal Rule of Civil Procedure 56(c). The purpose of summary judgment is to terminate unsupported claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is an integral component of the federal rules. *Id.* at 327. Additionally, "[t]he construction of an insurance policy is a question of law for which summary judgment is particularly appropriate." *Property-Owners Ins. Co. v. Ted's Tavern, Inc.*, 853 N.E.2d 973, 977 (Ind.App. 2006) (*citations omitted*). Moreover, where an insurer disputes its coverage obligations with regard to a third party's claim against the insured, declaratory relief is appropriate to clarify the legal relationship between the parties. *See Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 738 (2nd Cir.1992).

To determine whether the insurer owes a duty to defend, the court must compare the allegations of the underlying complaint with the terms of the policy. *Montrose Chemical Corp. v. Superior Court*, 24 Cal.Rptr.2d 467, 471, 861 P.2d 1153, 1157 (1993); *National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997)(the determination of an insurer's duty to defend depends exclusively upon the "eight corners" of the pleading and the policy).

There is a duty to defend if, in comparing the allegations in the underlying lawsuit against the applicable insurance policies, there is even the "potential" for coverage. *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 275, 54 Cal.Rptr. 104, 419 P.2d 168 (1966); *CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal.App.3d 598, 606, 222 Cal.Rptr. 276 (1986). Where the policy provides no potential for coverage, the insurer is under no duty to defend in the underlying action. *Waller v. Truck Ins. Exch.*, 11 Cal.4th 1, 44 Cal.Rptr.2d 370, 377-78, 900 P.2d 619, 627 (Cal.1995). The insured has the burden of proving that the underlying action comes within the terms of the policy's duty to defend provision while the insurer bears the burden of proving that the potential claim covered by the duty to defend falls within an exclusionary clause. *Olympic Club v. Those Interested Underwriters at Lloyd's London*, 991 F.2d 497, 500 (9th Cir.1993).

## IV.
## ARGUMENT

There is no duty to defend under either the CAR policy or the Auto policy. The events, as expressly alleged in the underlying complaints, are simply not accidental occurrences. Instead, regardless of the legal theories pleaded in the amended complaint and the SAC, the underlying allegations do not allege that any accident occurred. Additionally, other policy terms and conditions also bar any obligation by Dongbu, either in whole or in part.

**A. There is no duty to defend under the CAR policy.**

There is no duty to defend under the CAR policy. The alleged conduct does not fit within the policy's coverage provision in that there was no accident. Other terms also bar coverage.

### 1. There was no accident.

An insurance policy does not broadly insure against everything. Instead, the starting point is

1    to evaluate whether the claim fits within the policy's insuring provision, or in other words whether

2    the claim is within the boundary of covered risks.

3         Here, the CAR policy only provides coverage to OKP for third party claims "consequent

4    upon **_accidental_** loss of or damage to property belonging to third parties." *See* CAR policy, Third

5    Party Liability section, **Exhibit A** (emphasis added).  As discussed above, Mr. Atalig has not

6    alleged that there was any accidental damage.  Instead, he has alleged that OKP intentionally cleared

7    the land, and that they did so despite being warned not do so.  SAC, Paragraph 60.

8

9         In *Argonaut Southwest Ins. Co. v. Maupin,* 500 S.W.2d 633 (Tex. 1973), a construction

10   company entered into a contract to provide filler material from a third-party's land for use in a road

11   improvement project on a state highway.  *Maupin*, 500 S.W.2d at 633-34.  It turned out, however,

12   that the third-party did not own the land and the true owners subsequently brought an action against

13   the construction company for trespass.  *Id.* at 634.  The construction company turned to its insurance

14   company to defend it, which refused, prompting the construction company to sue its insurer.  *Id.*

15

16   The Texas Supreme Court ruled that the underlying defendant's removal of material from another's

17   land was intentional and deliberate, and the insurer had no duty to defend the prior suit.  *Id.* at 636.

18   That the construction company was mistaken as to the true of owner of the land, and that it had no

19   intention of doing harm to the true owners, were not material to the issue of whether the act was an

20   accident or not.  *Id.* at 635.  "Respondents did exactly what they intended to do . . . . The fact that

21

22   they were unaware of the true owner of the property has no bearing upon whether the trespass was

23   caused by accident." *Id.*  Similarly, in this case, OKP may claim that it did not intend the alleged

24   extent of property damage and that it did not know it would be sued for the alleged damages, but

25   OKP certainly intended to clear the land.

26

1    The *Maupin* decision is the genesis of the "natural and intended consequences" line of cases,

2 and as further developed by the decisions noted in footnote No. 5, this rule of law concludes that

