1  CARLSMITH BALL LLP

2  JOHN D. OSBORN
   SEAN E. FRINK
3  Carlsmith Building, Capitol Hill
   P.O. Box 5241
4  Saipan, MP  96950-5241
   Tel No. 670.322.3455
5  Fax No. 670. 322-3368

6  Attorneys for Defendant and Counterclaimant
   OKP (CNMI) Corporation
7

8

9              UNITED STATES DISTRICT COURT

10                      FOR THE

11             NORTHERN MARIANA ISLANDS

12  DONGBU INSURANCE                    CIVIL ACTION NO. CV 08-0002
    COMPANY, LTD.,
13                                      MOTION FOR PARTIAL SUMMARY
              Plaintiff,                JUDGMENT; MEMORANDUM OF
14                                      POINTS AND AUTHORITIES;
         vs.                            STATEMENT OF UNDISPUTED FACTS;
15                                      EXHIBITS 1-29; DECLARATIONS OF
                                        SEAN E. FRINK AND BRIAN M. CHEN
16  OKP (CNMI) CORPORATION,
    and JOAQUIN Q. ATALIG,              DATE:     July 10, 2008
17                                      TIME:     1:30 p.m.
              Defendants.               JUDGE:    Hon. Alex R. Munson
18

19
        Comes now Defendant OKP (CNMI) Corporation and moves the Court for an order on its
20
    Counterclaim for Declaratory Judgment.  Specifically, OKP seeks an order from the Court
21
    finding that Dongbu had and continues to have a duty to defend OKP in the underlying Atalig
22
    lawsuit.
23
        This Motion is supported by the attached Memorandum of Points and Authorities, the
24
    attached Statement of Undisputed Facts, the exhibits, declarations, the pleadings filed herein and
25
    such additional evidence and documents as may be presented at argument on this motion.
26

27

28

    4831-8385-9458.3.060927-00005

1

2                                                   CARLSMITH BALL LLP

3

DATED: Saipan, MP, May 22, 2008.
4                                                   JOHN D. OSBORN
                                                    SEAN E. FRINK
5                                                   Attorneys for Defendant and Counterclaimant
                                                    OKP (CNMI) Corporation
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   BACKGROUND AND SUMMARY OF ARGUMENT .................................................3
    A.   Background.............................................................................................................3
    B.   Summary of Argument ..........................................................................................5

II.   STANDARD OF REVIEW ..........................................................................................6

III.   NATURE OF DECLARATORY JUDGMENT PROCEEDINGS .................................7

IV.   GENERAL PRINCIPLES - DUTY TO DEFEND AND DUTY TO INDEMNIFY .........7
    A.   Duty to Defend .......................................................................................................7
    B.   Duty to indemnify ..................................................................................................8

V.   THE DONGBU POLICIES ..........................................................................................8
    A.   The Automobile Policy ..........................................................................................8
    B.   The Contractor's All Risk Policy (CAR Policy) ..................................................9
    C.   The Insuring Agreements Of The Automobile Policy And The Car Policy .........9
        1.   The Automobile Policy................................................................................9
        2.   The CAR Policy.........................................................................................10

VI.   INTERPRETATION OF THE POLICIES - GENERALLY ........................................10
    A.   Ambiguity .............................................................................................................10
    B.   Extrinsic Facts/Evidence .....................................................................................12
    C.   Exclusions - Generally .........................................................................................17

VII.   INTERPRETATION OF AND COMPLIANCE WITH DONGBU POLICIES .............18
    A.   "Caused by accident" ...........................................................................................19
    B.   "Accidental loss" ..................................................................................................23
    C.   No Failure To Comply With Notice Requirements.............................................25
        1.   Notice Under the Policies ..........................................................................25
        2.   Notification was timely .............................................................................27
        3.   Dongbu waived any defect in Notice ........................................................29
    D.   No Prejudice to Dongbu .......................................................................................29
    E.   Undertaking Defense ............................................................................................32
    F.   Events Occurring In Direct Connection With Construction On The Site ...........34
    G.   Exclusion IX(a) and V(a) Inapplicable ...............................................................35
        1.   Exclusion IX(a).........................................................................................35
        2.   Exclusion V(a) of the Auto Policy ...........................................................37

VIII.   OKP'S CONDUCT NOT INTENTIONAL CONDUCT ............................................38

IX.   PUNITIVE DAMAGES ..............................................................................................39

X.   CONCLUSION ...........................................................................................................39

1

2

3

## **TABLE OF AUTHORITIES**

4

Page

**Cases**

5

Adobe Systems, Inc. v. St. Paul Fire and Marine Ins. Co., 2007 WL 3256492
    (N.D. Cal.) ...................................................................................................................7

Aetna Casualty and Surety Co., Inc. v. Centennial Ins. Co.,
838 F.3d 436, 350 (1988) ..........................................................................................15

Aim Ins. Co. v. Culcasi, 280 Cal. Rptr 766, 771 (Ct. App. 1991).................................11

Allstate Insurance Company v. McCarn, 446 Mich. 277,
645 N.E.2d 20, 23 (2002) ..........................................................................................19

American Alternative Ins. Corp. v. Superior Court,
135 Cal.App. 4th 1239, 1247 37 Cal. Rptr.3d 918 927 (2006) ......................................24

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986) .......................................6

Arreguin v. Farmers Insurance Company of Idaho,
180 P.3d 498, 500 (2008) .....................................................................................11, 18

Brakeman v. Potomac, Ins. Co., 472 Pa. 166,
371 A.2d 193, 197 (1977)...........................................................................................31

British Motor Car Distrib. v. San Francisco Automotive Indus.
Welfare Fund, 882 F.2d 371, 374.............................................................................7, 37

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).....................................................6

Clinical Research Institute of Southern Oregon, P.C. v. Kemper Insurance
    Companies, 191 Or. App. 595, 84 P.3d 147, 150 (2004) ........................................10

Fagerstedt v. Continental Ins. Co., 72 Cal. Rptr. 126, 127, 266
Cal. App.2d 370, 372 (1968) .....................................................................................15

Federated Mutual Insurance Company v. Grapevine Excavations, Inc.,
197 F.3d 720, 726 (2000) ..........................................................................................38

Fidelity and Cas. Co. of New York v. Wrather, 652 S.W. 2d 245, 259 (1983) ..........21

Frogner v. American Community Mutual Insurance Company,
502 N.W. 2d 350, 352 (1993).....................................................................................17

Great Western Drywall, Inc. v. Intestate Fire & Casualty Co.,
74 Cal. Rptr. 3d 657, 662 (2008)..............................................................................8, 15

Greenwich Insurance Company v. RPS Products, Inc., 882 N.E.2d 1202,
1208 (2008)..................................................................................................................18

Haynes v. American Casualty Company, 228 Md. 394, 179 A.2d 900,

1
2

3    904 (19962)..................................................................................................22

4    Herrera v. C.A. Seguros Catatumbo, 844 So. 2d 664, 667 (2003) ................................21

5    Ito vs. Macro Energy, Inc. 4 N.M.I. 46, 68 (1993)...............................................8,11

     James v. Burlington Northern Santa Fe Railway Company, 2007 WL 2461685........................37

6    Major Oil Corp. v. Equitable Life Assur. Soc. of U.S., 457 F. 2d 596, 603 (1972)....................28

7    McAllister v. Hawkeye - Security Ins. Co., 68 Ill. App. 2d 222,
     215 N.E.2d 477, 481 (1966) ....................................................................................22

8    McGroarty v. Great Am. Ins. Co., 36 N.Y.S. 2d 358, 329 N.E.2d 172,

9     174-175 (1975) ..................................................................................................20

10   Meyer v. Pacific Employers Insurance Company, 233 Cal.App.2d 321, 43 Cal.
       Rptr. 542, 547 (1965) ........................................................................................23

11   Montrose Chemical Corp. of California v. Superior Court, 6 Cal. App. 4th, 287,
       861 P.2d 1153, 1157 (1993) ................................................................................14

12   Nationwide Ins. v. Zavalis, 52 F.3d 689, 695 (1995) ....................................................16

13   Northshire Communications, Inc. d/b/a WEQX (FM) v. AIU Insurance Company,
       174 Vt. 295, 811 A.2d 216, 220, 222 (2002)............................................................31

14   Olympic Inc vs. Providence Wash. Insur. Co. of Alaska, 648 P.2d 1008, 1011
15     (1982)..............................................................................................................37

16   Pac Indemnity v. Run-A-Ford Co., 161 So.2d 789, 794-795 (1964) ...........................15

     Producers Dairy Delivery Co. v. Sentry Ins. Co., 718 P.2d 920, 927 n.7. (Cal.
17     1986)..............................................................................................................11

18   Quincy Mutual Fire Insur. Co. v. Abernathy, 393 Mass. 81, 469 N.E. 797, 799
       (1984)..............................................................................................................21

19   Ross v. Home Ins. Co., 773 A.2d 654, 657 (N.H. 2001)................................................12

     Shelby Casualty Insurance Company v. H.T., 391 N.J. Supp. 406, 918 A.2d 659,
20     661 (2007)........................................................................................................20

21   State Farm Fire & Casualty Company v. Kohen, 424 N.E.2d 992, 994, 995 (1981) .................36

     State Farm Mut. Auto Ins. Company v. Kelly, 945 S.W.2d 905, 908, 910 (1997) ....................24

22   Systems, Inc. v. St. Paul Fire and Marine Ins. Co., 2007 WL 3256492 (N.D. Cal.)...............7, 11

23   Tudela v. Marianas Pub. Land Corp., 1 N.M.I. 179, 185 (1990) ......................................11

24   Tuttle v. Allstate Insurance Company, 134 Wash. App. 120, 138 P.3d 1107, 1111
       (2006)..............................................................................................................24

25   United Servs. Auto. Ass'n, 266 Cal. Rptr. at 692..........................................................11

26   Winchester v. Prudential Life Ins. Co. of America, 975 F.2d 1479, 1487 (1992) ..................24

**Statutes**
27
     4 CMC §7303 ..................................................................................................27
28

1

2

3   4 CMC §7505(c)................................................................................26

4   4 CMC §7505(e)...........................................................................26, 29

    4 CMC §7505(f)............................................................................26, 29

5   7 CMC § 3401.................................................................................12

6   **Rules**

7   Fed. R. Civ. Pro. 56(e)........................................................................6

8   Fed.R.Civ.P. 56(c).............................................................................6

    Federal Procedure, Lawyers Edition, §23:35. ................................................7

9   **Treatises**

10  44A Am.Jur. 2d Insurance, §1553.............................................................28

11  Couch on Insurance (3Ed.), §49:2............................................................28

12  Holmes' Appleman on Insurance 2d, Vol. 20 §129.2(5) (page 119-120)....................38

13  Homes' Appelman on Insurance 2d., Vol, 22, §139.4(c) .....................................30

    See Restatement (Second) of Contracts § 206................................................11

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.    **BACKGROUND AND SUMMARY OF ARGUMENT**

A.    **Background**

OKP (CNMI), Corporation ("OKP") brings this Motion For Summary Judgment seeking a determination that Dongbu Insurance Company, Ltd. ("Dongbu") had and has a duty to defend OKP in the pending CNMI Superior Court lawsuit entitled *Atalig v. OKP, et al*, Civil Action No. 06-119R.

