# Exhibit 9

Ramon K. Quichocho, Esq.
LAW OFFICES OF RAMON K. QUICHOCHO, LLC
2nd Floor, V.S. Sablan Building, Chalan Piao
P.O. Box 505621
Saipan, MP 96950
Tel. No.: 670.234.8946
Fax: 670.234.8920
Email: rayq@vzpacifica.net

*Attorney for Plaintiff Joaquin Q. Atalig*



E-FILED
CNMI SUPERIOR COURT
E-filed: Jul 31 2006 12:40PM
Clerk Review: Jul 31 2006 2:52PM
Filing ID: 11929652
Case Number: 06-0119-CV
Elsa  Duenas

# IN THE SUPERIOR COURT
## OF THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| JOAQUIN Q. ATALIG, ) | CIVIL ACTION NO. 06-0119(R) |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| OKP (CNMI) CORPORATION, OKP ) | **VERIFIED FIRST** |
| HOLDINGS LIMITED, a foreign corporation, ) | **AMENDED COMPLAINT** |
| KIM PEOW OR, TOH WAT OR, ERIC NAM ) | **FOR BREACH OF** |
| OH, HE KHENG SOH, BRIAN M. CHEN, ) | **CONTRACT** |
| PRASADA REDDY GOLUGURI, PRAMUAN ) | **AND TORT** |
| JAIPHAKDEE, WILAI PROMCHAI, ) | **CLAIMS AND** |
| COMMONWEALTH PORTS AUTHORITY, ) | **FOR RELIEF UNDER** |
| AND REGINO M. CELIS, in his capacity as ) | **THE OPEN GOVERNMENT** |
| Acting Executive Director of the ) | **MEETINGS AND RECORDS ACT** |
| Commonwealth Ports Authority, AND ) | **AND DEMAND FOR JURY TRIAL** |
| DOES 1-3, ) | |
| **Defendants.** ) | |

COMES NOW Plaintiff Joaquin Q. Atalig, by and through his counsel, Ramon K.

Quichocho, Esq., and for his Verified First Amended Complaint for Breach of Contract and Tort

Claims and for Relief Under the Open Government Meetings and Records Act and Demand for Jury

Trial (the "Amended Complaint") against Defendants OKP (CNMI) Corporation, OKP Holdings

Limited, Kim Peow Or, Toh Wat Or, Eric Nam Oh, He Kheng Soh, Brian M. Chen, Prasada Reddy

Goluguri, Pramuan Jaiphakdee, Wilai Promchai, the Commonwealth Ports Authority, and Regino M.

Celis, and Does 1-3, alleges as follows:

# I.
## INTRODUCTION

1.   This landmark case is about Defendants' destruction and desecration of several priceless and original Latte Stones, an ancient Chamorro grinding stone[1] other cultural and historical artifacts, and other things of value, in violation of the Lease Agreement, and in violation of the laws of the Commonwealth of the Northern Mariana Islands, despite being forewarned at least twice not to damage or destroy cultural and historical artifacts.

2.   More than 300 years ago, the early Chamorros painstakingly carved out and created the Latte Stone.  As a result, the Commonwealth of the Northern Mariana Islands, and the beautiful island of Rota in particular, is the Latte Stone capitol of the world.

3.   The Latte Stone is such an original art, symbol, and structure, that even with the advantage of modern technology, the modern Chamorros have not carved out a "modern" Latte Stone that even comes close to the original Latte Stones that are present throughout the Mariana Islands.

4.   Today, the Latte Stone is so sacred that it has become a living symbol of Chamorro strength, peace, solidarity, pride, respect, dignity, identity, and justice.

5.   In fact, on March 24, 2006, the CNMI's Miss Marianas Teen 2006 stated it succinctly when she elegantly declared that the Latte Stone "represents the foundation in which our community was built upon, ...."[2]

---

[1] Mortar and pestal.

[2] This quote is from Miss Marianas Teen 2006, Miss Myana T. Welch.  Miss Welch won the Miss Marianas Teen 2006 title and "got the loudest cheer when she responded to the following question: 'What single gift will you offer to the emperor and empress of Japan that will reflect the Marianas?' Welch replied:  'I would give them a replica of our latte stone made of limestone, the exact limestone that was used by our ancestors.  It represents the foundation on which our community was built upon, and giving this to them speaks more than a thousand words about the Marianas.'"

6.   The Latte Stone has become a permanent and official image of our CNMI flag, crowned with a beautiful mwar which signifies the highest respect and dignity, and untirelessly waving a friendly "Hafa Adai."

7.   The Latte Stone has been used in numerous business logos, in official government and corporate seals, in construction designs, in storybooks, and in many other aspects of life in the CNMI.

8.   The Latte Stone, however, has also been a bad experience for a few people who have intentionally or unintentionally disrespected and desecrated the sanctity of the place where a Latte Stone sits, causing some to suffer sicknesses that even modern science cannot cure, and in which the only cure is to "ask for forgiveness."

9.   Surely, the Latte Stone represents the Chamorro culture, tradition, and beliefs.

10. As of December 2005, several original Latte Stones lay on what is now the real property of Plaintiff Atalig, in Ginalangan, Rota, Lot No. 362 R 01 (sometimes referred to as "Plaintiff Atalig's land").

11.  But, in late December 2005, Defendant OKP wiped away a lot of the history, culture, value, and economic advantage that was on Plaintiff Atalig's land in Ginalangan, Rota, when Defendant OKP used heavy equipment to clear Plaintiff Atalig's land, to wit, Latte Stone clusters, ancient Chamorro grinding stone, and Japanese structures and other artifacts, without the required permits from the Historic Preservation Office, the Division of Environmental Quality, and other regulatory agencies, and definitely, without the prior written consent of Plaintiff Atalig.  The destruction, desecration, and obliteration of the cultural and historical artifacts and other things of value took less than two months into the Lease term.

12. Historically, the Spanish came and ruled the Chamorros, but the Spanish did not destroy the Latte Stone clusters.  They preserved and respected them.

13. Then, the Germans took over the Mariana Islands from Spain, but the Germans did not destroy the Latte Stone clusters.  They, too, preserved and respected them.

14. After the Germans, the Japanese took control of the Mariana Islands until the end of World War II in 1945, but the Japanese did not destroy the Latte Stone clusters.  Not only did they preserve them, the Japanese erected more structures that have become historical artifacts.

15. As a result of the Japanese occupation, the Japanese built other structures on Plaintiff Atalig's land, which leads to the Ginalangan Defensive Complex.

16. After World War II, the United Nations and the Unites States took over until the Mariana Islands voted to be in political union with the United States, but the United Nations and the United States did not destroy the Latte Stone clusters or the Japanese structures.  They, too, preserved and respected them.

17. For many decades, the Latte Stone clusters, the ancient Chamorro grinding stone, and certain Japanese structures, including but not limited to, a Japanese water tank, washing basin and frame, sat serenely on Plaintiff Atalig's land in Rota, under the watch of Plaintiff Atalig, who, in accordance with family tradition, was supposed to pass the "family treasure" to his children, who will then pass them on to their children, and their children's children.  But now, it is IMPOSSIBLE to do that!

18. For many years, Plaintiff Atalig has held on to the Constitutional guarantee that, "[p]laces of importance to the culture, traditions and history of the people of the Northern Mariana Islands shall be protected and preserved…" and that "[a]rtifacts and other things of cultural or historical significance shall be protected, preserved and maintained in the Commonwealth…."  N.M.I. Const.

art. XIV, § 3.  Short of litigation, however, that Constitutional guarantee is only as good as the enforcement resolve of the Historic Preservation Office and others with the enforcement powers.

19. In the CNMI, it is the Historic Preservation Office that must "issue or deny permits, after review by the Review Board, for use, access, and development of land containing cultural and historic properties, and for the taking of any artifact of historic or cultural significance from the Commonwealth for cultural exchange, scientific identification, or donation to a nonprofit organization recognized on the basis of its cultural significance to the Commonwealth[.]"  1 CMC § 2382(g).

20. Therefore, "[i]t is unlawful for any person, partnership, business, corporation or other entity to willfully remove or take any artifact that is of historic or cultural significance to the people of the Commonwealth, or knowingly destroy, remove, disturb, displace, or disfigure any cultural or historic property on public or private land or in the water surrounding the Commonwealth as designated by or eligible for designation by the Historic Preservation Office as a cultural or historic property, unless the activity is pursuant to a permit issued under 1 CMC § 2382(g) and 2 CMC § 4831."  2 CMC § 4841.

21. As such, "[a]ny person who, individually or acting for any business, corporation or other entity, knowingly and willfully violates any provision of this chapter or any valid rule or regulation promulgated under this chapter shall be fined not more than $10,000 per day or imprisoned not more than one year, or both."  2 CMC § 4842.

22. Unfortunately, some of the cultural and historical artifacts that once enjoyed the serenity on Plaintiff Atalig's land were unlawfully damaged, destroyed, and mutilated by Defendants, and are LOST AND GONE FOREVER.

23. Sadly, if only Defendant OKP followed the terms and provisions of the Lease Agreement, if only Defendant OKP obeyed the laws of the CNMI, if only Defendant OKP listened to warnings not to clear the areas where the cultural and historical artifacts lay, if only Defendant OKP had a little respect for the culture, heritage, race, and history of the Chamorro people, Defendant OKP could have avoided the despicable and disgraceful destruction and desecration of the priceless artifacts that were once part of who we are as CNMI citizens and as Chamorros.

**II.**
**JURISDICTION AND VENUE**

24. This Court has jurisdiction over this matter pursuant to N.M.I. Const. art. IV, § 2, and 1 CMC § 3202, as well as the Open Government Meetings and Records Act, which is codified at 1 CMC § 9901, *et seq.*, as amended.

25. Venue is proper in the Superior Court of the Commonwealth of the Northern Mariana Islands, in Luta.

**III.**
**PARTIES**

26. Plaintiff Joaquin Q. Atalig is a United States citizen and is residing in the Commonwealth of the Northern Mariana Islands.

27. Defendant OKP (CNMI) Corporation ("OKP") is a domestic corporation organized and existing under the laws of the Commonwealth of the Northern Mariana Islands, with its principal places of business located in Saipan and/or Rota, Commonwealth of the Northern Mariana Islands. Defendant OKP was only incorporated on May 3, 2005.  Defendant OKP is grossly undercapitalized for the project that Defendant OKP contracted with Defendant CPA, since Defendant OKP only has 100,003 shares at one dollar per share, and $25,003 paid-in shares.

28. Defendant OKP was awarded an $8,677,000.00 contract by the Commonwealth Ports Authority to improve the Rota Airport runway.  As part of that operation, Defendant OKP leased Plaintiff Atalig's improvements in November 2005.  Due to the magnitude of Defendant OKP's project in Rota, Defendant OKP knew that governmental permits are required before any land clearing activities are conducted.

29. On information and belief, Defendant OKP Holdings Limited ("OKP Singapore") is a foreign corporation organized and existing under the laws of Singapore, with its principal place of business located at No. 6 Tagore Drive #B1-06, Tagore Industrial Building, in Singapore.  Defendant OKP Singapore owns 96,000 shares of Defendant OKP's stocks.  At all relevant times, Defendant OKP is the alter ego of Defendant OKP Singapore.  Defendant OKP Singapore was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.

30. On information and belief, Defendant Kim Peow Or is a citizen of Singapore.  Defendant Kim Peow Or owns 1 share of Defendant OKP's stocks.  At all relevant times, Defendant OKP is the alter ego of Defendant Kim Peow Or.  Defendant Kim Peow Or was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.

