# Exhibit 11

1   Ramon K. Quichocho, Esq. (F0243)
    LAW OFFICES OF RAMON K. QUICHOCHO, LLC
2   2nd Floor, V.S. Sablan Building, Chalan Piao
    P.O. Box 505621
3   Saipan, MP  96950
    Tel. No.:  670.234.8946
4   Fax:  670.234.8920
    Email:  karissa129@gmail.com
5
    Antonio M. Atalig, Esq. (F0138)
6   Robert H. Myers, Jr. (SuprLI 2006-001)
    ATALIG LAW OFFICE
7   2nd Floor, V.S. Sablan Building, Chalan Piao
    P.O. Box 5332
8   Saipan, MP  96950
    Tel. No.:  670.234.2189
9   Fax:  670.234.8920
    Email:  info@ataliglawoffice.com
10
    Michael W. Dotts, Esq.
11  O'CONNOR BERMAN DOTTS & BANES
    2nd Floor, Nauru Building, Susupe
12  P.O. Box 501969
    Saipan, MP  96950
13  Tel. No.:  670.234.5684
    Fax:  670.234.5683
14  Email:  attorneys@saipan.com

15  *Attorneys for Plaintiff Joaquin Q. Atalig*

16

17                    **IN THE SUPERIOR COURT**

18                         **OF THE**

          **COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**
19

20  JOAQUIN Q. ATALIG,                    )  **CIVIL ACTION NO. 06-0119(R)**
                                          )
21              Plaintiff,                )
                                          )
22              vs.                       )        **SECOND AMENDED**
                                          )        **COMPLAINT FOR B**
23  OKP (CNMI) CORPORATION, BRIAN M.      )        **REACH OF CONTR**
    CHEN, PRASADA REDDY GOLUGURI,         )        **ACT AND TORT**
24  PRAMUAN JAIPHAKDEE, WILAI             )           **CLAIMS**
    PROMCHAI, COMMONWEALTH PORTS          )          **AND FOR RE**
25  AUTHORITY, AND REGINO M. CELIS, in    )        **LIEF UNDER T**
    his capacity as Acting Executive Director of  )  **HE OPEN GOVERN**
26  the Commonwealth Ports Authority, AND )        **MENT MEETINGS AND**
    DOES 1-3,                             )        **RECORDS ACT AND DE**
27                                        )        **MAND FOR JURY TRIAL**
                Defendants.               )
28  _____)

COMES NOW Plaintiff Joaquin Q. Atalig, by and through his counsel, Ramon K. Quichocho, Esq., and for his Second Amended Complaint for Breach of Contract and Tort Claims and for Relief Under the Open Government Meetings and Records Act and Demand for Jury Trial (the "SAC") against Defendants OKP (CNMI) Corporation, Brian M. Chen, Prasada Reddy Goluguri, Pramuan Jaiphakdee, Wilai Promchai, the Commonwealth Ports Authority, Regino M. Celis, and Does 1-3, alleges as follows:

## I.
## <u>INTRODUCTION</u>

1.   This landmark case is about Defendants OKP, Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3's destruction and desecration of several priceless and original Latte Stones, an ancient Chamorro grinding stone[1] other cultural and historical artifacts, and other things of value, in violation of the Lease Agreement, and in violation of the laws of the Commonwealth of the Northern Mariana Islands, despite being forewarned at least twice not to damage or destroy cultural and historical artifacts.

2.   More than 300 years ago, the early Chamorros painstakingly carved out and created the Latte Stone.  As a result, the Commonwealth of the Northern Mariana Islands, and the beautiful island of Rota in particular, is the Latte Stone capitol of the world.

3.   The Latte Stone is such an original art, symbol, and structure, that even with the advantage of modern technology, the modern Chamorros have not carved out a "modern" Latte Stone that even comes close to the original Latte Stones that are present throughout the Mariana Islands.

---

[1] Mortar and pestal.

4.   Today, the Latte Stone is so sacred that it has become a living symbol of Chamorro strength, peace, solidarity, pride, respect, dignity, identity, and justice.

5.   In fact, on March 24, 2006, the CNMI's Miss Marianas Teen 2006 stated it succinctly when she elegantly declared that the Latte Stone "represents the foundation in which our community was built upon, ...."[2]

6.   The Latte Stone has become a permanent and official image of our CNMI flag, crowned with a beautiful mwar which signifies the highest respect and dignity, and untirelessly waving a friendly "Hafa Adai."

7.   The Latte Stone has been used in numerous business logos, in official government and corporate seals, in construction designs, in storybooks, and in many other aspects of life in the CNMI.

8.   The Latte Stone, however, has also been a bad experience for a few people who have intentionally or unintentionally disrespected and desecrated the sanctity of the place where a Latte Stone sits, causing some to suffer sicknesses that even modern science cannot cure, and in which the only cure is to "ask for forgiveness."

9.   Surely, the Latte Stone represents the Chamorro culture, tradition, and beliefs.

10. As of December 2005, several original Latte Stones lay on what is now the real property of Plaintiff Atalig, in Ginalangan, Rota, Lot No. 362 R 01 (sometimes referred to as "Plaintiff Atalig's land").

---

[2] This quote is from Miss Marianas Teen 2006, Miss Myana T. Welch.  Miss Welch won the Miss Marianas Teen 2006 title and "got the loudest cheer when she responded to the following question: 'What single gift will you offer to the emperor and empress of Japan that will reflect the Marianas?' Welch replied:  'I would give them a replica of our latte stone made of limestone, the exact limestone that was used by our ancestors.  It represents the foundation on which our community was built upon, and giving this to them speaks more than a thousand words about the Marianas.'"

11. But, in late December 2005, Defendant OKP wiped away a lot of the history, culture, value, and economic advantage that was on Plaintiff Atalig's land in Ginalangan, Rota, when Defendant OKP used heavy equipment to clear Plaintiff Atalig's land, to wit, Latte Stone clusters, ancient Chamorro grinding stone, and Japanese structures and other artifacts, without the required permits from the Historic Preservation Office, the Division of Environmental Quality, and other regulatory agencies, and definitely, without the prior written consent of Plaintiff Atalig.  The destruction, desecration, and obliteration of the cultural and historical artifacts and other things of value took less than two months into the Lease term.

