# Exhibit 20C

E-FILED
CNMI SUPERIOR COURT
E-filed: Oct 26 2007  9:45PM
Clerk Review: Oct 30 2007  2:21PM
Filing ID: 16823755
Case Number: 06-0119-CV
Rosie Ada

1  CARLSMITH BALL LLP
   SEAN E. FRINK, F0212
2  Carlsmith Building, Capitol Hill
   P.O. Box 5241
3  Saipan, MP  96950-5241
   Tel No. 670.322.3455
4
5  BRUCE L. MAILMAN (CNMI Bar #F0153)
   MAYA B. KARA (CNMI Bar #F0169)
6  Mailman & Kara, LLC
   PMB 238 PPP, Box 10,000
7  Saipan, MP 96950
   Tel:(670)233-0081
8  Fax: (670)233-0090

9  Attorneys for Defendants
   OKP CNMI Corporation, Prasada
10 Reddy Goluguri, Pramuan Jaiphakdee, &
   Wilai Promchai
11
   REXFORD C. KOSACK
12 GLENN A. JEWELL
   DOUGLAS DALEY
13 LAW OFFICES OF REXFORD C. KOSACK
   Bank of Hawaii Bldg., Third Floor
14 P.O. Box 410
   Saipan, MP 96950
15 Telephone: (670) 322-8800
   Fax: (670) 322-7800
16 Attorneys for Defendant Brian M. Chen

17             IN THE SUPERIOR COURT
18                     OF THE
   COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
19
20 JOAQUIN Q. ATALIG,                    CIVIL ACTION NO. 06-0119

21        Plaintiff,                     **MEMORANDUM IN SUPPORT OF
                                         MOTION FOR PARTIAL SUMMARY
22   vs.                                 JUDGMENT AND TO STRIKE**

23 OKP (CNMI) CORPORATION, *et al.*,

24        Defendants.

25

26

27

28

1
2

# I.
## STATEMENT OF UNCONTROVERTED FACTS[1]

3

The following "facts" come primarily from the depositions of the Plaintiff, the defendants

4

(OKP, Jaiphakdee, Goluguri, and Chen), and a long-time employee of Plaintiff (Carillo).  Except

5

for items N, O, P, Q, & R,[2] they are taken entirely from the Statement of Undisputed Facts

6

submitted in support of Defendants' *Memorandum in Support of Their Summary Judgment*

7

*Motion Re: Punitive Damages*, E-Filed October 16, 2007 and its supporting documents.  The

8
9

citations to Declarations are to the Declarations E-Filed on October 16 and 26 2007.

10

A.      The Lease:  On November 2, 2005, Plaintiff and OKP executed a Lease

11

Agreement in which Plaintiff was the lessor of Lot No. 362 R 01 consisting of 49,998 square

12

meters, more or less, on Rota ("Atalig property") to OKP for a term of thirteen months

13

commencing on December 1, 2005. SAC && 47, 50, 53 (all paragraphs cited are admitted in the

14

answers).

15

B.      The Defendants:

16
17

1.      OKP is a corporation organized in the CNMI.  SAC & 27.

18
19

2.      Alan Yee was the project manager for OKP.  OKP deposition, p. 153.  Yee is not
a defendant.

20

3.      Brian Chen was the resident manager for OKP.  SAC & 29.

21

22

4.      Prasada Reddy Goluguri was an engineer employed by OKP.  He reported to Alan
Yee.  OKP at 153;  Goluguri deposition, pp. 39-41, 79.

23
24

5.      Pramuan Jaiphakdee was a heavy equipment operator for OKP.  SAC & 31.

25

6.      Wilai Promchai was also a heavy equipment operator for OKP.  SAC & 32.

26
27
28

---

[1]  This Statement of Uncontroverted Facts is uncontroverted only for the purposes of this Motion.  OKP and Chen reserve the right to dispute any facts or allegations asserted by Plaintiff in the event any issues remain for trial regarding it.
[2]  Items N, O, P, Q, & R were established in the Atalig Deposition or the 10/26/07 Chen Declaration.

C.    OKP=s Overall Use of the Atalig Property: The Atalig property was leased by OKP to be used as a location for its office, barracks, equipment repair shop and workstation, heavy and lightweight equipment parking and storage, and as a staging area while it worked on extension of the Rota International Airport runway for the Commonwealth Ports Authority. SAC && 44, 55.

