# Exhibit 22

**E-FILED**
**CNMI SUPERIOR COURT**
E-filed: Dec 5 2007 6:18PM
Clerk Review: Dec 13, 2007
Filing ID: 17531844
Case Number: 06-0119-CV
Elsa Duenas

REXFORD C. KOSACK
GLENN A. JEWELL
DOUGLAS DALEY
LAW OFFICES OF REXFORD C. KOSACK
Bank of Hawaii Bldg., Third Floor
P.O. Box 500410
Saipan, MP 96950
Telephone: (670) 322-8800
Fax: (670) 322-7800

Attorneys for Defendant Brian M. Chen

BRUCE L. MAILMAN
MAYA B. KARA
Mailman & Kara, LLC
PMB 238 PPP, Box 10,000
Saipan, MP  96950
Tel: (670) 233-0081
Fax: (670) 233-0090

CARLSMITH BALL, LLP
SEAN E. FRINK
Carlsmith Building, Capitol Hill
P.O. Box 5241
Saipan, MP  96950-5241
Tel: (670) 322-3455

Attorneys for Defendants:
OKP (CNMI) Corporation
Prasada Reddy Goluguri
Pramuan Jaiphakdee
Wilai Promchai

IN THE SUPERIOR COURT OF THE COMMONWEALTH
OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| JOAQUIN Q. ATALIG, ) | Civil Action No. 06-0119(R) |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| OKP (CNMI) CORPORATION, BRIAN M. ) | |
| CHEN, PRASADA REDDY GOLUGURI, ) | |
| PRAMUAN JAIPHAKDEE, WILAI PROMCHAI, ) | |
| and DOES 1-3, ) | |
| ) | Presiding Judge Robert C. Naraja |
| Defendants. ) | Date:   December 10, 2007 |
| _____) | Time:   10:00 a.m. |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'**

**SUMMARY JUDGMENT MOTION RE: BREACH OF CONTRACT**

# I.

## THE PROMISE TO LEASE FURNITURE

Summary judgment is ripe as to the ¶ 88(a) claim of breach of contract for failing to lease furniture on two grounds: (1) Atalig failed to issue a 30-day notice and opportunity to cure, and (2) the agreement is too indefinite to enforce as the parties never agreed on what was to be leased. There is no factual dispute, only a disagreement as to how to apply the law.

As to the 30-day notice, there is no disagreement that it applies and is a condition precedent; Atalig only argues that he provided <u>oral</u> notice ("Atalig told OKP if they would not accept the personal property . . . he would have to put it into storage [cites Atalig's declaration]" Opp., at 7) and this is sufficient. This is wrong on several counts. First, even though the Opposition says Atalig told OKP certain things, his declaration does not reflect this at all. Atalig presented <u>no evidence</u> that he gave oral notice to OKP. Second, oral notice does not comply with the Lease Agreement. Section 18 (Notice) expressly requires: "<u>All</u> <u>notices</u> . . . shall be given to each party at their respective addresses, as noted below." The address for the Lessee is "OKP (CNMI) Corporation, P.O. Box 10001, PMB A-25, Saipan, MP 96950." *Id.* The only way in which notice can be given to a post office box is in writing. Thus, it is clear that the parties contemplated that notice of default under § 15 be given in writing. Atalig understood this, because he wrote a notice of default letter and sent it to Lessee on January 17, 2006. SAC, ¶ 66, Exhibit "G." He just did not include the failure to lease the furniture as one of the grounds of default. There is no question that Atalig failed to give written notice; therefore, summary judgment must be granted for failure to comply with a condition precedent.

Furthermore, the "agreement" to lease furniture in the future is not enforceable as it is not definite and certain. RESTATEMENT (SECOND) OF CONTRACTS § 33. The question is *which* furniture, fixtures, appliances and tools were to be leased? This cannot be answered. Section 1 states it is those "which are all itemized in the List of Inventory which **will be verified and approved** by both parties on or before November 30, 2005." Emphasis added. That meant that there would be no agreement as to what was leased until four weeks later! Atalig argues: "Everything was leased." Opp., p. 7. That begs the question. What is "everything"?