3 "[w]here acts are voluntary and intentional and the injury is the natural result of the act, the result

4 was not caused by accident even though that result may have been unexpected, unforeseen and

5 unintended." *Maupin*, 500 S.W.2d at 635 (*citations omitted*); *Republic Nat'l Life Ins. Co. v.*

6 *Heyward*, 536 S.W.2d 549 (1976); *see also Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819

7 (Tex. 1997*); Wessinger v. Fire Ins. Exch.*, 949 S.W.2d 834 (Tex. App. 1997).[6]

8

9

---

10 [6]After *Maupin*, the Texas Supreme Court in *Republic Nat'l Life Ins. Co. v. Heyward* refined the basic holding of
*Maupin* and held that an insured's injuries are accidental (and therefore covered):

11
>    If from the viewpoint of the insured, the injuries are not the natural and probable
>    consequence of the action or occurrence which produced the injury; or in other words,
12 >    if the injury could not reasonably be anticipated by insured, or would not ordinarily
>    follow from the action or occurrence which caused the injury.
13

14    *Heyward*, 536 S.W.2d 549, 557.

15 Earlier in *Heyward*, the court had noted that:

16
>    An effect which is the natural and probable consequence of an act or course of action
>    is not an accident, nor is it produced by accidental means. It is either the result of
17 >    actual design, or it falls under the maxim that every man must be held to in-tend the
>    natural and probable consequence of his deeds. On the other hand, an effect which is
>    not the natural or probable con-sequence of the means which produced it, an effect
18 >    which does not ordinarily follow and cannot be reasonably anticipated from the use of
>    such means, an effect which the actor did not intend to produce and which he cannot
19 >    be charged with the design of producing, is produced by accidental means. It is
>    produced by means which was neither designed nor calculated to cause it. Such an
20 >    effect is not the result of design, cannot be reasonably anticipated, is unexpected, and
>    is produced by an unusual combination of fortuitous circumstances; in other words, it
21 >    is produced by accidental means.

22    *Id.* at 555 (Tex. 1976) (*citations omitted*).

23    The "natural and probable consequences" language surfaced again several years later in *Cowan*, when a photo
lab clerk showed copies to his friends of revealing photos that a customer had delivered to the lab for development.
24 *Cowan*, 945 S.W.2d at 821-22. The customer sued the clerk and his insurer, alleging, among other things, negligence
and gross negligence. *Id.* at 821. The court found that the clerk was not covered by his insurer -- whose definition of
25 "occurrence" is almost identical to that of the instant case -- because the clerk intentionally made copies of the

26

[Footnote continued on next page]

1   Here, OKP cleared land, tore down old buildings, removed soil, rocks and other minerals as

2   it re-contoured the property as agreed to and called for in the lease agreement contract it entered

3   with Mr. Atalig.  According to the SAC, Mr. Atalig himself remarks that sometime during

4   December 2005 and/or January 2006 and "**despite being warned not to clear the areas where the**

5   **cultural and historical artifacts lay**, Defendants used heavy equipment to clear the land, without

6   the proper permits from the government and without permission" from Mr. Atalig.  SAC, paragraph

7   60 (*emphasis added*).[7]  Hence, the damages that Mr. Atalig alleges were the natural and intended

8   consequences of OKP's actions under the Lease.

9

10   In *City of Atlanta v. St. Paul Fire & Marine Ins.*, 231 Ga. App. 206 (Ga. Ct. App. 1998)

11   property owners near an international airport owned and operated by the city filed actions that

12   asserted that the city took their property without first compensating them.  The insurer did not

13   respond to the city's request that the insurer defend the city in the lawsuits.  *Id*.  The city filed a

14   third-party complaint against the insurer that sought a declaratory judgment that would require that

15

16

17   _____

[Footnote continued from previous page]

18

19   customer's photographs and showed them to his friends. *Id.* at 827-28.  Relying on *Maupin*, the *Cowan* court stated that
the fact that the clerk "**did not expect or intend [the customer] to learn of his actions is of no consequence to our**
**determination of whether his actions were an 'accident.'**" *Id.* (*citing Maupin*, 500 S.W.2d at 635).  Once again, the

20   court found no accident because the underlying defendant had done "exactly what he had intended to do[.]" *Id.* at 827.
The *Cowan* court also relied on *Heyward* for the conclusion that the clerk's conduct was not an accident because the

21   customer's injury -- the invasion of her privacy -- is of a type that "ordinarily follows" from the clerk's conduct, and the
injuries "could reasonably have been anticipated from the use of the means, or an effect" the clerk could be charged

22   with. *Id.* at 828 (*citing State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 377 (Tex. 1993)(*quoting Heyward*, 536
S.W.2d at 555-56)).