On October 28, 2005 OKP entered into a contract with Commonwealth Ports Authority for a construction project in Rota known as the Rota International Airport Runway and Extension Project. (OKP Undisputed Fact No. 10) ("OKP U.F."). In connection with that project OKP secured the two subject policies of insurance from Dongbu through Dongbu's General Agent, Moylan's Insurance Underwriters, Inc. ("Moylans") (OKP U.F. 10). The two policies are: Automobile Policy KMA-0912-00) for the period of cover December 15, 2005 to December 14, 2006, and Contractors All Risk Policy KMCR0015-500, for the period of cover January 16, 2006 to January 17, 2007, subject to coverage beginning upon commencement of work or unloading of items insured, notwithstanding the specific coverage date shown in the policy. These policies are binding contracts between the parties wherein OKP is the insured and Dongbu is the insurer (OKP U.F. 1-7).

As part of the overall construction project on or about November 2, 2005, OKP leased from Joaquin Atalig ("Atalig") a portion of this property located in Sinapalo, Rota to be used as a staging area for the project. (Atalig/OKP Lease, Exhibit 10 and 12).[1]

On March 23, 2006 Atalig filed his original Complaint in CNMI Superior Court alleging various causes of action against OKP and others for violation of the terms of the lease between OKP and Atalig. (Exhibit 14, original Complaint in Civil Action No. 06-0119R.) On March 24, 2006 newspaper articles appeared in both the Marianas Variety and the Saipan Tribune which reported the lawsuit. (Exhibit 2 and 3). Within approximately a week of March 24, 2006, Brian

---

[1] In the underlying suit OKP questions the validity of the lease attached and referred to in the Atalig Complaints. Notwithstanding same, for purposes of this motion, the lease is identified as the operative document.

Chen, General Manager of OKP had a conversation with Cecilia A. Anas of Moylan's, the person responsible for OKP's policies and bonds at Moylan's and Ms. Anas acknowledged she had seen the newspaper article(s) and was aware of the lawsuit. (Brian Chen Declaration). Thereafter, until the later part of July, 2006 counsel for OKP filed several motions to strike portions of the original Complaint and to dismiss certain causes of actions (OKP U.F. 17, 18, 20, and 21). During this period of time OKP did not have any contact from Dongbu regarding the lawsuit and to OKP's knowledge Dongbu did not undertake any investigation of the Atalig claims. (Chen Declaration). Also during this time period counsel for OKP successfully defended against a Motion for Summary Judgment filed by Atalig. (OKP U.F. 19 and 21).

On July 31, 2006, Atalig filed a First Amended Complaint and on August 9, 2006 (Frink Declaration) Brian Chen delivered a copy of the First Amended Complaint to Cecilia A. Anas of Moylan's and asked that Dongbu defend and indemnify OKP. (Chen Declaration); this constitutes a tender of defense of the claims in the First Amended Complaint. On September 6, 2006 OKP wrote Dongbu to follow up on the tender of defense (see Exhibit 4, Chen Declaration) and on September 27, 2006 counsel for OKP wrote to Dongbu's authorized agent (Moylan's) to likewise follow up on the tender of defense (Exhibit 5, Chen Declaration). It was not until March 5, 2007 that Dongbu stated its position and by letter of that date counsel for Dongbu responded to counsel for OKP advising Dongbu believed there was no coverage under the Dongbu policies. (Exhibit 10). On April 18, 2007 Atalig filed his Second Amended Complaint (Exhibit 11) and on May 3, 2007, a copy of the Second Amended Complaint was delivered to Dongbu's counsel (Frink Declaration).

On July 12, 2007 counsel for OKP responded to the March 7, 2007 letter from Dongbu and again demanded Dongbu undertake defense of the Atalig lawsuit. (Exhibit 17). Dongbu, through counsel, responded on October 12, 2007 (Exhibit 18), again declining to defend the Atalig lawsuit.

Dongbu's ultimate response was to refuse to defend and after almost 18 months filed this declaration judgment action on March 3, 2008. In due course OKP filed its answer and counterclaim against Dongbu seeking declaratory judgment of Dongbu's obligations under its

1    policies issued to OKP.

2         OKP contends it has properly notified Dongbu of the Atalig suit, has properly tendered

3    defense of that action and that Dongbu wrongfully refuses to defend or indemnify OKP from the

4    Atalig claims.

5    B.    **Summary of Argument**

6         OKP purchased the subject two policies of insurance from Dongbu with the expectation

7    that such policies would provide coverage for claims which might potentially arise in connection

8    with the Rota International Airport Project.  Suit has been filed in the CNMI Superior Court by

9    Joaquin Atalig for a variety of claims, some of which would be covered by the policies and some

10   of which may not.

11        Dongbu received notification of the suit and defense has been tendered.  Despite

12   notification and tender of the defense of the suit and a demand that Dongbu fulfill its duty to

13   defend, Dongbu refused and continues to refuse to defend.

14        Dongbu's refusal is unjustified and in contravention of its obligations under the policies.

15   The claims in the underlying action were "caused by accident" as that term is to be applied under

16   the Auto Policy and the claims are an "accidental loss" as the term is used in the CAR Policy.

17   OKP's position is that the plain meaning of these terms requires Dongbu to defend.  However, if

18   it were to be determined these terms are ambiguous, then Dongbu would still be required to

19   defend as any ambiguity is to be resolved against the insurer as drafter of the policy.

20        When the allegations of the underlying Complaint are compared to the Dongbu policies

21   and consideration is given to extrinsic facts/evidence that were available or readily ascertainable

22   to Dongbu had it undertaken any investigation of the facts related to the Atalig Complaint, the

23   underlying claims in the Atalig suit come within coverage of the Dongbu policies.

24        Dongbu by its prolonged inaction after knowledge of the suit and tender of defense has

25   waived any right to forfeit coverage based on any alleged deficiency in notification.  Under the

26   circumstances, because of Dongbu's failure to act it is completely appropriate that OKP

27   undertake the defense of the Atalig lawsuit.

28

OKP is entitled to a determination that there are no genuine issues of material fact as it relates to the duty to defend and the court is requested to determine as a matter of law that Dongbu is required to assume the defense of the Atalig suit.

In the event the Court determines there is a duty to defend, OKP by separate application will request the Court to determine that Dongbu be required to reimburse OKP for its attorney fees and expenses incurred by reason of Dongbu's failure to defend the Atalig lawsuit and being compelled to pursue this counterclaim.

II.    **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(c), a court should grant summary judgment when, viewing the evidence in the light most favorable to the nonmoving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Pro. 56(e). However, it is not necessary for the party moving for summary judgment to introduce evidence that negates the plaintiff's claim. *Celotex*, 477 U.S. 258, 323. Instead, the moving party may show in its motion that there is no evidence to support an essential element of the non-moving party's claim. Id. at 325.

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive

*Casualty Co.*, 74 Cal. Rptr. 3d 657, 662 (2008):

    1. Insurer owes a duty to defend when the claim presents any potential for indemnity;

    2. Determine duty to defend by comparing the terms of the policy with the allegations of the Complaint and any known extrinsic facts;

    3. Any doubt as to duty to defend is resolved in favor of the insured;

    4. To afford the insured the greatest possible protection, policy provisions are interpreted broadly, and exclusionary clauses are interpreted narrowly against the insurer;

A CNMI case that considered the question of ambiguity in an insurance policy is *Ito vs. Macro Energy, Inc.* 4 N.M.I. 46, 68 (1993) which says:

> A policy will be enforced according to its terms by reading it as a whole. (citations omitted.) The exception to this rule is where there is an ambiguity, in which case <u>the ambiguous term is interpreted in favor of coverage</u>. (citation omitted) (emphasis supplied)

B.    **Duty to indemnify**

OKP would acknowledge that it would be premature for the court to address the issue of duty to indemnify; duty to indemnify is more appropriately considered after further resolution of the underlying Atalig suit.

Notwithstanding it being too early to determine duty to indemnify, the court can and should decide the issue of duty to defend.

V.    **THE DONGBU POLICIES**[2]

A.    **The Automobile Policy**

On December 27, 2005 Dongbu issued to OKP Policy No. 150230-150230 (KMA-09102-500), the Automobile Policy for the coverage period December 15, 2005 to December 15, 2006. A copy of the Automobile Policy is attached hereto marked as Exhibit 6. The policy provides coverage as follows: Coverage A Bodily Injury Liability $1,000,000 each

---

[2] For purpose of this motion only, the Auto Policy and CAR Policy attached as Exhibits should be considered as the applicable policies. This qualification is made because OKP has repeatedly requested complete copies of the policies from Dongbu which have yet to be provided.

1  person/$2,000,000 each accident; Coverage B Property Damage Liability $3,000,000.

2  B.      **The Contractor's All Risk Policy (CAR Policy)**

3
4          On January 19, 2006 Dongbu issued to OKP Policy No. KMCR0015-500, for the period

5  of January 16, 2006 to January 16, 2007 subject to the Period of Cover which states in part:

6               **"PERIOD OF COVER**:  The liability of the Insurers shall
                commence, notwithstanding any date to the contrary specified in
7               the Schedule, directly upon commencement of work or after the
                unloading of the items entered in the Schedule at the site.  The
8               Insurer's liability expires for parts of the insured contract works
                taken over or put into service.  At the latest the insurance shall
9               expire on the date specified in the Schedule.  Any extensions of the
                period of insurance are subject to the prior written consent of the
10              Insurers."

11
12         The policy identifies the site as Rota, Commonwealth of the Northern Marianas.  The

13  equipment arrived on Rota on December 20, 2005 and work began between December 20-22,

14  2005 (Chen Declaration).

15  C.      **The Insuring Agreements Of The Automobile Policy And The Car Policy**

16          1.      **The Automobile Policy**

17          As it relates to the property damage claims made against OKP in the *Atalig v. OKP*

18  lawsuit pending in the Commonwealth Superior Court, the **INSURING AGREEMENT** states:

19               **Coverage B.  Property Damage Liability**:  To indemnify the
                insured for all sums which he shall become legally obligated to pay
20              as damages because of injury to or destruction of property,
                including the loss of use thereof, caused by accident and arising
21              out of ownership, maintenance or use of the automobile.

22               11. **Defense, Settlement, Supplementing Payments**:  As respects
                the insurance afforded by the other terms of this policy under
23              coverage A and B the Company shall:

24
25                    (a)  defend in his name and behalf any suit against
                     the insured alleging such injury or destruction and
26                   seeking damages on account thereof, even if such
                     suit is groundless, false or fraudulent; but the
27                   Company may make such investigation, negotiation

28

evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. *British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374

III.    **NATURE OF DECLARATORY JUDGMENT PROCEEDINGS**

A declaratory judgment action is a means by which questions related to construction and application of an insurance policy can be judicially determined. Such an action can be brought by a counterclaim. A declaratory judgment proceeding is an appropriate mechanism to determine whether an insurer has a duty to defend and to indemnify its insured. Federal Procedure, Lawyers Edition, §23:35.