31. On information and belief, Defendant Toh Wat Or is a citizen of Singapore.  Defendant Toh Wat Or owns 1 share of Defendant OKP's stocks.  At all relevant times, Defendant OKP is the alter ego of Defendant Toh Wat Or.  Defendant Toh Wat Or was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.

32. On information and belief, Defendant Eric Nam Oh is a citizen of Singapore.  Defendant Eric Nam Oh owns 1 share of Defendant OKP's stocks.  At all relevant times, Defendant OKP is the alter ego of Defendant Eric Nam Oh.  Defendant Eric Nam Oh was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.

33. On information and belief, Defendant He Kheng Soh is a citizen of Singapore.  Defendant He Kheng Soh owns 2,000 shares of Defendant OKP's stocks.  At all relevant times, Defendant OKP is the alter ego of Defendant He Kheng Soh.  Defendant He Kheng Soh was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.

34. On information and belief, Defendant Brian M. Chen is a U.S. citizen.  Defendant Brian M. Chen owns 2,000 shares of Defendant OKP's stocks.  At all relevant times, Defendant OKP is the alter ego of Defendant Brian M. Chen.  Defendant Brian M. Chen was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.  On information and belief, Defendant Brian M. Chen is the brother of Endymion M. Chen of E.M. Chen & Associates (CNMI), Inc., who is the Project Designer for the Rota Project.[3]

35. On information and belief, Defendant Prasada Reddy Goluguri is a citizen of Singapore.  Defendant Goluguri is a non-resident worker employed by Defendant OKP as a "Project Engineer" for the CPA Project, yet he is not licensed to practice any branch of engineering in the CNMI.

---

[3] Although there is reason to belief that Defendant OKP had the benefit of an insider through the relationship of Defendant Brian M. Chen, who is a part owner of Defendant OKP, and E.M. Chen & Associates (CNMI), Inc., who is Defendant CPA's Project Designer for the Rota CPA Project, Plaintiff Atalig is still investigating this issue, but due to the unjustified and unlawful denial of access to public documents at CPA, it is hard to ascertain this fact without the Court's assistance to order Defendant CPA to provide access to public records.

Defendant Goluguri was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. Furthermore, Defendant Goluguri aided or abetted, or participated with the other defendants and/or others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and is responsible for the acts, occurrences and events alleged in this Amended Complaint.

36. On information and belief, Defendant Pramuan Jaiphakdee is a citizen of Singapore. Defendant Jaiphakdee is a non-resident worker employed by Defendant OKP as a Heavy Equipment Operator for the CPA Project. Defendant Jaiphakdee was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. Furthermore, Defendant Jaiphakdee aided or abetted, or participated with the other defendants and/or others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and is responsible for the acts, occurrences and events alleged in this Amended Complaint.

37. On information and belief, Defendant Wilai Promchai is a citizen of Singapore. Defendant Promchai is a non-resident worker employed by Defendant OKP as a Heavy Equipment Operator for the CPA Project. Defendant Promchai was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. Furthermore, Defendant Promchai aided or abetted, or participated with the other defendants and/or others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and is responsible for the acts, occurrences and events alleged in this Amended Complaint.

38. Defendant Commonwealth Ports Authority ("CPA") is a public corporation and a CNMI Government autonomous and self-sustaining agency created under 2 CMC § 2101, *et seq*., whose

principal office is located in Saipan, Commonwealth of the Northern Mariana Islands. Under the Grant Agreement, Defendant CPA is the Sponsor and is responsible to carry out and complete the Project without undue delays and in accordance with the terms of the Grant Agreement. Under the Construction Agreement, however, Defendant CPA delegated all its responsibilities to Defendant OKP, thus, creating an agency relationship with Defendant OKP. Defendant CPA is the principal and Defendant OKP is the agent.

39. Defendant Regino M. Celis is a U.S. citizen and a resident of the CNMI and, on information and belief, is currently the Acting Executive Director for CPA. Defendant Celis is named as a Defendant in this lawsuit for purposes of the Open Government Meetings and Records Act violation only.

40. Except as described herein, the true names of the defendants sued as Does 1 through 3, inclusive, are unascertained to Plaintiff Atalig which therefore sues these defendants by such fictitious names. Plaintiff Atalig will further amend this Amended Complaint to allege their true names and capacities when ascertained. These fictitiously named defendants were involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. These defendants aided or abetted, or participated with the other defendants and others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and are responsible for the acts, occurrences and events alleged in this Amended Complaint.

41. Except Defendant Celis, the named and Doe defendants in this action are sometimes collectively referred to herein as "Defendants."

# IV.
## OPERATIVE FACTS

42. On or about May 4, 2005, Defendant CPA submitted to the Department of Transportation —Federal Aviation Administration ("FAA") an application for a grant of Federal funds for a project associated with the Rota International Airport Runway 09/27 Extension – Phase I (the "Project").

43. On August 24, 2005, the FAA offered and agreed to pay, as the United States share of the allowable costs incurred in accomplishing the Project, ninety-five per centum (95%) thereof.  A true and correct copy of the Grant Agreement is attached hereto, labeled "Exhibit A," and incorporated herein by this reference as if set forth in full.

44. On August 30, 2005, Defendant CPA accepted the FAA's offer and agreed, among other things, to "carry out and complete the Project without undue delays and in accordance with the terms [of the Grant Agreement], and such regulations and procedures as the Secretary shall prescribe," and agreed to comply with the assurances which were made part of the Project application.

45. As a result, Defendant CPA conducted a bid for the Project and ultimately selected Defendant OKP over other bidders.  But, since Defendant OKP was newly incorporated and undercapitalized, Defendant CPA was concerned with the financial capabilities of Defendant OKP.

46. On September 30, 2005, Defendant OKP wrote a letter to Defendant CPA explaining, among other things, that the "Project will be funded from Singapore."  A true and correct copy of the September 30, 2005 letter from Defendant OKP is attached hereto, labeled "Exhibit B," and incorporated herein by this reference as if set forth in full.

47. On October 19, 2005, Defendant OKP Singapore wrote an electronic mail to Defendant CPA emphasizing that Defendant OKP Singapore "has given a strong mandate and commitment to Defendant OKP the fullest assistance for this Rota project."  A true and correct copy of the October

19, 2005 electronic mail from Defendant OKP Singapore is attached hereto, labeled "Exhibit C," and incorporated herein by this reference as if set forth in full.

48. On October 24, 2005, Defendant OKP Singapore wrote a letter to Defendant CPA to inform Defendant CPA that Defendant OKP Singapore will handle and finance the preparation and purchasing of all machinery and equipment and to give Defendant CPA assurance that Defendant OKP Singapore is financially capable of carrying out the Project.  A true and correct copy of the October 24, 2005 letter from Defendant OKP Singapore is attached hereto, labeled "Exhibit D," and incorporated herein by this reference as if set forth in full.

49. Consequently, on October 28, 2005, Defendants CPA and OKP entered into a Construction Contract for Rota International Airport Runway 09/27 Extension—Phase I, Project No. CPA-RA-001-03.  A true and correct copy of the Construction Contract is attached hereto, labeled "Exhibit E," and incorporated herein by this reference as if set forth in full.

50. Defendants CPA and OKP agreed that the Construction Contract and any interest therein shall not be assigned or transferred by Defendant OKP; provided that Defendant OKP with the express prior written approval of Defendant CPA, may secure subcontractors and suppliers that are necessary to carry out the work on the Project; and provided further that Defendant OKP "shall remain fully responsible and accountable at all times for the Project and for complying with the terms and conditions of [the Construction] Contract."  Emphasis added.

51. In preparation for the Project, Defendant OKP negotiated with Plaintiff Atalig to lease Plaintiff Atalig's improvements for Defendant OKP's office, employees' barracks, etc., in Ginalangan, Rota.

52. On November 2, 2005, Plaintiff Atalig and Defendant OKP executed a Lease Agreement (the "Lease"), which was filed at the Commonwealth Recorder's Office, as File No. 05-3030, on

November 3, 2005.  Under the Lease, Plaintiff Atalig is the Lessor, and Defendant OKP is the

Lessee.  A true and correct copy of the Lease is attached hereto, labeled "Exhibit F," and

incorporated herein by this reference as if set forth in full.

53. Plaintiff Atalig leased unto Defendant OKP, and Defendant OKP leased from Plaintiff

Atalig, "the <u>improvements</u> described in Section 1" of the Lease.  Emphasis added.

54. Pursuant to Section 1 of the Lease, the leased premises "consist of all <u>improvements</u>

situated on the real property in Northern Part (Area No. 4) Ginalangan, Municipality of Rota,

Commonwealth of the Northern Mariana Islands,…, <u>together with the right to use Lessor's</u>

<u>easements and appurtenances in adjoining and adjacent land, highways, roads, streets, lanes</u>, whether

public or private, reasonably required for the installation, maintenance, operation and service of

sewer, water, gas, power and other utility lines and for driveways and approaches to and from

abutting highways or streets for the use and benefit of the above-described improvements and the

parcel of real property described below."  Emphases added.

55.  Defendant OKP also has the right to use the real property, described below, where the

leased improvements are situated:

> Lot No. 362 R 01, containing an area of 49,998 square meters, more or less, as more
> particularly described in Cadastral Plat No. 362 R 00, the original of which was
> registered with the Land Registry as Document No. 6503, on September 12, 1978.

56. The existing improvements and improvements subsequently erected on Lot 362 R 01

during the term of the Lease are collectively referred to in the Lease as the "Premises."  See Section

1 of the Lease.

57. Furthermore, Defendant OKP agreed to lease the furniture, fixtures, appliances, and tools,

which were all itemized in the List of Inventory which was supposed to be verified and approved by

both parties on or before November 30, 2005.  Unfortunately, Defendant OKP reneged and Plaintiff

Atalig incurred additional storage and other costs for many of the items that Defendant OKP and its representatives refused to accept.

58. The Lease was for a term of thirteen (13) months, commencing on December 1, 2005, and ending on December 31, 2006, unless sooner terminated, with Lessee's option to extend for a period of one year at the monthly rent of $3,000.00.  See Sections 2 and 5 of the Lease.

59. Pursuant to Section 3 of the Lease, Defendant OKP agreed to pay the full-time salaries of Edita (Ms. Ludivina P. Carillo) and Esther (Ms. Ester M. Langit), at $4.50 per hour and $3.50 per hour, respectively.  On information and belief, Defendant OKP broke its promise.

60. Pursuant to Section 6 of the Lease, Defendant OKP may use, improve and develop the Premises or any part thereof for any lawful use or purpose, provided that Defendant OKP does not commit waste, but primarily as office, barracks, equipment repair shop and workstation, heavy and lightweight equipment parking and storage, and as staging area related to Defendant OKP's business and operation on Rota.  Emphases added.

61. Pursuant to Section 13.1 of the Lease, Defendant OKP "shall have the right during the term of this Lease, to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvement on the Premise[s], and correct and change the contour of the Premises pursuant to the plans and drawings attached [to the Lease] as Exhibits "A" and "B", …only with the prior written consent of Lessor."  Emphasis added.

62. Plaintiff Atalig never gave a written consent and Defendant OKP never asked for a written consent to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvement on the Premises, and correct and change the contour of the Premises pursuant to the plans and drawings attached [to the Lease] as Exhibits "A" and "B."

63. Furthermore, Section 13.1 of the Lease expressly states that "*[a]ny* other alterations and changes require Lessor's consent in writing."

64. Plaintiff Atalig never gave a written consent and Defendant OKP never asked for a written consent to make any other alterations and changes.