12. Historically, the Spanish came and ruled the Chamorros, but the Spanish did not destroy the Latte Stone clusters.  They preserved and respected them.

13. Then, the Germans took over the Mariana Islands from Spain, but the Germans did not destroy the Latte Stone clusters.  They, too, preserved and respected them.

14. After the Germans, the Japanese took control of the Mariana Islands until the end of World War II in 1945, but the Japanese did not destroy the Latte Stone clusters.  Not only did they preserve them, the Japanese erected more structures that have become historical artifacts.

15. As a result of the Japanese occupation, the Japanese built other structures on Plaintiff Atalig's land, which leads to the Ginalangan Defensive Complex.

16. After World War II, the United Nations and the Unites States took over until the Mariana Islands voted to be in political union with the United States, but the United Nations and the United States did not destroy the Latte Stone clusters or the Japanese structures.  They, too, preserved and respected them.

17. For many decades, the Latte Stone clusters, the ancient Chamorro grinding stone, and certain Japanese structures, including but not limited to, a Japanese water tank, washing basin and

frame, sat serenely on Plaintiff Atalig's land in Rota, under the watch of Plaintiff Atalig, who, in accordance with family tradition, was supposed to pass the "family treasure" to his children, who will then pass them on to their children, and their children's children.  But now, it is IMPOSSIBLE to do that!

18. For many years, Plaintiff Atalig has held on to the Constitutional guarantee that, "[p]laces of importance to the culture, traditions and history of the people of the Northern Mariana Islands shall be protected and preserved…" and that "[a]rtifacts and other things of cultural or historical significance shall be protected, preserved and maintained in the Commonwealth…."  N.M.I. Const. art. XIV, § 3.  Short of litigation, however, that Constitutional guarantee is only as good as the enforcement resolve of the Historic Preservation Office and others with the enforcement powers.

19. In the CNMI, it is the Historic Preservation Office that must "issue or deny permits, after review by the Review Board, for use, access, and development of land containing cultural and historic properties, and for the taking of any artifact of historic or cultural significance from the Commonwealth for cultural exchange, scientific identification, or donation to a nonprofit organization recognized on the basis of its cultural significance to the Commonwealth[.]"  1 CMC § 2382(g).

20. Therefore, "[i]t is unlawful for any person, partnership, business, corporation or other entity to willfully remove or take any artifact that is of historic or cultural significance to the people of the Commonwealth, or knowingly destroy, remove, disturb, displace, or disfigure any cultural or historic property on public or private land or in the water surrounding the Commonwealth as designated by or eligible for designation by the Historic Preservation Office as a cultural or historic property, unless the activity is pursuant to a permit issued under 1 CMC § 2382(g) and 2 CMC § 4831."  2 CMC § 4841.

21. As such, "[a]ny person who, individually or acting for any business, corporation or other entity, knowingly and willfully violates any provision of this chapter or any valid rule or regulation promulgated under this chapter shall be fined not more than $10,000 per day or imprisoned not more than one year, or both."  2 CMC § 4842.

22. Unfortunately, some of the cultural and historical artifacts that once enjoyed the serenity on Plaintiff Atalig's land were unlawfully damaged, destroyed, and mutilated by Defendants OKP, Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3, and are LOST AND GONE FOREVER.

23. Sadly, if only Defendant OKP followed the terms and provisions of the Lease Agreement, if only Defendant OKP obeyed the laws of the CNMI, if only Defendant OKP listened to warnings not to clear the areas where the cultural and historical artifacts lay, if only Defendant OKP had a little respect for the culture, heritage, race, and history of the Chamorro people, Defendant OKP could have avoided the despicable and disgraceful destruction and desecration of the priceless artifacts that were once part of who we are as CNMI citizens and as Chamorros.

## II.
## JURISDICTION AND VENUE

24. This Court has jurisdiction over this matter pursuant to N.M.I. Const. art. IV, § 2, and 1 CMC § 3202, as well as the Open Government Meetings and Records Act, which is codified at 1 CMC § 9901, *et seq.*, as amended.

25. Venue is proper in the Superior Court of the Commonwealth of the Northern Mariana Islands, in Luta.

## III.
## PARTIES

26. Plaintiff Joaquin Q. Atalig is a United States citizen and is residing in the Commonwealth of the Northern Mariana Islands.

27. Defendant OKP (CNMI) Corporation ("OKP") is a domestic corporation organized and existing under the laws of the Commonwealth of the Northern Mariana Islands, with its principal places of business located in Saipan and/or Rota, Commonwealth of the Northern Mariana Islands. Defendant OKP was only incorporated on May 3, 2005. Defendant OKP is grossly undercapitalized for the project that Defendant OKP contracted with Defendant CPA, since Defendant OKP only has 100,003 shares at one dollar per share, and $25,003 paid-in shares.

28. Defendant OKP was awarded an $8,677,000.00 contract by the Commonwealth Ports Authority to improve the Rota Airport runway. As part of that operation, Defendant OKP leased Plaintiff Atalig's improvements in November 2005. Due to the magnitude of Defendant OKP's project in Rota, Defendant OKP knew that governmental permits are required before any land clearing activities are conducted.

29. On information and belief, Defendant Brian M. Chen is a U.S. citizen. Defendant Brian M. Chen owns 2,000 shares of Defendant OKP's stocks. Defendant Brian M. Chen is also the Secretary, a member of the Board of Directors of Defendant OKP, and the Resident Manager. At all relevant times, Defendant OKP is the alter ego of Defendant Brian M. Chen. Defendant Brian M. Chen was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. On information and belief, Defendant Brian M. Chen is the brother of Endymion M. Chen of E.M. Chen & Associates (CNMI), Inc., who is the Project Designer for the Rota Project.[3]

---

[3] Although there is reason to belief that Defendant OKP had the benefit of an insider through the relationship of Defendant Brian M. Chen, who is a part owner of Defendant OKP, and E.M. Chen & Associates (CNMI), Inc., who is Defendant CPA's Project Designer for the Rota CPA Project, Plaintiff Atalig is still investigating this issue, but due to the unjustified and unlawful denial of access to public documents at CPA, it is hard to ascertain this fact without the Court's assistance to order Defendant CPA to provide access to public records.