D.    Meeting Between Plaintiff and Brian Chen: Plaintiff walked through the old hotel site on his property with Brian Chen, discussing the renovations that OKP would make when it moved in. At that time, they were standing by Room 108 and Plaintiff pointed out a latte stone set near Room 108 (which is not involved in this case) and told Chen that there were latte by the water tank and latte by the taro patch. Chen said he knew. Chen did not say how he knew because Chen was more interested in continuing because he was going to renovate and his guys were coming. Atalig deposition, pp. 669-670.[3]

E.    The Need to Clear Vegetation To Create A Parking Area: OKP needed to clear an area of vegetation on the Atalig property to create a parking area for its equipment, as well as a recreation area. The area was to be 100' x 150'. This task was managed by Alan Yee when OKP moved onto the property during December of 2005. The area he selected was behind, or west of, the former Sunrise Hotel. The Sunrise Hotel was located approximately mid-way along the eastern boundary of the property. Reddy Goluguri was told by Alan Yee to have Pramuan Jaiphakdee do the clearing work with heavy equipment. 10/16/07 Declaration of Reddy Goluguri.

F.    Consent to Do the Clearing (Edita warns Reddy about Water Tank Area): Alan Yee told Goluguri to ask Ludivina (AEdita@) Carillo where they can clear. Reddy had one

---

[3] OKP and Chen's position is that Plaintiff gave Chen consent to clear all of the property. OKP at 132-133. For this motion, we will assume Atalig=s testimony is true.

conversation with her on this subject.  Goluguri at 44.  Edita had been Plaintiff=s hotel manager for the past 10 years, and was still on the property.  Edita checked with Plaintiff who told her to tell OKP not to touch the area near the pig house.  Edita told Reddy not to touch that area.  She indicated with her arms outstretched where the area was.  Carillo at 189-194, 238-239.[4]  The area near the pig house is the area of the water tank.  Plaintiff did not tell Edita to warn OKP about the area near the taro patch.  Atalig at 814-815.  Edita did not tell Reddy not to go into the taro patch area.  Edita at 258.

G.     Description of Water Tank Area (Area AA@) and Taro Patch Area (Area AB@): The location and contents of two areas of concern in this motion are described as follows:

a.  Water Tank Area: This area is adjacent to a Japanese-era concrete water tank at about the center of the Atalig property and located just east of an unimproved roadway going through the lot in an arc starting near the northeast corner and ending near the southeast corner.  For purposes of this motion, this shall be referred to as Area AA.@

(1) Area AA@ contained two complete lattes (each with a *tasa* on top of a *haligi*) and an unknown number of additional parts.  Atalig at 193-94, 516-17, 521-22.  It contained a Chamorro *lusong* (mortar) and *lummock* (pestle).  Atalig at 195-96.  There were several Japanese-era artifacts: the concrete water tank, a concrete foundation, a small low wall, and a washing basin and stand.  Atalig at 602-04; SAC & 88(e).[5]

( 2) Area AA@ contained several permanent trees.  Atalig at 202-04, 554-58, 982-83; SAC & 62.

---

[4]  It should be noted that Reddy testified that Edita told him he could clear everything, but warned him about a hole on the property.  He passed this information on to Yee.  Goluguri at 48-50.  For this motion, we assume that Edita=s testimony is not disputed.

[5]  The existence of the latte, lusong, and lummock, and the authenticity of the AJapanese-era@ artifacts are disputed, but are assumed to be true for the purpose of this motion only.

b. <u>Taro Patch Area</u>: This area is adjacent to a taro patch and is situated just northeast of the center of the Atalig property and just south of the northern part of the unimproved roadway just described. For purposes of this motion, this shall be referred to as Area "B."

(1) Area "B" contained one complete latte (with a *tasa* on top of the *haligi*) and an unknown number of additional parts. Atalig at 285-89, 551-52.

H. <u>Reddy Goluguri Instructs Pramuan Jaiphakdee Where to Clear</u>: At the site, Reddy told Pramuan that he is to clear an area 100' x 150'. To show him exactly where to clear, Reddy measured out 100' on the property one way and 150' on the property perpendicular to it (like the intersection of an X and Y axis) with Pramuan. Pramuan marked the width and the length by placing rocks and sticks at the starting and ending points. Reddy told Pramuan this is the area to be cleared. The 100' x 150' box did not contain either Area "A" or Area "B," or any part of either area within it. Goluguri at 54-55; Goluguri Declaration.

I. <u>Reddy Has Pramuan First Clear the Outside Perimeter of the Box</u>: Reddy is Indian and Pramuan is Thai. The two communicated in English. Goluguri Declaration. To ensure there would be no misunderstanding of his instructions, Reddy instructed Pramuan to first clear a border around the perimeter of the 100' x 150' box for him to check. *Id.* Pramuan scraped a 3' wide boundary line around the area to be cleared. Reddy inspected the boundary line and found it was in the right location and had the right dimensions. He then went to Alan Yee to get approval for Pramuan to begin clearing the area within the box. Alan Yee gave his approval, which Reddy communicated to Pramuan. Goluguri at 56, 58; Goluguri 10/16/07 Declaration.