Atalig tries to pooh-pooh the requirement of a future agreement by the parties: "Nothing more needed to be done or agreed to." Opp., p. 7. But, that flies in face of the clear meaning of the Lease stating that "the List of Inventory . . . will be verified <u>and</u> <u>approved</u> by both parties." (Emphasis added.) There clearly was more that needed to be done. And, it did require agreement. The inventory list did not just require verification by OKP, *it required OKP's approval*. Until OKP gave that approval, the identity of *which items* were being leased remained uncertain. Though Atalig says he wants to be paid for storing items, there is no evidence that OKP had agreed to lease any particular items. Thus, for this second reason summary judgment must be granted to OKP.

## II.

## THE PAYMENT OF TWO EMPLOYEES

Summary judgment is ripe as to the ¶ 88(b) claim of breach of contract for failing to pay the salaries of Carillo and Langit at $4.50 and $3.50 per hour. Atalig cannot prove this claim because he failed to issue a notice of default and 15-day opportunity to cure under § 15 of the Lease. There is no dispute that Atalig failed to issue any default notice on this ground. Instead, he argues that one of the employees (Carillo) "complained that her wages were wrong" and this put OKP on notice. Opp., p. 8. This fails for two reasons. First, Atalig does not claim that this notice was written; so, it fails for the same reason as stated above. Second, the Lease states that "notice of such default is [to be] <u>given</u> <u>by</u> <u>the</u> <u>Lessor</u> to Lessee . . . ." § 15. (Emphasis added.) Notice must be given by Atalig, not some third party. Again, Atalig understood this fact, since he sent a letter to OKP on January 17, 2006 entitled "Notice of Default and Violations."[1] He also knows it is a condition precedent to his right to sue, since he specifically pled that he provided notice and that despite such notice OKP failed to cure its violations. SAC ¶¶ 66, 89 & Exhibit "G." He listed several violations, but did not include the nonpayment of the employees. Summary judgment must be granted for failure to comply with this condition precedent to suit.

---

[1] Atalig wrote: "Therefore, OKP (CNMI) Corporation is hereby put on notice, pursuant to section 15 of the Lease Agreement, that OKP (CNMI) Corporation has violated and defaulted on the Lease Agreement. OKP (CNMI) Corporation is hereby given thirty (30) days from the date of this notice to cure the above-noted violations and default which may be cured."

1  In our motion we candidly admitted that if this count were not dismissed for this failure, that
2  Atalig would have sufficient standing to sue for the failure to pay the wages of two other persons,
3  but that his recovery would be limited to nominal damages. Atalig responds with two specious
4  claims, neither of which he provides support for. First, "OKP can still be required to pay what it
5  agreed to pay." Opp., p. 8. Perhaps Atalig forgets that he sued for damages and has not sued for
6  specific performance. *See* SAC ¶ 90. Second, he states: "Atalig believes that a jury should award
7  him the full amount of OKP's actual breach." Opp., p. 9. So, the alleged unpaid wages would be
8  paid in full to Atalig and also to the employees who supposedly suffered the loss? It is no surprise
9  that Atalig cites no authority. It is a surprise that he would make such empty arguments.

## III.

### HUNTING FOR DEER AND FRUITBAT ON THE PROPERTY

12  Summary judgment may be ripe as to the ¶ 88(c) claim that OKP "illegally hunted for deer
13  and fruitbat on Plaintiff Atalig's land in violation of Section 6 . . . ." We believe Atalig cannot prove
14  this claim because he cannot prove that the hunting occurred on his land; however, this depends
15  upon the Court's ruling on our motion to strike. In addition, we believe that Atalig cannot prove that
16  such hunting, if it occurred, was illegal.

17  Atalig has no personal knowledge as to whether hunting occurred on his property. At his
18  deposition he was asked if he knew OKP was actually hunting on his property or if maybe its
19  employees were hunting on public property or someone else's property. He replied: "I'm not sure
20  whether they were hunting on my property . . . ." Fact 7. His attempt to now re-interpret his answer
21  to mean that the shot "was taken somewhere on Atalig's land" is ridiculous. Opp., at 9. After
22  realizing that he was pinned down, he offers Carillo's statement that "I saw OKP employees hunting
23  for deer and coconut crabs on . . . Atalig's property . . . ." Declaration, ¶ 3. We have moved to
24  strike the answer for lack of foundation (personal knowledge). What if her statement is not stricken?
25  Then there would be evidence of deer hunting on the property, but not fruitbat. Still, Atalig must
26  prove that such deer hunting was illegal.