23

24   [7]The SAC is replete with other—**non-accident**—causes of action:  Paragraph 88 – reneged on promises to lease
furniture, fixtures, appliances and tools; failed to pay salaries, illegally hunted for deer and fruit bat, stole rocks and

25   other materials; failed to obtain written permission and otherwise committed waste in a willful, wanton vile, outrageous
and malicious nature.

26

1  the insurer defend and indemnify the city in the actions.  *Id*.  The insurer filed a motion for summary

2  judgment, and the city filed a cross-motion for summary judgment.  *Id*. at 207.  The trial court

3  granted summary judgment to the insurer.  *Id*.  The court held that the trial court did not err when it

4  granted summary judgment to the insurer on the indemnity issue because: (1) the insurer had no

5  duty to provide a defense or to indemnify the city in the lawsuit, and (2) the insurance policy

6

7  language required that the damages result from an accidental event.  The Court explained:

8  > The complaints in the cases before us do not allege that the damages
   > were caused by any unexpected happening, but from the City's willful

9  > and intentional entry and trespass upon their property.  In their
   > complaints, the property owners allege that the City continued to enter

10 > upon and damage the property even after the owners notified the City's
   > agents that the property was privately owned.  Based upon the

11 > allegations in the complaints and the policy language requiring that the
   > damages result from an accidental event, St. Paul had no duty to

12 > provide a defense to or indemnify the City in the lawsuits.

13 > *City of Atlanta v. St. Paul Fire & Marine Ins.*, 231 Ga. App. 206, 208 (Ga. Ct. App.
   > 1998).

14     The complaint alleges that OKP was warned and knew of the cultural artifacts and other

15 historical items, and had contracted in advance to get the written permission to do the work under

16 the contract.  Therefore, the damages which resulted and of which Mr. Atalig complains should

17

18 have been expected (not an accident).  Different analyses in other cases also support this conclusion.

19     Some courts look to the *intent of the actor to do the act which leads to the injury*.  As

20 explained in *Collin v. Am. Empire Ins.* Co., 21 Cal. App. 4th 787, 810-811 (Cal. Ct. App. 1994):

21 > California courts interpreting "occurrence" have focused exclusively on
   > the insured's intent to perform the act which gives rise to liability, not

22 > on the insured's state of mind.  If the claimant's injuries did not result
   > from an accident, it does not matter whether the insured expected or

23 > intended his conduct to cause any harm.

24 > ……

25 > The California Supreme Court has defined the term "accident" as "an

26

unexpected, unforeseen, or undesigned happening or consequence from either a known or unknown cause." (*Hogan v. Midland National Ins. Co.* (1970) 3 Cal.3d 553, 559 [91 Cal.Rptr. 153, 476 P.2d 825].) Put differently, it is "something out of the usual course of events . . . which happens suddenly and unexpectedly and without design." (*State Farm Fire & Casualty Co. v. Drasin* (1984) 152 Cal.App.3d 864, 867 [199 Cal.Rptr. 749].) This common law construction of the term "accident" becomes part of the policy and precludes any assertion that the term is ambiguous. (*Allstate Ins. Co. v. LaPore* (N.D.Cal. 1991) 762 F.Supp. 268, 270.)]

Thus, because the term "accident" refers to the insured's intent to commit the act giving rise to liability, as opposed to his or her intent to cause the consequences of that act, the courts have recognized--virtually without exception--that deliberate conduct is not an "accident" or "occurrence" irrespective of the insured's state of mind. *Id.*

A comprehensive discussion of the term accident appeared in *Merced Mutual Ins. Co. v. Mendez* 213 Cal.App.3d 41, 50 (1989), in which the court reiterated that conscious and deliberate actions of an insured are never an "accident," irrespective of whether the insured intends for harm to result from those actions, and irrespective of whether the plaintiff couches the claims under the title of negligence or not.  Or, as explained in *Quan v. Truck Ins. Exch.*, 67 Cal. App. 4th 583, 595 (Cal. Ct. App. 1998):

It is common to hear the argument that if the underlying complaint alleges negligence, there must be a duty to defend. This is not necessarily true. The duty to defend depends upon the coverage provided by the policy--the nature and kind of risk covered--which in turn depends upon the wording of the coverage clauses.

Dongbu has no duty to defend under the CAR policy because, regardless of the causes of action stated, the alleged damages are not the result of any ***accidental*** loss of or damage to property. There are no claims in Mr. Atalig's complaint for accidental damages or that Mr. Atalig's property was damaged from the chance activities of OKP employees while on the job (or, even while off-the-

job for that matter). Instead, all of Mr. Atalig's causes of action and claims for damages are the off-spring of OKP's intentional activities and/or illegal, willful (and even claims of criminal) actions taken under Lease it entered into with Mr. Atalig.