IV.    **GENERAL PRINCIPLES - DUTY TO DEFEND AND DUTY TO INDEMNIFY**

The courts have established certain general principles that are applied in declaratory judgment proceedings related to both duty to defend and duty to indemnify.

A.    **Duty to Defend**

As a general rule, the following are principles to be applied in determining duty to defend as stated in *Adobe Systems, Inc. v. St. Paul Fire and Marine Ins. Co.*, 2007 WL 3256492 (N.D. Cal.):

1. Liability insurer owes duty to defend if there is any potential for indemnity coverage;

2. If there is a possibility of coverage, insurer must defend the entire action;

3. To interpret the meaning of policy language, the court looks first to the policy provisions. Policy provisions are given their ordinary and popular meaning unless the parties give the term special meaning;

4. A provision is ambiguous if it is susceptible of two or more reasonable constructions;

5. An ambiguity is to be resolved against the insurer;

6. The Court compares the Complaint with the policy language and any relevant extrinsic evidence submitted by the insured to see if there is a possibility of coverage.

The *Adobe* principles find support in *Great Western Drywall, Inc. v. Intestate Fire &*

and settlement of any claim or suit as it deems
expedient;

2.    **The CAR Policy**

As it relates to the property damage claims made against OKP in the *Atalig v. OKP* lawsuit pending in the Commonwealth Superior Court the CAR Policy states:

**Section - Third Party Liability**

> The Insurers will indemnify the Insured up to but not exceeding the amounts specified in the Schedule against such sums which the insured shall become legally liable to pay as damages consequent upon
>
> a)  accidental bodily injury to or illness of third parties (whether fatal or not),
>
> b)  accidental loss of or damage to property belonging to third parties occurring in direct connection with the construction or erection of the items insured under Section and happening on or in the immediate vicinity of the site during the Period of Cover.
>
> In respect of a claim for compensation to which the indemnity provided herein applies, the insurers will in addition indemnify the Insured against
> a) all costs and expenses of litigation recovered by any claimant from the Insured, and
> b) all costs and expenses incurred with the written consent of the Insurer, provided always that the liability of the Insurers under this section shall not exceed the limits of indemnity stated in the Schedule.

VI.    **INTERPRETATION OF THE POLICIES - GENERALLY**

A.    **Ambiguity**

In this motion the Court is called upon to interpret the language of the policies issued by Dongbu to determine if there is a duty to defend. In interpreting the policy language the Court may need to determine whether there is language in the policy which is ambiguous and therefore construed against Dongbu. In particular, the Court may need to determine whether the term "caused by accident" in the Auto Policy and the term "accidental loss" as that term appears in the CAR Policy are ambiguous as neither term is defined in either policy.

The general principle to be applied in considering language in an insurance policy is set forth in *Clinical Research Institute of Southern Oregon, P.C. v. Kemper Insurance Companies*, 191 Or. App. 595, 84 P.3d 147, 150 (2004):

1

2

3

4

5

6

7

8

> We first determine whether the policy defined the term at issue and, if it did not, we look to the plain meaning of the term. (citation omitted)  If we determine that there are two or more plausible interpretations of the term, then we consider whether those interpretations "withstand scrutiny, *i.e.* continue [ ] to be reasonable after the interpretations are examined in light of, among other things, the particular context in which the term is used in the policy and the broader context of the policy as a whole." (citation omitted)  Only if more than one interpretation remains reasonable after such examination will we conclude that the policy provision is ambiguous.  *Id.*  If the provision is ambiguous, we construe it against the insurer as the drafter.  *Id.*

9   This interpretation is supported by Commonwealth case law.  "A basic principle of construction

10  is that language must be given its plain meaning."  *Tudela v. Marianas Pub. Land Corp.*, 1

11  N.M.I. 179, 185 (1990); "[an insurance] policy will be enforced according to its terms by reading

12  it as a whole.   The exception to this rule is where there is an ambiguity, <u>in which case the</u>

13  <u>ambiguous term is interpreted in favor of coverage</u>."  *Ito v. Macro Energy Inc.*, 4 N.M.I. 46, at

14  68 (1993); (emphasis supplied)  Citing, *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 718

15  P.2d 920, 927 n.7. (Cal. 1986); *United Servs. Auto. Ass'n*, 266 Cal. Rptr. at 692; and *Aim Ins. Co.*

16  *v. Culcasi*, 280 Cal. Rptr 766, 771 (Ct. App. 1991), review denied; and "In choosing among the

17  reasonable meanings of a promise or agreement or term thereof, that meaning is generally

18  preferred which operates against the party who supplies the words or from whom a writing

19  otherwise proceeds;" "*See* Restatement (Second) of Contracts § 206 .

20      The foregoing principle finds support in the recent case of *Adobe Systems, Inc. v. St. Paul*

21  *Fire and Marine Insurance Co.*, 2007 WL 3256492, 5 (N.D. Cal.):

22

23

24

> A policy provision is ambiguous if it is susceptible to two or more reasonable constructions (citation omitted).  Any ambiguous terms are interpreted in favor of finding coverage, consistent with the insured's reasonable expectations.

25  See *Also*:  *Arreguin v. Farmers Insurance Company of Idaho*, 180 P.3d 498, 500 (2008) ([a]ny

26  ambiguity that exists in the contract must be construed most strongly against the insurers.)

27      The terms "caused by accident" and "accidental loss" being undefined in the policy, if the

28

1   Court finds that either of those terms is susceptible of two or more reasonable constructions they

2   are ambiguous and are to be interpreted against Dongbu and in favor of OKP's position of there

3   being a duty to defend and duty to indemnify OKP for the Atalig claims.

4   B.    **Extrinsic Facts/Evidence**

5          No CNMI statutes or cases address what facts CNMI Courts are limited to in determining

6   whether an insurer has a duty to defend.  Nor does the Restatement speak to this issue.  Thus, the

7   Court must look to "the rules of common law ...as generally understood and applied in the

8   United States" to determine the issue.  7 CMC § 3401.

9

10          A few states limit the determination to one in which only the facts alleged in the

11  complaint are compared against the language of the policy.  This is commonly referred to as the

12  "eight corners" test.  A significant majority of the states and territories --thirty-three--, however,

13  do not follow the "eight corners" rule.  They instead require insurers, in addition to reviewing the

14  complaint and the insurance policy, to take into account extrinsic facts that they either know of

15  or could have reasonably ascertained.  As the New Hampshire Supreme Court explained, this is

16  "to avoid permitting the pleading strategies, whims and vagaries of third party claimants to

17  control the rights of parties to an insurance contract," *Ross v. Home Ins. Co.,* 773 A.2d 654, 657

18  (N.H. 2001).[3]

19

20  _____

21  [3]  The Alabama Supreme Court "has rejected the argument that the insurer's obligations to defend must be
    determined solely from the facts alleged in the complaint in the action against the insured. *Acceptance Ins. Co. v.*

22  *Brown,* 832 So.2d 1, 14 (Ala. 2001); "The potential for coverage [in Alaska] may be shown either on the face of the
    complaint or through facts the insurer knew or could have reasonably ascertained that would bring an otherwise

23  uncovered complaint within the policy's coverage. *Makarka ex rel. Makarka v. Great American Ins. Co.,* 14 P.3d
    964, 969 (Alaska 2000) and *State of Alaska Dep't of Trans. & Pub. Facilities v. State Farm Fire & Cas. Co.,* 939

24  P.2d 788, 793 (Alaska 1997); An insurer in Arizona has a duty to investigate extrinsic facts advanced by the insured
    that suggest potential coverage, *Northern Ins. Co. v. Morgan,* 918 P.2d 1051, 1053 (Ariz. St. App. 1995), *United*

25  *States Fid. Guar. Co. v. Advance Roofing & Supply Co.,* 788 P.2d 1227, 1331 (Ariz. Ct. App. 1989); An insurance
    company in Arkansas cannot close its eyes to extrinsic facts it knew or should have known, because they were easily

26  ascertainable, in determining coverage issues, *Commercial Union Ins. Co. v. Henshall,* 553 S.W.2d 274, 277 (Ark.
    1977), insurer required to look beyond the tort complaint alleging intentional acts to see whether insured's actions

27  would potentially be covered, *Smith v. St. Paul Guardian Ins. Co.,* 622 F. Supp. 867 (W.D. Ark. 1985); Facts
    extrinsic to the complaint in California give rise to a duty to defend when they reveal a possibility that the claim may

28  be covered by the policy.  *Waller v. Truck Ins. Exchange, Inc.,* 11 Cal. 4th 1, 19, 900 P.2d 619, 627 (Cal. 1995),
    *Scottsdale Ins. Co. v. MV Transp.,* 115 P.2d 460, 466 (Cal. 2005); Connecticut rejects strict application of the four