65. In or about December 2005 and/or January 2006, despite being warned not to clear the areas where the cultural and historical artifacts lay, Defendants used heavy equipment to clear the land, without the proper permits from the Government and without permission from Plaintiff Atalig, in order to erect other structures for the use and benefit of Defendant OKP.

66. Similarly, in or about December 2005 and/or January 2006, despite not having a written consent from Plaintiff Atalig, Defendants tore down the kitchen, laundry, and storage facilities, and used the materials therefrom to build a *palapala*.  In the process, Defendants damaged and destroyed the homemade cooking stove, *ifik* posts, and other valuable items that were stored.

67. Similarly, in or about December 2005 and/or January 2006, despite not having a written consent from Plaintiff Atalig, Defendants bull-dozed down valuable trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants.

68. Similarly, in or about December 2005 and/or January 2006, despite not having a written consent from Plaintiff Atalig or an earthmoving permit from the Division of Environmental Quality, Defendants removed soil and other rocks and minerals, including excavating Plaintiff Atalig's land, for Defendant OKP's parking lot.

69. Defendant OKP did not obtain and pay for a permit before clearing the land despite agreeing to "be responsible for the payment of all utilities, assessments, and other public charges arising by reason of the occupancy, use or possession of the Premises."  See Section 11 of the Lease.

70. Pursuant to Section 15 of the Lease, Defendant OKP "shall be in default in the prompt and full performance of any other term, covenant, or condition of the Lease, (except as to payment of rent), if such default shall continue for a period of thirty (30) days after notice of such default is given by the Lessor to Lessee, unless the default is of such a nature that the same cannot be cured or corrected within said thirty (30) day period and the Lessee shall have promptly and diligently commenced to cure and correct such default and shall have thereafter continued therewith with reasonable diligence and in good faith, in a manner as to cure and correct the same as promptly and as reasonably practicable under the circumstances, and shall have continued therewith until the default shall have been cured or corrected."

71. On January 17, 2006, Plaintiff Atalig sent a Notice of Default and Violations to Defendant OKP.  A true and correct copy of the January 17, 2006 Notice of Default and Violations is attached hereto, labeled "Exhibit G," and incorporated herein by this reference as if set forth in full.

72. Defendant OKP is unable and unwilling to cure the default and violations.

## V.
## PRINCIPAL-AGENT LIABILITY
### (Piercing the Corporate Veil of Defendant OKP)

73. Defendant OKP's corporate form should be disregarded because:

a.  Defendant OKP was organized and operated as a mere tool or business conduit of Defendants OKP Singapore, Kim Peow Or, Toh Wat Or, Eric Nam Oh, He Kheng Soh, and Brian M. Chen (collectively, the "Defendant Shareholders").  Defendant OKP is the alter ego of Defendant Shareholders.

b.  Defendant OKP was incorporated to circumvent the procurement statute and regulations.

c.  Defendant OKP was inadequately capitalized so as to work an injustice.

74. The Defendant Shareholders has some financial interest, ownership, or control over Defendant OKP.

75. There is such a unity between Defendant OKP and Defendant Shareholders that the separateness of Defendant OKP has ceased.

76. Holding only Defendant OKP liable would result in injustice.

77. Defendant OKP did not have enough capital for the type of business and project it was conducting.

## VI.
## FIRST CAUSE OF ACTION
### (Breach of Contract)

78. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

79. The Lease was a valid contract supported by bargained for consideration.

80. Plaintiff Atalig has performed all the conditions and agreements required of Plaintiff Atalig under the terms of the Lease.

81. Defendant OKP, including its agents, representatives, shareholders, principals, and employees, had a duty to act with reasonable care and diligence in performing the Lease so as not to injure a person or property by its performance.

82. Defendants breached the Lease with Plaintiff Atalig, to the detriment of Plaintiff Atalig, in the following respects:

a.   Defendant OKP reneged on the promise to lease furniture, fixtures, appliances, and tools, which forced Plaintiff Atalig to incur storage costs for the furniture, fixtures, appliances, and tools that were not leased by Defendant OKP, in violation of Section 1 of the Lease.

b.  Defendant OKP has failed to pay the full-time salaries of Ms. Carillo and Ms. Langit at the rate of $4.50 per hour and $3.50 per hour, respectively, as agreed, in violation of Section 3 of the Lease;

c.  Defendants have illegally hunted for deer and fruitbat on Plaintiff Atalig's land in violation of Section 6 of the Lease and in violation of the laws of the CNMI;

d.  On information and belief, Defendants have stolen rocks and other materials from the Ginalangan Defensive Complex in their attempt to cover up the damage and destruction to the historical Japanese water tank.  The stolen rocks are laid and stacked up on the Japanese water tank, which Defendant OKP has re-plastered to pretend that there is no damage.  As a result, Defendant OKP violated Section 3 of the Lease, and the laws of the CNMI;

e.  Defendants have committed waste by unlawfully damaging, destroying, and/or mutilating historical artifacts, structures, and other valuable relics, including but not limited to, Latte Stone clusters, ancient Chamorro grinding stone, Japanese structures, water tank, washing basin and frame, and areas surrounding Japanese building(s), in violation of Sections 1 and 6 of the Lease and in violation of CNMI laws and regulations;

f.  Defendants have committed waste by damaging, destroying, and/or mutilating permanent trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, lemon trees, atis trees, and other plants, in violation of Sections 1 and 6 of the Lease;

g.  Defendants have committed waste by damaging, destroying, and/or mutilating preexisting buildings/improvements to the land, including but not limited to, laundry,

storage, and kitchen facilities, and the stored contents therein, in violation of Sections 1 and 6 of the Lease;

h.   Defendants have committed waste by placing a fuel tank station on Plaintiff's property without the proper permits, in violation of Section 6 of the Lease;

i.   Defendants have committed waste by moving and/or removing soil and other minerals without the proper permits or authorization, in violation of Sections 1 and 6 of the Lease and in violation of CNMI laws and regulations;

j.   Defendants failed to obtain Plaintiff Atalig's written consent to erect, maintain, alter, remodel, reconstruct, rebuild, replace and remove building and other improvement on the Premises, and correct and change the contour of the Premises, in violation of Section 13.1 of the Lease.

83. Notwithstanding demand and/or notice to cure the violations, Defendants have failed, neglected, and refused, and still fail, neglect, and refuse to cure the violations and default.

84. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, property damages and loss of prospective economic advantages, and have been damaged in the amount of $11,000,000.00, or more, to be proven at trial.

85. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $5,000,000.00, or more, to be proven at trial.

86. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

# VII.
## SECOND CAUSE OF ACTION
### (Waste)

87. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

88. At all relevant times, Plaintiff Atalig was the fee simple owner of Lot No. 362 R 01, on which are present priceless cultural and historical artifacts and other things of value.

89. Defendant OKP leased the underlined improvements situated on Lot No. 362 R 01, and occupied Lot No. 362 R 01 since the commencement of the term of the Lease.

90. During the period of such occupation, Defendants greatly injured the improvements and the land, as follows:

a. By unlawfully damaging and/or destroying historical artifacts, structures and other valuable relics, including but not limited to, Latte Stone clusters, ancient Chamorro grinding stone, Japanese structures, water tank, washing basin and frame, and areas surrounding Japanese building(s), and removing them from Plaintiff Atalig's land;

b. By damaging, destroying and/or cutting permanent trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, lemon trees, atis trees, and other plants, and removing them from Plaintiff Atalig's land;

c. By damaging and/or destroying preexisting buildings/improvements to the land, including but not limited to, the laundry, storage, and kitchen facilities, and leaving the stored items exposed;

d. By placing a hazardous fuel tank on Plaintiff Atalig's land without the proper and necessary safety requirements in place; and

e.   By quarrying, moving, removing, and digging soil and other minerals (about 40' x 50'x

8' hole in the ground and lined by concrete, including other excavations), and removing

them from Plaintiff Atalig's property.

91. Defendant OKP did not obtain the necessary permits from the Division of Environmental

Quality and the Historic Preservation Office before conducting its wasteful and unlawful activities.

92. Although required under the Lease, Defendant OKP failed to obtain the prior written

permission of Plaintiff Atalig before conducting its wasteful and unlawful activities.

93. As a direct and proximate result of Defendants' conduct detailed above and in other

respects, Plaintiff Atalig has suffered damages, including, but not limited to, diminution in property

values and loss of prospective economic advantages, and has been damaged in the amount of

$11,000,000.00, or more, to be proven at trial.

94. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants'

conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of

Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $5,000,000.00, or more,

to be proven at trial.

95. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## VIII.
## THIRD CAUSE OF ACTION
### (Conversion—Historical and Cultural Artifacts)

96. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth

under this cause of action, all the allegations contained in this Amended Complaint.

97. At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01, on

which are present cultural and historical artifacts.

98. Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of historical and cultural artifacts, to wit, Latte Stones, ancient Chamorro grinding stone, Japanese structures, Japanese washing basin and frame, and Japanese water tank, located on Plaintiff Atalig's land, and converted them to Defendants' own use.

99. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including but not limited to, property damages, diminution in property values, and loss of prospective economic advantages, and has been damaged in the amount of $11,000,000, or more, to be proven at trial.

100. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $5,000,000.00, or more, to be proven at trial.

101. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

**IX.**
**FOURTH CAUSE OF ACTION**
**(Conversion—Soil and Other Minerals)**

102. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

103. At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01, on which are present fertile top soil and minerals.

104. Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of soil and other minerals located on Plaintiff Atalig's land, and converted them to Defendants' own use.

105.     As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, property damages and loss of prospective economic advantages, and has been damaged in the amount of $500,000.00, or more, to be proven at trial.

106.     Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $250,000.00, or more, to be proven at trial.

107.     Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## X.
### FIFTH CAUSE OF ACTION
### (Conversion—Permanent Trees)

108.     Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

109.     At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01, on which are present valuable permanent trees.

110.     Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of permanent trees, to wit, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, lemon trees, atis trees, shrubs, manicured flowers, and other plants, located on Plaintiff Atalig's land, and converted them to Defendants' own use.

111.     As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, property damages and loss of prospective economic advantages, and has been damaged in the amount of $500,000.00, or more, to be proven at trial.

112.     Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $250,000.00, or more, to be proven at trial.

113.     Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XI.
## SIXTH CAUSE OF ACTION
### (Conversion—Preexisting Buildings/Improvements)

114.     Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

115.     At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01 on which are present preexisting buildings and improvements.

116.     Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of preexisting buildings/improvements, to wit, laundry, storage, and kitchen facilities, including the stored items, located on Plaintiff Atalig's land, and converted them to Defendants' own use.

117.     As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, property damages and loss of prospective economic advantages, and has been damaged in the amount of $500,000.00, or more, to be proven at trial.

118.     Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $250,000.00, or more, to be proven at trial.

119.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XII.
## SEVENTH CAUSE OF ACTION
### (Negligence)

120.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

121.    Defendant OKP had the duty not to commit waste on Plaintiff Atalig's land and to obtain the prior written consent of Plaintiff Atalig before any alterations or changes are done on the leased improvements and the real property.

122.    Defendant OKP breached its duty to Plaintiff Atalig when it violated the laws of the CNMI by damaging and destroying cultural and historical artifacts and other things of value, and when Defendant OKP failed to obtain the prior written consent of Plaintiff Atalig to damage, remove, alter or change the improvements, the real property, and other things of value.

123.    As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, property damages and loss of prospective economic advantages, and has been damaged in the amount of $2,000,000, or more, to be proven at trial.