30. On information and belief, Defendant Prasada Reddy Goluguri is a citizen of Singapore. Defendant Goluguri is a non-resident worker employed by Defendant OKP as a "Project Engineer" for the CPA Project, yet he is not licensed to practice any branch of engineering in the CNMI. Defendant Goluguri was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.  Furthermore, Defendant Goluguri aided or abetted, or participated with the other defendants and/or others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and is responsible for the acts, occurrences and events alleged in this SAC.

31. On information and belief, Defendant Pramuan Jaiphakdee is a citizen of Singapore. Defendant Jaiphakdee is a non-resident worker employed by Defendant OKP as a Heavy Equipment Operator for the CPA Project.  Defendant Jaiphakdee was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.  Furthermore, Defendant Jaiphakdee aided or abetted, or participated with the other defendants and/or others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and is responsible for the acts, occurrences and events alleged in this SAC.

32. On information and belief, Defendant Wilai Promchai is a citizen of Singapore. Defendant Promchai is a non-resident worker employed by Defendant OKP as a Heavy Equipment Operator for the CPA Project.  Defendant Promchai was involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.  Furthermore, Defendant Promchai aided or abetted, or participated with the other defendants and/or others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and is responsible for the acts, occurrences and events alleged in this SAC.

Defendant Wilai Promchai is not sued as to any alleged damage occurring prior to December 30, 2005, pursuant to the Court's December 4, 2006 Order.

33. Defendant Commonwealth Ports Authority ("CPA") is a public corporation and a CNMI Government autonomous and self-sustaining agency created under 2 CMC § 2101, *et seq*., whose principal office is located in Saipan, Commonwealth of the Northern Mariana Islands.  Under the Grant Agreement, Defendant CPA is the Sponsor and is responsible to carry out and complete the Project without undue delays and in accordance with the terms of the Grant Agreement.  Under the Construction Agreement, however, Defendant CPA delegated all its responsibilities to Defendant OKP, thus, creating an agency relationship with Defendant OKP.  Defendant CPA is the principal and Defendant OKP is the agent.

34. Defendant Regino M. Celis is a U.S. citizen and a resident of the CNMI and was the Acting Executive Director for CPA.  Defendant Celis is named as a Defendant in this lawsuit for purposes of the Open Government Meetings and Records Act violation only.

35. Except as described herein, the true names of the defendants sued as Does 1 through 3, inclusive, are unascertained to Plaintiff Atalig which therefore sues these defendants by such fictitious names.  Plaintiff Atalig will further amend this SAC to allege their true names and capacities when ascertained.  These fictitiously named defendants were involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions.  These defendants aided or abetted, or participated with the other defendants and others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and are responsible for the acts, occurrences and events alleged in this SAC.

36. Except Defendant Celis, the named and Doe defendants in this action are collectively referred to herein as "Defendants."

# IV.
## OPERATIVE FACTS

37. On or about May 4, 2005, Defendant CPA submitted to the Department of Transportation —Federal Aviation Administration ("FAA") an application for a grant of Federal funds for a project associated with the Rota International Airport Runway 09/27 Extension – Phase I (the "Project").

38. On August 24, 2005, the FAA offered and agreed to pay, as the United States share of the allowable costs incurred in accomplishing the Project, ninety-five per centum (95%) thereof.  A true and correct copy of the Grant Agreement is attached to the Verified First Amended Complaint for Breach of Contract and Tort Claims and for Relief Under the Open Government Meetings and Records Act and Demand for Jury Trial (the "FAC"), labeled "Exhibit A," and incorporated herein by this reference as if set forth in full.

39. On August 30, 2005, Defendant CPA accepted the FAA's offer and agreed, among other things, to "carry out and complete the Project without undue delays and in accordance with the terms [of the Grant Agreement], and such regulations and procedures as the Secretary shall prescribe," and agreed to comply with the assurances which were made part of the Project application.

40. As a result, Defendant CPA conducted a bid for the Project and ultimately selected Defendant OKP over other bidders.  But, since Defendant OKP was newly incorporated and undercapitalized, Defendant CPA was concerned with the financial capabilities of Defendant OKP.

41. On September 30, 2005, Defendant OKP wrote a letter to Defendant CPA explaining, among other things, that the "Project will be funded from Singapore."  A true and correct copy of the September 30, 2005 letter from Defendant OKP is attached to the FAC, labeled "Exhibit B," and incorporated herein by this reference as if set forth in full.

42. On October 19, 2005, OKP Holdings Limited ("OKP Singapore"), a Singapore company and the majority shareholder of Defendant OKP, wrote an electronic mail to Defendant CPA

emphasizing that OKP Singapore "has given a strong mandate and commitment to Defendant OKP the fullest assistance for this Rota project." A true and correct copy of the October 19, 2005 electronic mail from OKP Singapore is attached to the FAC, labeled "Exhibit C," and incorporated herein by this reference as if set forth in full.

43. On October 24, 2005, OKP Singapore wrote a letter to Defendant CPA to inform Defendant CPA that OKP Singapore will handle and finance the preparation and purchasing of all machinery and equipment and to give Defendant CPA assurance that OKP Singapore is financially capable of carrying out the Project. A true and correct copy of the October 24, 2005 letter from OKP Singapore is attached to the FAC, labeled "Exhibit D," and incorporated herein by this reference as if set forth in full.

44. Consequently, on October 28, 2005, Defendants CPA and OKP entered into a Construction Contract for Rota International Airport Runway 09/27 Extension—Phase I, Project No. CPA-RA-001-03. A true and correct copy of the Construction Contract is attached to the FAC, labeled "Exhibit E," and incorporated herein by this reference as if set forth in full.

45. Defendants CPA and OKP agreed that the Construction Contract and any interest therein shall not be assigned or transferred by Defendant OKP; provided that Defendant OKP with the express prior written approval of Defendant CPA, may secure subcontractors and suppliers that are necessary to carry out the work on the Project; and provided further that Defendant OKP "shall remain fully responsible and accountable at all times for the Project and for complying with the terms and conditions of [the Construction] Contract." Emphasis added.

46. In preparation for the Project, Defendant OKP negotiated with Plaintiff Atalig to lease Plaintiff Atalig's improvements for Defendant OKP's office, employees' barracks, etc., in Ginalangan, Rota.