J. <u>Pramuan Does the Clearing</u>: Pramuan cleared the box on December 23 and 24, 2005. OKP at 161. He knew that he was to clear within the box, but he did not know about the existence of any artifacts or items of value in Areas "A" and "B." On the first day, he cleared

-5.-

three-quarters of the area of the box first using an excavator and then a bulldozer.  He left piles

of debris in the box.  On the second day, he cleared the remainder of the box area and then made

his own decision to push the debris outside of the box using the bulldozer.  Jaiphakdee 10/16/07

Declaration.  The affected area ended up measuring approximately 150' x 214'.  Goluguri at 67.

K.    The Damage: Pramuan moved the debris into Area AA@ and Area AB@ when he

moved it out of the box.  Goluguri 10/16/07 Declaration.  This destroyed the latte located in both

areas.  In Area AA,@ it destroyed the trees, lusong and lummock, and water stand and wash basin.

It damaged the remaining Japanese-era artifacts in that area.[6]  (Plaintiff sues in Counts I-III and

V for this damage.)

L.    Later Placing of Coral in Parking Area:  Due to anticipated problems with mud in

the area that had been cleared, OKP removed the topsoil and stockpiled it.  It put down one to

two truckloads of crushed coral.  OKP at 239-240.

M.    Replacement of Topsoil in Cleared Area: When OKP was about to leave the

Atalig property at the end of the lease, it returned the stockpiled topsoil to the cleared area.  It

added to the cleared area an additional 18 to 20 truckloads of high quality topsoil that it had

obtained from the airport project.  OKP at 240.  (Count IV seeks punitive damages for the

conversion of soil.  SAC & 63.)

N.    Jaiphakdee Did the Clearing.  It was Pramuan Jaiphakdee who operated the heavy

equipment that cleared the yard causing the damage to the historic and cultural artifacts.  Atalig

at 996.

O.    Jaiphakdee Did Not Know of the Artifacts.  Plaintiff does not have any

knowledge to indicate Pramuan Jaiphakdee knew of the existence of the latte stones and the

---

[6]  At trial these will be disputed issues, but are assumed true for this motion only.

lummock and admits that it is possible that these items were not intentionally damaged.  Atalig at 1005.

P.    <u>Soil & Rocks</u>.  Plaintiff is referring to the soil, and rocks within the soil, when making a claim for soil and other minerals.  Atalig at 584.

Q.    <u>The Fuel Tank Was Never Used</u>.  A fuel tank was installed on Plaintiff's premises during the lease term.  It was never used.  Fuel was never placed in the tank.  Declaration of Brian M. Chen, ¶¶ 4 & 5 (E-Filed 10/26/07).

R.    <u>The Fuel Tank Was Removed When OKP Left</u>.  Before the end of the lease term and the return of the premises to Plaintiff, the fuel tank was removed from the premises.  No trace remained at the end of the lease term.  *Id.,* at 6.

## II.
## OKP CNMI CORPORATION IS ENTITLED TO SUMMARY JUDGMENT ON THE THIRD CAUSE OF ACTION (CONVERSION OF ARTIFACTS)

### A.    Plaintiff Claims OKP Employees Converted Historical and Cultural Artifacts

Plaintiff has sued OKP CNMI Corporation ("OKP") in the Third Cause of Action for Conversion of Historical and Cultural Artifacts.  Conversion requires an intentional exercise of dominion or control over a chattel.  As has been demonstrated in OKP's previous motion for summary judgment related to punitive damages, there is no evidence to suggest that any alleged destruction of the historical and cultural artifacts was done intentionally.  In the absence of evidence to support the essential elements of a claim, summary judgment is appropriate pursuant to Rule 56 of the Commonwealth Rules of Civil Procedure.  For these reasons, summary judgment should be granted regarding the Third Cause of Action.

In his cause of action entitled "Conversion–Historical and Cultural Artifacts," Plaintiff alleges that:

> Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of historical and cultural artifacts, to wit, Latte

Stones, ancient Chamorro grinding stone, Japanese structures, Japanese washing basin and frame, and Japanese water tank, located on Plaintiff Atalig's land, and converted them to Defendant OKP's own use.

SAC, ¶ 104.

**B.     Plaintiff Cannot Prove An Intentional Exercise of Dominion or Control**

An examination of the elements of conversion and application of the facts of the SAC to those elements show that Plaintiff does not have evidence to satisfy the necessary elements of this conversion claim.  The Restatement informs us that:

Conversion is an ***intentional exercise*** of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.

Restatement (Second) of Torts, § 222A(1)(emphasis added). [7]

Intentional conduct means more than merely intending to do an act.  It means that the actor "desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it."  Restatement (Second) of Torts, § 8A (Intent).

Without proof of intentional conduct, there can be no claim for conversion:

One who does not intentionally exercise dominion or control over a chattel is not liable for a conversion even though his act or omission is negligent.