27  Section 6 does not prohibit deer hunting. It only limits the use of the land to "any lawful use
28  or purpose." So, Atalig must show sufficient evidence that such deer hunting, if it occurred, violated

the law. There has been no showing that the hunting was unlawful.

## IV.

## ROCKS ALLEGEDLY STOLEN FROM GINALANGAN DEFENSIVE COMPLEX

Summary judgment is ripe as to the ¶ 88(d) claim that OKP violated § 3 of the Lease because "[o]n information and belief, Defendant OKP . . . [has] stolen rocks and other materials from the Ginalangan Defensive Complex in their attempt to cover up the damage and destruction to the historical Japanese water tank." There are several reasons why they cannot prove their claim. Any one of them is sufficient for summary judgment.

First, we objected that they failed to give the required default notice and 30-day opportunity to cure as required by § 15 of the Lease. Nowhere in the default letter (Exhibit "G" to the SAC) is there mention of OKP having stolen rocks from the Ginalangan Defensive Complex. The Opposition fails to address this issue at all. Thus, it is clear that there is a failure to prove a condition precedent to filing suit on this basis and summary judgment must be granted.

Second, there is no evidence of an unlawful use of the premises.[2] We argued that the illegal act alleged is the stealing of "rocks and other materials" from the Defensive Complex and the Complex is not on the premises. Atalig admits that the Complex is on "public land." Opp., p. 10. Section 6 states: "Lessee may use, improve and develop the Premises or any part thereof for any lawful use or purpose . . . ." Even if OKP had taken rocks from public land without a permit, and then used the rocks on Atalig's land, such conduct would not be a use of *Atalig's Premises* for an unlawful purpose. So, this would not violate § 6.

Atalig is stuck. The heart of ¶ 88(d) is an allegation that OKP stole rocks from the Defensive Complex. But, he forgot that even if that were true, it would not violate the Lease as the unlawful use must be of Atalig's property, not public property. In the Opposition, Atalig attempts to change his position to argue that the repair of the water tank was harmful and constituted waste in violation of § 6. But, this is covered by the next paragraph of the complaint, ¶ 88(e), which alleges the

---

[2]The SAC charges that such activity violates § 3 of the Lease. We pointed out that this is the rent provision. Atalig admits that he is relying on § 6 of the Lease. Thus, there is no question that Atalig cannot prove a violation of § 3 as alleged.

4

1  damage to the water tank was waste and was in violation of CNMI laws, both which violate § 6 of
2  the Lease. In short, ¶ 88(d) focuses on the employees stealing rocks, and that activity – which, if
3  it occurred at all, occurred off premises – does not violate the Lease.

4  Third, Atalig cannot prove that the rocks came from the Defensive Complex. He knows it,
5  because unlike most of the allegations of the complaint, this paragraph is only alleged "on
6  information and belief." ¶ 88(d). He did manage to bring Edita to the rescue once again, because
7  her declaration states: "I saw a group of OKP employees go to the Ginalangan Defensive Complex
8  (the 'Command Post') with the OKP pickup truck and dump truck. The trucks were empty when
9  they went up to the Command Post, but when they returned, the dump truck was filled with rocks."
10 ¶ 12. We moved to strike her statement that she saw the employees go to the Defensive Complex
11 for lack of foundation (personal knowledge). Note that she had to deduce that rocks were taken
12 from the Command Post on the basis of an empty truck going one way and a full dump truck
13 returning. Thus, she did not see the rocks being put into the truck, which means she did not see
14 where the rocks came from. Obviously, all she saw was the direction the truck left in. This is
15 evidence that the truck went toward the Command Post, but no more. Whether it stopped there or
16 went further, turned left or turned right, is unknown. In short, there is no evidence as to where the
17 rocks came from.