2. Other terms also bar or limit coverage.

Even if this Court were to conclude that the alleged occurrences were somehow accidental within the meaning of the CAR policy insuring provisions, then other terms and conditions also plainly bar or limit and obligations of Dongbu.

First, it is undisputed that OKP never gave Dongbu notice of the underlying claims until August 2006, after OKP had been defending the case for nearly six months. The CAR policy expressly requires OKP to give Dongbu notice within "14 days" of becoming aware of any claim. While it is not known when OKP first became aware of the claim it is certainly undisputed that it was aware at least from its active defense of the case in March or April 2006, which of course is months before it gave Dongbu notice. Hence, the plain language of General Condition No. 5, the notice provision, should bar any obligation under the CAR policy. *Ito v. Macro Energy, Inc.*, 4 N.M.I. 46, 68 (1993)(just because a term is not defined does not mean it is ambiguous; terms will be construed according to their plain and obvious meaning).

Second, the third party liability coverage only applies to events "occurring in direct connection with the construction" and it is undisputed that the Lease and activity on the leased premised was only incidental to, or at most, *indirectly* related to the actual work under the Runway Expansion Project to expand the Rota airport runway.

Third, Exclusion No. 4(b) to the Third Party Liability section excludes claims in connection with property "held in the care, custody or control" of OKP, and it is expressly and repeatedly

1    alleged that the property damage was done to the lease premises.

2         Fourth, Exclusion No. 4(d) to the Third Party Liability section excludes claims in connection

3    with liability assumed under a contract, and here, as discussed above, all of the claims of OKP arise

4    out of the obligations it assumed under the Lease, a contract.

5         Finally, other terms and conditions may apply depending on how fact issues are resolved in

6
the underlying case and this lawsuit (for example, whether the alleged damage occurred during the
7
policy period), and other terms and conditions may limit Dongbu's obligations under the policy (for
8
9    example, the SAC claims punitive damages, and Endorsement No. 5 to the policy excludes such

10    damages).

11    **B. There is no duty to defend under the Auto policy.**

12         There is also no duty to defend under the Auto policy. The alleged conduct does not fit
13
within the policy's coverage provision in that there was no accident. Other terms also bar coverage.
14
15                       1. <u>There was no accident.</u>

16         Like the CAR policy, the Auto policy has an insuring agreement that defines and limits the

17    scope of risks covered. The Auto policy only provides coverage for injury or damage to any person

18    or property "***caused by an accident***" (emphasis added). The problem for OKP is that there was no
19
automobile accident.
20
21         OKP is alleged to have cleared the land intentionally and in disregard of warnings and

22    contractual obligations not to do so, and without the permits required by CNMI law. It is

23    undisputed that OKP never reported any automobile accident at the time (despite the requirement of

24    immediate notice), and of course that is because there was no automobile accident—under any

25    rational, plain interpretation of the term. In fact, this would seem to be precise opposite of an

26

1   accident, such as where an OKP equipment operator, for example, might have inadvertently struck

2   and damaged a building or vehicle while using a scheduled piece of over-size construction

3   equipment. This should be the end of the inquiry. *Ito*, 4 N.M.I. at 68 (just because a term is not

4   defined does not mean it is ambiguous; terms will be construed according to their plain and obvious

5   meaning).

6          The legal authority is in agreement:

7
           The term "accident" as used in an automobile liability insurance policy means an
8          unexpected happening without intention or design which produces injury or damage.
           That is, "accident" is generally construed to relate to the cause rather than the effect,
9          not that the cause must be accidental. Conversely, the result is not "accidental" even
           though it was unexpected.
10
           Couch on Insurance 3rd, § 119.2 (*citations omitted*).
11
    *See also* discussion of "accident," *supra*, with respect to the CAR policy.
12
13         A recent case from Texas considered whether an automobile accident had occurred and the

14  insurance company was required to defend its insured parties who—in effect—caused the driver of

15  another vehicle to pull into an intersection while at a stop at a red light where it collided with

16  another vehicle crossing the intersection. *Collier v. Allstate County Mut. Ins. Co.*, 64 S.W.3d 54

17  (Tex. App. 2001). As alleged in the complaint, the insured parties had followed closely behind the

18
    vehicle for several minutes and while it was stopped at a red light, one of the insured "got out of the
19
    vehicle he was driving, approached the Plaintiff's vehicle, shouted at the Plaintiff and this time,
20
21  kicked at the door while attempting to open the Plaintiff's car door." *Id.* at 57. Fearing bodily harm,

22  the driver attempted to escape and proceeded through the red light where the collision with another

23  vehicle occurred. The insureds were sued. They requested coverage and the insurance provider

24  sought a declaratory judgment that it had no duty to defend.