corners rule, and instead requires the insurer to provide a defense when it has actual knowledge of facts establishing a reasonable possibility of coverage, *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.,* 876 A.2d 1139, 1146 (Conn. 2005); In <u>Georgia</u> if the insured notifies the insurer of facts that would place the claim within the policy coverage, the insurer is obligated to conduct an investigation into the insured's contentions and base its decision on the duty to defend on "true facts," *Penn-America Ins. Co. v. Disabled Veterans, Inc.,* 490 S.E.2d 374, 376 (Ga. 1997); Where the insured in <u>Hawaii</u> tenders its defense in a lawsuit in which the complaint does not clearly and unambiguously assert a covered claim, the insurer, as a precondition to refusing the tender on the ground that there is no possibility of coverage, must conduct a reasonable investigation to ensure that the facts of the case do not obligate it to defend the insured, *Dairy Road Partners v. Island Ins. Co., Ltd.,* 992 P.2d 93, 107 (Haw. 2000); The insurer in <u>Illinois</u> must defend if it possesses knowledge of true but unpleaded facts that, when taken together with the allegations of the complaint, indicate that the claim is potentially within the policy coverage, *National Union Fire Ins. Co. v. Olson Constr.,* 329 Ill. App. 3d 228, 234, 769 N.E.2d 977, 981 (2d Dist. Ill. 2002), *State Farm Fire & Cas. Co. v. Tillerson,* 334 Ill. App.3d 404, 407, 777 N.E.2d 986, 989 (5th Dist. Ill. 2002); The duty to defend in <u>Indiana</u> is determined from the allegations contained in the underlying complaint and from those facts known or reasonably ascertainable by the insurer after reasonable investigation, *Trailer v. Indiana Ins. Co.,* 575 N.E.2d 1021, 1023 (Ind. Ct. App. 1991), *Cincinnati Ins. Co. v. Mallon,* 409 N.E.2d 1100, 1105 (Ind.Ct. App. 1980); In <u>Iowa</u>, a liability insurer should generally consider facts beyond the allegations of the petition in determining whether to tender a defense, *Talen v. Employers Mut. Cas. Co.,* 703 N.W.2d 395, 405 (Iowa 2005); In <u>Kansas</u>, for purposes of whether a defense must be provided "an insurer must look beyond the effect of the pleadings and must consider any facts brought to its attention or any facts which it could reasonably discover in determining whether it has a duty to defend. If those facts give rise to a 'potential of liability,' even if remote, under the policy, the insurer bears a duty to defend… The duty to defend rests primarily on the possibility that coverage exists, and the possibility of coverage must be determined by a good faith analysis of all information the insurer may know or could have reasonably ascertained." *Aselco, Inc. v. Hartford Ins. Group,* 21 P.3d 1011, 1018 (Kan. Ct. App. 2001); In <u>Kentucky</u>, the determination of the duty to defend must be made " by reference to the complaint and known facts," *Lenning v. Commercial Union Ins. Co.,* 260 F.3d 574, 581 (6th Cir. 2001); In <u>Maine</u>, the insurer cannot avoid its duty to defend by establishing, before the underlying action has concluded, that ultimately there will be no duty to defend, *York Ins. Group of Me. v. Lambert,* 740 A.2d 984, 986 (Me. 1999), *Penny v. Capital City Transfer, Inc.,* 707 A.2d 387, 388 (Me. 1998); In <u>Maryland</u>, extrinsic evidence should be considered by the insurer but is must "relate in some manner to a cause of action actually alleged in the complaint," *Moscarillo v. Professional Risk Mgmt. Servs., Inc.,* 921 A.2d 245 (Md. 2007); In <u>Massachusetts</u>, the scope of the insurer's duty to defend is "based not only on the facts alleged in the complaint but also on the facts that are known or readily knowable by the insurer," *Dilbert v. Hanover Ins. Co.,* 825 N.@. 2d 1071, 1075 (Mass. App.Ct. 2005); The duty to defend cannot be limited by the precise language of the pleadings in <u>Michigan</u>, the insurer has the duty to look behind the third party's allegation to analyze whether coverage is possible, *Citizens Ins. Co. v. Pro-Serv. Group,* 730- N.W.2d 682, 289 (Mich. 2007); In <u>Minnesota</u>, "[t]he complaint …does not control [the duty to defend] when actual facts clearly establish the existence or nonexistence of the duty to defend," *Fluoroware, Inc. v. Chubb Group of Ins. Cos.,* 545 N.W.2d 678, 681 (Minn.Ct.App. 1996); Under <u>Mississippi</u> law an insurer has a duty to defend when it "has knowledge, or could obtain knowledge through a reasonable investigation, of the existence of facts that trigger coverage," *American States Ins. Co., v. Natchez Steam Laundry,* 131 F.3d 551, 553 (5th Cir. 1998); In <u>Missouri</u>, "even if the pleadings do not show coverage, where known or reasonably ascertainable facts become available that show coverage[,] the duty to defend devolves upon the insurer," *King v. Continentall Western Ins. Co.,* 123 S.W.3d 259, 264 (Mo.Ct.App. 2003); Coverage under an insurance policy is determined upon the facts giving rise to the claim in <u>Montana</u>, not any legal theories contained in the complaint. *Brabeck v. Employer's Mut. Cas. Co.,* 16 P.3d 355 (Mont. 2000), *Burns v. Underwriters Adjusting Co.,* 765 P.2d 712 (Mont. 1988); "In determining its duty to defend [in <u>Nebraska</u>], an insurer must not only look to the petition or complaint filed against its insured, but must also investigate and ascertain the relevant facts from all available sources," *Peterson v. Ohio Cas. Group.,* 724 N.W.2d 765, 774 (Neb. 2006); An inquiry into the underlying facts of a claim in <u>New Hampshire</u> is required in determining the duty to defend "to avoid permitting the pleading strategies, whims and vagaries of third party claimants to control the rights of parties to an insurance contract," *Ross v., Home Ins. Co.,* 773 A.2d 654, 657 (N.H. 2001); In <u>New Jersey</u>, facts extrinsic to the complaint but known to the insurer may trigger the duty to defend, *SL Indus. Inc. v. American Motorists Ins. Co.,* 128 N.J. 188, 199-200, 607 A.2d 1266, 1272 (NJ 1992); In <u>New Mexico</u>, "[a]n insurance company is required to conduct such investigation into the facts and circumstances underlying the complaint against its insured as is reasonable given the factual information provided by the insured or provided by the circumstances surrounding the claim in order to determine

1    As reflected by footnote 3, the Court is not strictly limited in its determination of duty to

2    defend and duty to indemnify to comparing the four corners of the policy to the four corners of

3    the Complaint.  Under appropriate circumstances the court may consider extrinsic facts either

4    known to the insurer, facts which the insurer could have ascertained upon reasonable

5    investigation, or facts which may have previously been determined:

6        The case of *Montrose Chemical Corp. of California v. Superior Court*, 6 Cal. App. 4th,

7    287, 861 P.2d 1153, 1157 (1993) supports the foregoing principle regarding extrinsic facts,

8    saying:

9        "The determination whether the insurer owes a duty to defend is
10        usually made in the first instance by comparing the allegations of
         the complaint with terms of the policy.  Facts extrinsic to the
11       complaint may also give rise to a duty to defend when they reveal
         a possibility that the claim may be covered by the policy."
12       (citation omitted)

13       *Gray* made clear that facts known to the insurer and extrinsic to the
         third party complaint can generate a duty to defend, even though
14       the face of the complaint does not reflect a potential for liability
         under the policy (citation omitted) *Id.*, 1158.
15

16

---

17   whether it has a duty to defend," *G&G Servs., Inc. v. Agora Syndicate, inc.*, 993 P.2d 751 (N.M.Ct.App. 1999); In
     New York, extrinsic facts can be used to show that there is a duty to defend, *International Business Machines Corp.*
18   *v. Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 426 (2d Cir. 2002), *Petr-All v. Fireman's Ins. Co.*, 188 A.D.2d 139, 141
     (4th Dept. N.Y. 1993); Where a North Carolina liability insurer knows or reasonably could ascertain facts that, if
19   proven, would be covered by its policy, it has a duty to defend even if the facts as alleged in the complaint appear to
     be outside coverage or within an exception to coverage, *Nationwide Mut. Fire Ins. Co. v. Grady*, 502 S.E.2d 648
20   (N.C. Ct. App. 1998); The United States Court of Appeals for the Eighth Circuit has predicted that the North Dakota
     Supreme Court would hold that the insurer is required to defend if facts outside the underlying complaint come to
21   the insurer's attention and "establish a reasonable possibility of coverage," *Pennzoil Co. v. united States Fid. and*
     *Guar. Co.*, 50 F.3d 580 (8th Cir. 1995); "In Oklahoma, the insurer's defense duty is determined on the basis of
22   information gleaned from the petition (and other pleadings), from the insured and from other sources available to the
     insurer at the time the defense is demanded (or tendered)," *First Bank of Turley v. Fid. & Deposit Ins. Co.*, 928 P.2d
23   298, 3030-04(Okla. 1996); If an insurer in South Dakota possesses knowledge of facts beyond the complaint that
     implicate potential coverage, than it is obligated to defend, *Stoebner, v. S.D. Farm Bureau Mut. Inc. Co.*, 598
24   N.W.2d 557, 559 (S.D. 1999); In Washington, readily ascertainable facts outside the complaint should be considered
     when determining a duty to defend, *Truck Ins. Exch., v. Vanport Homes, inc.*, 58 P.3d 276, 282 (Wash. 2002); In
25   West Virginia, an insurer must look beyond the bare allegations of the third party's pleadings and conduct a
     reasonable inquiry into the facts in order to ascertain whether the claims asserted may come within the scope of the
26   coverage that the insurer is obligated to provide, *State Auto Mut. Ins. Co., v. Alpha Eng'g Servs., Inc.* 542 S.E.2d
     876, 879 (W.Va. 2000); In Guam the duty to defend is triggered by focusing on the facts in the complaint and those
27   known to the insurer "regardless of the technical legal cause of action pleaded by the third party," *National Union*
     *fire Ins. Company of Pittsburg v. Guam Housing & Urban Renewal Authority*, 2003 WL 22497996 [22].
28

---

The court concluded that facts extrinsic to the Complaint can generate a duty to defend as well as defeat a duty to defend. The point is that the Court is not always required to the apply the "eight corners" rule.

Further support for the Court's consideration of extrinsic facts/evidence is found in the following authority:

1. *Great Western Drywall, Inc. v. Intestate Fire & Ca. Co.*, 74 Cal. Rptr. 3d 657, 662 (2008)

> "'[T]he determination of whether the duty to defend arises is made by comparing the terms of the policy with the allegations of the complaint and any known extrinsic facts, and any doubt as to whether the facts create a duty to defend is resolved in favor of the insured.'" (citation omitted)

2. *Aetna Casualty and Surety Co., Inc. v. Centennial Ins. Co.*, 838 F.3d 436, 350 (1988):

> An insurer's duty to defend must be analyzed and determined on the basis of any potential liability arising from the facts available to the insurer from the Complaint or other sources available to it at the time of the tender of defense. (citation omitted) The insurer's obligation to defend is not dependent on the facts contained in the complaint alone; the insurer must furnish a defense when it learns of facts from *any* source that creates a possibility of coverage under its policy. (citation omitted) (ital. in decision)

3. *Pac Indemnity v. Run-A-Ford Co.*, 161 So.2d 789, 794-795 (1964)

> In the case at bar, insurer, by its policy, agreed, 'With respect to such insurance as is afforded by this policy for bodily injury liability,' to defend 'any suit against insured alleging *such injury*.' We have undertaken to show that the complaint in the action at law, with respect to the insurance afforded by the instant policy, does allege 'such injury.' We are of opinion that in deciding whether a complaint alleges such injury, the court is not limited to the bare allegations of the complaint in the action against insured but may also look to facts which may be proved by admissible evidence in suit for declaratory relief such as the instant case. (ital. in decision)

4. *Fagerstedt v. Continental Ins. Co.*, 72 Cal. Rptr. 126, 127, 266 Cal. App.2d 370, 372 (1968).

> Relevant facts in addition to those alleged in appellant's complaint are subject to judicial notice. The rule has long been established in

California 'that in the consideration of a pleading the courts must read the same as if it contained a statement of all matters of which they are required to take judicial notice, even when the pleading contains an express allegation to the contrary.' (citation omitted)

5. *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 695 (1995):

Courts will therefore on occasion look beyond the complaint to evidentiary materials that may shed additional light on the duty to defend, so long as doing so does not involve them in factfinding that may overlap or interfere with the underlying litigation.