124.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XIII.
## EIGHTH CAUSE OF ACTION
### (Negligent Entrustment)

125.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

126.    At all relevant times, Defendant OKP is the owner, or else had the complete control, custody, and care, of the heavy equipment and/or motor vehicles, e.g., excavator, bulldozer, motor grader, compactor roller, and dump truck, that were used to damage and destroy the cultural and historical artifacts, permanent trees, soil and minerals, preexisting building, and other things of value on Plaintiff Atalig's land.  A true and correct copy of the Contractor's All Risk Policy is attached hereto, labeled "Exhibit H," and incorporated herein by this reference as if set forth in full.  Exhibit H is attached and incorporated herein for the purpose of proving agency, ownership, control, or, bias or prejudice of a witness, or suing Dongbu Insurance Co., Ltd., if the requirements of 4 CMC § 7101(e) are met.

127.    Defendants Pramuan Jaiphakdee and Wilai Promchai, at the times Plaintiff Atalig's properties were damaged and destroyed, were driving Defendant OKP's heavy equipment and motor vehicles as mentioned above, with the permission and for the benefit of Defendant OKP, during the course and scope of Defendants Jaiphakdee and Promchai's employment.

128.    At the time of the incidents underlying this Amended Complaint, Defendants Jaiphakdee and Promchai were incompetent and reckless drivers, in that Defendants Jaiphakdee and Promchai knew or should have known that the areas where the cultural and historical artifacts lay must not be disturbed, yet they went ahead and damaged and destroyed the clearly visible Latte Stones, Japanese water tank, and other structures and things of value, without inspecting the areas that they illegally cleared.

129.    Defendant OKP acted negligently in entrusting its heavy equipment and motor vehicles to Defendants Jaiphakdee and Promchai, in that Defendant OKP knew or should have known that Defendants Jaiphakdee and Promchai are ignorant of the laws of the CNMI, and would therefore, drive Defendant OKP's vehicles in an incompetent and reckless manner.

130.    As a direct and proximate result of the negligence of Defendant OKP in entrusting the motor vehicles to Defendants Jaiphakdee and Promchai, Plaintiff Atalig suffered damages, including but not limited to, emotional distress, fear, anguish, sleeplessness, and anxiety, property damages and loss of prospective economic advantages, and has been damaged in the amount of $2,000,000, or more, to be proven at trial.

131.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

**XIV.**
**NINTH CAUSE OF ACTION**
**(Intentional and/or Negligent Infliction of Emotional Distress)**

132.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

133.    From December 2005, Defendants, knowing that they have no right to damage, destroy, or mutilate cultural and historical artifacts and other structures, or to unlawfully remove soil and minerals, or to unlawfully place a huge fuel tank, or to damage and/or destroy permanent trees, cleared and quarried Plaintiff Atalig's land by using heavy equipment without a permit from the proper agencies and without permission from Plaintiff Atalig despite being specifically warned, in advance, about the location and presence of cultural and historical artifacts.

134.    Defendants' actions were extreme and outrageous and done intentionally to inflict severe emotional distress upon Plaintiff Atalig and his family.

135.    As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig did suffer severe emotional distress including, but not limited to, sleeplessness, headaches, anguish, grief, shame, humiliation, fear, anger and worry, and has been damaged in the amount of $4,000,000, or more, to be proven at trial.

136.    Because of the malicious, willful, wanton, vile, outrageous, and intentional nature of Defendants' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendants are liable for punitive damages, in the amount of $2,000,000, or more, to be determined at trial.

137.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XV.
## TENTH CAUSE OF ACTION
### (Unjust Enrichment)

138.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

139.    Defendants used and benefited from the use of Plaintiff Atalig's land to build certain structures and to remove certain historical and cultural artifacts and permanent trees, without the prior written consent of Plaintiff Atalig.

140.    Defendants used and benefited from the use of certain materials that were taken from the storage, laundry, and kitchen facilities without the prior written consent of Plaintiff Atalig.

141.    Defendants knew that they do not have the prior written permission from Plaintiff Atalig to remove preexisting improvements, historical and cultural artifacts, and permanent trees so that they can build other structures, but ignored the applicable provisions of the Lease, i.e., not to commit waste and to obtain the prior written consent of Plaintiff Atalig for any changes or alterations to the leased improvements.

142.    Defendant OKP has accepted and enjoyed the benefits of the impermissible use of Plaintiff Atalig's land to further Defendant OKP's business in Rota and the CNMI.

143.    The retention of the benefit and enjoyment of the use of Plaintiff Atalig's land and properties without the payment of its value is unfair and unjust.

144.    Defendants have been unjustly enriched at the expense of Plaintiff Atalig.

145.    As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, including but not limited to, property damages, and has been damaged in the amount of $3,500,000, or more, to be proven at trial.

146.    Wherefore, Plaintiff prays for the relief as set forth herein.

## XVI.
## ELEVENTH CAUSE OF ACTION
### (Nuisance)

147.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

148.    At all relevant times mentioned, Plaintiff Atalig was the fee simple owner of Lot No. 362 R 01.

149.    Defendants have installed a huge fuel tank with a fuel pump/station on Plaintiff Atalig's land, and on information and belief, without a valid permit from the regulatory agencies.

150.    Defendants' conduct in installing a huge fuel tank without the proper authorizations from regulatory agencies constitutes a nuisance.  It is injurious and hazardous to Plaintiff Atalig and those living with him, including contaminating the soil and water resources from any spillage that occurs as a result of the operation of a fuel station.

151.    Plaintiff Atalig gave notice to Defendant OKP to cure the default, but Defendant OKP, through counsel, refused.

152.    As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, property damages, and has been damaged in the amount of $100,000, or more, to be proven at trial.

153.    As a further direct and proximate result of the nuisance created by Defendants, Plaintiff Atalig's land has been diminished in value in the sum to be proven at trial.  Unless the nuisance created by defendants is abated, Plaintiff Atalig's land will continue to diminish in value.

154.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

**XVII.**
**<u>TWELFTH CAUSE OF ACTION</u>**
**(Indemnification)**

155.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

156.    Pursuant to Sections 12 and 12A of the Lease, Defendant OKP "shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of litigation…[o]n the account of or through the use of the demised premise[s] or improvements or any part thereof by Lessee or by any other person acting under the authority, direction, in the interest of, or through the title of the Lessee for any purpose inconsistent with the provisions of this Lease."

157.    The destruction of the historical and cultural artifacts and permanent trees, and the removal of soil and other minerals, and other things of value, have diminished the market value of Plaintiff Atalig's land and constitutes waste which is inconsistent with the provisions of the Lease.

158.    Pursuant to Sections 12 and 12B of the Lease, Defendant OKP "shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of litigation…[a]rising out of, or directly or indirectly due to, any failure of Lessee in any respect promptly and faithfully to satisfy Lessee's obligations under this [L]ease."

159.    Defendant OKP failed to promptly and faithfully satisfy Defendant OKP's obligations under the Lease by failing to obtain Plaintiff Atalig's written consent prior to the unlawful activities, and by destroying invaluable artifacts and other structures and things which constitutes waste.

160.    Pursuant to Sections 12 and 12C of the Lease, Defendant OKP "shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of litigation…[a]rising out of directly or indirectly due to any accident or other occurrence causing injury to any person or persons or property resulting from the use of the premises or any part thereof, including the land."

161.    Defendants' actions caused the injury to Plaintiff Atalig's land by diminishing its value now and in the future.

162.    No such indemnification shall be required with respect to losses or liabilities arising by reason of the affirmative negligence or recklessness of Lessor.  See Section 12 of the Lease.

163.    Plaintiff Atalig was not, and is not, negligent, much less affirmatively negligent or reckless, in the performance of Plaintiff Atalig's duties and responsibilities under the Lease.

164.    As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, property damages, loss of prospective economic advantages, and has been damaged in an amount to be proven at trial.

165.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XVIII.
## THIRTEENTH CAUSE OF ACTION
### (Principal-Agent Liability:  Actual Authority)

166.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

167.    Defendant CPA, as the Sponsor of the Project under the Grant Agreement, expressly and intentionally delegated and conferred authority to Defendant OKP to be "fully responsible and

accountable at all times for the Project and for complying with the terms and conditions of [the Construction] Contract."  See Section 7 of the Construction Contract.

168.    Defendant OKP was acting within the scope of its agency when Defendant OKP entered into the Lease with Plaintiff Atalig and when Defendant OKP committed the various torts that are set forth herein.

169.    As admitted and acknowledged by Defendant OKP, "all of the work that has been performed at Plaintiff's property has been performed solely for the purpose of supporting the performance of OKP (CNMI) Corporation's obligations under its contract with the Commonwealth Ports Authority for the extension of the Rota Airport Runway."  OKP (CNMI) Corporation's Opposition to Plaintiff's Motion for Partial Summary Judgment at 11, lines 10-16.

170.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

### XIX.
### FOURTEENTH CAUSE OF ACTION
(Respondeat Superior)

171.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

172.    Plaintiff Atalig was injured as the result of the tortious conduct as set forth herein.

173.    The tortfeasors, Defendants Jaiphakdee, Promchai, Goluguri, and others, are employees of Defendant OKP, and committed the torts set forth herein while they were acting within the scope of their employment.

174.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XX.
## FIFTEENTH CAUSE OF ACTION
**(Punitive Damages)**

175.     Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

176.     Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig and others, Defendants are liable for punitive damages in the amount as set forth herein, or more, to be proven at trial.

177.     Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XXI.
## SIXTEENTH CAUSE OF ACTION
**(Violation of the Open Government Meetings and Records Act)**
*Against Defendants CPA and Celis*

178.     Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

179.     On June 4, 2006, Plaintiff Atalig served, via facsimile and U.S. mail, a second Open Government Act request upon Defendant CPA and Defendant Regino Celis, in his capacity as [Acting] Executive Director of CPA, requesting copies of certain public records in Defendant CPA's possession, custody, or control, pursuant to the Open Government Meetings and Records Act.  A true and correct copy of the June 4, 2006 Open Government Act request is attached hereto, labeled "Exhibit I," and incorporated herein by this reference as if set forth in full.

180.     On June 14, 2006, Plaintiff Atalig served, via facsimile and U.S. mail, another Open Government Act request upon Defendant CPA and Defendant Regino Celis, in his capacity as [Acting] Executive Director of CPA, requesting copies of certain public records in Defendant CPA's possession, custody, or control, pursuant to the Open Government Meetings and Records Act.  A

true and correct copy of the June 14, 2006 Open Government Act request is attached hereto, labeled "Exhibit J," and incorporated herein by this reference as if set forth in full.

181.    On June 15, 2006, Defendant CPA and Celis, through counsel, responded to Plaintiff Atalig's June 4, 2006 request.  Mr. Douglas F. Cushnie, in his capacity as counsel for Defendant CPA, and on behalf of the Acting Executive Director of CPA, denied Plaintiff Atalig's request by failing to comply with the Open Government Meetings and Records Act.  A true and correct copy of the June 15, 2006 letter from Mr. Cushnie is attached hereto, labeled "Exhibit K," and incorporated herein by this reference as if set forth in full.

182.    On June 15, 2006, Plaintiff Atalig replied and requested, again, that Defendant CPA comply with the Open Government Meetings and Records Act.  A true and correct copy of the June 15, 2006 letter from Plaintiff Atalig's attorney is attached hereto, labeled "Exhibit L," and incorporated herein by this reference as if set forth in full.

183.    On June 22, 2006, Defendant CPA and Celis, through counsel, responded to Plaintiff Atalig's June 4, 2006 request.  Mr. Douglas F. Cushnie denied Plaintiff Atalig's request in large part and provided very few documents for review.  Mr. Cushnie made excuses, such as, "improper request requiring conclusions of law and fact is (*sic*) not a mere request for documents," "improper request requiring fact and legal determination," "the request is currently under review and will be responded to at a later time," "improper request, not being one for public records," "improper request not in conformance with the requirements of the Open Government Act," "will be provided, if available, at a later date," and "improper request not within the scope of Sections 9917 and 9918 of the OGA," in an effort to strangle and suffocate Plaintiff Atalig's right to access public records. A true and correct copy of the June 22, 2006 letter from Mr. Cushnie is attached hereto, labeled "Exhibit M," and incorporated herein by this reference as if set forth in full.