47. On November 2, 2005, Plaintiff Atalig and Defendant OKP executed a Lease Agreement (the "Lease"), which was filed at the Commonwealth Recorder's Office, as File No. 05-3030, on November 3, 2005.  Under the Lease, Plaintiff Atalig is the Lessor, and Defendant OKP is the Lessee.  A true and correct copy of the Lease is attached to the FAC, labeled "Exhibit F," and incorporated herein by this reference as if set forth in full.

48. Plaintiff Atalig leased unto Defendant OKP, and Defendant OKP leased from Plaintiff Atalig, "the <u>improvements</u> described in Section 1" of the Lease.  Emphasis added.

49. Pursuant to Section 1 of the Lease, the leased premises "consist of all <u>improvements</u> situated on the real property in Northern Part (Area No. 4) Ginalangan, Municipality of Rota, Commonwealth of the Northern Mariana Islands,…, <u>together with the right to use Lessor's easements and appurtenances in adjoining and adjacent land, highways, roads, streets, lanes,</u> whether public or private, reasonably required for the installation, maintenance, operation and service of sewer, water, gas, power and other utility lines and for driveways and approaches to and from abutting highways or streets for the use and benefit of the above-described improvements and the parcel of real property described below."  Emphases added.

50.  Defendant OKP also has the right to use the real property, described below, where the leased improvements are situated:

> Lot No. 362 R 01, containing an area of 49,998 square meters, more or less, as more particularly described in Cadastral Plat No. 362 R 00, the original of which was registered with the Land Registry as Document No. 6503, on September 12, 1978.

51. The existing improvements and improvements subsequently erected on Lot 362 R 01 during the term of the Lease are collectively referred to in the Lease as the "Premises."  See Section 1 of the Lease.

52. Furthermore, Defendant OKP agreed to lease the furniture, fixtures, appliances, and tools, which were all itemized in the List of Inventory which was supposed to be verified and approved by both parties on or before November 30, 2005.  Unfortunately, Defendant OKP reneged and Plaintiff Atalig incurred additional storage and other costs for many of the items that Defendant OKP and its representatives refused to accept.

53. The Lease was for a term of thirteen (13) months, commencing on December 1, 2005, and ending on December 31, 2006, unless sooner terminated, with Lessee's option to extend for a period of one year at the monthly rent of $3,000.00.  See Sections 2 and 5 of the Lease.

54. Pursuant to Section 3 of the Lease, Defendant OKP agreed to pay the full-time salaries of Edita (Ms. Ludivina P. Carillo) and Esther (Ms. Ester M. Langit), at $4.50 per hour and $3.50 per hour, respectively.  On information and belief, Defendant OKP broke its promise.

55. Pursuant to Section 6 of the Lease, Defendant OKP may use, improve and develop the Premises or any part thereof for any lawful use or purpose, provided that Defendant OKP does not commit waste, but primarily as office, barracks, equipment repair shop and workstation, heavy and lightweight equipment parking and storage, and as staging area related to Defendant OKP's business and operation on Rota.  Emphases added.

56. Pursuant to Section 13.1 of the Lease, Defendant OKP "shall have the right during the term of this Lease, to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvement on the Premise[s], and correct and change the contour of the Premises pursuant to the plans and drawings attached [to the Lease] as Exhibits "A" and "B", …only with the prior written consent of Lessor."  Emphasis added.

57. Plaintiff Atalig never gave a written consent and Defendant OKP never asked for a written consent to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building

and other improvement on the Premises, and correct and change the contour of the Premises pursuant to the plans and drawings attached [to the Lease] as Exhibits "A" and "B."

58. Furthermore, Section 13.1 of the Lease expressly states that "*[a]ny* other alterations and changes require Lessor's consent in writing."

59. Plaintiff Atalig never gave a written consent and Defendant OKP never asked for a written consent to make any other alterations and changes.

60. In or about December 2005 and/or January 2006, despite being warned not to clear the areas where the cultural and historical artifacts lay, Defendants used heavy equipment to clear the land, without the proper permits from the Government and without permission from Plaintiff Atalig, in order to erect other structures for the use and benefit of Defendant OKP.

61. Similarly, in or about December 2005 and/or January 2006, despite not having a written consent from Plaintiff Atalig, Defendants tore down the kitchen, laundry, and storage facilities, and used the materials therefrom to build a *palapala*. In the process, Defendants damaged and destroyed the homemade cooking stove, *ifik* posts, and other valuable items that were stored.

62. Similarly, in or about December 2005 and/or January 2006, despite not having a written consent from Plaintiff Atalig, Defendants bull-dozed down valuable trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants.

63. Similarly, in or about December 2005 and/or January 2006, despite not having a written consent from Plaintiff Atalig or an earthmoving permit from the Division of Environmental Quality, Defendants removed soil and other rocks and minerals, including excavating Plaintiff Atalig's land, for Defendant OKP's parking lot.

64. Defendant OKP did not obtain and pay for a permit before clearing the land despite agreeing to "be responsible for the payment of all utilities, assessments, and other public charges arising by reason of the occupancy, use or possession of the Premises." See Section 11 of the Lease.

65. Pursuant to Section 15 of the Lease, Defendant OKP "shall be in default in the prompt and full performance of any other term, covenant, or condition of the Lease, (except as to payment of rent), if such default shall continue for a period of thirty (30) days after notice of such default is given by the Lessor to Lessee, unless the default is of such a nature that the same cannot be cured or corrected within said thirty (30) day period and the Lessee shall have promptly and diligently commenced to cure and correct such default and shall have thereafter continued therewith with reasonable diligence and in good faith, in a manner as to cure and correct the same as promptly and as reasonably practicable under the circumstances, and shall have continued therewith until the default shall have been cured or corrected."

66. On January 17, 2006, Plaintiff Atalig sent a Notice of Default and Violations to Defendant OKP. A true and correct copy of the January 17, 2006 Notice of Default and Violations is attached to the FAC, labeled "Exhibit G," and incorporated herein by this reference as if set forth in full.

67. Defendant OKP is unable and unwilling to cure the default and violations.

**V.**
**PRINCIPAL-AGENT LIABILITY**
**(Piercing the Corporate Veil of Defendant OKP)**
*Against Defendant Chen*

68. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this section, all the allegations contained in this SAC.

69. Defendant OKP's corporate form should be disregarded because:

a.   Defendant OKP was organized and operated as a mere tool or business conduit of

Defendant Brian M. Chen.  Defendant OKP is the alter ego of Defendant Chen.

b.   Defendant OKP was incorporated to circumvent the procurement statute and regulations.

c.   Defendant OKP was inadequately capitalized so as to work an injustice.