Restatement (Second) of Torts, § 224.

Comment b to Section 224 further explains that negligent conduct is not enough for conversion:

[A]n act which is not intended to exercise any dominion or control over a chattel but is merely negligent with respect to it is not a conversion, even though it may result in the loss or destruction of the chattel.

Thus, the elements of conversion are:

(1) intentional exercise;

(2) of dominion or control;

---

[7]  The tort of conversion has been recognized by the CNMI Supreme Court on numerous occasions. *See, e.g., Demapan v. Bank of Guam*, 2006 MP 16 ("[u]nder the common law, conversion is an intentional tort which requires an intentional exercise of dominion and control over property of another") (citing Restatement (Second) of Torts, § 222A).

(3) over a chattel (for purposes of this portion of this motion, the artifacts);

(4) resulting in serious interference with the right of control.

Is there any evidence that, as Plaintiff claims in this cause of action, an employee or agent on behalf of OKP *"intentionally"* exercised control over the historical and cultural artifacts? The obvious answer is "no." There is simply no evidence that the defendants' desired to cause damage to Plaintiff's artifacts or knew such damage was substantially certain to result from their acts.

**C.    The Relevant Employees Did Not Have the Requisite Intent**

1.    Pramuan Jaiphakdee.

Plaintiff himself admits that he has no knowledge that the person who he alleges damaged the artifacts, Pramuan Jaiphakdee, even knew that the latte stones or Chamorro grinding stone existed. Facts N & O. On the other side, Pramuan makes explicit the fact that he did not know about the existence of any cultural or historical artifacts or other items of value on the Atalig Property at the time he performed the clearing. Fact J.

Since Pramuan did not know that there were artifacts in the area that he cleared he could not have desired to damage the artifacts. A similar factual scenario was faced by the Court in *Berry v. Giannina B., Inc.,* 460 F. Supp. 145 (D. Mass. 1978), which dealt with a fishing boat which damaged lobster traps that persons on the boat did not know existed at the time the damage occurred. The *Berry* Court ruled that there could be no conversion of the traps because the persons on the boat did not know that they existed. Any damage done must have been done unintentionally. *Berry,* 460 F. Supp. at 148.

The *Giannina B.* ruling merely supports common sense. It is not possible for someone to intentionally exercise dominion or control over something that he does not know even exists. It was not possible that Pramuan, as "OKP's [agent] or [employee], acting within the scope of [his]

employment" (SAC, ¶ 104) intentionally exercised dominion or control over the artifacts. Therefore, OKP cannot be liable for conversion of the artifacts through Pramuan.

2.    Wilai Promchai.

The alleged destruction of the artifacts took place on December 24, 2005 when Jaiphakdee performed the clearing.  Fact J.  This Court previously found that Wilai Promchai did not enter the Commonwealth until December 30, 2005 and could not be liable for any acts occurring before then.  *Order: Granting in Part and Denying in Part Defendant Wilai Promchai's Motion for Summary Judgment,* December 4, 2006.  p. 5, ll. 4-5.  OKP, consequently, cannot be liable for any acts of Wilai that allegedly occurred before December 30, 2007 either.  Simply put, it is clear that Wilai was not involved in any manner the alleged taking or damage of the artifacts.  Therefore, he could not have converted them.  Therefore, OKP cannot be liable for conversion of the artifacts through Wilai.

3.    Reddy Goluguri.

Immediately prior to Pramuan's clearing of the property, however, Plaintiff claims that Edita Carillo told Project Engineer Prasada Reddy Goluguri not to touch an area that Plaintiff claims included the artifacts.  Fact F.  Reddy instructed Pramuan to clear an area of the Atalig property that did not include the area where the artifacts were and had Pramuan clear the boundary of the area to be cleared.  Facts H & I.  Pramuan subsequently cleared outside the marked boundary without Reddy's or anyone else's approval.  Fact J.

Thus, it is clear that Reddy had no intent to damage the artifacts, now did he know that such damage was substantially certain to occur.  Therefore, OKP cannot be liable for the conversion of the artifacts through Reddy.

4.    Brian Chen.

Plaintiff also claims that he told OKP Resident Manager Brian Chen of the existence of

the areas "A" and "B" latte stones, which were in the area of the other artifacts, and not to touch

the areas in which they were located.  Fact D.  Even though OKP disputes these claims they must

be accepted as true for purposes of this motion.  There is no evidence that Brian Chen

participated in the clearing that is alleged to have damaged the artifacts.  He could not, therefore,

have intentionally exercised dominion or control over the artifacts.  Thus, OKP cannot be liable

for the conversion of the artifacts through Brian Chen.

With no evidence that any OKP employee or agent intentionally exercised control over

the cultural or historic artifacts, OKP is entitled to summary judgment on Plaintiff's claim for

conversion of the Third Cause of Action of the Complaint.