18 Paragraph 88(d) fails: (1) for failure to give notice and warning as required by the Lease, (2)
19 for lack of proof (as acknowledged by the complaint), and (3) for failing to constitute a violation of
20 § 6 (because any illegal act occurred off the Premises).

21                                                    **V.**

22         **ALLEGED WASTE BY HARMING ARTIFACTS, TREES, FUEL TANK & SOIL**

23 Summary judgment is ripe as to ¶¶ 88(e) (artifacts), (f) (trees), (g) (kitchen), (h) (fuel tank),
24 and (i) (topsoil) which allege damage to these items is waste in violation of Section 6 of the Lease.
25 For the purpose of this argument only, we assume that Atalig is able to prove OKP damaged all
26 these items, and that their damage constitutes waste. The sole issue is what is the legal effect under
27 the Lease Agreement of waste. The effect is that the commission of waste is a ground for
28 terminating the Lease, but it is not a ground for suing the lessee.

1    The issue is framed quite simply as whether Section 6 states a covenant by the lessee or a condition as to the use of the Premises. Section 6 provides: "Lessee may use, improve and develop the Premises . . . provided that Lessee does not commit waste . . . ." If § 6 is a condition, then its failure to occur excuses performance by the other party. RESTATEMENT (SECOND) OF CONTRACTS § 224. In leases, the failure of a condition terminates the leasehold. *Parten v. Cannon,* 889 S.W.2d 327, 330 (Tex. Ct. App. 1992). But, it does not entitle a party to sue for damages. Only the violation of a covenant allows for damages. *Housing Authority of Mansfield v. Rovig,* 676 S.W.2d 314, 317 (Mo. Ct. App. 1984). Here, Atalig is suing for damages, not to terminate the leasehold. SAC ¶ 90. Thus, he can succeed only if § 6 is found to be a covenant and not a condition.

Whether a term is a covenant or a condition depends upon the intent of the parties. The Restatement counsels that words, such as "provided that" are often used to create <u>conditions</u>. § 226. The Court must look to the intent of the parties – as disclosed by the language used (the "four corners" of the document) – to make this determination. *Housing Authority*, 676 S.W.2d at 317. This Lease has no ambiguity in its language. It states that the lessee may use the Premises "provided that" it does not commit waste. This use of classic language of a condition shows the intent of the parties. This is a condition, and Atalig cannot sue for its non-occurrence.

We have reviewed these principles here because Atalig simply does not understand the argument. He cites an Am Jur article on "CC & Rs," essentially covenants restricting the use of land, to state that it fails to mention a distinction between covenants and conditions. Opp., p. 5. But, the article does not discuss conditions. It is essentially an article on a common type of covenant used in real estate. If Atalig wants to understand the difference between covenants and conditions in leases, he should look at an article on <u>leases</u>. For example, 49 Am. Jur. 2d *Landlord and Tenant* § 63 starts off an entire chapter on "Covenants and Conditions." The very first section is on their "definitions and distinctions." It states:

> The primary distinction between a covenant and condition pertains to the remedy in case of a breach; the breach of a condition upon which a leasehold estate is granted results in automatic termination or forfeiture of the estate, whereas the breach of a covenant does not automatically terminate the estate but instead subjects the breaching party to liability for monetary damages at law . . . .

§ 63.

1    The very next section is on their creation: "[T]here is authority holding that words such as 'on condition that,' 'if,' and 'provided,' are words of conditions, and in the absence of an indication to the contrary, the employment of such words in a contract will create a condition precedent rather than a covenant." § 64. So, Am Jur certainly supports our position.