25

26

1   The Texas Court noted that although the insurance policy did not define auto accident,

2   controlling precedent required that it first determine whether specific acts alleged to have caused the

3   plaintiff's injuries in the underlying suit were "voluntary and intentional." *Collier* at 64 S.W.3d at

4   60 (*citing Argonaut S.W. Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex. 1973). And if so, next,

5   whether the injuries alleged were a "natural result" of the acts. *Id., citing Wessinger v. Fire Ins.*

6   *Exch.*, 949 S.W.2d 834, 838 (Tex. App., 1997). Applying that line of reasoning to the facts as

7   alleged, the Texas Court ruled that what the insured parties had intentionally done was clearly "no

8   accident." *Collier*, 64 S.W.3d at 61. As reasoned by the Court, the acts as alleged in the petition do

9   not suggest anything other than volitional and intentional behavior and the subsequent collision and

10  injuries naturally resulted from that behavior. *Id.* In additional support, the Court noted the term

11  "auto accident" generally refers to situations where one or more vehicles are involved in some type

12  of collision or near collision with another vehicle, object, or person. *Id., citing Farmers Tex.*

13  *County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 83 (Tex. 1997). Accordingly, the Court ruled the

14

15  insurance provider had no duty to defend the insured parties under the automobile policy at issue.

16

17  Additionally, it is not surprising that property damage and related claims in connection with

18  a leasehold property are not covered under an automobile liability policy. Such risks would

19  generally be covered by property insurance and premises liabilitiy covers.

20

21  2. Other terms also bar or limit coverage.

22  Even if this Court were to conclude that the alleged occurrences were somehow accidental

23  within the meaning of the Auto policy insuring provisions, then other terms and conditions also

24  plainly bar or limit and obligations of Dongbu.

25  First, as noted above, it is undisputed that OKP never gave Dongbu notice of the underlying

26

1  claims until August 2006, which was after OKP had been defending the case for nearly six months.

2  The CAR policy expressly requires OKP to give Dongbu immediate notice of any automobile

3  accident.  That never happened.

4      Second, Exclusion IX(a) applies to property damage claims  for "injury to or destruction of

5  property owned by, rented to, in charge of or transported by the insured."  This exclusion applies

6  because the claim is that all the damage was to property leased to and in the charge of OKP.  *See for*

7  *example State Farm Fire & Casualty Co. v. Kohen*, 424 N.E.2d 992, 995 (Ill.App. 1981); *and Rose*

8  *Construction Co. v. Gravatt*, 642 P.2d 569, 571 (Kansas 1982)(exclusion would have applied but

9  did not because of severability of interests clause in that policy).

10

11     Third, Exclusion V(a) excludes claims in connection with "liability assumed by the insured

12  under any contract or agreement."

13     Finally, other terms and conditions may apply depending on how fact issues are resolved in

14  the underlying case and this lawsuit (for example, whether the alleged damage occurred during the

15  policy period), and other terms and conditions may limit Dongbu's obligations under the policy (for

16

17  example, the SAC claims punitive damages, and the policy excludes such damages).

18                                    **V.**
                                **CONCLUSION**
19

20     OKP obtained the two insurance policies at issue in this case from Dongbu in connection

21  with its planned work to expand the Rota airport runway.  The contractors all risk policy was

22  designed to cover damage to contract works and third party liability claims in direct connection with

23  OKP's construction work at the airport.  The automobile liability policy was designed to cover

24  automobile accidents.

25

26

1         In contrast, the claims in the underlying lawsuit arise out of OKP's intentional clearing of

2  the land that it leased from Mr. Atalig.  There is nothing "accidental" about OKP's conduct as

3  alleged by Mr. Atalig, and of course there was no automobile accident.  A number of other terms

4  and conditions in the two policies further bar any coverage.

5         Therefore, for the reasons stated above, Dongbu prays that this Court enter summary

6
7  judgment in its favor and against OKP and Mr. Atalig, and declare that Dongbu has no duty to

8  defend OKP in the underlying lawsuit as a matter of law.

9  Respectfully submitted this 14th day of May, 2008.

10

11  _____
    Thomas E. Clifford

12      Counsel for Dongbu Insurance Company, Ltd.

13

14

15

16

17

18

19

20

21

22

23

24

25

26