To OKP's knowledge at no time did Dongbu undertake any reasonable investigation into the allegations of Plaintiff's Complaint(s) to make a determination of its obligations under the policy. Without making any attempt to investigate the claim Dongbu denied coverage and now relies on its own inaction as a basis for refusing to defend and indemnify. Dongbu knew about the filing of the original complaint by virtue of knowledge of its agent, Moylan's, and received copies of the First and Second Amended Complaints and did nothing. Under the circumstances of this case, extrinsic facts/evidence should be considered by the court in its determination of the issuance of duty to defend and duty to indemnify.

Had Dongbu conducted even the most cursory investigation it would have learned that it was OKP's position that: "Atalig never mentioned any latte stones, other Chamorro artifacts, or Japanese ruins being on his property to Brian Chen or anyone else…. *Chen May 16, 2006 Declaration,* ¶ 7; and that the Lease Atalig refers to in the Complaints and attaches to them, was entered into fraudulently by Atalig. *Chen May 16, 2006 Declaration,* ¶¶13-17.

In addition, Dongbu had conducted the simplest of investigations by merely reviewing the public filings in the underlying Atalig lawsuit it would have learned of many of the true events surrounding the clearing, the primary act that is at issue in the case, <u>because they have already been determined by the CNMI Superior Court</u>. For instance, Judge Naraja, in his January 30, 2008 *Order Granting in Part and Denying in Part Defendants OKP and Chen's Motion for Partial Summary Judgment and Granting Defendants' Motion to Strike,* (Frink Declaration, Exhibit "26.")(the "Naraja Summary Judgment Decision") reviewed the parties

undisputed facts and determined what actually happened at the time a portion of the Atalig property was cleared by OKP, the clearing that Atalig claims destroyed his valuable Chamorro and Japanese artifacts. The Naraja Summary Judgment Decision determined the following to be the true manner in which the clearing took place:

1.    OKP Project Engineer Prasada Reddy Goluguri was allegedly informed by Atalig's former Hotel Manager Edita Carillo not to disturb an area of the Atalig property. Carillo did not tell Goluguri why not to disturb that area, just not to.

2.    Goluguri demarcated corners of a 100' x150" box for OKP Heavy Equipment operator Pramuan Jaiphakdee to clear. The demarcated box did not include the area that Carillo told Goluguri not to clear (this is the same area that Atalig subsequently claimed included the destroyed Chamorro and Japanese artifacts). Goluguri approved Jaiphakdee to clear within the box after viewing the area that had been demarcated.

3.    Jaiphakdee then, after clearing the box, **independently** made the decision to push the cleared debris piles outside of the box and into the "do not disturb" area.

4.    Jaiphakdee had no knowledge of the existence of the allegedly destroyed artifacts.

5.    Jaiphakdee's alleged destruction of the artifacts was "negligent at best."

*Naraja Summary Judgment Decision*, pgs. 4-7.

Extrinsic facts/evidence are available from the underlying action which leads to the conclusion there is coverage.

C.    **Exclusions - Generally**

In considering the various exclusionary provisions which Dongbu says apply, it must be kept in mind that the burden is on Dongbu to show the exclusion is applicable to defeat coverage. Exclusionary clauses are to be strictly construed against the insurer and any ambiguity is to be resolved in favor of the insured:

1. *Frogner v. American Community Mutual Insurance Company*, 502 N.W. 2d 350, 352 (1993):

1  Exclusionary clauses are to be strictly construed against the
2  insured. (citation omitted)

3  2. *Arreguin vs. Farmers Insurance Company of Idaho*, 180 P.3d 498, 500, 501 (2008)

4  A provision that seeks to exclude the insurer's coverage must be
5  strictly construed in favor of the insured. (citation omitted). The
   "burden is on the insurer to use clear and precise language if it
6  wishes to restrict the scope of its coverage." (citation omitted)

7  Furthermore, a provision excluding coverage is strictly construed
   in favor of the insured and the insurer has the burden to use clear
8  and precise language if it is restricting the scope of its coverage.
9  (citation omitted)

10  3. *Greenwich Insurance Company v. RPS Products, Inc.*, 882 N.E.2d 1202, 1208 (2008)

11  Where an exclusionary clause is relied upon to deny coverage, its
12  applicability must be clear and free from doubt because any doubts
    as to coverage will be resolved in favor of the insured. (citation
13  omitted)

14  VII.   **INTERPRETATION OF AND COMPLIANCE WITH DONGBU POLICIES**

15  **"Caused By Accident" And "Accidental Loss"**

16      Dongbu contends there is no coverage under either policy because the Atalig claims were

17  neither "caused by accident" under the Auto Policy or an "accidental loss of or damage to

18  property" under the CAR Policy.

19      The Auto Policy Insuring Agreement for property damage liability states:

20  **Coverage B. Property Damage Liability**: To indemnify the
21  insured for all sums which he shall become legally obligated to pay
    as damages because of injury to or destruction of property,
22  including the loss of use thereof, <u>caused by accident</u> and arising
    out of the ownership, maintenance or use of the automobile.
23  (emphasis supplied)

24      The CAR Policy with respect to property damage liability states:
25

26  The Insurer will indemnify the Insured up to but not exceeding the
    amounts specified in the Schedule against such sums which the
27  insured shall become legally liable to pay as damages consequent
    upon

28

4831-8385-9458.3.060927-00005                    -18.-

(b) <u>accidental loss of or damage to property</u> belonging to third parties.

occurring in direct connection with the construction or erection of items insured under Section and happening on or in the immediate vicinity of the site during the period of cover. (emphasis supplied)

An examination of both the Auto Policy and the CAR Policy shows that the terms "caused by accident" and "accidental loss" are not defined in either policy. In such case it is the Court's function to determine what meaning should be given to these terms or whether the failure of Dongbu to define the terms in the policies makes the terms ambiguous and therefore construed in favor of coverage for OKP.

A.    **"Caused by accident"**

Dongbu's Complaint at paragraph 34 sets out the policy language with regard to property damage liability and at paragraph 35 alleges that the companion provision under Coverage A for personal injury liability is similarly applicable. Then Dongbu alleges in paragraph 35 as the sole basis for denial of coverage the following:

The conduct made the basis of the claim is not an "accident" according to the plain meaning of the term.

What is an accident? An accident is to be viewed from the perspective of the insured and has been defined as an event with unintended results. The Court is directed to the following authority:

1. *Allstate Insurance Company v. McCarn*, 446 Mich. 277, 645 N.E.2d 20, 23 (2002):

Accidents are to be evaluated from the standpoint of the insured, not the injured party. (citation omitted) In *Masters* we held that "the appropriate focus of the term 'accident' must be both '*the injury causing act* or *event* and its relation to the resulting property damage or personal injury.'" (citation omitted) (italics in decision)

What this essentially boils down to is that, if both the act and the consequences were intended by the insured, the act does not constitute an accident. On the other hand, if the act was intended by the insured, but the consequences were not, the act does constitute an accident, unless the intended act created a direct risk

1    of harm from which the consequences should reasonably have
2    been expected by the insured.

3    2. *McGroarty v. Great Am. Ins. Co.*, 36 N.Y.S. 2d 358, 329 N.E.2d 172, 174-175 (1975)

4        One often contemplates and envisions a sudden or catastrophic
5        event when considering the term accident - an event which is
         unanticipated and the product of thoughtlessness rather than
6        willfulness.  But a broader view must be taken of the term for
         otherwise how could we classify catastrophic results which are the
7        unintended fruits of willful conduct.  Certainly one may intend to
         run a red light, but not intend that the catastrophic results of
8        collision with another car occur.  Calculated risks can result in
9        accidents.  Judge Cardozo framed the situation perfectly in
         *Messersmith vs. American Fid .Co.*, 232 N.Y. 161, 133 N.E. 432 in
10       which he advanced similar illustrations and stated:  'Injuries are
         accidental or the opposite, for the purpose of indemnity, according
11       to the quality of the results rather than the quality of the causes.'

12       We agree also that it is not legally impossible to find accidental
13       results flowing from intentional causes, i.e. that the resulting
         damage was unintentional although the original act or acts leading
14       to the damage were intentional.

15       [b]ut we hold that the relevant context to be considered is the fact
         that it is a word [accident] employed by an insurer in the contract
16       and should be given the construction most favorable to the insured.
         Thus, regardless of the initial intent or lack thereof as it relates to
17       causation, or the period of time involved, <u>if the resulting damage
         could be viewed as unintentional by the fact finder the total</u>
18       <u>situation could be found to constitute an accident.</u>  *Id*. 175
19       (emphasis supplied)

20
21   3. *Shelby Casualty Insurance Company v. H.T.*, 391 N.J. Supp. 406, 918 A.2d 659, 661 (2007)

22       It is by now well settled that "the accidental nature of an
         occurrence is determined by analyzing whether the wrongdoer
23       intended or expected to cause an injury.  If not, then the resulting
         injury was 'accidental', even if the act that caused the injury was
24       intentional." (citation omitted)  The controlling issue, then, is
         whether the insured intended or expected to cause harm to the
25       victims.  (citation omitted)

26       Generally, the intent or expectation of injury is a subjective
27       inquiry, requiring a determination of what the insured actually
         intended or expected.  (citation omitted)

28

4. *Quincy Mutual Fire Insur. Co. v. Abernathy*, 393 Mass. 81, 469 N.E. 797, 799 (1984)

> This court consistently has stated that the resulting injury which ensues from the volitional act of an insured is still an "accident" within the meaning of an insurance policy if the insured does not specifically intend the resulting harm or is not substantially certain that such harm will occur.

5. *Herrera v. C.A. Seguros Catatumbo*, 844 So. 2d 664, 667 (2003)

> Recently the Florida Supreme Court held that "where the term 'accident' in a liability policy is not defined, the term, being susceptible of varying interpretations, encompasses not only 'accidental events', but also injuries or damages neither expected nor intended from the standpoint of the insured." (citation omitted) As the Supreme Court explained, under this formulation, "if the resulting damages are unintended, the resulting damage is 'accidental even though the original acts were intentional.'" (citation omitted)

There being significant authority that "accident" can be an event with unintentional results, what then does the term "caused by accident" mean? It means that where an insurer premises coverage on a loss "caused by accident" an intentional act with unintentional results comes within the definition of "caused by accident" and there is coverage.

In *Fidelity and Cas. Co. of New York v. Wrather*, 652 S.W. 2d 245, 259 (1983) the court interpreted a provision in a liability policy which provided the insurer would:

> " 1. pay damages which an insured becomes legally liable to pay because of a ... b. damage to or destruction of property including loss of use, <u>caused by accident</u> resulting from the ownership, maintenance or use of your car; and ... 2. defend any suit against an insured for such damages with attorneys hired and paid by us ..." (emphasis supplied)

The claim against the insured was for damages alleged to have been the result of the insured setting fire to wheat stubble near a highway. The fire created smoke which obscured the vision of those using the highway and was the alleged causal connection of vehicle damage on the highway. State Farm contended the alleged damage was not "caused by accident" because the insured intentionally started the fire. The court disposed of the State Farm's contention in the

following manner:

> [t]he term "caused by accident," as used in policies of liability insurance, is satisfied where the insured did not intend that damage result from his act although the act itself was intentional and did so result.