184.    On June 25, 2006, Plaintiff Atalig, in good faith, attempted one more time to persuade Defendant CPA to make all public records, documents, materials, and information available for inspection in order to try to resolve any disputes without court action.  A true and correct copy of the June 25, 2006 letter from Plaintiff Atalig's attorney is attached hereto, labeled "Exhibit N," and incorporated herein by this reference as if set forth in full.

185.    Defendant CPA failed, refused, neglected, and continues to fail, refuse, and neglect, to make available public records for inspection and copying pursuant to Plaintiff Atalig's repeated requests, and pursuant to the Open Government Meetings and Records Act.

186.    Defendant CPA's conduct in making the above-described responses to Plaintiff Atalig's Open Government Meetings and Records Act request constitutes an unjustified and unlawful denial of Plaintiff Atalig's right to access to public records.

187.    Pursuant to the Open Government Meetings and Records Act (1 CMC § 9916(b)), Plaintiff Atalig, as an aggrieved party whose Open Government Act request has been denied in whole or in part, has the right to immediate judicial review.

188.    Plaintiff Atalig has fulfilled all of his obligations under said Open Government Meetings and Records Act with respect to his Open Government Act request.

189.    Pursuant to 1 CMC 9917(b), Plaintiff Atalig is entitled to recourse from this Court for the Defendants' unlawful denial of access to the requested public records and is entitled also to costs of suit together with reasonable attorney's fees upon prevailing in this action.

190.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XXII.
## SEVENTEENTH CAUSE OF ACTION
### (Attorneys' Fees)

191.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Amended Complaint.

192.    Pursuant to Section 23 of the Lease Agreement identified above, in the event of a lawsuit by any party to the Lease Agreement "for the recovery of any rent due, or because of any breach of any term, covenant, condition, or provision hereof, the prevailing party shall be entitled to recover from the other party costs of suit and reasonable attorney's fees which shall be fixed by the Court."

193.    Plaintiff Atalig has incurred legal fees and continues to incur legal fees as a result of Defendant OKP's breach of the Lease and tortious acts.

194.    Furthermore, pursuant to 1 CMC § 9917(b), Plaintiff Atalig is entitled to attorney's fees once he prevails under the cause of action for violation of the Open Government Meetings and Records Act.

195.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XXIII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joaquin Q. Atalig prays for judgment against all Defendants, jointly and severally, as follows:

a.    General damages, in an amount to be proven at trial, for the destruction and desecration of several priceless and original Latte Stones, ancient Chamorro grinding stone, other cultural and historical artifacts, and other things of value;

b.    Punitive damages, in an amount appropriate to punish Defendants and set an example to others, to be proven at trial, because Defendants knew or should have known that the priceless Latte

Stones, ancient Chamorro grinding stone, and other cultural and historical artifacts are forever lost once damaged or destroyed, yet Defendants deliberately destroyed and desecrated the artifacts on Plaintiff Atalig's land, despite being forewarned of the presence of artifacts before clearing, which amounts to cultural and historical "terrorism" against the Chamorro people and the people of the CNMI, pure and simple;

c. Temporary restraining order, preliminary and permanent injunction to prohibit Defendants from damaging, destroying, or removing any cultural or historical artifacts;

d. An award of restitution to Plaintiff Atalig for the use of the Latte Stones and other valuable artifacts, materials, trees, soil, and minerals, which are forever lost or destroyed, so that Defendants will not be unjustly enriched at the expense of Plaintiff Atalig in an amount to be proven at trial;

e. Pre-judgment interest on amounts owed;

f. Post-judgment interests;

g. To pierce the corporate veil of Defendant OKP CNMI;

h. An order from this Court compelling Defendants CPA and Celis, including their employees, representatives, legal counsels, to produce the documents demanded in Plaintiff Atalig's June 4, 2006, and June 14, 2006 Open Government Act requests, including those demanded in follow up letters;

i. For reasonable attorneys fees and costs as specifically provided by agreement and by statute under the Open Government Meetings and Records Act (1 CMC § 9917(b)); and

j. For such other and further relief to which Plaintiff Atalig is entitled under law or equity as the Court deems just and proper.

## XXIV.
## DEMAND FOR JURY TRIAL

Plaintiff Joaquin Q. Atalig hereby demands a trial by jury of all issues triable of right by jury.

Respectfully submitted this 28th day of July, 2006.

LAW OFFICES OF RAMON K. QUICHOCHO, LLC


/s/Ramon K. Quichocho, Esq.
CNMI Bar No. F0243
Attorney for Plaintiff Joaquin Q. Atalig


## VERIFICATION

I declare under penalty of perjury that I have read the foregoing Amended Complaint and

that it is true and correct to the best of my recollection and knowledge, as it applies to me, and that

this declaration is executed on this 28th day of July, 2006, in Saipan, Commonwealth of the Northern

Mariana Islands.


/s/JOAQUIN Q. ATALIG
Plaintiff




I hereby certify that the filed hereof is a full, true
and correct copy of the original filed in the office
of the Clerk of Court ...

Date 4-17-2008

NORTHER... ...LANDS
SAIPAN, MP 9...

*38*
*Amended Complaint*



**E-FILED**
**CNMI SUPERIOR COURT**
E-filed: Jul 31 2006 12:40PM
Clerk Review: Jul 31 2006  2:52PM
Filing ID: 11929652
Case Number: 06-0119-CV
Elsa  Duenas

# EXHIBIT  A



# COMMONWEALTH PORTS AUTHORITY

Main Office: SAIPAN INTERNATIONAL AIRPORT
P.O. BOX 501055 • SAIPAN • MP 96950-1055
Phone: (670) 664-3500 / 1    Fax: (670) 234-5962
E-Mail Address: cpa.admin@saipan.com
Website: www.cpa.gov.com

August 30, 2005

Mr. Ron V. Simpson
Airports District Office Manager
Federal Aviation Administration
PO Box 50244
Honolulu, Hawaii 96850-0001

Dear Mr. Simpson:

Subject: Rota International Airport Runway 09/27 Extension
AIP No. 3-69-0003-19
Grant Agreement

Enclosed are the originally signed copies of the grant agreements for the above-mentioned project.
Please transmit one copy to our office upon final execution after our legal counsel has signed.

Your continued support and assistance is greatly appreciated. Should you require additional
information, please do not hesitate to call.

Sincerely,

CARLOS H. SALAS
Executive Director/Contracting Officer

Enclosures

CHS:wlp

Cc:    CPA Board of Directors
       Staff Engineer
       Comptroller

β

*SAIPAN INTERNATIONAL AIRPORT / SEAPORT*
*P.O. Box 501055, Saipan, MP 96950*

*ROTA INTERNATIONAL AIRPORT / SEAPORT*
*P.O. Box 561, Rota, MP 96951*

*WEST TINIAN AIRPORT / SEAPORT*
*San Jose Village, Tinian, MP 96952*



**U.S Department**
**of Transportation**

**Federal Aviation**
**Administration**

Western-Pacific Region
Airports District Office

300 Ala Moana Blvd., Rm. 7-128
Honolulu, HI  96850
Mail:  Box 50244
Honolulu, HI  96850-0001
Telephone:  (808) 541-1232
Facsimile:  (808) 541-3566



August 24, 2005

Mr. Jose R. Lifoifoi
Chairman, Board of Directors
Commonwealth Ports Authority
P. O. Box 501055
Saipan, MP  96950-1005

Dear Mr. Lifoifoi:

> Rota International Airport, Rota Island, N. Mariana Islands
> Airport Improvement Program (AIP) Project No. 3-69-0003-19
> Grant Offer

Enclosed are the original and three copies of the approved Grant Offer for the above project.

Acceptance of the Grant Offer will obligate the Sponsor to accomplish the described improvement project.  The United States commits itself to participate in the allowable cost of the project not to exceed the amount shown on Page 2 of the Grant Offer.  The offer must be accepted on or before the date specified in Condition 6, Page 2 of the Grant Offer.

Basic considerations are that members of the Sponsor's governing body know the full content of the Grant Offer and that the method of acceptance conforms to local law.

The official of the Sponsor authorized to accept the enclosed Grant Offer shall accept same by signing said offer and inserting the date in the space provided under Part II - Acceptance.  The Sponsor's attorney shall certify that the acceptance complies with all applicable laws and constitutes a legal and binding obligation of the Sponsor by executing the "Certificate of Sponsor's Attorney."  The date of said certificate shall be the same as, or later than the date of execution.

When the document is fully executed, certified, attested and appropriate seals are impressed, please return the original and two (2) originally signed and dated copies of the executed Grant Agreement to this office.  Retain the remaining copy for your files.

2

Your cooperation on this project is greatly appreciated.

Sincerely,

Ronnie V. Simpson
Manager, Airports District Office

Enclosure

cc: (w/o encl.)
Mr. Carlos Salas

# DEPARTMENT OF TRANSPORTATION
## FEDERAL AVIATION ADMINISTRATION

## GRANT AGREEMENT

### Part I - Offer

Date of Offer: August 24, 2005

Rota International Airport

Project No. 3-69-0003-19

Contract No. DTFA08-05-C-50522

TO:   The Commonwealth Ports Authority (herein called the "Sponsor")

FROM:   The United States of America (acting through the Federal Aviation Administration, herein called the "FAA")

**WHEREAS,** the Sponsor has submitted to the FAA a Project Application dated May 4, 2005, for a grant of Federal funds for a project at or associated with the Rota International Airport which Project Application, as approved by the FAA, is hereby incorporated herein and made a part hereof; and

**WHEREAS,** the FAA has approved a project for the Airport or Planning Area (herein called the "Project") consisting of the following:

### Extend Runway 9/27

all as more particularly described in the Project Application.

**NOW THEREFORE,** pursuant to and for the purpose of carrying out the provisions of Title 49, United States Code, as amended, herein called "the Act", and in consideration of (a) the Sponsor's adoption and ratification of the representations and assurances contained in said Project Application and its acceptance of this Offer as hereinafter provided, and (b) the benefits to accrue to the United States and the public from the accomplishment of the Project and compliance with the assurances and conditions as herein provided, **THE FEDERAL AVIATION ADMINISTRATION, FOR AND ON BEHALF OF THE UNITED STATES, HEREBY OFFERS AND AGREES** to pay, as the United States share of the allowable costs incurred in accomplishing the Project, ninety-five per centum (95%) thereof.

The Offer is made on and **SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:**

### Conditions

1.  The maximum obligation of the United States payable under this offer shall be **$5,000,000.00.** For the purposes of any future grant amendments which may increase the foregoing maximum obligation of the United States under the provisions of Section 47108(b) of the Act, the following amounts are being specified for this purpose:

    $0.00 for planning
    **$5,000,000.00** for airport development or noise program implementation.

2.  The allowable costs of the project shall not include any costs determined by the FAA to be ineligible for consideration as to allowability under the Act.

3.  Payment of the United States' share of the allowable project costs will be made pursuant to and in accordance with the provisions of such regulations and procedures as the Secretary shall prescribe. Final determination of the United States' share will be based upon the final audit of the total amount of allowable project costs and settlement will be made for any upward or downward adjustments to the Federal share of costs.