70. Defendant Chen has some financial interest, ownership, or control over Defendant OKP.

71. There is such a unity between Defendant OKP and Defendant Chen that the separateness

of Defendant OKP has ceased.

72. Holding only Defendant OKP liable would result in injustice.

73. Defendant OKP did not have enough capital for the type of business and project it was

conducting.

74. Wherefore, Defendant Chen should be held liable for the tortious acts and wrongdoings

of Defendant OKP, as set forth herein, under the vicarious liability theory of piercing the corporate

veil.

## VI.
## PRINCIPAL-AGENT LIABILITY
### (Respondeat Superior)
### *Against Defendant OKP*

75. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth

under this section, all the allegations contained in this SAC.

76. Plaintiff Atalig was injured as the result of the tortious conduct as set forth herein.

77. The tortfeasors, Defendants Chen, Jaiphakdee, Promchai, Goluguri, and Does 1-3 are

employees, agents, or representatives of Defendant OKP, and committed the torts set forth herein

while they were acting within the scope of their employment.

78. Wherefore, Defendant OKP should be held liable for the tortious acts and wrongdoings of

its employees, as set forth herein, under the vicarious liability theory of respondeat superior.

**VII.**
**PRINCIPAL-AGENT LIABILITY**
**(Actual Authority)**
*Against Defendant CPA*

79. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this section, all the allegations contained in this SAC.

80. Defendant CPA, as the Sponsor of the Project under the Grant Agreement, expressly and intentionally delegated and conferred authority to Defendant OKP to be "fully responsible and accountable at all times for the Project and for complying with the terms and conditions of [the Construction] Contract."  See Section 7 of the Construction Contract (emphasis added).

81. Defendant OKP was acting within the scope of its agency when Defendant OKP entered into the Lease with Plaintiff Atalig and when Defendant OKP committed the various torts that are set forth herein.

82. As admitted and acknowledged by Defendant OKP, "all of the work that has been performed at Plaintiff's property has been performed solely for the purpose of supporting the performance of OKP (CNMI) Corporation's obligations under its contract with the Commonwealth Ports Authority for the extension of the Rota Airport Runway."  OKP (CNMI) Corporation's Opposition to Plaintiff's Motion for Partial Summary Judgment at 11, lines 10-16.

83. Wherefore, Defendant CPA should be held liable for the tortious acts and wrongdoings of its agent, Defendant OKP, as set forth herein, under the vicarious liability theory of actual authority.

**VIII.**
**FIRST CAUSE OF ACTION**
**(Breach of Contract)**
*Against Defendant OKP*

84. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this SAC.

85. The Lease was a valid contract supported by bargained for consideration.

86. Plaintiff Atalig has performed all the conditions and agreements required of Plaintiff Atalig under the terms of the Lease.

87. Defendant OKP, including its agents, representatives, shareholders, principals, and employees, had a duty to act with reasonable care and diligence in performing the Lease so as not to injure a person or property by its performance.

88. Defendant OKP breached the Lease with Plaintiff Atalig, to the detriment of Plaintiff Atalig, in the following respects:

    a.   Defendant OKP reneged on the promise to lease furniture, fixtures, appliances, and tools, which forced Plaintiff Atalig to incur storage costs for the furniture, fixtures, appliances, and tools that were not leased by Defendant OKP, in violation of Section 1 of the Lease.

    b.   Defendant OKP has failed to pay the full-time salaries of Ms. Carillo and Ms. Langit at the rate of $4.50 per hour and $3.50 per hour, respectively, as agreed, in violation of Section 3 of the Lease;

    c.   Defendant OKP, including its agents, representatives, and employees have illegally hunted for deer and fruitbat on Plaintiff Atalig's land in violation of Section 6 of the Lease and in violation of the laws of the CNMI;

    d.   On information and belief, Defendant OKP, including its agents, representatives, and employees have stolen rocks and other materials from the Ginalangan Defensive Complex in their attempt to cover up the damage and destruction to the historical Japanese water tank. The stolen rocks are laid and stacked up on the Japanese water tank, which Defendant OKP has re-plastered to pretend that there is no damage. As a result, Defendant OKP violated Section 3 of the Lease, and the laws of the CNMI;

e.  Defendant OKP, including its agents, representatives, and employees have committed waste by unlawfully damaging, destroying, and/or mutilating historical artifacts, structures, and other valuable relics, including but not limited to, Latte Stone clusters, ancient Chamorro grinding stone, Japanese structures, water tank, washing basin and frame, and areas surrounding Japanese building(s), in violation of Sections 1 and 6 of the Lease and in violation of CNMI laws and regulations;

f.  Defendant OKP, including its agents, representatives, and employees have committed waste by damaging, destroying, and/or mutilating permanent trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, lemon trees, atis trees, and other plants, in violation of Sections 1 and 6 of the Lease;

g.  Defendant OKP, including its agents, representatives, and employees have committed waste by damaging, destroying, and/or mutilating preexisting buildings/improvements to the land, including but not limited to, laundry, storage, and kitchen facilities, and the stored contents therein, in violation of Sections 1 and 6 of the Lease;

h.  Defendant OKP, including its agents, representatives, and employees have committed waste by placing a fuel tank station on Plaintiff's property without the proper permits, in violation of Section 6 of the Lease;

i.  Defendant OKP, including its agents, representatives, and employees have committed waste by moving and/or removing soil and minerals without the proper permits or authorization, in violation of Sections 1 and 6 of the Lease and in violation of CNMI laws and regulations;

j.   Defendant OKP, including its agents, representatives, and employees failed to obtain Plaintiff Atalig's written consent to erect, maintain, alter, remodel, reconstruct, rebuild, replace and remove building and other improvement on the Premises, and correct and change the contour of the Premises, in violation of Section 13.1 of the Lease.

89. Notwithstanding demand and/or notice to cure the violations, Defendant OKP, including its agents, representatives, and employees have failed, neglected, and refused, and still fail, neglect, and refuse to cure the violations and default.

90. As a direct and proximate result of Defendant OKP, including its agents, representatives, and employees' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, property damages and loss of prospective economic advantages, and have been damaged in an amount to be proven at trial.

91. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendant OKP, including its agents, representatives, and employees' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendant OKP, is liable for punitive damages in an amount to be proven at trial.

92. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## IX.
## SECOND CAUSE OF ACTION
### (Waste)
### *Against Defendant OKP*

93. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this SAC.

94. At all relevant times, Plaintiff Atalig was the fee simple owner of Lot No. 362 R 01, on which are present priceless cultural and historical artifacts and other things of value.

95. Defendant OKP leased the <u>improvements</u> situated on Lot No. 362 R 01, and occupied Lot No. 362 R 01 since the commencement of the term of the Lease.

96. During the period of such occupation, Defendant OKP, including its agents, representatives, and employees greatly injured the improvements and the land, as follows:

a.  By unlawfully damaging and/or destroying historical artifacts, structures and other valuable relics, including but not limited to, Latte Stone clusters, ancient Chamorro grinding stone, Japanese structures, water tank, washing basin and frame, and areas surrounding Japanese building(s), and removing them from Plaintiff Atalig's land;

b.  By damaging, destroying and/or cutting permanent trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, lemon trees, atis trees, and other plants, and removing them from Plaintiff Atalig's land;

c.  By damaging and/or destroying preexisting buildings/improvements to the land, including but not limited to, the laundry, storage, and kitchen facilities, and leaving the stored items exposed;

d.  By placing a hazardous fuel tank on Plaintiff Atalig's land without the proper and necessary safety requirements in place; and

e.  By quarrying, moving, removing, and digging soil and other minerals (about 40' x 50' x 8' hole in the ground and lined by concrete, including other excavations), and removing them from Plaintiff Atalig's property.

97. Defendant OKP did not obtain the necessary permits from the Division of Environmental Quality and the Historic Preservation Office before conducting its wasteful and unlawful activities.

98. Although required under the Lease, Defendant OKP failed to obtain the prior written permission of Plaintiff Atalig before conducting its wasteful and unlawful activities.

99. As a direct and proximate result of Defendant OKP, including its agents, representatives, and employees' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, diminution in property values and loss of prospective economic advantages, and has been damaged in an amount to be proven at trial.

100.   Because of the willful, wanton, vile, outrageous, and malicious nature of Defendant OKP, including its agents, representatives, and employees' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendant OKP is liable for punitive damages in an amount to be proven at trial.

101.   Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

### X.
### THIRD CAUSE OF ACTION
### (Conversion—Historical and Cultural Artifacts)
### *Against Defendant OKP*

102.   Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this SAC.

103.   At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01, on which are present cultural and historical artifacts.

104.   Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of historical and cultural artifacts, to wit, Latte Stones, ancient Chamorro grinding stone, Japanese structures, Japanese washing basin and frame, and Japanese water tank, located on Plaintiff Atalig's land, and converted them to Defendant OKP's own use.

105.   As a direct and proximate result of Defendant OKP and its agents, representatives and employees' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages,

including but not limited to, property damages, diminution in property values, and loss of prospective economic advantages, and has been damaged in an amount to be proven at trial.

106.    Because of the willful, wanton, vile, outrageous, and malicious nature of Defendant OKP and its agents, representatives, and employees' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendant OKP is liable for punitive damages in an amount to be proven at trial.

107.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XI.
## FOURTH CAUSE OF ACTION
### (Conversion—Soil and Other Minerals)
### *Against Defendant OKP*

108.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this SAC.

109.    At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01, on which are present fertile top soil and minerals.

110.    Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of soil and other minerals located on Plaintiff Atalig's land, and converted them to Defendant OKP's own use.

111.    As a direct and proximate result of Defendant OKP and its agents, representatives and employees' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, property damages and loss of prospective economic advantages, and has been damaged in an amount to be proven at trial.

112.    Because of the willful, wanton, vile, outrageous, and malicious nature of Defendant OKP and its agents, representatives and employees' conduct as alleged herein, and their conscious

and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendant OKP is liable for punitive damages in an amount to be proven at trial.

113.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XII.
### FIFTH CAUSE OF ACTION
**(Conversion—Permanent Trees)**
***Against Defendant OKP***

114.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this SAC.

115.    At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01, on which are present valuable permanent trees.

116.    Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of permanent trees, to wit, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, lemon trees, atis trees, shrubs, manicured flowers, and other plants, located on Plaintiff Atalig's land, and converted them to Defendant OKP's own use.

117.    As a direct and proximate result of Defendant OKP and its agents, representatives and employees' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, property damages and loss of prospective economic advantages, and has been damaged in an amount to be proven at trial.

118.    Because of the willful, wanton, vile, outrageous, and malicious nature of Defendant OKP and its agents, representatives and employees' conduct as alleged herein, and their conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendant OKP is liable for punitive damages in an amount to be proven at trial.

119.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

1

2

3

**XIII.**
**SIXTH CAUSE OF ACTION**
**(Conversion—Preexisting Buildings/Improvements)**
*Against Defendants OKP, Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3*

4

5

120.     Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set

forth under this cause of action, all the allegations contained in this SAC.

6

7

8

121.     At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01

on which are present preexisting buildings and improvements.

9

10

11

12

13

14

122.     Defendants OKP, Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3 took

possession of preexisting buildings/improvements, to wit, laundry, storage, and kitchen facilities,

including the stored items, such as golf ball dispensers, sinks, mattresses, kitchen tools, located on

Plaintiff Atalig's land, and converted them to Defendants OKP, Chen, Goluguri, Jaiphakdee,

Promchai, and Does 1-3's own use.

15

16

17

18

19

123.     As a direct and proximate result of Defendants OKP, Chen, Goluguri, Jaiphakdee,

Promchai, and Does 1-3's conduct detailed above and in other respects, Plaintiff Atalig has suffered

damages, including, but not limited to, property damages and loss of prospective economic

advantages, and has been damaged in an amount to be proven at trial.

20

21

22

23

24

25

124.     Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants

OKP, Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3's conduct as alleged herein, and their

conscious and reckless disregard and indifference of the rights of Plaintiff Atalig, Defendants OKP,

Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3 are liable for punitive damages in an amount to

be proven at trial.

26

125.     Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

27

28

*25*
*Second Amended Complaint*

# XIV.
## SEVENTH CAUSE OF ACTION
### (Negligence)
### *Against Defendant OKP*

126.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this SAC.