**III.**

**OKP IS ENTITLED TO SUMMARY JUDGMENT ON THE FOURTH CAUSE OF
ACTION (CONVERSION OF SOIL AND OTHER MINERALS)**

**A.     Plaintiff Claims OKP Converted Soil and Other Minerals When It
Cleared the Yard**

For his Fourth Cause of Action Plaintiff claims OKP converted soil and other minerals.

He alleges:

> Defendant OKP, by its agents and employees acting within the scope of
> their employment, took possession of soil and other minerals located on
> Plaintiff Atalig's land, and converted them to Defendant OKP's own use.

SAC, ¶ 110.

Plaintiff's factual explanation in the Complaint for this claim is that:

> Defendants removed soil and other rocks and minerals, including excavating
> Plaintiff Atalig's land, for Defendant OKP's parking lot.

SAC, ¶ 63.

**B.     Conversion Requires a Serious Interference With the Plaintiff's Right of
Control Over the Soil and Other Minerals**

> Conversion is an intentional exercise of dominion or control over a chattel which
> ***so seriously interferes with the right of another to control it*** that the actor may
> justly be required to pay the other the full value of the chattel.

-11.-

Restatement (Second) of Torts, § 222A(1) (emphasis added).

> In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:
>
> (a)  the extent and duration of the actor's exercise of dominion and control;
>
> (b)  the actor's intent to assert a right in fact inconsistent with the other's right of control;
>
> (c)  the actor's good faith;
>
> (d)  the extent and duration of the resulting interference with the other's right of control;
>
> (e)  the harm done to the chattel; and
>
> (f)  the inconvenience and expense caused to the other.

Restatement (Second) of Torts, § 222A(2) (emphasis added).

> Comment (d) to Section 222A explains that the analysis boils down to the following:
>
> [T]he question to be asked [in determining if the seriousness of the interference is sufficient] is whether the actor has exercised such dominion and control over the chattel, and has so seriously interfered with the other's right to control it, that in justice he should be required to buy the chattel.

**C.    The Soil and Other Minerals Were Restored and Improved Before OKP Left the Property.**

OKP is entitled to summary judgment on this claim for two reasons.  First, there was no "serious interference" with Plaintiff's right of control over the land.  Second, instead of causing injury to the land, OKP's actions actually increased the value of the land.  The evidence shows that OKP merely removed topsoil and stockpiled it on site.  Fact L.  Before OKP left the property, it returned the stockpiled soil to the cleared area.  Fact M. Thus, the topsoil was not converted.  In fact, OKP added 18 to 20 truckloads of high quality topsoil that it had obtained from the airport project to the Atalig property.  Fact M.  So, rather than Atake@topsoil from the property, OKP actually Agave@topsoil to the property.

-12.-

1
2
3

**IV.**
**OKP IS ENTITLED TO SUMMARY JUDGMENT ON**
**PLAINTIFF'S "FUEL TANK" WASTE CLAIM**

4
5

**A.     Plaintiff Claims OKP Committed Waste By Putting A Fuel Tank Station on the Premises**

6
7

As part of his second cause of action (waste), alleged against OKP, Plaintiff sues for

8
9

essentially the same thing regarding the fuel tank as he did in his breach of contract cause of

10

action.  He alleges:

11

During the period of such occupation, Defendant OKP, including its agents, representatives, and employees greatly injured the improvements and the land, as follows:

12
13

. . .

d.  By placing a hazardous fuel tank on Plaintiff Atalig's land without the proper and necessary safety requirements in place[.]

14
15

SAC, ¶ 96.

16
17

**B.     A Change to the Premises Constitutes Waste Only if it Results in Permanent Damage**

18

The concept of waste is rooted in protecting the reversionary interest of the lessor:
Voluntary waste as a concept stems from early English common law concern that the interests in land held by reversioners or remaindermen be protected from depredations by life tenants of scarce natural resources (5 Powell, Real Property, par 637.  For instance, the cutting of trees or exhaustion of coal supplies were regarded as waste because their effects extended well beyond the term of the tenant's temporary interest in the land or premises.  **It is the impingement upon the ultimate estate of the landlord which is the keynote to the definition of waste** (Rasch, New York Landlord and Tenant [2d ed], § 455).

19
20
21
22
23

*Rumiche Corp. v. Eisenreich,* 352 N.E.2d 125, 128 (N.Y. App. Div. 1976) (no waste as no proof

24

of any permanent or lasting injury to the premises).

25

The issue posed by an allegation of waste is whether there is any harm done to the

26

ultimate holder of the estate, the landlord:

27

The tort of waste is defined as an "action or inaction by a possessor of land causing unreasonable injury to the holders of other estates in the same land."

28

Black's Law Dictionary 1589 (6th ed. 1990).