None of the cases Atalig cites refutes our argument. *Anderson v. Tranquility Comm. Church,* 2002 Ohio 6152 (Ohio Ct. App. 2002) actually supports our position. Land was leased to a church for $1 per year. "[T]he lease provided that, '[appellant] will not commit or suffer any waste on the premises . . . .'" When the lessor died, an heir sued to terminate the lease, so the issue was whether the church had committed waste. This case illustrates how the breach of a condition works to terminate a leasehold estate. In *King's Court Racquetball v. Dawkins,* 62 S.W.3d 229 (Tex. Ct. App. 2001), a lease was amended to permit the tenant to alter the premises without restriction. The tenant left the premises with the interior of a building demolished and the landlord sued for waste. The issue was whether the amendment consented to the waste. There was no issue in the case whether any prohibition against waste was a covenant or a condition. In *McLane v. Wal-Mart Stores, Inc.,* 10 S.W.3d 602 (Miss. App. Div. 2000), the issue was whether a landlord was limited to stating only a claim for waste or whether he could also sue for breach of contract. Atalig argues he is not limited to only a tort claim. We agree. We have not argued that he is limited to only his tort claim. Our argument is entirely different – it is that he cannot sue for damages in a contract claim unless the lease has a covenant against waste. The Atalig/OKP lease has only a condition not to commit waste.

In short, Atalig has not presented any evidence that § 6 should be interpreted as a covenant rather than a condition. The use of the words "provided that" indicate that it is a condition. Atalig cannot sue OKP for money damages for acts of waste as a breach of contract claim. While summary judgment should be granted as to paragraphs 88(e), (f), (g), (h), and (i) under the breach of contract claim, it does not affect Atalig's ability to bring separate claims for the tort of waste (as he has done).

**VI.**

**THE FUEL TANK AS WASTE – THERE WAS NO WASTE**

Although Atalig would like to argue there is a genuine dispute here, there is no dispute as

to the material facts. In addition to the argument just presented (*i.e.* that waste is a condition), Atalig cannot prove that by placing an empty fuel tank on his property OKP committed waste. ¶ 88(h).

Here are the material undisputed facts. (1) OKP placed a fuel tank on Atalig's property. (2) it was never filled with fuel. It was never used. Fact 10. (3) Before the end of the lease term, OKP removed the fuel tank. No trace remained of it. Fact 11. In addition, Atalig agrees on the law, which is that in order to prove a claim for waste there must be some harm to the plaintiff's reversionary interest. *Rumiche Corp. v. Eisenreich,* 352 N.E.2d 125, 128 (N.Y. App. Div. 1976). Our point is simple – moving a fuel tank onto Atalig's land and then off again, without being used, leaving no trace behind, is not waste. It is no more an act of waste than rolling an empty 55 gallon drum made for holding oil – which holds no oil – onto the land and then off again. Where's the damage?

Atalig tries to introduce "expert" opinion that the mere presence of the fuel tank raises questions that must be answered by testing the soil and then issuing warranties of no hazard to a future lessee or buyer. First, we have objected to this declaration on several grounds – most notably that he has no real expertise. Second, we must not confuse factual expertise with legal expertise. The issue is a legal one, not a factual one. Why? Because the only evidence before this Court is that the fuel tank was not used and no trace of it is left behind. Thus, Atalig's suggestion that the credibility of this statement must be tested ("While it is nice to have OKP and Chen's word that they did not fill the fuel tank . . . ." Opp., 5.), for summary judgment it must be accepted that this is true as it is the only evidence presented on this issue. (Note that Demapan admits "it is now uncertain exactly where the fuel tank was located." ¶ 2.) In brief, since there was no fuel, there is no need to test for its presence and there is no harm in giving a warranty that there is no fuel present. So, even if Demapan's testimony is admitted into evidence, his concerns should carry no weight in this Court.[3]

---

[3] It is also interesting to note that his testimony failed to recognize that the Lease Agreement permits waste that could raise the exact same environmental issues. Section 6 allows the Premises to be used as an "equipment repair shop and workstation, heavy and lightweight equipment parking and storage, and as staging area . . . ." These activities all carry the risk of

1    The law is clear – the reversionary interest must be damaged. The facts are clear – there was
2 no fuel in the fuel tanks and no trace was left behind. There is no need to test the area or to worry
3 about warranties. At bedrock, the evidence is that the property was not harmed. Summary judgment
4 must be granted as to ¶ 88(h).