In *McAllister v. Hawkeye - Security Ins. Co.*, 68 Ill. App. 2d 222, 215 N.E.2d 477, 481 (1966) a claim was made for damage resulting from earth moving activities. The insured's policy provided coverage for "[d]amages because of injury to or destruction of property, ... <u>caused by accident</u> and arising out of the ownership, maintenance or use of the insured's equipment." The defense was tendered to the insurer which refused coverage. In a subsequent declaratory judgment proceeding the insurance company took the position that its insured's acts were deliberate, voluntary and intentional and therefore the ensuing loss was not the result of an accident. The Court found that while the insured intended to move earth, he didn't intend to do damage to a third party's land; that the damage was unforeseen and unexpected in the course of an intentional act. In finding coverage the Court stated:

> In the case at bar, we likewise believe that the damage to the Foss' land was not intentionally caused by plaintiff, but rather, was the unintentional result of an intended act directed at other property. Since there was not intent to damage Foss' land, the resulting harm was 'caused by accident.'

In interpreting the term "caused by accident" the Court in *Haynes v. American Casualty Company*, 228 Md. 394, 179 A.2d 900, 904 (19962) said:

> In our view, to hold that recovery under such a provision (caused by accident) is limited to those situations where not only the result was unintentional, but also where the means were accidental, would place too narrow an interpretation upon the phrase. As the conflicting findings in other jurisdictions and as the language itself would indicate, the phrase is somewhat ambiguous. We have made it clear that where an insurance company, in attempting to limit coverage, employs ambiguous language, the ambiguity will be resolved against it as the one who drafted the instrument, as is true in the construction of contracts generally.

"Caused by accident" was interpreted by the case of *Meyer v. Pacific Employers*

1    *Insurance Company*, 233 Cal.App.2d 321, 43 Cal. Rptr. 542, 547 (1965) as follows:

2
> The fact that an act which causes an injury is intentional does not
3
> take the consequence of that act outside of coverage of a policy
> which excludes damage unless caused by accident for if the
4
> consequence that is the damage or injury is not intentional and is
> unexpected it is accidental in character.  (citation omitted)
5

6        What we have in this case is clearly an incident that was caused by accident.  OKP's

7    heavy equipment operator was asked to clear an area of the property that did not include any

8    artifacts.  He cleared that area, then, not knowing that there were any artifacts in another area,

9    pushed the debris from the area he was asked to clear into the area that Atalig claims contained

10   artifacts.   This is clearly an unintentional consequence, on the part of both OKP and the heavy

11   equipment operator.  OKP did not ask the operator to clear the area containing the artifacts.  The

12   operator did not know that the artifacts existed in the additional area that he cleared without

13   OKP's approval.  Under these circumstances, the claimed loss was "caused by accident" and

14   therefore Dongbu should provide coverage under the Auto Policy.

15   B.       **"Accidental loss"**

16
         Dongbu's Complaint at paragraph 43 in alleging the basis for refusing coverage under the
17
     CAR Policy states:
18
> The third party liability coverage is only applicable to "accidental
19
> loss of or damage to property."  CAR coverage form, Third Party
> Liability Section.  The claims in the lawsuit are not based on
20
> accidental loss according to the plain meaning of the term or legal
> authority that has construed that language.
21

22       As previously noted, the CAR Policy does not define the term "accidental loss" and

23   therefore the Court must determine how the term should be interpreted.

24       The word "accidental" has been defined as follows:

25   *Meyer v. Pacific Employers Ins. Co.*, 233 Cal. App.2d 321, 327 43 Cal,Rptr. 542 (1965)

26
> The fact that an act which causes injury is intentional does not take
27
> the consequence of that act outside the coverage of a policy which
> excludes damage unless caused by accident for if the consequence
28

that is the damage or injury is not intentional and is unexpected it
is accidental in character.

*Winchester v. Prudential Life Ins. Co. of America*, 975 F.2d 1479, 1487 (1992)

We are convinced that the Utah courts currently use the less strict
standard of defining "accidental" as a result not reasonably
foreseeable even if the means causing the result was foreseeable or
even intentional.

*American Alternative Ins. Corp. v. Superior Court*, 135 Cal.App. 4th 1239, 1247 37 Cal. Rptr.3d 918 927 (2006)

"Accidental" in an insurance policy ordinarily means unintended
and unexpected by the insured."

These definitions have one thing in common: "accidental" means an unintended and

unforeseeable result.

"Accidental loss" was defined in *Tuttle v. Allstate Insurance Company*, 134 Wash. App.

120, 138 P.3d 1107, 1111 (2006) as follows:

The ordinary meaning of an accidental loss is "'when [something]
happens without design, intent or obvious motivation.'"

In *State Farm Mut. Auto Ins. Company v. Kelly*, 945 S.W.2d 905, 908, 910 (1997) the court said:

The Texas Supreme Court has recognized that a loss or injury is
accidental when it is "not the natural and probable consequence of
the means which produce it. (citations omitted)  In other words,
accidental loss is one that does not ordinarily follow and *cannot be
reasonably anticipated from the producing act.* (citation omitted)
An accidental loss is one the actor did not intend to produce
(citation omitted) (emphasis supplied) (italics in orig).

An accidental loss occurs when it is not the natural and probable
consequence of the act which produces it, or does not ordinarily
flow and cannot be reasonably anticipated from the act. *Id.* 910.

It is clear that the alleged damage to the artifacts which Atalig claims was an unintended

and unforeseen consequence.  The heavy equipment operator, Pramuan Jaiphakdee, did not know

that the artifacts existed in the additional area he pushed the debris into.  OKP only instructed

Jaiphakdee to clear an area that did not include the artifacts.  Clearly, neither Jaiphakdee or OKP

intended the alleged loss of the artifacts to occur. This constitutes an "accidental loss" within the property damage liability coverage of the CAR policy and triggers a duty to defend.

C.　　**No Failure To Comply With Notice Requirements**

Both the Auto Policy and the CAR Policy have provisions regarding notification by the insured to the insurer. Those provisions state:

1.　　**Notice Under the Policies**

The Auto Policy - Conditions

**2. Notice of Accident - Coverage A, B and C**: When an accident occurs written notice shall be given by or on behalf of the insured to the Company or to any of its authorized representative as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information regarding the time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses.

**3. Notice of Claim of Suit - Coverage A and B**: If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

The Car Policy - Conditions

The applicable notification provision of the CAR Policy states:

5. In the event of any occurrence which might give rise to a claim under this Policy, the Insured shall

a) immediately notify the Insurers by telephone or telegram as well as in writing, giving an indication as to the nature and extent of loss or damage;

The Insurers shall not in any case be liable for loss, damage or liability of which no notice has been received by the Insurers within 14 days of its occurrence.

Upon notification being given to the Insurers under this condition, the Insured may carry out the repairs or replacement of any minor damage; in all other cases a representative of the Insurers shall have the opportunity of inspecting the loss or damage before any repairs or alterations are effected. If a representative of the Insurers does not carry out the inspection within a period of time which could be considered adequate under the circumstances, the Insured is entitled to proceed with the repairs or replacement.

1    When addressing the issue of notification to Dongbu of the claims and suit made by

2    Atalig, the following CNMI statutes from the Insurance Code must be taken into consideration:

3

4    1.  4 CMC §7505(c) *Notice of Loss.*  Failure to give notice of loss covered by marine or fire
insurance within any period provided for by the policy or otherwise does not exonerate the
insurer if the notice is given within a reasonable time after the insured has or should have first-

5    hand knowledge of the loss.  In all other classes of insurance, the insured shall have at least 20
days after the event within which to give notice of loss.  No requirement of notice within a lesser

6    period is valid.

7    2.  4 CMC §7505(e) *Waiver of Defects in Notice or Preliminary Proof.*  All defects in a notice of
loss, or in a preliminary proof thereof, which the insured might remedy, and which the insurer

8    omits to specify to the insured, without unnecessary delay, as grounds of objection, are waived.

9    3.  4 CMC §7505(f) *Waiver of Delay.*  Delay in the presentation to an insurer of notice, or
preliminary proof of loss, is waived if caused by an act of the insurer, or if the insurer omits to

10    make <u>objection promptly and specifically</u> upon that ground. (emphasis supplied)

11    These provisions become significant in this case as Dongbu relies heavily in its

12    allegations that OKP failed to give timely notice of the Atalig claim or to tender defense of the

13    Atalig suit in a timely manner.  The undisputed facts are that timely notice of the claim and

14    subsequent tender of defense was made.  Additionally, Dongbu by its inaction after being

15    notified of the claim and subsequent suit has waived any defense of failure to give notification.

16    In considering the notification issue, it must be kept in mind that the Atalig suit involves

17    three (3) different Complaints:

18

19    1.  Original Complaint filed March 23, 2006; Exhibit 8 to Frink Declaration;

20    2.  Verified First Amended Complaint filed July 31, 2006; Exhibit 9 to Frink Declaration; and

21    3.  Second Amended Complaint filed April 18, 2007; Exhibit 11 to Frink Declaration.

22    <u>Original Complaint</u>

23    The original Complaint was filed on March 23, 2006.  On March 24, 2006 articles

24    regarding the lawsuit appeared in both the Marianas Variety and the Saipan Tribune (See

25    Exhibits 2 and 3 to Chen Declaration).  Within a week or so of March 24, 2006, Brian Chen

26    visited the offices of Moylan's Insurance on an unrelated matter; Moylan's is the authorized agent

27    for Dongbu in the CNMI and the agent that placed the Auto Policy and CAR Policy with

28    Dongbu.  On that occasion Brian Chen had a conversation with Cecilia A. Anas, Surety Division

Manager, of Moylan's Insurance Underwriters, Inc. who advised that she had seen at least one of the March 24, 2006 newspaper articles and she remarked it looked like a ridiculous lawsuit.  At that point in time Dongbu's agent had knowledge of the pending lawsuit.

First Amended Complaint

When the First Amended Complaint was filed on July 31, 2006, a copy was delivered by Brian Chen of OKP to Cecilia A. Anas, Surety Division Manager of Moylan's Insurance Underwriters, Inc. on August 9, 2006 and defense and indemnification was requested.  Ms. Anas advised Mr. Chen that she would discuss the matter with Dongbu.  (Chen Declaration).  Delivery of the First Amended Complaint to Ms. Anas clearly meets the notification and tender requirements of both the Auto Policy and the CAR Policy.

Second Amended Complaint

Additionally, when the Second Amended Complaint was filed on April 18, 2007 a copy was delivered to Thomas Clifford on May 3, 2007, the attorney for Dongbu who was handling this matter.  Dongbu received timely notice of the Second Amended Complaint and the defense was therefore tendered timely.