4.  The Sponsor shall carry out and complete the Project without undue delays and in accordance with the terms hereof, and such regulations and procedures as the Secretary shall prescribe, and agrees to comply with the assurances which were made part of the project application.

5.  The FAA reserves the right to amend or withdraw this offer at any time prior to its acceptance by the Sponsor.

6.  This offer shall expire and the United States shall not be obligated to pay any part of the costs of the project unless this offer has been accepted by the Sponsor on or before **August 31, 2005,** or such subsequent date as may be prescribed in writing by the FAA.

7.  The Sponsor shall take all steps, including litigation if necessary, to recover Federal funds spent fraudulently, wastefully, or in violation of Federal antitrust statutes, or misused in any other manner in any project upon which Federal funds have been expended. For the purposes of this grant agreement, the term "Federal funds" means funds however used or disbursed by the Sponsor that were originally paid pursuant to this or any other Federal grant agreement. It shall obtain the approval of the Secretary as to any determination of the amount of the Federal share of such funds. It shall return the recovered Federal share, including funds recovered by settlement, order or judgment, to the Secretary. It shall furnish to the Secretary, upon request, all documents and records pertaining to the determination of the amount of the Federal share or to any settlement, litigation, negotiation, or other efforts taken to recover such funds. All settlements or other final positions of the Sponsor, in court or otherwise, involving the recovery of such Federal share shall be approved in advance by the Secretary.

8.  The United States shall not be responsible or liable for damage to property or injury to persons which may arise from, or be incident to, compliance with this grant agreement.

9.   Unless otherwise approved by the FAA, the Sponsor will not acquire or permit any contractor or subcontractor to acquire any steel or manufactured products produced outside the United States to be used for any project for airport development or noise compatibility for which funds are provided under this grant. The Sponsor will include in every contract a provision implementing this special condition.

10.  The Sponsor shall comply with the Part V, Assurances dated 3/2005, which are attached to and made a part of the Grant Agreement in lieu of the Assurances which accompanied the Project Application dated May 4, 2005.

11.  The Sponsor agrees to request cash drawdowns on the letter of credit only when actually needed for its disbursements and to timely reporting of such disbursements as required. It is understood that failure to adhere to this provision may cause the letter of credit to be revoked.

12.  In accordance with Section 47108(b) of the Act, as amended, the maximum obligation of the United States, as stated in Condition No. 1 of this Grant Offer:

     a.  may not be increased for a planning project;
     b.  may be increased by not more than 15 percent for development projects;
     c.  may be increased by not more than 15 percent for land projects.

13.  It is mutually understood and agreed that if, during the life of the project, the FAA determines that the maximum grant obligation of the United States exceeds the expected needs of the Sponsor by $25,000.00 or five percent (5%), whichever is greater, the maximum obligation of the United States can be unilaterally reduced by letter from the FAA advising of the budget change. Conversely, if there is an overrun in the total actual eligible and allowable project costs, FAA may increase the maximum grant obligation of the United States to cover the amount of the overrun not to exceed the statutory percent limitation and will advise the Sponsor by letter of the increase. It is further understood and agreed that if, during the life of the project, the FAA determines that a change in the grant description is advantageous and in the best interests of the United States, the change in grant description will be unilaterally amended by letter from the FAA. Upon issuance of the aforementioned letter, either the grant obligation of the United States is adjusted to the amount specified or the grant description is amended to the description specified.

14.  The Sponsor agrees to take the following actions to maintain and/or acquire a property interest, satisfactory to the FAA, in the Runway Protection Zones:

     a.  Existing Fee Title Interest in the Runway Protection Zone: The Sponsor agrees to prevent the erection or creation of any structure or place of public assembly in the Runway Protection Zone, except for NAVAIDS that are fixed by their functional purposes or any other structure approved by the FAA. Any existing structures or uses within the Runway Protection Zone will be cleared or discontinued unless approved by the FAA.

b. Existing Easement Interest in the Runway Protection Zone: The Sponsor agrees to take any and all steps necessary to ensure that the owner of the land within the designated Runway Protection Zone will not build any structure in the Runway Protection Zone that is a hazard to air navigation or which might create glare or misleading lights or lead to the construction of residences, fuel handling and storage facilities, smoke generating activities, or places of public assembly, such as churches, schools, office buildings, shopping centers, and stadiums.

c. Future Interest in the Runway Protection Zone: The Sponsor agrees that it will acquire fee title or less-than-fee interest in the Runway Protection Zones for runways that presently are not under its control within ten years of this Grant Agreement. Said interest shall provide the protection noted in the above Subparagraphs a and b.

15. The sponsor agrees to perform the following:

a. Furnish a construction management program to the FAA prior to the start of construction which shall detail the measures and procedures to be used to comply with the quality control provisions of the construction contract, including, but not limited to, all quality control provisions and tests required by the Federal specifications. The program shall include as a minimum:

1) The name of the person representing the sponsor who has overall responsibility for contract administration for the project and the authority to take necessary actions to comply with the contract.

2) Names of testing laboratories and consulting engineer firms with quality control responsibilities on the project, together with a description of the services to be provided.

3) Procedures for determining that testing laboratories meet the requirements of the American Society of Testing and Materials standards on laboratory evaluation, referenced in the contract specifications (D 3666, C 1077).

4) Submit qualifications of engineering supervision, and construction inspection personnel.

5) A listing of all test required by the contract specifications, including the type and frequency of test to be taken, the method of sampling, the applicable test standard, and the acceptance criteria or tolerances permitted for each type of test.

6) Procedures for ensuring that the tests are taken in accordance with the program, that they are documented daily, and that the proper corrective actions, where necessary, are undertaken.

b. Submit at completion of the project, a final test and quality control report documenting the results of all tests performed, highlighting those tests that failed or did not meet the applicable test standard. The report shall include the pay reductions applied and reasons for accepting any out-of-tolerance material. An interim test and quality control report shall be submitted, if requested by the FAA.

c. Failure to provide a complete report as described in paragraph 2, or failure to perform such tests, shall, absent any compelling justification, result in a reduction in Federal participation for costs incurred in connection with construction of the applicable pavement. Such reduction shall be at the discretion of the FAA and will be based on the type or types of required tests not performed or not documented and will be commensurate with the proportion of applicable pavement with respect to the total pavement constructed under the grant agreement.

d. The FAA, at its discretion, reserves the right to conduct independent tests and to reduce grant payments accordingly if such independent tests determine that sponsor test results are inaccurate.

16.    For a project to replace or reconstruct pavement at the airport, the Sponsor shall implement an effective airport pavement maintenance management program as is required by Airport Sponsor Assurance Number C-11. The Sponsor shall use such program for the useful life of any pavement constructed, reconstructed, or repaired with Federal financial assistance at the airport. As a minimum, the program must conform with the provisions outlined below:

## Pavement Maintenance Management Program

An effective pavement maintenance management program is one that details the procedures to be followed to assure that proper pavement maintenance, both preventive and repair, is performed. An airport sponsor may use any form of inspection program it deems appropriate. The program must, as a minimum, include the following:

a. Pavement inventory. The following must be depicted in an appropriate form and level of detail:
   (1) location of all runways, taxiways, and aprons;
   (2) dimensions;
   (3) type of pavement, and;
   (4) year of construction or most recent major rehabilitation.

For compliance with the Airport Improvement Program (AIP) assurances, pavements that have been constructed, reconstructed, or repaired with Federal financial assistance shall be so depicted.

b. Inspection Schedule.
   (1) Detailed Inspection. A detailed inspection must be performed at least once a year. If a history of recorded pavement deterioration is available, i.e, Pavement Condition Index (PCI) survey as set forth in Advisory Circular 150/5380-6, "Guidelines and Procedures for Maintenance of Airport Pavements," the frequency of inspections may be extended to three years.
   (2) Drive-By Inspection. A drive-by inspection must be performed a minimum of once per month to detect unexpected changes in the pavement condition.

    c. Record Keeping. Complete information on the findings of all detailed inspections and on the maintenance performed must be recorded and kept on file for a minimum of five years. The types of distress, their locations, and remedial action, scheduled or performed, must be documented. The minimum information to be recorded is listed below:

        (1) inspection date,

        (2) location,

        (3) distress types, and

           (4) maintenance scheduled or performed.

For drive-by inspections, the date of inspection and any maintenance performed must be recorded.

    d. Information Retrieval. An airport sponsor may use any form of record keeping it deems appropriate, so long as the information and records produced by the pavement survey can be retrieved to provide a report to the FAA as may be required.

    e. Reference. Refer to Advisory Circular 150/5380-6, "Guidelines and Procedures for Maintenance or Airport Pavements," for specific guidelines and procedures for maintaining airport pavements and establishing an effective maintenance program. Specific types of distress, their probable causes, inspection guidelines, and recommended methods of repair are presented.

17. Approval of the project included in this agreement is conditioned on the Sponsor's compliance with applicable air and water quality standards in accomplishing project construction. Failure to comply with this requirement may result in suspension, cancellation, or termination of Federal assistance under this agreement.

The Sponsor's acceptance of this Offer and ratification and adoption of the Project Application incorporated herein shall be evidenced by execution of this instrument by the Sponsor, as hereinafter provided, and this Offer and Acceptance shall comprise a Grant Agreement, as provided by the Act, constituting the contractual obligations and rights of the United States and the Sponsor with respect to the accomplishment of the Project and compliance with the assurances and conditions as provided herein. Such Grant Agreement shall become effective upon the Sponsor's acceptance of this Offer.

                              **UNITED STATES OF AMERICA**
                              **FEDERAL AVIATION ADMINISTRATION**
                              **WESTERN-PACIFIC REGION**

                              Ronnie V. Simpson
                              Manager, Airports District Office

## Part II - Acceptance

The Sponsor does hereby ratify and adopt all assurances, statements, representations, warranties, covenants, and agreements contained in the Project Application and incorporated materials referred to in the foregoing Offer and does hereby accept this Offer and by such acceptance agrees to comply with all of the terms and conditions in this Offer and in the Project Application.

Executed this _____ 30th _____ day of _____ August _____, 2005.

COMMONWEALTH PORTS AUTHORITY

By: ___CARLOS H. SALAS___
(Sponsor's Designated Official Representative)

Title: ___Contracting Officer/Executive Director___

Attest: ___BARBARA A. YAMADA___

Title: ___Board Secretary___

## CERTIFICATE OF SPONSOR'S ATTORNEY

I, ___DOUGLAS F. CUSHNIE___, acting as Attorney for the Sponsor do hereby certify:

That in my opinion the Sponsor is empowered to enter into the foregoing Grant Agreement under the laws of the **Commonwealth of the Northern Mariana Islands**. Further, I have examined the foregoing Grant Agreement and the actions taken by said Sponsor and Sponsor's official representative has been duly authorized and that the execution thereof is in all respects due and proper and in accordance with the laws of the said State and the Act. In addition, for grants involving projects to be carried out on property not owned by the Sponsor, there are no legal impediments that will prevent full performance by the Sponsor. Further, it is my opinion that the said Grant Agreement constitutes a legal and binding obligation of the Sponsor in accordance with the terms hereof.

Dated at _____ Saipan, CNMI _____ this _30th_ day of _____ August _____, 2005.

(Signature of Sponsor's Attorney)

**ASSURANCES**
**Airport Sponsors**

A.    **General.**

1.    These assurances shall be complied with in the performance of grant agreements for airport development, airport planning, and noise compatibility program grants for airport sponsors.

2.    These assurances are required to be submitted as part of the project application by sponsors requesting funds under the provisions of Title 49, U.S.C., subtitle VII, as amended. As used herein, the term "public agency sponsor" means a public agency with control of a public-use airport; the term "private sponsor" means a private owner of a public-use airport; and the term "sponsor" includes both public agency sponsors and private sponsors.