127.    Defendant OKP had the duty not to commit waste on Plaintiff Atalig's land and to obtain the prior written consent of Plaintiff Atalig before any alterations or changes are done on the leased improvements and the real property.

128.    Defendant OKP breached its duty to Plaintiff Atalig when it violated the laws of the CNMI by damaging and destroying cultural and historical artifacts and other things of value, and when Defendant OKP failed to obtain the prior written consent of Plaintiff Atalig to damage, remove, alter or change the improvements, the real property, and other things of value.

129.    As a direct and proximate result of Defendant OKP's conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, property damages and loss of prospective economic advantages, and has been damaged in an amount to be proven at trial.

130.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

# XV.
## EIGHTH CAUSE OF ACTION
### (Unjust Enrichment)
### *Against Defendants OKP, Chen, Goluguri, Jaiphakdee, Promchai, Does 1-3*

131.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this SAC.

132.    Defendant OKP is sued under this cause of action in the alternative to the breach of contract cause of action, and for damages for any actions taken by Defendant OKP that were outside of the scope of the Lease.

133.    Defendants Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3 are sued under this cause of action for damages for any actions taken by them since they are not parties to the Lease.

134.    Defendants OKP, Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3 used and benefited from the use of Plaintiff Atalig's land to build certain structures and to remove certain historical and cultural artifacts and permanent trees, without the prior written consent of Plaintiff Atalig.

135.    Defendants OKP, Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3 used and benefited from the use of certain materials that were taken from the storage, laundry, and kitchen facilities without the prior written consent of Plaintiff Atalig.

136.    Defendants OKP, Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3 knew that they do not have permission from Plaintiff Atalig to take and remove preexisting improvements, including the stored items such as golf ball dispensers, sinks, mattresses, etc., historical and cultural artifacts, and permanent trees, but they went ahead and took, removed, and benefited from the use of Plaintiff Atalig's properties as set forth herein.

137.    Defendant OKP has accepted and enjoyed the benefits of the impermissible use of Plaintiff Atalig's properties to further Defendant OKP's business in Rota and the CNMI.

138.    Defendants Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3 have accepted and enjoyed the benefits of the impermissible use of Plaintiff Atalig's properties.

139.    The retention of the benefit and enjoyment of the use of Plaintiff Atalig's land and properties without the payment of its value is unfair and unjust.

140.     Defendants OKP, Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3 have been unjustly enriched at the expense of Plaintiff Atalig.

141.     As a direct and proximate result of Defendants OKP, Chen, Goluguri, Jaiphakdee, Promchai, and Does 1-3's conduct detailed above and in other respects, Plaintiff Atalig has suffered personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, including but not limited to, property damages, and has been damaged in an amount to be proven at trial.

142.     Wherefore, Plaintiff prays for the relief as set forth herein.

## XVI.
## NINTH CAUSE OF ACTION
### (Indemnification)
### *Against Defendant OKP*

143.     Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this SAC.

144.     Pursuant to Sections 12 and 12A of the Lease, Defendant OKP "shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of litigation…[o]n the account of or through the use of the demised premise[s] or improvements or any part thereof by Lessee or by any other person acting under the authority, direction, in the interest of, or through the title of the Lessee for any purpose inconsistent with the provisions of this Lease."

145.     The destruction of the historical and cultural artifacts and permanent trees, and the removal of soil and minerals, and other things of value, have diminished the market value of Plaintiff Atalig's land and constitutes waste which is inconsistent with the provisions of the Lease.

146.     Pursuant to Sections 12 and 12B of the Lease, Defendant OKP "shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of

litigation…[a]rising out of, or directly or indirectly due to, any failure of Lessee in any respect promptly and faithfully to satisfy Lessee's obligations under this [L]ease."

147.    Defendant OKP failed to promptly and faithfully satisfy Defendant OKP's obligations under the Lease by failing to obtain Plaintiff Atalig's written consent prior to the unlawful activities, and by destroying invaluable artifacts and other structures and things which constitutes waste.

148.    Pursuant to Sections 12 and 12C of the Lease, Defendant OKP "shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of litigation…[a]rising out of directly or indirectly due to any accident or other occurrence causing injury to any person or persons or property resulting from the use of the premises or any part thereof, including the land."

149.    Defendant OKP, including its agents, representatives, and employees' actions caused the injury to Plaintiff Atalig's land by diminishing its value now and in the future.

150.    No such indemnification shall be required with respect to losses or liabilities arising by reason of the affirmative negligence or recklessness of Lessor.  See Section 12 of the Lease.

151.    Plaintiff Atalig was not, and is not, negligent, much less affirmatively negligent or reckless, in the performance of Plaintiff Atalig's duties and responsibilities under the Lease.

152.    As a direct and proximate result of Defendant OKP, including its agents, representatives, and employees' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including, but not limited to, personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, property damages, loss of prospective economic advantages, and has been damaged in an amount to be proven at trial.

153.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XVII.
## <u>TENTH CAUSE OF ACTION</u>
### (Violation of the Open Government Meetings and Records Act)
### *Against Defendants CPA and Celis*

154.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this SAC.

155.    On June 4, 2006, Plaintiff Atalig served, via facsimile and U.S. mail, a second Open Government Act request upon Defendant CPA and Defendant Regino Celis, in his capacity as [Acting] Executive Director of CPA, requesting copies of certain public records in Defendant CPA's possession, custody, or control, pursuant to the Open Government Meetings and Records Act.  A true and correct copy of the June 4, 2006 Open Government Act request is attached to the FAC, labeled "Exhibit I," and incorporated herein by this reference as if set forth in full.

156.    On June 14, 2006, Plaintiff Atalig served, via facsimile and U.S. mail, another Open Government Act request upon Defendant CPA and Defendant Regino Celis, in his capacity as [Acting] Executive Director of CPA, requesting copies of certain public records in Defendant CPA's possession, custody, or control, pursuant to the Open Government Meetings and Records Act.  A true and correct copy of the June 14, 2006 Open Government Act request is attached to the FAC, labeled "Exhibit J," and incorporated herein by this reference as if set forth in full.