*Independence Lead Mines Co. v. Hecla Mining Co.*, 137 P.3d 409, 416 (Idaho 2006). *See also Hardie v. Chew Fish Yuen,* 258 Cal. App.2d 301 (Cal. App. 1968) ("[t]o constitute waste, there must be an injury to the inheritance") (citations omitted) (applying California law).

**C.    The Fuel Tank Was Removed And No Harm Was Done to the Premises**

A fuel tank was installed on Plaintiff's premises during the lease term.  It was never filled with any fuel.  It was never used.  Fact Q.  Before the end of the lease term and the return of the premises to Plaintiff, the fuel tank was removed from the premises.  No trace remained of the fuel tank at the end of the lease term.  Fact R.  There is no evidence that there was any injury to the premises upon their return to the Plaintiff; therefore, Defendants did not commit waste and summary judgment is appropriate.

**V.**

**NEITHER OF PLAINTIFF'S TWO THEORIES OF NEGLIGENCE
STATES A VIABLE CLAIM OF NEGLIGENCE**

**A.    Plaintiff Alleges A Duty Not to Commit Waste and A Duty to Obtain Consent
Before Making Alterations**

The Seventh Cause of Action attempts to state a claim for negligence.  It does so based on two separate causes of action.  First, that OKP "had the duty not to commit waste on Plaintiff Atalig's land" (¶ 127); but, breached its duty "when it violated the laws of the CNMI damaging and destroying cultural and historical artifacts and other things of value . . . ."  ¶ 128.  Where does this duty come from?  Section 6 of the Lease Agreement states: "Lessee may use, improve and develop the Premises or any part thereof for any lawful use or purpose, provided that Lessee does not commit waste . . . ."  ¶ 55.

The second theory is that OKP "had the duty . . . to obtain the prior written consent of Plaintiff Atalig before any alterations or changes are done on the leased improvements and the real property."  ¶ 127.  This duty was allegedly breached "when Defendant OKP filed to obtain

the prior written consent of Plaintiff Atalig to damage, remove, alter or change the

improvements, the real property, and other things of value." ¶ 128.  The duty comes from

Section 13.1 of the Lease which states that OKP needs the prior written consent of the Lessor to

erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove buildings and other

improvements.  ¶ 56.  The specific breach refers to the damage to artifacts, trees, soil, and the

kitchen/laundry/storage facilities.  ¶¶ 60-63.

**B.     Theory # 1:  By Creating A Duty Not to Commit Waste, Plaintiff's Claim Does Not Sound in Negligence, But In Waste**

The first theory posits: (1) that the Lease Agreement gives rise to a duty not to commit

waste, and (2) OKP negligently committed waste when it destroyed the cultural and historical

artifacts.  This is not a claim for negligence, but a claim for negligent waste.  Is there such a

cause of action?  Yes.

> Basically, at common law waste had three different definitions, each related to
> particular types of conduct on the part of tenants.  **Involuntary waste was
> defined as failure to prevent damage to the premises, in other words
> <u>negligence</u>**.

*Rumiche Corp. v. Eisenreich,* 352 N.E.2d 125, 128 (N.Y. Ct. App. 1976) (emphases added).

This is a special application of the negligence doctrine to real property.  As it embodies

the duty not to commit waste, and the concept of waste, it should not be treated as the tort of

negligence, but as the tort of involuntary waste.  It is analogous to the tort of the negligent

infliction of emotional distress ("NIED"), which is a special application of the negligence

doctrine to mental and emotional distress.  One would not plead a cause of action for negligence

in an NIED case.  Similarly, one would not plead a cause of action for negligence in a waste

case.  What has happened here, by analogy, is that Plaintiff has filed a claim for NIED <u>and</u> a

claim for negligence based on the same event.

Simply put, when there is a claim for negligent waste, it is not proper to split it up – suing

for waste and for negligence separately.  There is one cause of action, and it is for negligent waste.  Plaintiff has already filed an extensive waste claim as his Second Cause of Action (with five different types of harm alleged).  That is his claim for negligent waste.  His attempt to plead the same conduct a second time as negligence should be not be permitted.

**C.    Theory #2: Plaintiff Cannot Base A Claim For *Negligence* On the Failure to Obtain Consent to Do Alterations**

The second theory alleges that OKP was negligent in doing alterations without prior written consent.  But, what does "consent" have to do with negligence?  It is not an element of negligence.  RESTATEMENT (SECOND) OF TORTS § 281.  The breach of duty in negligence should come from the undertaking of particular conduct, not from the failure to obtain consent prior to undertaking the conduct.  The only reason "consent" is involved at all is that it is required by the Lease Agreement.  So, if the Plaintiff wants to complain about the failure to obtain consent prior to the undertaking, his claim should be for breach of contract.  In fact, he does sue for breach of contract based on the failure to obtain consent prior to making alterations in ¶ 88(j).