## VII.

## THE TOPSOIL WAS NOT PERMANENTLY REMOVED

Paragraph 88(i) states that OKP breached Section 6 of the Lease (committing waste) by "moving and/or removing soil . . . ." Specifically, Atalig complains that the topsoil on his land was removed. In our motion, we produced evidence that the topsoil was temporarily stockpiled and it was returned to the site before the end of the lease term. Fact 13. There is no dispute that the governing law is that for there to be waste there must be harm to the reversionary interest. *Rumiche*. Since the topsoil was returned, there was no harm. In addition, we argued that we added benefit to the land by adding 18-20 dump truck loads of high-quality topsoil. Fact 13.

Atalig seeks to create a genuine dispute of material fact here. "There is a big dispute here." Opp., at 6. But, that is not true. He states: "First off, the soil was not returned." He offers no citation. <u>Atalig's declaration nowhere states that the soil was not returned</u>. *See* ¶ 71. Thus, the only evidence is that the soil <u>was</u> <u>returned</u>. So, there is no big dispute here.

Atalig next argues that there was no benefit added with the 18-20 dump truck loads of soil. This is because he disputes the quality of the topsoil. He states it was "mostly clay" and "was not of the quality of the topsoil OKP had removed." ¶ 71. Fine. For now, we will drop the argument that OKP actually added benefit to the land.

Atalig's final argument is that his reversionary interest was damaged because OKP left the coral beneath the added soil which makes the land no longer tillable. Plant roots allegedly cannot penetrate the coral. <u>Atalig's declaration nowhere states that the land is not tillable and that plant roots cannot penetrate the coral</u>. Once again, counsel is arguing "facts" not in the record. So, this

---

spillage of oil, fuel, coolant, and solvents. Atalig cannot complain about these activities, which may raise the same concern, because he has consented to these uses of his land.

9

1 argument is not appropriate and must be disregarded.

2 The "big dispute" is really not a dispute. The only *material fact* is whether there has been
3 a harm to the reversionary interest. Atalig's argument is that the topsoil was removed and not
4 returned – but, the only evidence is that it *was returned*. His other argument is that leaving the coral
5 in place has made his land not tillable – but, there is no evidence at all that his land was harmed.
6 This is a summary judgment motion. It is not the place for merely making arguments, but the place
7 for show and tell – the plaintiff must show us that he has evidence and tell us how it proves his case.
8 Atalig has failed to "show" us the proof. Summary judgment must be granted.

## VIII.

### PUNITIVE DAMAGES ARE NOT AVAILABLE FOR PURELY CONTRACT CLAIMS

11 There is, surprisingly, little disagreement in this area. We maintain that a plaintiff may not
12 recover punitive damages for breach of contract unless the conduct constituting the breach is also
13 a tort for which punitive damages are recoverable. This is what RESTATEMENT (SECOND) OF
14 CONTRACTS § 355 specifically states. Atalig agrees.

15 We maintain that three of Atalig's claims for breach of contract involve conduct which is not
16 tort conduct: 1) reneging on a promise to lease furniture (¶ 88(a)), 2) failing to pay the full-time
17 salaries of two employees (¶ 88(b)), and 3) failing to obtain written consent before erecting
18 improvements (¶ 88(j)). These are purely contractual obligations. Atalig agrees. In fact, he states:
19 "Atalig is not, and has never, said that the individual contractual breaches, standing alone, would
20 support an award of punitive damages." Opp., p. 31.

21 Atalig's only argument is legal. "Rather, it is Atalig's contention that, taken as a whole, the
22 actions of OKP (including those discrete contractual breaches), constitute a course of conduct that
23 is sufficiently 'willful, wanton, vile, outrageous, and malicious' so as to justify an award of punitive
24 damages." *Id.* Atalig is arguing that "each of the individual contractual breaches should be
25 presented as further evidence of OKP's pattern of 'reckless indifference' . . . ." *Id.* This argument,
26 however, confuses apples with oranges. We are stating that punitive damages cannot be awarded
27 based upon paragraphs 88(a), 88(b), and 88(j). Atalig is stating that "evidence" of the contract
28 violations described in those three paragraphs should be *admissible* to prove a pattern of conduct.

This is an evidentiary matter, not a question of proving a cause of action.