       2.    **Notification was timely**

Unquestionably, timely notification and tender of defense was made under both the Auto Policy and CAR Policy as far as the First Amended Complaint and Second Amended Complaint are concerned.  Regarding knowledge by Moylan's of the filing of the original Complaint, knowledge of Moylan's as General Agent[4] for Dongbu is knowledge of Moylan's and as such the notification of suit provision of the policy has been satisfied and such knowledge triggers the duty of Dongbu to fulfill its obligations under the policies to OKP.

In the CNMI a General Agent under the Insurance Code is defined as follows:

        4 CMC §7303  **General Agents, Subagents, Adjusters, and Solicitors Defined**.

---

[4] Both the Auto Policy and CAR Policy state Moylan's is the General Agent for Dongbu Insurance Co., Ltd.

(a) *General Agent.*

   (1) "General Agent" means any person appointed under 4 CNMI §7301(b)(1)(D) and authorized by the insurer to perform any of the following acts in the Commonwealth:

   (A) Solicit application for insurance;

   (B) Effectuate and countersign insurance contracts;

   (C) Collect premiums on insurance applied for or effectuated;

   (D) Appoint subagents and solicitors;

   (E) Any other lawful acts pursuant to this decision.

The designation of Moylan's as General Agent for Dongbu and knowledge by Moylan's of the original suit filed by Atalig is notice to Dongbu.

   The general rule of agency that the principal is chargeable with, and is bound by, the knowledge of or notice to his or her agent received while the agent is acting within the scope of his or her authority, and which is in reference to a matter over which his or her authority extends, is fully applicable to agents of insurance companies. The general rule of insurance law is that the knowledge of or notice to an insurance agent as to a matter within the scope of his or her authority, is chargeable to the insurer. The agent's knowledge is in law the knowledge of the insurer, therefore, even if such knowledge on the part of the agent is not in fact communicated to the insurer.

44A Am.Jur. 2d Insurance, §1553

   This general principle is supported by the following authority:

1. *Couch on Insurance (3Ed.),* §49:2 Effect of Agent's Failure to Inform Insurer.

   Although the rule which imputes the agent's knowledge to the principal is predicated upon the assumption that the agent will communicate such matters to its principal, it is immaterial whether the agent actually does so, for in either case it is held that the knowledge of the agent is the knowledge of the insurer.

2. *Major Oil Corp. v. Equitable Life Assur. Soc. of U.S.,* 457 F. 2d 596, 603 (1972):

Equitable concedes that the general rule is that knowledge obtained by an agent of the insurer while acting within the scope of his authority is imputed to the insurer, whether such is actually communicated or not.

3.    **Dongbu waived any defect in Notice**

Notwithstanding OKP's compliance with the suit notification requirements of the Auto Policy and CAR Policy, Dongbu has waived any reliance on lack of notice because of its failure to comply with 4 CMC §7505(e) which states:

4 CMC §7505(e) *Waiver of Defects in Notice or Preliminary Proof.* All defects in notice of loss, or in a preliminary proof thereof, which the insured might remedy and which the insurer omits to specify to the insured, without unnecessary delay, as grounds for objection, are waived.

and

failure to comply with 4 CMC §7505(f) which states:

4 CMC §7505(f) *Waiver of Delay.* Delay in the presentation to an insurer of notice, or preliminary proof of loss, is waived if caused by an act of the insurer, or if the insurer omits to make objection promptly and specifically upon that ground.

In considering the applicability of these two statutes Dongbu finds itself in the awkward situation of saying that a delay in notification of the filing of the original complaint for approximately 4 months (from late March to early August, 2006) and tendering defense of the First Amended Complaint in early August, 2006 voids coverage, yet failure of Dongbu to respond to the tender of the defense until March, 2007 (a period of approximately 7 months) does not violate either statute. Any lack of notice has been waived by Dongbu by its failure under 4 CMC §7505(e) to specify the grounds of its objections without unnecessary delay and under 4 CMC §7505(f) to object promptly and specifically about delay in presentation of notice.

D.    **No Prejudice to Dongbu**

Also to be considered is that Dongbu cannot demonstrate that it has been prejudiced by any delay in notification; it should be emphasized that OKP disputes there has been any delay in

lack of notification.  Dongbu does not make any allegation that delay in notification has been

prejudicial.  Dongbu's First Amended Complaint alleges:

> 32.  The Auto Policy declarations page requires "immediate" notice of claims be provided to the claims adjusting company indicated.  The Auto Policy's Condition 3 provides that "the insured shall immediately forward to the [insurer] every demand, notice, summons or other process" received.  The Atalig claim was filed in March 2006 and OKP had knowledge of the lawsuit at least since early April 2006.  OKP first provided notice to Dongbu of the claim approximately four months later, in early August 2006.  That is not "immediate" notice. (¶35, Dongbu First Amended Complaint)

> 42.  General Condition No. 5 requires immediate notice of claims, and expressly bars any coverage under the CAR Policy where the insured does not provide notice to the insurer within 14 days of the insured being aware of the claim.[5] (¶42. First Amended Complaint)

Conspicuously absent from the allegations regarding delay in notice is any allegation that

Dongbu has been prejudiced by any alleged delay.

The requirement that an insurer show it has been prejudiced by a lack or delay in notice

as a basis to disclaim coverage is the rule in the majority of jurisdictions:

> In the overwhelming majority of states, an insurer may not raise the failure of an insured to give notice as a valid defense to its obligation to provide coverage under an insurance policy, unless the insurer can demonstrate prejudice from the insured's failure to comply with the policy's notice provisions.

*Homes' Appelman on Insurance 2d.*, Vol, 22, §139.4(c).

Factors the courts consider in determining whether the insurer has been prejudiced by lack or

delay in notice include: (1) the availability of witnesses, (2) the ability to discover other

information, (3) the existence of official reports concerning the occurrence, (4) the preparation

and preservation of demonstrative and illustrative evidence, and (5) the ability of experts to

reconstruct the occurrence.  *Id*, §139.4(c)(l).

---

[5] The 14 days requirement in the policy is unenforceable as 4 CMC §7505(c) says an insured shall have at least 20 days to give notice of loss and no requirement of notice for a lesser period is valid.

1    Case authority in accord with the requirement the insurer prove prejudice is found in the

2  following cases:

3    1. *Northshire Communications, Inc. d/b/a WEQX (FM) v. AIU Insurance Company*, 174 Vt.

4  295, 811 A.2d 216, 220, 222 (2002):

5            In 1997, this Court departed from nearly sixty years of precedent
6            and adopted a modern view of prompt-notice provisions in
             insurance contracts by holding that an insured's failure to provide
7            prompt notice does not automatically defeat liability insurance
             coverage. (citation omitted). While noting the value and
8            importance of prompt-notice provisions, we recognized that the
             forfeiture of coverage for breach of these provisions is unfair to
9            insureds when that breach does not prejudice the insurer's position
             relative to the coverage claim. (citation omitted). Pursuant to the
10           holding in *White Caps*, an insurer that seeks to be relieved of its
             obligations under a liability policy because of a breach of the
11           prompt-notice provision must prove that the breach resulted in
12           <u>substantial</u> prejudice to its position in the underlying action.
             (citation omitted) (emphasis supplied)
13

14    In this case Dongbu has not made any claim of prejudice from lack or delay in

15  notification, much less providing any evidence of prejudice. Further, even after being notified of

16  the claim Dongbu undertook no effort to investigate the matter. Under that circumstance

17  Dongbu is even precluded from asserting prejudice:

18           The insurer did not assert that it had made any investigative effort
19           to identify potential witnesses to the accident, that any particular
             witness was unavailable or had suffered memory loss, that any
20           evidence had been lost or was unavailable, or that it had actually
             made any significant investigation of the incident following the
21           notice of the claim. "'An insured cannot assert prejudice with
             regard to its ability to conduct an investigation that it never even
22           tried to conduct.'" *Id.*, 222.
23

24    2. *Brakeman v. Potomac, Ins. Co.*, 472 Pa. 166, 371 A.2d 193, 197 (1977).

25    In holding that an insurer that seeks to disclaim coverage on the basis of late notice must

26  show prejudice the *Brakeman* court said:

27           In short, the function of a notice requirement is to protect the
             insurance company's interests from being prejudiced. Where the
28           insurance company's interests have not been harmed by late notice,

even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation.

Allowing an insurance company, which has collected full premiums for coverage, to refuse compensation to an accident victim or insured on the ground of late notice, where it has not shown timely notice would have put the company in a more favorable position is unduly severe and inequitable. Moreover, we do not think such a result comports with the reasonable expectations of those who purchase insurance policies. *Id.* 197-198.

[W]e therefore hold that where an insurance company seeks to be relieved of its obligations under a liability insurance policy on the ground of late notice, the insurance company will be required to prove that the notice provision was in fact breached and that the breach resulted in prejudice to its position. *Id.*, 198

The majority view being that for an insurance company to refuse to provide coverage on the basis of lack or delay in notification it must show prejudice, no claim of prejudice having been made by Dongbu, the claims regarding lack of coverage on that basis must fail.

In reality, the lack/delay of notification claim is academic as Dongbu did receive notice of the original complaint by knowledge on the part of its agent and then tendering of the defense when the First Amended Complaint was filed.

E.    **Undertaking Defense**

Dongbu disclaims coverage under the Auto Policy based on OKP undertaking defense of the Atalig claim without Dongbu's permission.

Notwithstanding that Dongbu had knowledge of the Atalig suit, either through Moylan's or by being provided copies of the First and Second Amended Complaints, despite demand Dongbu undertook no steps to provide a defense to OKP. As Dongbu notes, the insurer will defend any lawsuit and Dongbu didn't do that. Section II.(a) of the Insuring Agreements of the Auto Policy states:

1

2

**II. Defense, Settlement, Supplementary Payments:** As respects the insurance afforded by the other terms of this policy under Coverage A and B the company shall:

3

4

5

6

7

     (a) defend in his name and behalf any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the Company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient.

8

Dongbu did not come forward to defend the suit; Dongbu didn't even offer to provide a defense

9

under a reservation of rights. For Dongbu to have knowledge of the suit, to have the defense

10

tendered, to do nothing and then seek to disclaim coverage on the basis that OKP undertook

11

defense of the suit without its permission is unconscionable. By its inaction Dongbu has

12

forfeited any defense based on OKP defending the suit without its permission. Further, Dongbu

13

has not been prejudiced by OKP's defense of the Atalig suit and Dongbu makes no allegation

14

that it was prejudiced.

15

     As was noted in *Major Oil*:

16

17

18

19

20

21

22

23

"Courts are loathe to enforce forfeitures and indeed they should be, except where an insurer has so conducted itself in the issuance of the policy as to preclude it from asserting any ground upon which it might be entitled to avoid the policy. There is no doubt but that an insurer may waive provisions inserted in the contract for its benefit, and may be estopped from asserting reasons ordinarily justifying a forfeiture of the policy … An insurance company may be charged with knowledge of facts which it ought to have known … Knowledge which is sufficient to lead a prudent person to inquire about the matter, when it could have been ascertained conveniently, constitutes notice of whatever the inquiry would have disclosed, and will be regarded as knowledge of the facts." (citation omitted.)