3.    Upon acceptance of the grant offer by the sponsor, these assurances are incorporated in and become part of the grant agreement.

B.    **Duration and Applicability.**

1.    **Airport development or Noise Compatibility Program Projects Undertaken by a Public Agency Sponsor.** The terms, conditions and assurances of the grant agreement shall remain in full force and effect throughout the useful life of the facilities developed or equipment acquired for an airport development or noise compatibility program project, or throughout the useful life of the project items installed within a facility under a noise compatibility program project, but in any event not to exceed twenty (20) years from the date of acceptance of a grant offer of Federal funds for the project. However, there shall be no limit on the duration of the assurances regarding Exclusive Rights and Airport Revenue so long as the airport is used as an airport. There shall be no limit on the duration of the terms, conditions, and assurances with respect to real property acquired with federal funds. Furthermore, the duration of the Civil Rights assurance shall be specified in the assurances.

2.    **Airport Development or Noise Compatibility Projects Undertaken by a Private Sponsor.** The preceding paragraph 1 also applies to a private sponsor except that the useful life of project items installed within a facility or the useful life of the facilities developed or equipment acquired under an airport development or noise compatibility program project shall be no less than ten (10) years from the date of acceptance of Federal aid for the project.

3.    **Airport Planning Undertaken by a Sponsor.** Unless otherwise specified in the grant agreement, only Assurances 1, 2, 3, 5, 6, 13, 18, 30, 32, 33, and 34 in section C apply to planning projects. The terms, conditions, and assurances of the grant agreement shall remain in full force and effect during the life of the project.

C.    **Sponsor Certification.** The sponsor hereby assures and certifies, with respect to this grant that:

1.    **General Federal Requirements.** It will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance and use of Federal funds for this project including but not limited to the following:

**Federal Legislation**

a.    Title 49, U.S.C., subtitle VII, as amended.
b.    Davis-Bacon Act - 40 U.S.C. 276(a), et seq.[1]
c.    Federal Fair Labor Standards Act - 29 U.S.C. 201, et seq.
d.    Hatch Act - 5 U.S.C. 1501, et seq.[2]
e.    Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 Title 42 U.S.C. 4601, et seq.[1][2]

f. National Historic Preservation Act of 1966 - Section 106 - 16 U.S.C. 470(f).[1]

g. Archeological and Historic Preservation Act of 1974 - 16 U.S.C. 469 through 469c.[1]

h. Native Americans Grave Repatriation Act - 25 U.S.C. Section 3001, et seq.

i. Clean Air Act, P.L. 90-148, as amended.

j. Coastal Zone Management Act, P.L. 93-205, as amended.

k. Flood Disaster Protection Act of 1973 - Section 102(a) - 42 U.S.C. 4012a.[1]

l. Title 49 ,U.S.C., Section 303, (formerly known as Section 4(f))

m. Rehabilitation Act of 1973 - 29 U.S.C. 794.

n. Civil Rights Act of 1964 - Title VI - 42 U.S.C. 2000d through d-4.

o. Age Discrimination Act of 1975 - 42 U.S.C. 6101, et seq.

p. American Indian Religious Freedom Act, P.L. 95-341, as amended.

q. Architectural Barriers Act of 1968 -42 U.S.C. 4151, et seq.[1]

r. Power plant and Industrial Fuel Use Act of 1978 - Section 403- 2 U.S.C. 8373.[1]

s. Contract Work Hours and Safety Standards Act - 40 U.S.C. 327, et seq.[1]

t. Copeland Anti kickback Act - 18 U.S.C. 874.[1]

u. National Environmental Policy Act of 1969 - 42 U.S.C. 4321, et seq.[1]

v. Wild and Scenic Rivers Act, P.L. 90-542, as amended.

w. Single Audit Act of 1984 - 31 U.S.C. 7501, et seq.[2]

x. Drug-Free Workplace Act of 1988 - 41 U.S.C. 702 through 706.

## Executive Orders

Executive Order 11246 - Equal Employment Opportunity[1]

Executive Order 11990 - Protection of Wetlands

Executive Order 11998 – Flood Plain Management

Executive Order 12372 - Intergovernmental Review of Federal Programs.

Executive Order 12699 - Seismic Safety of Federal and Federally Assisted New Building Construction[1]

Executive Order 12898 - Environmental Justice

## Federal Regulations

a. 14 CFR Part 13 - Investigative and Enforcement Procedures.

b. 14 CFR Part 16 - Rules of Practice For Federally Assisted Airport Enforcement Proceedings.

c. 14 CFR Part 150 - Airport noise compatibility planning.

d. 29 CFR Part 1 - Procedures for predetermination of wage rates.[1]

e. 29 CFR Part 3 - Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States.[1]

f. 29 CFR Part 5 - Labor standards provisions applicable to contracts covering federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act).[1]

g. 41 CFR Part 60 - Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor (Federal and federally assisted contracting requirements).[1]

h. 49 CFR Part 18 - Uniform administrative requirements for grants and cooperative agreements to state and local governments.[3]

i. 49 CFR Part 20 - New restrictions on lobbying.

j.    49 CFR Part 21 - Nondiscrimination in federally-assisted programs of the Department of Transportation - effectuation of Title VI of the Civil Rights Act of 1964.

k.    49 CFR Part 23 - Participation by Disadvantage Business Enterprise in Airport Concessions.

l.    49 CFR Part 24 - Uniform relocation assistance and real property acquisition for Federal and federally assisted programs.[1][2]

m.    49 CFR Part 26 – Participation By Disadvantaged Business Enterprises in Department of Transportation Programs.

n.    49 CFR Part 27 - Nondiscrimination on the basis of handicap in programs and activities receiving or benefiting from Federal financial assistance.[1]

o.    49 CFR Part 29 – Government wide debarment and suspension (non-procurement) and government wide requirements for drug-free workplace (grants).

p.    49 CFR Part 30 - Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors.

q.    49 CFR Part 41 - Seismic safety of Federal and federally assisted or regulated new building construction.[1]

**Office of Management and Budget Circulars**

a.    A-87 - Cost Principles Applicable to Grants and Contracts with State and Local Governments.

b    A-133 - Audits of States, Local Governments, and Non-Profit Organizations

[1] These laws do not apply to airport planning sponsors.

[2] These laws do not apply to private sponsors.

[3] 49 CFR Part 18 and OMB Circular A-87 contain requirements for State and Local Governments receiving Federal assistance. Any requirement levied upon State and Local Governments by this regulation and circular shall also be applicable to private sponsors receiving Federal assistance under Title 49, United States Code.

Specific assurances required to be included in grant agreements by any of the above laws, regulations or circulars are incorporated by reference in the grant agreement.

2.    **Responsibility and Authority of the Sponsor.**

a.    **Public Agency Sponsor:** It has legal authority to apply for the grant, and to finance and carry out the proposed project; that a resolution, motion or similar action has been duly adopted or passed as an official act of the applicant's governing body authorizing the filing of the application, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the applicant to act in connection with the application and to provide such additional information as may be required.

b.    **Private Sponsor:** It has legal authority to apply for the grant and to finance and carry out the proposed project and comply with all terms, conditions, and assurances of this grant agreement. It shall designate an official representative and shall in writing direct and authorize that person to file this application, including all understandings and assurances contained therein; to act in connection with this application; and to provide such additional information as may be required.

3. **Sponsor Fund Availability.** It has sufficient funds available for that portion of the project costs which are not to be paid by the United States. It has sufficient funds available to assure operation and maintenance of items funded under the grant agreement which it will own or control.

4. **Good Title.**

   a. It, a public agency or the Federal government, holds good title, satisfactory to the Secretary, to the landing area of the airport or site thereof, or will give assurance satisfactory to the Secretary that good title will be acquired.

   b. For noise compatibility program projects to be carried out on the property of the sponsor, it holds good title satisfactory to the Secretary to that portion of the property upon which Federal funds will be expended or will give assurance to the Secretary that good title will be obtained.

5. **Preserving Rights and Powers.**

   a. It will not take or permit any action which would operate to deprive it of any of the rights and powers necessary to perform any or all of the terms, conditions, and assurances in the grant agreement without the written approval of the Secretary, and will act promptly to acquire, extinguish or modify any outstanding rights or claims of right of others which would interfere with such performance by the sponsor. This shall be done in a manner acceptable to the Secretary.

   b. It will not sell, lease, encumber, or otherwise transfer or dispose of any part of its title or other interests in the property shown on Exhibit A to this application or, for a noise compatibility program project, that portion of the property upon which Federal funds have been expended, for the duration of the terms, conditions, and assurances in the grant agreement without approval by the Secretary. If the transferee is found by the Secretary to be eligible under Title 49, United States Code, to assume the obligations of the grant agreement and to have the power, authority, and financial resources to carry out all such obligations, the sponsor shall insert in the contract or document transferring or disposing of the sponsor's interest, and make binding upon the transferee all of the terms, conditions, and assurances contained in this grant agreement.

   c. For all noise compatibility program projects which are to be carried out by another unit of local government or are on property owned by a unit of local government other than the sponsor, it will enter into an agreement with that government. Except as otherwise specified by the Secretary, that agreement shall obligate that government to the same terms, conditions, and assurances that would be applicable to it if it applied directly to the FAA for a grant to undertake the noise compatibility program project. That agreement and changes thereto must be satisfactory to the Secretary. It will take steps to enforce this agreement against the local government if there is substantial non-compliance with the terms of the agreement.

   d. For noise compatibility program projects to be carried out on privately owned property, it will enter into an agreement with the owner of that property which includes provisions specified by the Secretary. It will take steps to enforce this agreement against the property owner whenever there is substantial non-compliance with the terms of the agreement.

e.  If the sponsor is a private sponsor, it will take steps satisfactory to the Secretary to ensure that the airport will continue to function as a public-use airport in accordance with these assurances for the duration of these assurances.

f.  If an arrangement is made for management and operation of the airport by any agency or person other than the sponsor or an employee of the sponsor, the sponsor will reserve sufficient rights and authority to insure that the airport will be operated and maintained in accordance Title 49, United States Code, the regulations and the terms, conditions and assurances in the grant agreement and shall insure that such arrangement also requires compliance therewith.

6.  **Consistency with Local Plans.** The project is reasonably consistent with plans (existing at the time of submission of this application) of public agencies that are authorized by the State in which the project is located to plan for the development of the area surrounding the airport.

7.  **Consideration of Local Interest.** It has given fair consideration to the interest of communities in or near where the project may be located.

8.  **Consultation with Users.** In making a decision to undertake any airport development project under Title 49, United States Code, it has undertaken reasonable consultations with affected parties using the airport at which project is proposed.

9.  **Public Hearings.** In projects involving the location of an airport, an airport runway, or a major runway extension, it has afforded the opportunity for public hearings for the purpose of considering the economic, social, and environmental effects of the airport or runway location and its consistency with goals and objectives of such planning as has been carried out by the community and it shall, when requested by the Secretary, submit a copy of the transcript of such hearings to the Secretary. Further, for such projects, it has on its management board either voting representation from the communities where the project is located or has advised the communities that they have the right to petition the Secretary concerning a proposed project.

10.  **Air and Water Quality Standards.** In projects involving airport location, a major runway extension, or runway location it will provide for the Governor of the state in which the project is located to certify in writing to the Secretary that the project will be located, designed, constructed, and operated so as to comply with applicable air and water quality standards. In any case where such standards have not been approved and where applicable air and water quality standards have been promulgated by the Administrator of the Environmental Protection Agency, certification shall be obtained from such Administrator. Notice of certification or refusal to certify shall be provided within sixty days after the project application has been received by the Secretary.