157.    On June 15, 2006, Defendant CPA and Celis, through counsel, responded to Plaintiff Atalig's June 4, 2006 request.  Mr. Douglas F. Cushnie, in his capacity as counsel for Defendant CPA, and on behalf of the Acting Executive Director of CPA, denied Plaintiff Atalig's request by failing to comply with the Open Government Meetings and Records Act.  A true and correct copy of the June 15, 2006 letter from Mr. Cushnie is attached to the FAC, labeled "Exhibit K," and incorporated herein by this reference as if set forth in full.

158.    On June 15, 2006, Plaintiff Atalig replied and requested, again, that Defendant CPA comply with the Open Government Meetings and Records Act.  A true and correct copy of the June 15, 2006 letter from Plaintiff Atalig's attorney is attached to the FAC, labeled "Exhibit L," and incorporated herein by this reference as if set forth in full.

159.    On June 22, 2006, Defendant CPA and Celis, through counsel, responded to Plaintiff Atalig's June 4, 2006 request.  Mr. Douglas F. Cushnie denied Plaintiff Atalig's request in large part and provided very few documents for review.  Mr. Cushnie made excuses, such as, "improper request requiring conclusions of law and fact is (*sic*) not a mere request for documents," "improper request requiring fact and legal determination," "the request is currently under review and will be responded to at a later time," "improper request, not being one for public records," "improper request not in conformance with the requirements of the Open Government Act," "will be provided, if available, at a later date," and "improper request not within the scope of Sections 9917 and 9918 of the OGA," in an effort to strangle and suffocate Plaintiff Atalig's right to access public records.  A true and correct copy of the June 22, 2006 letter from Mr. Cushnie is attached to the FAC, labeled "Exhibit M," and incorporated herein by this reference as if set forth in full.

160.    On June 25, 2006, Plaintiff Atalig, in good faith, attempted one more time to persuade Defendant CPA to make all public records, documents, materials, and information available for inspection in order to try to resolve any disputes without court action.  A true and correct copy of the June 25, 2006 letter from Plaintiff Atalig's attorney is attached to the FAC, labeled "Exhibit N," and incorporated herein by this reference as if set forth in full.

161.    Defendant CPA failed, refused, neglected, and continues to fail, refuse, and neglect, to make available public records for inspection and copying pursuant to Plaintiff Atalig's repeated requests, and pursuant to the Open Government Meetings and Records Act.

162.    Defendant CPA's conduct in making the above-described responses to Plaintiff Atalig's Open Government Meetings and Records Act request constitutes an unjustified and unlawful denial of Plaintiff Atalig's right to access to public records.

163.    Pursuant to the Open Government Meetings and Records Act (1 CMC § 9916(b)), Plaintiff Atalig, as an aggrieved party whose Open Government Act request has been denied in whole or in part, has the right to immediate judicial review.

164.    Plaintiff Atalig has fulfilled all of his obligations under said Open Government Meetings and Records Act with respect to his Open Government Act request.

165.    Pursuant to 1 CMC 9917(b), Plaintiff Atalig is entitled to recourse from this Court for Defendant CPA's unlawful denial of access to the requested public records and is entitled also to costs of suit together with reasonable attorney's fees upon prevailing in this action.

166.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XVIII.
## ELEVENTH CAUSE OF ACTION
### (Attorneys' Fees)
### *Against Defendant OKP*

167.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this SAC.

168.    Pursuant to Section 23 of the Lease Agreement identified above, in the event of a lawsuit by any party to the Lease Agreement "for the recovery of any rent due, or because of any breach of any term, covenant, condition, or provision hereof, the prevailing party shall be entitled to recover from the other party costs of suit and reasonable attorney's fees which shall be fixed by the Court."

169.    Plaintiff Atalig has incurred legal fees and continues to incur legal fees as a result of Defendant OKP's breach of the Lease and tortious acts.

170.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XIX.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joaquin Q. Atalig prays for judgment against all Defendants, jointly and severally, as follows:

a.    General damages, in an amount to be proven at trial, for the destruction and desecration of several priceless and original Latte Stones, ancient Chamorro grinding stone, other cultural and historical artifacts, and other things of value;

b.    Punitive damages, in an amount appropriate to punish Defendants and set an example to others, to be proven at trial, because Defendants knew or should have known that the priceless Latte Stones, ancient Chamorro grinding stone, and other cultural and historical artifacts are forever lost once damaged or destroyed, yet Defendants deliberately destroyed and desecrated the artifacts on Plaintiff Atalig's land, despite being forewarned of the presence of artifacts before clearing, which amounts to cultural and historical "terrorism" against the Chamorro people and the people of the CNMI, pure and simple;

c.    Temporary restraining order, preliminary and permanent injunction to prohibit Defendants from damaging, destroying, or removing any cultural or historical artifacts;

d.    An award of restitution to Plaintiff Atalig for the use of the Latte Stones and other valuable artifacts, materials, trees, soil, and minerals, which are forever lost or destroyed, so that Defendants will not be unjustly enriched at the expense of Plaintiff Atalig in an amount to be proven at trial;

e.    Pre-judgment interest on amounts owed;

f.    Post-judgment interests;

g.    To pierce the corporate veil of Defendant OKP;

1    h.   An order from this Court compelling Defendants CPA and Celis, including their

2  employees, representatives, legal counsels, to produce the documents demanded in Plaintiff Atalig's

3  June 4, 2006, and June 14, 2006 Open Government Act requests, including those demanded in

4  follow up letters;

5

6    i.   For reasonable attorneys fees and costs as specifically provided by agreement and by

7  statute under the Open Government Meetings and Records Act (1 CMC § 9917(b)); and

8    j.   For such other and further relief to which Plaintiff Atalig is entitled under law or equity

9  as the Court deems just and proper.

10                            **XX.**
11                   **DEMAND FOR JURY TRIAL**

12    Plaintiff Joaquin Q. Atalig hereby demands a trial by jury of all issues triable of right by jury.

13  Respectfully submitted this 18th day of April, 2007.
14

15                            ATALIG LAW OFFICE
16

17                            Antonio M. Atalig, Esq.
                              CNMI Bar No. F0138
18

19                            O'CONNOR BERMAN DOTTS & BANES
20

21                            Michael W. Dotts, Esq.
                              CNMI Bar No. _____
22

23                            LAW OFFICES OF RAMON K. QUICHOCHO, LLC
24

25                            /s/Ramon K. Quichocho, Esq.
                              CNMI Bar No. F0243
26

27                            *Attorneys for Plaintiff Joaquin Q. Atalig*

28