If the lease requires consent prior to undertaking alterations, and if the Plaintiff fails to obtain consent prior to making alterations, why is he prevented from filing an action for negligence?  First, because the failure to obtain consent does not create an unreasonable risk of harm.  "Conduct is negligent because it tends to subject the interests of another to an unreasonable risk of harm." § 281, com. "e."  The failure to obtain consent does not tend to subject Plaintiff to an unreasonable risk of harm.  The act of altering the leasehold premises, however, brings the unreasonable risk of a permanent diminution in the value of Plaintiff's reversionary interest in the land.  Or, another way to look at it, is that there is no causal connection between the alleged breach (the failure to obtain consent) and the alleged harm (damage to the property).  Negligence requires a causal connection between the act of breach and the harm.  RESTATEMENT (SECOND) OF TORTS §§ 281(c).  It was the alteration activity which

could have caused the alleged damage to the property – not the failure to obtain consent.  Thus, summary judgment should be granted as to this second theory of the negligence cause of action for a failure to show the elements of negligence and causation.

In sum, Plaintiff can sue for voluntary (negligent) waste, if he claims the acts damaging his property were done negligently.  He can sue for breach of contract, if he claims that OKP failed to obtain his written consent prior to undertaking the activity.  He has done both in this case.  But, he cannot sue for negligence based upon OKP's failure to obtain his written consent – as that was not the cause of the damage to his property.

## VI.
## OKP IS ENTITLED TO SUMMARY JUDGMENT ON THE INDEMNIFICATION CLAIM

### A.    Plaintiff's Claim

The Plaintiff appears to be attempting to use the indemnification clause in a way that was not intended by the parties.  In his ninth cause of action he sues OKP for "Indemnification."  It seems he believes that he can recover for damage allegedly caused to his property <u>by OKP</u> through the indemnification clause.  That is not the purpose of an indemnification clause.  The purpose of an indemnification clause is *not* to allow a landlord to sue a *tenant* for alleged damage to the property.  The purpose of an indemnification clause is to protect the landlord against claims by *third-parties*.

Most of a lease covers the relationship between the landlord and the tenant.  These provisions include things like what is being leased, the conditions, the covenants, how default is declared, how termination occurs, etc.  One provision addresses what happens if the tenant's conduct on the land creates liability for the landlord to people *other than* the tenant.  That is the indemnification clause.  Because Plaintiff's indemnification claim is not supported by either the indemnification clause or the intent of the parties, summary judgment is appropriate.

-17.-

**B.    The Language of the Indemnification Clause**

Paragraph 12 of the lease, the indemnification clause, reads as follows:

12.    <u>INDEMNIFICATION OF LESSOR BY LESSEE:</u>    Lessee shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of litigation arising prior to the expiration of the term hereof and delivery to Lessor of possession of the premises and use of the land:

A.  On the account of or through the use of the demised premised or improvements or any part thereof by Lessee or by any other person acting under the authority, direction, in the interest of, or through the title of the Lessee for any purpose inconsistent with the provisions of this Lease;

B.  Arising out of, or directly or indirectly due to, any failure of Lessee in any respect promptly and faithfully to satisfy Lessee's obligations under this lease; or

C.  Arising out of directly or indirectly due to any accident or other occurrence causing injury to any person or persons or property
resulting from the use of the premises or any part thereof, including the land.

No such indemnification shall be required with respect to losses or liabilities arising by reason of the affirmative negligence or recklessness of Lessor.

**C.    The Indemnification Clause Should Only Apply to Third Party Exposure**

We believe the indemnification clause should be interpreted only to apply to exposure created for Plaintiff to a third party, not harm allegedly caused by the tenant.  This conclusion is supported by the rules of interpretation.

Plaintiff's interpretation would lead to a result that would be at odds with another provision of the lease.  The indemnification clause states that the lessee shall indemnify lessor "against all . . . expense of litigation[.]" If this clause is interpreted as Plaintiff wishes, where it would be applicable to disputes between Plaintiff and OKP and not just disputes against Plaintiff by third parties, it would be inconsistent with Section 23 of the lease, entitled "Attorneys' Fees." That section reads: "In the event of any suit by any party to this Lease for the recovery of any rent due, or because of any breach of any term, covenant, condition, or provision hereof, the ***prevailing party*** shall be entitled to recover from the other party *costs of suit and reasonable*

1  *attorney's fees* which shall be *fixed by the Court*."  (Emphases added.)