What Atalig seeks to do is to admit evidence of other bad acts (the three alleged breaches of the lease) to show OKP's state of mind ("reckless indifference"). Whether such evidence is admissible is a question that should be deferred for a motion *ad limine*. The present issue is different. The issue is whether these three acts – independently – can be the basis for punitive damages. Atalig admits that "standing alone" they cannot be. He presents no authority stating that three acts which do not qualify for punitive damages can – collectively – qualify for punitive damages. The rule is stated clearly by the Commonwealth Supreme Court: "In other words, the breaching party's act must not only be a breach of contract, but must also amount to an independent, intentional tort." *Pangelinan v. Itaman,* 4 N.M.I. 114, 119 (1994). None of the three acts alleged – failing to lease furniture, failing to get written consent before erecting improvements, and failing to pay the salaries of two employees – constitutes an intentional tort. This is the test. It has not been met. Summary judgment must be granted as to the punitive damage request for these three acts.

## CONCLUSION

There are ten different causes of action for breach of contract in Count I. The Court should grant summary judgment as follows:

1. ¶ 88(a) – failing to agree on furniture to be leased
   a. Plaintiff failed to satisfy the condition of giving a notice of default and a 30-day cure period to Defendant under Lease § 15, so he cannot seek a legal remedy,
   b. Plaintiff cannot sue to enforce an agreement where an essential term (the identity of the items to be leased) is not definite and certain,
2. ¶ 88(b) – failing to pay the salaries of two employees
   a. Plaintiff failed to satisfy the condition of giving a notice of default and a 30-day cure period to Defendant under Lease § 15, so he cannot seek a legal remedy,
   b. Plaintiff is only entitled to nominal damages as he has suffered no actual loss,
3. ¶ 88(c) – illegally hunting for deer and fruitbat on Premises
   a. Plaintiff has no evidence that the hunting occurred on the Premises as prohibited by § 6 of the Lease Agreement if the Court strikes ¶3 of Carillo's declaration,

1      b.    If it does not strike ¶ 3, then the only evidence presented is as to deer hunting, and

2      c.    As to deer hunting, Plaintiff has no evidence that the hunting was illegal,

3  4.    ¶ 88(d) – stealing rocks from the Ginalangan Defensive Complex

4      a.    Plaintiff pleads this as a violation of § 3 (rent), but it is not,

5      b.    Plaintiff failed to satisfy the condition of giving a notice of default and a 30-day cure

6      period to Defendant under Lease § 15, so he cannot seek a legal remedy,

7      c.    The alleged act – the stealing of rocks – did not occur on the Premises as required

8      by § 6 of the Lease Agreement but off premises at the Defensive Complex,

9      d.    Plaintiff has no evidence that the rocks actually came from the Defensive Complex

10      other than ¶ 12 of Carillo's statement, which should be stricken,

11  5.    ¶ 88(e), (f), (f), (h), and (i) – waste was committed in violation of § 6 by various acts

12      a.    Section 6 states that the Plaintiff may use the Premises "provided that" Lessee does

13      not commit waste, which states a condition, and Plaintiff cannot seek damages for

14      the failure of a condition (as opposed to the breach of a covenant), so each of these

15      allegations permits only the termination of the lease,

16  6.    ¶ 88(h) – waste was committed by putting a fuel tank on the Premises

17      a.    Waste requires a showing of permanent damage, and the undisputed evidence is that

18      there was no permanent damage as the tank was never used and it was removed,

19  7.    ¶ 88(i) – waste was committed by removing soil from the Premises

20      a.    There was no permanent damage as the undisputed evidence shows the soil was

21      returned, and there is no evidence that the coral has harmed the Premises

22  8.    ¶ 88(a), (b) and (j) – request for punitive damages on purely contract claims

23      a.    Punitive damages may not be recovered for contract claims unless the conduct

24      constituting the breach is also a tort for which punitive damages may be recovered.

25  Dated: December 5, 2007.

26      Respectfully submitted,

28      /s/ _____

1 | Rexford C. Kosack, CNMI Bar No. F0140
2 |
3 | ___/s/_____
4 | Sean E. Frink, CNMI Bar No. F00212