24

*Major Oil* at page 602.

25

26

     Perhaps Dongbu feels an appropriate course of action for OKP would be to have done

27

nothing and simply allow a default judgment to be entered against it. This makes no sense.

28

Dongbu had notice of the suit and did nothing to protect the interests of its insured, yet seeks to

1    disclaim coverage because OKP took steps to protect itself and its employees when Dongbu

2    refused to fulfill its obligations under the policies.

3    F.    **Events Occurring In Direct Connection With Construction On The Site**

4
5          At page 45 of the Complaint Dongbu makes the following allegation as basis for denial

6    of coverage under the CAR Policy:

7                45.  The third party liability coverage only applies to events
                "occurring in direct connection with the construction" that also
8                occurs on the site.  CAR coverage form, Third Party Liability
                 section.  The Atalig claim arises out of events that occurred in
9                indirect connection with the construction project, and did not occur
                 on the construction site.
10

11   A reading of the applicable provision from the Third Party Liability section regarding property

12   damage provides actually that the policy covers:

13               b) accidental loss of or damage to property belonging to third
                 parties
14
                 (sic) occurring in direct connection with the construction or
15               erection of the items insured under Section. and happening on or in
                 the immediate vicinity of the site during the Period of Cover.
16

17   When examining the language "occurring in direct connection with the construction or erection

18   of the items insured under Section and happening on or in the immediate vicinity of the site

19   during the Period of Cover", the "Section" provision/number is not included thereby rendering

20   that provision ambiguous and unenforceable.

21         Regarding whether the events occurred on or in the immediate vicinity of the site, the

22   Declaration Page recites: Site of Construction:  **Rota, Commonwealth of the Northern**

23   **Marianas**.

24   The claims arose from events on the site as "site" is described in the policy.

25         The CAR Policy does not define what constitutes "occurring in direct connection with the

26   construction …"  The policy identifies the "Title of Construction" as **Rota Int'l Airport Project**.

27   Common sense dictates that leasing the property which was to act as a staging area for the

28

project and clearing that area would constitute an event "occurring in direct connection with the construction." It is part of the overall construction project. The term being undefined, it should be interpreted as a reasonable person would understand the term and any ambiguity is resolved against Dongbu as the drafter of the policy.

G.      **Exclusion IX(a) and V(a) Inapplicable**

    1.      **Exclusion IX(a)**

        Exclusion IX(a) of the Auto Policy reads:  This Policy Does Not Apply:

                **IX.  Under Coverage B**,

            (a)  to injury to or destruction of property owned by, rented to, in charge of or transported by the insured.

    The comparable exclusion in the CAR Policy is in the **Third Party Liability, Special Exclusions to Section** which reads:

        The insurers will not indemnify the Insured in respect of

        4.  liability consequent upon

        b) loss of or damage to property belonging to or held in care, custody or control of the Contractor(s), the Principal(s) or any other firm connected with the project which or part of which is insured under Section, or an employee or workman of one of the aforesaid;

An examination of the Atalig Complaint, whether it be the original Complaint, the First Amended Complaint or the Second Amended Complaint alleges claims for damage to property which was not covered by the lease agreement between Atalig and OKP.  Indeed the claims are that OKP committed acts of waste or conversion either without the specific written consent of Atalig or without obtaining the required permits before beginning clearing of the property where these acts are alleged to have occurred.

    Clearly there is no claim by Atalig that OKP owned or transported property.  Regarding whether OKP rented or was in charge of the property which is the subject of the damage claims, it is equally clear those property items were not rented to or that OKP was in charge of them,

because of the lease requirements that Atalig's written consent was required to:

> ...erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvements on the Premise[s], and correct and change the contour of the Premises ... (¶38, Original Complaint; ¶61, First Amended Complaint; ¶56, Second Amended Complaint).

The Lease included in all three versions of the Complaints sets forth what OKP was leasing, and it was not the Atalig real property.  According to the Complaints and Lease OKP leased:

> 1. Premises:  The Premises consist of all *improvements* situated on the real property ...together with the right to use Lessor's easements and appurtenances in adjoining and adjacent land. highways, roads, streets, lanes ....  Lessee shall also have the *right to use* the real property described below where the leased improvements are situated: (italicized emphases added).

The lease provisions setting forth what portion of the property was being leased, the improvements only, and requiring Atalig's prior written consent prior to OKP undertaking certain actions and Atalig's related claims in the Complaints are inconsistent with Dongbu's position that the allegedly damaged property, ancient Chamorro and Japanese artifacts, was "rented to" or "in charge of" OKP.

In *State Farm Fire & Casualty Company v. Kohen*, 424 N.E.2d 992, 994, 995 (1981) the court examined an exclusionary clause very similar to Exclusion IX(a) of the Auto Policy.  The clause in the *State Farm* case read:

> THERE IS NO COVERAGE:  For any damages
>
> b.  To property owned by rented to, in charge of, or transported by an Insured.  But coverage applies to a rented residence or private garage damaged by a car use insure.

The Court interpreting this exclusion stated:

> Typically, liability coverage includes damage to property owned by someone other than the insured.  The purpose of the clause in issue is to exclude from liability coverage damage to property of the insured.

1    The Court went to say:

2          [w]e find that the ordinary meaning of "in charge of" is possession
          of the property and some degree of control of or dominion over it
3          so as to give the insured an ownership-like status and an insurable
          interest in the property.
4

5    The Atalig lease requirements that OKP have his written consent is inconsistent with

6    OKP having an "ownership-like status" and therefore Exclusion IX(a) is inapplicable.

7          2.      **Exclusion V(a) of the Auto Policy**

8

9    Exclusion V(a) of the Auto Policy reads:

10         This Policy Does Not Apply:

11         **V. Under Coverage A, B and C**[6]

12         (a) to liability assumed by the Insured under any contract or
          agreement
13

14   This exclusion does not apply because the purpose of such provision is to exclude coverage

15   liability where the insured assumes the responsibility for the acts of a third party, usually in

16   situations under an indemnity or hold harmless agreement.  That is not our case.

17         In *Olympic Inc vs. Providence Wash. Insur. Co. of Alaska*, 648 P.2d 1008, 1011 (1982) a

18   similarly worded exclusion was examined.  The Court said:

19         "Liability assumed by the insured under any contract" refers to
          liability incurred when one promises to indemnify or hold harmless
20         another, and does not refer to liability that results from breach of
          contract.  (citations omitted)
21

22         Because "liability assumed by contract" refers to a particular type
          of contract - a hold harmless or indemnification agreement - and
23         not to a liability that results from breach of contract, the
          contractual liability exclusion applies only to hold harmless
24         agreements (citation omitted) *Id*, 1011.

25

26   Citing with approval the *Olympic Inc.* case, the court in *James v. Burlington Northern Santa Fe*

27   *Railway Company*, 2007 WL 2461685 said:

28   ────────────────
     [6] Coverage B is Property Damage Liability

Yet another exclusion provides, "[Coverage A] does not apply to bodily injury or property damage for which the insured is obligated to pay damages by reason of assumption of liability in a contract or agreement."  This contractual liability exclusion "functions to relieve the insurer of responsibility for any 'extra' liability the insured undertakes by contract beyond the liability imposed by law for negligence."  (citation omitted)  The contractual liability exclusion limits Coverage A to bodily injury or property damage liability "which the law imposes upon all insured alike."  (citation omitted)

See *also*:  *Federated Mutual Insurance Company v. Grapevine Excavations, Inc.*, 197 F.3d 720, 726 (2000) regarding interpretation of the contractual liability exclusion (This exclusion operates to deny coverage when the insured assumes responsibility for the conduct of a third party.)

Clearly exclusion V(a) does not apply to defeat coverage.

VIII.    **OKP'S CONDUCT NOT INTENTIONAL CONDUCT**

At paragraph 36 of the Complaint Dongbu alleges:

The intentional conduct alleged may further be outside the scope of insurable risks pursuant to the Commonwealth Insurance Code and public policy, which provides that willful acts and illegal conduct are not insurable.  4 CMC §7505(b)

Dongbu makes the same allegation with reference to the CAR Policy at paragraph 44 of its Complaint.

Initially it is noted that neither the Auto Policy or the CAR Policy contain any intentional acts exclusion provision for property damage liability.  Typically an intentional acts exclusion would be worded to exclude from coverage "an event or series of events, including continuous or repeated exposure to conditions, which results in personal injury or property damage <u>neither expected nor intended from the standpoint of the insured</u>.  There is no language in either of the Dongbu policies similar to the foregoing.  Whether or not the acts of OKP complained of were intentional acts or not makes no difference.  The standard for determining whether or not conduct constitutes an intentional act is set forth in *Holmes' Appleman on Insurance 2d*, Vol. 20 §129.2(5) (page 119-120):

1
2
3

> The criteria for deciding whether the insured intended or expected
> to cause bodily injury is not merely whether an intentional act
> occurred; but rather what consequences an objective, reasonable
> person might expect or intend to result from the deliberate act.

4   The allegations of the Plaintiff's Complaint(s) do not allege intentional acts.  Further,

5   notwithstanding the language of the Complaint(s), there is no intentional acts exclusion in the

6   policies.

7         Dongbu's reliance on 4 CMC §7505(b) to disclaim coverage in its entirety is misplaced.

8   The statute goes to the issue of indemnification if OKP's conduct is determined to be willful, it

9   does not go to duty to defend.  As previously noted, duty to defend and duty to indemnify are

10  separate obligations and even if conduct were found to be willful in the context of 4 CMC

11  §7505(b), that does not relieve Dongbu of its duty to defend.

12  ## IX.    **PUNITIVE DAMAGES**

13
14        OKP acknowledges that punitive damages are excluded under the CAR Policy.  There is

15  no punitive damage exclusion in the Auto Policy.

16  ## X.    **CONCLUSION**

17        Based on the statements and authorities contained in the Memorandum of Points and

18  Authorities, OKP (CNMI) Corporation moves the Court for an order determining there are no

19  genuine issues of material fact regarding Dongbu's duty to defend the *Atalig v. OKP* lawsuit in

20  the CNMI Superior Court and finding as a matter of law that Dongbu Insurance Company, Ltd.

21  has a duty to defend OKP (CNMI) Corporation in Commonwealth Superior Court Civil Action

22  No. 06-0119R.  Additionally, OKP requests that upon determination of the duty to defend that a

23  separate proceeding be held to determine the amount that Dongbu should be required to pay to

24  OKP for attorney fees and costs incurred by OKP as a consequence of Dongbu's failure to defend

25  the underlying *Atalig v. OKP* lawsuit.

26
27
28

1

2

3    DATED: Saipan, MP, May 22, 2008.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CARLSMITH BALL LLP

JOHN D. OSBORN
SEAN E. FRINK
Attorneys for Defendant and Counterclaimant
OKP (CNMI) Corporation