11.  **Pavement Preventive Maintenance.** With respect to a project approved after January 1, 1995, for the replacement or reconstruction of pavement at the airport, it assures or certifies that it has implemented an effective airport pavement maintenance-management program and it assures that it will use such program for the useful life of any pavement constructed, reconstructed or repaired with Federal financial assistance at the airport. It will provide such reports on pavement condition and pavement management programs as the Secretary determines may be useful.

---

12.    **Terminal Development Prerequisites.** For projects which include terminal development at a public use airport, as defined in Title 49, it has, on the date of submittal of the project grant application, all the safety equipment required for certification of such airport under section 44706 of Title 49, United States Code, and all the security equipment required by rule or regulation, and has provided for access to the passenger enplaning and deplaning area of such airport to passengers enplaning and deplaning from aircraft other than air carrier aircraft.

13.    **Accounting System, Audit, and Record Keeping Requirements.**

    a.    It shall keep all project accounts and records which fully disclose the amount and disposition by the recipient of the proceeds of the grant, the total cost of the project in connection with which the grant is given or used, and the amount or nature of that portion of the cost of the project supplied by other sources, and such other financial records pertinent to the project. The accounts and records shall be kept in accordance with an accounting system that will facilitate an effective audit in accordance with the Single Audit Act of 1984.

    b.    It shall make available to the Secretary and the Comptroller General of the United States, or any of their duly authorized representatives, for the purpose of audit and examination, any books, documents, papers, and records of the recipient that are pertinent to the grant. The Secretary may require that an appropriate audit be conducted by a recipient. In any case in which an independent audit is made of the accounts of a sponsor relating to the disposition of the proceeds of a grant or relating to the project in connection with which the grant was given or used, it shall file a certified copy of such audit with the Comptroller General of the United States not later than six (6) months following the close of the fiscal year for which the audit was made.

14.    **Minimum Wage Rates.** It shall include, in all contracts in excess of $2,000 for work on any projects funded under the grant agreement which involve labor, provisions establishing minimum rates of wages, to be predetermined by the Secretary of Labor, in accordance with the Davis-Bacon Act, as amended (40 U.S.C. 276a-276a-5), which contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

15.    **Veteran's Preference.** It shall include in all contracts for work on any project funded under the grant agreement which involve labor, such provisions as are necessary to insure that, in the employment of labor (except in executive, administrative, and supervisory positions), preference shall be given to Veterans of the Vietnam era and disabled veterans as defined in Section 47112 of Title 49, United States Code. However, this preference shall apply only where the individuals are available and qualified to perform the work to which the employment relates.

16.    **Conformity to Plans and Specifications.** It will execute the project subject to plans, specifications, and schedules approved by the Secretary. Such plans, specifications, and schedules shall be submitted to the Secretary prior to commencement of site preparation, construction, or other performance under this grant agreement, and, upon approval of the Secretary, shall be incorporated into this grant agreement. Any modification to the approved plans, specifications, and schedules shall also be subject to approval of the Secretary, and incorporated into the grant agreement.

17. **Construction Inspection and Approval.** It will provide and maintain competent technical supervision at the construction site throughout the project to assure that the work conforms to the plans, specifications, and schedules approved by the Secretary for the project. It shall subject the construction work on any project contained in an approved project application to inspection and approval by the Secretary and such work shall be in accordance with regulations and procedures prescribed by the Secretary. Such regulations and procedures shall require such cost and progress reporting by the sponsor or sponsors of such project as the Secretary shall deem necessary.

18. **Planning Projects.** In carrying out planning projects:

   a. It will execute the project in accordance with the approved program narrative contained in the project application or with the modifications similarly approved.

   b. It will furnish the Secretary with such periodic reports as required pertaining to the planning project and planning work activities.

   c. It will include in all published material prepared in connection with the planning project a notice that the material was prepared under a grant provided by the United States.

   d. It will make such material available for examination by the public, and agrees that no material prepared with funds under this project shall be subject to copyright in the United States or any other country.

   e. It will give the Secretary unrestricted authority to publish, disclose, distribute, and otherwise use any of the material prepared in connection with this grant.

   f. It will grant the Secretary the right to disapprove the sponsor's employment of specific consultants and their subcontractors to do all or any part of this project as well as the right to disapprove the proposed scope and cost of professional services.

   g. It will grant the Secretary the right to disapprove the use of the sponsor's employees to do all or any part of the project.

   h. It understands and agrees that the Secretary's approval of this project grant or the Secretary's approval of any planning material developed as part of this grant does not constitute or imply any assurance or commitment on the part of the Secretary to approve any pending or future application for a Federal airport grant.

19. **Operation and Maintenance.**

   a. The airport and all facilities which are necessary to serve the aeronautical users of the airport, other than facilities owned or controlled by the United States, shall be operated at all times in a safe and serviceable condition and in accordance with the minimum standards as may be required or prescribed by applicable Federal, state and local agencies for maintenance and operation. It will not cause or permit any activity or action thereon which would interfere with its use for airport purposes. It will suitably operate and maintain the airport and all facilities thereon or connected therewith, with due regard to climatic and flood conditions. Any proposal to temporarily close the airport for non-aeronautical purposes must first be approved by the Secretary.

In furtherance of this assurance, the sponsor will have in effect arrangements for-

(1) Operating the airport's aeronautical facilities whenever required;

(2) Promptly marking and lighting hazards resulting from airport conditions, including temporary conditions; and

(3) Promptly notifying airmen of any condition affecting aeronautical use of the airport.

Nothing contained herein shall be construed to require that the airport be operated for aeronautical use during temporary periods when snow, flood or other climatic conditions interfere with such operation and maintenance. Further, nothing herein shall be construed as requiring the maintenance, repair, restoration, or replacement of any structure or facility which is substantially damaged or destroyed due to an act of God or other condition or circumstance beyond the control of the sponsor.

b.      It will suitably operate and maintain noise compatibility program items that it owns or controls upon which Federal funds have been expended.

20.   **Hazard Removal and Mitigation.** It will take appropriate action to assure that such terminal airspace as is required to protect instrument and visual operations to the airport (including established minimum flight altitudes) will be adequately cleared and protected by removing, lowering, relocating, marking, or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

21.   **Compatible Land Use.** It will take appropriate action, to the extent reasonable, including the adoption of zoning laws, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including landing and takeoff of aircraft. In addition, if the project is for noise compatibility program implementation, it will not cause or permit any change in land use, within its jurisdiction, that will reduce its compatibility, with respect to the airport, of the noise compatibility program measures upon which Federal funds have been expended.

22. **Economic Nondiscrimination.**

a.      It will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport.

b.      In any agreement, contract, lease, or other arrangement under which a right or privilege at the airport is granted to any person, firm, or corporation to conduct or to engage in any aeronautical activity for furnishing services to the public at the airport, the sponsor will insert and enforce provisions requiring the contractor to-

(1) furnish said services on a reasonable, and not unjustly discriminatory, basis to all users thereof, and

(2) charge reasonable, and not unjustly discriminatory, prices for each unit or service, provided that the contractor may be allowed to make reasonable and nondiscriminatory discounts, rebates, or other similar types of price reductions to volume purchasers.

c.      Each fixed-based operator at the airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-based operators making the same or similar uses of such airport and utilizing the same or similar facilities.

    d.    Each air carrier using such airport shall have the right to service itself or to use any fixed-based operator that is authorized or permitted by the airport to serve any air carrier at such airport.

    e.    Each air carrier using such airport (whether as a tenant, non tenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rules, regulations, conditions, rates, fees, rentals, and other charges with respect to facilities directly and substantially related to providing air transportation as are applicable to all such air carriers which make similar use of such airport and utilize similar facilities, subject to reasonable classifications such as tenants or non tenants and signatory carriers and non signatory carriers. Classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status.

    f.    It will not exercise or grant any right or privilege which operates to prevent any person, firm, or corporation operating aircraft on the airport from performing any services on its own aircraft with its own employees [including, but not limited to maintenance, repair, and fueling] that it may choose to perform.

    g.    In the event the sponsor itself exercises any of the rights and privileges referred to in this assurance, the services involved will be provided on the same conditions as would apply to the furnishing of such services by commercial aeronautical service providers authorized by the sponsor under these provisions.

    h.    The sponsor may establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport.

    i.    The sponsor may prohibit or limit any given type, kind or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public.

23.    **Exclusive Rights.** It will permit no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public. For purposes of this paragraph, the providing of the services at an airport by a single fixed-based operator shall not be construed as an exclusive right if both of the following apply:

    a.    It would be unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide such services, and

    b.    If allowing more than one fixed-based operator to provide such services would require the reduction of space leased pursuant to an existing agreement between such single fixed-based operator and such airport.

It further agrees that it will not, either directly or indirectly, grant or permit any person, firm, or corporation, the exclusive right at the airport to conduct any aeronautical activities, including, but not limited to charter flights, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, air carrier operations, aircraft sales and services, sale of aviation petroleum products whether or not conducted in conjunction with other aeronautical activity, repair and maintenance of aircraft, sale of aircraft parts, and any other activities which because of their direct relationship to the operation of aircraft can be regarded as an aeronautical activity, and that it will terminate any

exclusive right to conduct an aeronautical activity now existing at such an airport before the grant of any assistance under Title 49, United States Code.

24. **Fee and Rental Structure.** It will maintain a fee and rental structure for the facilities and services at the airport which will make the airport as self-sustaining as possible under the circumstances existing at the particular airport, taking into account such factors as the volume of traffic and economy of collection. No part of the Federal share of an airport development, airport planning or noise compatibility project for which a grant is made under Title 49, United States Code, the Airport and Airway Improvement Act of 1982, the Federal Airport Act or the Airport and Airway Development Act of 1970 shall be included in the rate basis in establishing fees, rates, and charges for users of that airport.

25. **Airport Revenues.**

   a. All revenues generated by the airport and any local taxes on aviation fuel established after December 30, 1987, will be expended by it for the capital or operating costs of the airport; the local airport system; or other local facilities which are owned or operated by the owner or operator of the airport and which are directly and substantially related to the actual air transportation of passengers or property; or for noise mitigation purposes on or off the airport. Provided, however, that if covenants or assurances in debt obligations issued before September 3, 1982, by the owner or operator of the airport, or provisions enacted before September 3, 1982, in governing statutes controlling the owner or operator's financing, provide for the use of the revenues from any of the airport owner or operator's facilities, including the airport, to support not only the airport but also the airport owner or operator's general debt obligations or other facilities, then this limitation on the use of all revenues generated by the airport (and, in the case of a public airport, local taxes on aviation fuel) shall not apply.

   b. As part of the annual audit required under the Single Audit Act of 1984, the sponsor will direct that the audit will review, and the resulting audit report will provide an opinion concerning, the use of airport revenue and taxes in paragraph (a), and indicating whether funds paid or transferred to the owner or operator are paid or transferred in a manner consistent with Title 49, United States Code and any other applicable provision of law, including any regulation promulgated by the Secretary or Administrator.

   c. Any civil penalties or other sanctions will be imposed for violation of this assurance in accordance with the provisions of Section 47107 of Title 49, United States Code.

26. **Reports and Inspections.** It will:

   a. submit to the Secretary such annual or special financial and operations reports as the Secretary may reasonably request and make such reports available to the public; make available to the public at reasonable times and places a report of the airport budget in a format prescribed by the Secretary;

   b. for airport development projects, make the airport and all airport records and documents affecting the airport, including deeds, leases, operation and use agreements, regulations and other instruments, available for inspection by any duly authorized agent of the Secretary upon reasonable request;