2          Thus, one section, if interpreted in the way Plaintiff seeks, would make OKP essentially

3  strictly liable for Plaintiff's "expense of litigation," while another provision would make OKP

4  liable for such expenses *only if* Plaintiff were determined by the Court to be the "prevailing

5  party."  Such an interpretation would make two provisions inconsistent and would violate two

6  principles of our governing law[1] as provided in the RESTATEMENT (SECOND) OF CONTRACTS.  *See*

7  § 202 ("[a] writing is interpreted as a whole, and all writings that are part of the same transaction

8  are interpreted together"); *and* §203 ("an interpretation which gives a reasonable, lawful, and

9  effective meaning to all the terms is preferred to an interpretation which leaves a part

10 unreasonable, unlawful, or of no effect[.]" Plaintiff's interpretation of the indemnification clause

11 has that section contradicting the clear meaning of the attorneys' fees clause.

12         The interpretation we favor is supported by numerous cases.  For example, in the case of

13 *Connecticut Resources Recovery Authority v. Murtha Cullina, LLP*, 2006 Conn. Super. LEXIS

14 1498 (Conn. Super. Ct. 2006), the court stated that:

15

16         **[I]ndemnification claims are to be brought only to recover losses for third-
           party, not first-party, losses**. . . . "the logic and rationale underlying our
17         indemnity case law are based on the premise that an action for indemnification is
           one in which one party seeks reimbursement from another party for losses
18         incurred in connection with the first party's liability to a third party."

19 *Id.* at *5 (emphasis added; citation omitted).  *See also Pinkert v. Olivieri*, 2001 U.S. Dist. LEXIS

20 8133, *21 (D. Del. 2001) ("[o]ther Delaware courts have held that similar indemnification

21 provisions are **not applicable to claims between contracting parties**; they are intended to

22 protect one contracting party against liability from third party claims when the other contracting

23 party is at fault") (emphasis added; citations omitted); *Boulevard Associates v. Sovereign Hotels*,

24

25 ─────────────────────
27    [1] *See* 7 CMC § 3401.

28

72 F.3d 1029, 1035 (2d Cir. 1995) ("[w]e have previously noted that 'indemnity agreements are generally designed only to protect against liability for **damage to third parties**'") (emphasis added; citation omitted).

In addition to the principle expressed in the cases cited above, it is critical to keep in mind that "the words of a contract of indemnification must be construed strictly against the indemnitee." *The Service Merchandise Co. v. Hunter Fan Co.*, 617 S.E.2d 235, 237 (Ga. Ct. App. 2005) (citation omitted).  This rule of construction is <u>doubly</u> applicable here as the lease (and the clause in question) were drafted by Plaintiff's counsel, Mr. Quichocho. *See* RESTATEMENT (SECOND) OF CONTRACTS § 206 ("In choosing among the reasonable meanings of a promise or agreement or term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.").

For these reasons, a claim against OKP under the lease's indemnification clause fails and summary judgment is appropriate.

**VII.**
**ALL REFERENCES TO "DOE" DEFENDANTS SHOULD BE STRICKEN**

In his Second Amended Complaint ("SAC"), Plaintiff purports to sue "DOES 1-3." SAC, caption, p. 1.  In addition, Plaintiff addresses these Doe defendants in some detail in paragraph 35 of the SAC.  Because Plaintiff has no right to bring suit against fictitious defendants, these "defendants" should be stricken from the caption and all references to them in the SAC should be stricken.

A Plaintiff may not bring suit against an unknown person unless there is a statute or rule allowing such conduct.  *See, e.g., Mohl v. Doe and State Farm Ins. Co.*, 1995 Del. Super. LEXIS 215, *4 (Del. Super. Ct. 1995) (citing 59 Am. Jur. 2d Parties § 16) ("[i]n actions or proceedings which are not strictly in rem but are in personam or only quasi in rem, there is generally no authority to proceed against unknown persons in the absence of statute or rule") (citations

1    omitted)).

2    As it appears there is no statute or rule in the CNMI authorizing suit against unknown or

3    fictitious persons, there is no authority for Plaintiff to sue "DOES 1-3." As such, all references

4    to these defendants should be stricken from the SAC, including but not limited to the caption and

5    paragraph 35. *See, e.g., Gelfand v. Stone*, 1989 U.S. Dist. LEXIS 6352, *8 (S.D.N.Y. 1989)

6    ("the Court has inherent power to strike . . . matter in the pleadings"). Without a statute that

7    authorizes fictitious pleading to have a particular effect in litigation (*e.g.* tolling the statute of

8    limitations against the unknown party), the use of a "John Doe" allegation in this case has

9    absolutely no meaning. The allegations should be stricken.

10

11   **CONCLUSION**

12   For the above stated reasons, OKP CNMI Corporation's and Brian Chen's Motions should

13   be granted.

14

15   Date: October 26, 2007.

16                                          Respectfully submitted,

17

18                                          _____
                                            /s/
19                                          SEAN E. FRINK, CNMI Bar No. F0212

20

21                                          _____
                                            /s/
22                                          REXFORD C. KOSACK, CNMI Bar No. F0140

23

24

25

26

27

28