# Exhibit 23

CARLSMITH BALL LLP
SEAN E. FRINK
Carlsmith Building, Capitol Hill
P.O. Box 5241
Saipan, MP  96950-5241
Tel No. 670.322.3455

BRUCE L. MAILMAN (CNMI Bar #F0153)
MAYA B. KARA (CNMI Bar #F0169)
Mailman & Kara, LLC
PMB 238 PPP, Box 10,000
Saipan, MP 96950
Tel:(670)233-0081
Fax: (670)233-0090

Attorneys for Defendants
OKP CNMI Corporation, Prasada
Reddy Goluguri, Pramuan Jaiphakdee, &
Wilai Promchai

REXFORD C. KOSACK
GLENN A. JEWELL
DOUGLAS DALEY
LAW OFFICES OF REXFORD C. KOSACK
Bank of Hawaii Bldg., Third Floor
P.O. Box 410
Saipan, MP 96950
Telephone: (670) 322-8800
Fax: (670) 322-7800

Attorneys for Defendant Brian M. Chen

**E-FILED**
**CNMI SUPERIOR COURT**
E-filed: Dec  7 2007 11:58PM
Clerk Review: Dec 13, 2007
Filing ID: 17568305
Case Number: 06-0119-CV
Elsa Duenas

IN THE SUPERIOR COURT

OF THE

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

JOAQUIN Q. ATALIG,

       Plaintiff,

vs.

OKP (CNMI) CORPORATION, *et al.*,

       Defendants.

CIVIL ACTION NO. 06-0119

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO STRIKE**

**I.**

**PLAINTIFF IS TRYING TO RE-TOOL HIS NEGLIGENCE CLAIM, BUT
IT IS TOO LITTLE TOO LATE**

Atalig states two separate theories for recovery based on negligence: (1) that OKP had a duty not commit waste on the land, but breached it, and (2) that OKP had a duty to obtain consent prior to making alterations, but it failed to do so before damaging the land.  SAC ¶¶ 127-128.  We showed that neither theory is appropriate under negligence.  In his Opposition, Atalig simply drops his second theory.  Nowhere does he even mention that failure to obtain consent is a basis of his negligence claim.  Obviously, after we pointed out that failure to obtain consent does not create an unreasonable risk of harm and is not causally connected to any damage, Atalig chose not to defend this theory.  Thus, summary judgment should be granted now on the "failure to obtain consent" theory.

The remaining theory is that: "OKP had the duty not to commit waste on Plaintiff Atalig's land" (¶ 127); but, breached its duty "when it violated the laws of the CNMI by damaging and destroying cultural and historical artifacts and other things of value . . . ."  ¶ 128.  We stated that the duty not to commit waste was taken from Section 6 of the Lease Agreement (use of the land conditioned on not committing waste).  Memo, p. 14.  *See* ¶ 55 and notice of default letter (based on § 6).

Atalig argues that we "misinterpret the negligence claim," and he then proceeds to re-invent his negligence claim:

> The negligence cause of action at ¶¶ 127 and 128 set forth two separate *duties*. . . . The first duty is not to commit waste or abide by the lease, which is essentially the duty to exercise ordinary care.  The second duty is technically the same duty but because it is alleged that OKP failed to comply with applicable statutes that set forth the standard of care, it is negligence *per se*.  OKP is alleged to have breach [sic] the duty owed to Atalig either by failing to exercise ordinary care (¶ 127), or as a matter of law (¶ 128).

Opp., p. 19.

Atalig portrays his complaint as stating two types of breach – one in ¶ 127, the other in ¶ 128. Clearly, that is not the case. Paragraph 127 begins: "Defendant **OKP had the duty** to . . . ." Emphasis added. Paragraph 128 begins: "Defendant **OKP breached its duty** . . . ." Emphasis added. The difference between the paragraphs is not the duties they state, but that ¶ 127 sets out the duty and ¶ 128 sets out the breach. The two paragraphs match exactly – the two duties set out in ¶ 127 match the two breaches set out in ¶ 128. It is obvious that Atalig is misrepresenting the language of the complaint. Why? Because he wants to get rid of the duty to get consent and not commit waste, and he wants to swap in the duty of ordinary care and a negligence per se theory. Counsel even offers an apology, suggesting that the confusion here is due to poor drafting. "Admittedly, this cause of action could have been better pled." Opp., p. 19, n. 4.[1] But, that is not the case. The complaint clearly says what it says. The complaint controls, not discovery. We are defending against the case stated in the pleading, not the one in counsel's head. Summary judgment should be analyzed based upon what the complaint says.

Other than setting up this diversion, Atalig has done nothing to respond to our argument against negligence based on waste. We showed that when a party negligently fails to prevent damage to the premises, the proper cause of action is one for involuntary waste. *Rumiche v. Eisenreich,* 352 N.E.2d 125, 128 (N.Y. Ct. App. 1976). Atalig has sued for waste in his Second Cause of Action. He cannot sue for the negligent commission of waste a second time by calling the action one for "negligence." Summary judgment should be granted as to the cause of action for negligence because: (1) as to the negligent waste claim, it is properly stated as waste (which has been done), and (2) as to the failure to obtain consent claim, Atalig has clearly abandoned it.

---

[1] Ironically, on the next page, counsel says the problem was caused by OKP: "The question remains . . . why would Defendants go to such lengths to stretch the meaning of Plaintiff's Seventh Cause of Action beyond the simple claim for negligence that was intended?" Opp., p. 20, n. 6. A quick check of the SAC will show which party is engaging in the "stretching."

## II.
## ALL REFERENCES TO "DOE" DEFENDANTS SHOULD BE STRICKEN

In his Second Amended Complaint ("SAC"), plaintiff purports to sue "DOES 1-3." SAC, caption, p. 1. In our opening memorandum we showed that plaintiff has no right to bring suit against fictitious defendants and these "defendants" should be stricken from the caption and the body of the SAC.

In his Consolidated Opposition, Plaintiff does not challenge defendants' legal authority on this point. Instead, plaintiff effectively concedes that the motion should be granted. "Consequently, Atalig agrees that all the John Doe Defendants can be dismissed at this time." Opposition, p. 35. As plaintiff has conceded that the Doe defendants can be dismissed, the motion should be granted.[1]

## III.
## OKP IS ENTITLED TO SUMMARY JUDGMENT ON
## PLAINTIFF'S "FUEL TANK" WASTE CLAIM

Plaintiff makes two arguments in opposition to the motion for summary judgment on his fuel tank waste claim. One is to counter our argument that there was no waste by claiming that there *was* waste. This argument has been handled in section I, above, and will not be repeated here.

Second, plaintiff makes the novel argument that, "Commonwealth law does not permit partial motions for summary judgment that do not resolve a full claim." Opp., p. 11. Plaintiff cites *Estate of Hillblom v. Superior Court* for this proposition. Unfortunately for plaintiff, he is wrong on what CNMI law allows and he is wrong on the holding in *Hillblom*.

Plaintiff's claim is that, "OKP and Chen's Joint Motion that seeks summary judgment as to 20% of the Second Cause of Action is [a impermissible] partial motion. It does not resolve the entire claim." Opp., p. 11. Plaintiff could not be more wrong.

"Commonwealth law" actually *does* allow motions for summary judgment on a part of a claim. "A party against whom a claim . . . is asserted . . . may at any time, move . . . for a

---

[1] Plaintiff goes on to say, "However, should the trial date be continued for any reason, Atalig may seek leave to name [Allen] Yee as a Defendant at that time." Opposition, p. 35. If the trial date is continued, then plaintiff can bring his motion. The merits of any such motion may be addressed if and when it is ever filed.

summary judgment in the party's favor as to all **or any part thereof**." Com. R. Civ. P. 56(b). This language could not be more clear and that is no need to construe it. The plain meaning rule applies: a defendant may move for summary judgment on part of a claim.

Given this, then, what is the role of Rule 56(d)? If a party moves for summary judgment, but it is not granted in full, the Court may consider under Rule 56(d) whether it would be helpful to issue an order that narrows the issues for trial. And *that* is what the CNMI Supreme Court essentially said in *Hillblom*, not that a party is forbidden from moving for summary judgment on a part of a claim. The Court further ruled that Rule 56(d) cannot be used as a basis for a stand-alone motion.

> We adopt the view of a majority of jurisdictions that hold Rule 56(d) does not permit an independent motion to obtain summary judgment on part of a claim. Specifically, the primary purpose of Rule 56(d) is to save the serviceable fruits of a court's denial of a procedurally accurate, but ultimately unsuccessful motion for summary judgment. As such, Rule 56(d) is not designed as a stand-alone motion, but as an ancillary tool to a motion for summary judgment. In sum, <u>Rule 56(d) permits a court to determine some material facts that appear without substantial controversy</u>, but ***only*** when a party has unsuccessfully moved for full summary judgment under Rule 56(a) or (b).

*Hillblom*, ¶ 20 (underscoring added, other emphasis in original; footnotes and citations omitted).

Thus, a party may move for summary judgment on all or part of a cause of action (what the Supreme Court calls moving for "full summary judgment"). If that motion fails, then the trial court – in certain circumstances – may determine "some material **facts** that appear without substantial controversy[.]" What a party may not do is use Rule 56(d) "as a device to obtain adjudications of non-dispositive fact issues." *Id.* at ¶ 25 (citation and quotation marks omitted).

For these reasons, defendants acted properly under Rule 56(b). Plaintiff, on the other hand, has miscited CNMI law and Supreme Court authority.

## IV.
## THE ONLY REASONABLE INTERPRETATION OF THE LEASE IS THAT THE INDEMNIFICATION TERM DOES NOT APPLY BETWEEN THE PARTIES; FURTHERMORE, ANY AMBIGUITY MUST BE RESOLVED IN FAVOR OF OKP

The most mysterious claim in this lawsuit is the Ninth Cause of Action where Atalig seeks to recover for all his losses under Section 12 of the Lease Agreement, an indemnification clause. This one claim swallows the remainder of the lawsuit. No longer does Atalig need his

tort claims or his contract claims. No longer does he have to prove negligent or intentional conduct. He seeks to substitute these with strict liability – proving only that he was harmed, and the harm resulted from OKP's use (even proper use) of his Premises. He tosses all his damages into this one claim – property harms, emotional distress, and the expense of litigation. Obviously, the stakes are high for OKP in this particular motion.

We have moved for summary judgment, because – as a matter of law – Section 12 does not apply to indemnification of the lessor's direct losses, but only to reimbursing him for his losses to third parties. The difference is between Atalig seeking reimbursement of his litigation expenses and any judgment he must pay resulting from a lawsuit brought against him by OKP's visitor who is hurt while on the Premises (third party), and Atalig seeking reimbursement of his litigation expenses in his lawsuit against OKP for OKP's alleged breach of the lease (first party). Under Section 12, Atalig would argue that he is entitled to indemnification of his costs, even if he loses the lawsuit against OKP. This situation should not arise here, because Section 12 does not apply to first party reimbursement.

We need to be clear as to what we are not arguing. We are not arguing that, as a general matter, indemnity provisions are limited to third-party claims and not to disputes between the parties to a lease. We recognize that some courts have found the indemnity provisions before them to be limited to third-party claims[1] while other courts have found the provisions before

---

[1] *City of Dillingham v. CH2M Hill Northwest, Inc.,* 873 P.2d 1271, 1275-76 (Alaska 1994); *Citizens Ins. Co. of New Jersey v. Signal Ins. Co.,* 493 P.2d 46, 47-48 (Or. 1972); *Ray D. Baker Contractor, Inc. v. Chris Nelson & Sons,* 136 N.W.2d 771, 773 (Mich. Ct. App. 1965) (cases collected at *Mead Corp. v. ABB Power Generation, Inc.,* 141 F. Supp.2d 914, *21 (D.C. Ohio 2001).

them were not so limited.[2]  Our position is that <u>the issue is one of contract interpretation</u>.  Memo, p. 18.

> "As a matter of well-settled legal doctrine, it is clear that an indemnity provision is to be construed in accordance with the rules for construction of contracts generally, and hence that the judicial task is to ascertain the intent of the parties . . . ."

*Mantilla v. NC Mall Associates,* 770 A.2d 1144, 1150-51 (N.J. 2001) (quoting from *Doloughty v. Blanchard Constr. Co.,* 352 A.2d 613 (N.J. Super. 1976).

Atalig has only one argument in favor of an interpretation that the clause applies to disputes between the parties.  Citing BLACK'S LAW DICTIONARY, he points out that the definition of "indemnify" is not limited to third-party claims.  But, Black's provides only a definition of the verb "indemnify'; it makes no attempt to state what an indemnification clause is and how it commonly works.  This is what is relevant when examining what the parties intended.  There are a great many courts which recognize that typically these clauses involve only third-party claims.  In his own case, *Rand-Whitney Containerboard Ltd. Part. v. Town of Montville,* 2007 U.S. Dist. LEXIS 52301 (D.C. Conn. 2007), the court mentions that the party arguing Atalig's position acknowledged "that indemnification agreements typically involve third-party claims . . . ."  *Id.* at *42.  Other courts have recognized that indemnity provisions have "traditionally been used to indemnify one of the contracting parties against tort liability to third parties . . . ."  *Ray D. Baker Contractor, Inc. v. Chris Nelson & Sons,* 136 N.W.2d 771, 773 (Mich. Ct. App. 1965).

The Restatement, however, does explain how indemnity works.  Specifically, while indemnification could possibly cover disputes between contracting parties, <u>ordinarily</u> the term applies only to third party claims.  Of course, we are bound to apply the rules of the Restatement.

---

[2] *Litton Microwave Cooking Prods. v. Leviton Mfg. Co.,* 15 F.3d 790, 795-96 (8th Cir. 1994); *Atari Corp. v. Ernst & Whinney,* 981 F.2d 1025, 1031-32 (9th Cir. 1992); *Battelle Mem'l Inst. v. Nowsco Pipeline Services, Inc.,* 56 F. Supp. 2d 944, 950-51 (S.D. Ohio 1999) (cases also collected at *Mead Corp., supra.*).

7 CMC § 3401. The trial court in *The Mead Corp. v. ABB Power Generation, Inc.*, 141 F. Supp.2d 914, *21 (D.C. Ohio 2001) provided the list of cases cited in the above two footnotes, and after citing the cases where courts held that indemnity provisions *are limited to third-party reimbursement situations*, stated:

> The Restatement of Restitution also supports the **generally accepted meaning of indemnity**:
>
> > "A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other . . . ."
>
> RESTATEMENT OF RESTITUTION § 76 (1937).

Emphasis added.

The Sixth Circuit, on the appeal of the same case, made the observation that indemnity provisions historically apply only to third-party claims and this is the Restatement's rule:

> In light of Article 31 [of the contract before the court], Article 16 could be read to provide indemnity only for third-party claims, which is the historical scope of usual indemnification provisions. *See generally* RESTATEMENT OF RESTITUTION § 76 & cmt. b (1937).

*Mead Corporation v. ABB Power Generation, Inc.,* 319 F.3d 790, 798 (6th Cir. 2003).

The Restatement provides that in interpreting a contract: "Unless a different intention is manifested, technical terms and words of art are given their technical meaning when used in a transaction within their technical field." RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(b). Thus, the term "indemnification" should be assigned its generally-accepted meaning, the one that fits within the historical use of such a term, and which is assigned to it by the Restatement, itself – that it provides indemnity for third-party claims.

Atalig's remaining argument is that when contract language is ambiguous, the jury should determine its meaning. Opp., at 33. He cites *Rand-Whitney Containerboard*, which found the particular indemnification provision before it to be ambiguous and that it was proper to

submit the issue to the jury.[3]    That case is distinguishable because in the present case the

indemnification provision is not ambiguous.    It can be interpreted based upon two sources: 1)

looking at the whole Lease Agreement, and 2) relying upon a strong presumption regarding

indemnification clauses.    We will show that courts use both techniques to find contracts are not

ambiguous and to determine the meaning of indemnification clauses as a matter of law.

There is nothing about summary judgment which prevents a court from engaging in the

interpretation of a contract.

> The construction of a contract is peculiarly well suited for disposition by
> summary judgment because, in the absence of an ambiguity in terms, it is a
> question of law for the court.

*The Service Merchandise Co. v. Hunter Fan Co.,* 617 S.E.2d 235, 237 (Ct. App. Ga. 2005)

(summary judgment granted to defendant when court interpreted indemnification provision to

not apply to a two-party situation).

Summary judgment was granted after the court interpreted an indemnification clause in

*Mead Corporation,* 141 F. Supp.2d 914.    The customer sued the manufacturer for breach of

contract when the turbine it was sold failed after the twelve-month warranty period had expired.

Summary judgment was granted on the breach of contract claim because it was in reality a

warranty claim and the time for such claims had expired.    The customer also sought its expenses

from the turbine failure under an indemnification clause in the contract.    The parties squared-off

over whether such clauses are limited to third-party claims or claims between the two parties.

The court took neither position and instead interpreted the provision based upon the whole of the

contract.    Since the warranty provision stated that its warranties are exclusive, and its term was

---

[3]Atalig quips that we wrongly relied on an unpublished opinion, *Conn. Res. Recovery Auth. v. Murtha Cullina, LLP,* 2006 Conn. Super LEXIS 1498 (Conn. Super. 2006).    The case, however, is discussed at some length by the U.S. District Court for Connecticut in a 2007 opinion – in fact, it is the very case Atalig relies upon:  *Rand-Whitney Containerboard,* 2007 U.S. Dist LEXIS 52301 *42.

limited to one year, it was decided that "applying the indemnity provision to a first party breach of warranty claim would eviscerate the 'exclusive and in lieu of all other warranties' limitation found in the contract." *Id.* at 24. If the indemnity applied between the parties, "then the one-year limit on the [contract] would be nullified. When viewing the contract as a whole, it is clear that the parties intended that the March, 1996 repairs would be covered by a one-year warranty. Plaintiffs cannot side-step that time limitation by bringing a claim under the warranty provision." *Id.* Summary judgment was granted.

We have essentially made the same argument in this case. Section 23 (Attorneys' Fees) states: "In the event of any suit by any party to this Lease . . . **the prevailing party** shall be entitled to recover from the other party costs of suit and reasonable attorney's fees . . . ." Emphasis added. Clearly, this provision applies between the two parties. If Section 12 (Indemnification) is applied to the two parties, then a major inconsistency results. "**Lessee** shall . . . indemnify the Lessor against all liability, loss, cost, damage or expense of litigation . . . ." Thus, if the lessor sues the lessee regarding a claimed breach based on the use of the Premises and the lessee prevails, the two provisions – under Atalig's construction – would be contradictory. Section 23 would result in the lessor paying the lessee's attorney fees because the lessee prevailed, while Section 12 would require the lessee to pay the lessor's attorney fees (as an expense of litigation) regardless of the fact that the lessee prevailed. One measure is based upon who wins, the other is based on strict liability for the lessee. As in *Mead Corporation*, if Atalig's interpretation were applied to the indemnification provision of this Lease Agreement, there would be no need for Section 23 on Attorneys' Fees.

When an interpretation of contract provisions leads to contradictory results, it violates RESTATEMENT (SECOND) OF CONTRACTS § 202 (writing to be interpreted as a whole). Instead, the interpretation which gives a reasonable and effective meaning to all terms is the preferred

interpretation.  RESTATEMENT (SECOND) OF CONTRACTS § 203.  That interpretation is that Section

16 (Indemnification) applies only to actions brought by third parties.

Even if this contradiction were not present, and the Lease Agreement were ambiguous,

summary judgment would still be appropriate.  This is because "the words of a contract of

indemnification must be construed strictly against the indemnitee.  And every presumption is

against such intention [to indemnify]."  *Service Merchandise,* 617 S.E.2d 235, 237-38 (citations

omitted).  This is not a fact determination, but one of law:

> As a matter of law, the scope of the written indemnification provisions must be
> strictly construed against SM, the indemnitee.

*Id.* at 296 (finding no explicit language stating indemnification applied between the parties, the

court found indemnification applied only to third parties and granted summary judgment).

An approach very similar to this was used to interpret an indemnification provision in

*Mead Corporation* when it was heard on appeal by the Sixth Circuit.  319 F.3d 790, 798-99 (6th

Cir. 2003).  The court reversed the ruling barring the breach of contract claim as a hidden

warranty claim, but affirmed the summary judgment ruling on the indemnity claim.

Interestingly, on appeal, the basis for the ruling was changed.   The court found the

indemnification provision ambiguous.  It applied the presumption against the drafter of the

contract, who happened to be the indemnitee, and, thus, limited the indemnification claim to

third parties.  We made the same argument in our Opening Memorandum, but Atalig pointed out

that OKP's former counsel was involved in the first drafts of the Lease Agreement and Atalig's

counsel reviewed and edited the final draft.  In that case, we would agree that the presumption

would not work against Atalig.  *Centennial Enterprises, Inc. v. Mansfield Development Co.,* 568

P.2d 50, (Colo. 1977) (where a sublease is the product of several negotiating sessions and both

parties are involved, there is no presumption).  But, we argued the presumption against the

indemnitee as well.  Memo, p. 20.  Atalig failed to address that argument; obviously conceding its merit.

The reason for the strict construction of indemnity clauses is because their effect can be so sweeping.  The Colorado Supreme Court stated: "[W]e are mindful that it is inappropriate to construe statements so narrowly as to deprive them of any meaning, yet the burden of indemnity is so onerous that we hesitate to impose it unless the language used clearly requires such a result."  *Williams v. White Mountain Contr. Co.,* 749 P.2d 423, 426-27 (Colo. 1988). "Ambiguities will be resolved against the party seeking indemnity."  *Id.* at 426.  *Mantilla,* 770 A.2d 1144, 1151 ("When the meaning of the clause is ambiguous, however, the clause should be strictly construed against the indemnitee.")

> It is also well settled that in contracts of indemnity the losses to be indemnified must be clearly stated and the intent of the indemnitor's obligation to indemnify against them must be expressed in clear and unequivocal terms and to such an extent that no other meaning can be ascribed.

*Chevron U.S.A., Inc. v. Murphy Exploration & Production Co.,* 151 S.W.3d 306, 330 (Ark. 2004).

Atalig's proposed interpretation of Section 12 cannot withstand strict construction.  The section fails to state an intent in clear and unequivocal terms that the lessee must indemnify the lessor for the lessor's own losses.  To the extent that there is ambiguity (and we think there is none in light of the conflict with Section 23), the clause must be strictly construed against Atalig. Thus,  pursuant to the principles of interpretation legally mandated, Section 12 must be construed narrowly to be apply only to reimbursement for third-party claims.

For two reasons, summary judgment as to the Indemnification cause of action must be granted: (1) because the parties must have intended Section 12 to apply to reimbursement for third-party claims in order for Section 23 to not be contradictory, and (2) if there is any

ambiguity, then the provision must be interpreted, as a matter of law, against Atalig as the indemnitee.

## V.
### SUMMARY JUDGMENT IS APPROPRIATE AS TO CONVERSION OF ARTIFACTS BECAUSE THERE IS NO EVIDENCE THAT THE ARTIFACTS WERE INTENTIONALLY DAMAGED

There is remarkably little disagreement as to the conversion claim based on artifacts. As to the law, both parties agree that conversion is an <u>intentional</u> tort. Opp., p. 11 ("intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it . . . ."), p. 12 ("willfully interfering with any *chattel*"). There is, however, some disagreement over what it means to do an act intentionally. Atalig argues that one need not intentionally damage an artifact, only that one intended to exercise control over the property. By doing so, he contradicts himself. He states on page 14: "It does not matter whether OKP or any of its employees did, or did not, *intend to damage* the historical and cultural artifacts." Apparently, he forgot that on page 12 he offered the following quote: "A conversion may be committed by **intentionally** dispossessing of, **destroying**, using, receiving, disposing of, misdelivering, or refusing to surrender a chattel." Emphasis added. He cites to *Del Rosario v. Camacho,* 6 N.M.I. 213, 232 (2001) (citing Restatement (Second) of Torts § 242, cmt. d (1965)). So, does it matter, or not, whether the actor intentionally destroyed a chattel?

It matters a lot. "Conversion is always an intentional exercise of dominion or control over the chattel." Restatement (Second) of Torts § 223, cmt. "b." Intent is defined in section 8A with a definition to be "used throughout the Restatement of this Subject . . . ." It means that "the actor desires to cause the **consequences** of his act, or that he believes the consequences are substantially certain to result from it." *Id.* Emphasis added. Thus, Atalig is wrong. It <u>does matter</u> whether OKP's employees intended to damage the artifacts – they *must* intend to cause the <u>consequence</u> of their acts (*i.e.* the damage).

Comment "a" offers an illustration that leaves no doubt that it is not the intent to do the act, but the intent to cause the harm that results from it which is crucial:

> When an actor fires a gun in the midst of the Mojave Desert, he intends to pull the trigger; but when the bullet hits a person who is present in the desert without the actor's knowledge, he does not intend that result. "Intent" is limited, whenever it is used, to the consequences of the act.

§ 8 A, cmt. "a."

The outcome of numerous cases has turned on this definition. In *Branstetter v. Beaumont Supper Club, Inc.,* 727 P.2d 933 (Mont. 1986), excavation by an owner to build a house punctured a sewer line that a neighbor had run through his property. When the owner sued for trespass, the neighbor counterclaimed for trespass for having damaged their sewer line. As trespass requires an intentional intrusion, and the excavating owner had "no knowledge or notice of the drain line," there could be no intent under Restatement § 8A. In another case, *Mountain States Telephone and Telegraph Co. v. Kelton,* 285 P.2d 168 (Ariz. 1955), a contractor's bulldozer, in burying ashes from burning trees, dug down into the soil deep enough to break through a clay tile conduit housing telephone and telegraph lines. In a lawsuit by the phone company, it was determined that this was not an act of trespass, as trespass requires an intentional act. "There is no proof that the defendant intended to strike the pipe and, in fact, it is clearly established to the contrary, for the [sic] did not know the existence or location of the line . . . ."

*McNeal v. City of Easton,* 598 A.2d 638 (Pa. Cmwlth. 1991), involved a claim of intentional infliction of emotional distress brought by a worker against his supervisors for having made him a target of harassment and ridicule by his co-workers. Relying not only on Restatement § 8A, but also on Black's Law Dictionary (intent "presupposes knowledge"), the court found no intentional act and granted summary judgment. This was because the supervisors

had no knowledge of the co-workers' conduct and plaintiff had never told them about the co-workers' taunts or that the taunts bothered him.

> Without the "presupposed knowledge" necessary to find intent, it cannot be concluded on this record that Appellees desired or were substantially certain that their failure to intervene would result in harm to Appellant.

*Id.* at 641.

That same special knowledge was lacking in *Reeves v. Bridges,* 284 S.E.2d 416 (Ga. 1981) where a father sued a liquor store owner for selling whiskey to his son who was later injured in a car accident as a consequence of the liquor being consumed by the driver of the car in which he was a passenger. Citing Restatement § 8A, the Georgia Supreme Court found that in order to prove liability under the statute which makes selling liquor to a minor an intentional tort, the plaintiff must show that the store owner intended to sell to a minor. In the absence of knowledge that the plaintiff's son was a minor, there was no liability.

In each of these cases, the missing element to establish intentional conduct was some "presupposed knowledge": either that a person was a minor (*Reeves*), or that a worker was being harassed (*McNeal*), or that a conduit was buried beneath the soil (*Mountain States*), or that a sewage line was buried beneath the soil (*Branstetter*), or that a person was nearby in the Mojave Desert (the Restatement). In the present case, the "presupposed knowledge" is that there were artifacts located on Atalig's property. Without presupposing that knowledge, there can be no finding that the actor intended the consequences of his act. Without that intent, there can be no intentional tort. In this case, there can be no tort of conversion.

There is no genuine dispute about whether Pramuan Jaiphakdee, the bulldozer operator, knew about the existence of the artifacts on Atalig's land. The only direct evidence is his testimony that: "At the time that I performed the clearing I knew I was to clear within the box. I was not told of the existence of any cultural or historical artifacts or any other items of value on

the Atalig property. Additionally, I had no other knowledge of any cultural or historical artifacts or any other items of value existing on the property." Declaration, October 15, 2007, ¶ 4. Atalig testified at his deposition that he had no knowledge that would indicate Jaiphakdee knew of the existence of the latte stones and lummock and that it is possible these items were not intentionally damaged. Transcript, p. 1005. Atalig now argues that OKP had an opportunity to inspect the area to be bulldozed, that the rim of the water tank was above the ground and there was barbed wire and a fishing net near the latte stones. But, the Restatement is clear: "One who does not intentionally exercise dominion or control over a chattel is not liable for a conversion even though his act or omission is negligent." § 224. *See also* § 223, cmt. "b" ("Mere nonfeasance or negligence, without such an intent, is not sufficient for conversion.")

In brief, without proof that Pramuan Jaiphakdee had the presupposed knowledge of the presence of the artifacts, there can be no intent necessary for conversion. The only evidence before the Court is that Jaiphakdee did not have the presupposed knowledge. Thus, he did not convert the artifacts.

Atalig is aware that his case falls short, because after analyzing Jaiphakdee's conduct he immediately switches to another argument: "In any case, only OKP is sued under the Third Cause of Action for conversion of historical and cultural artifacts. What matters is Defendant OKP's intent, not that of another person." Opp., p. 15. In other words, "I can't prove Jaiphakdee acted intentionally, so I will take the acts and knowledge of all the employees, attribute them to the corporation, and then we can pretend that the corporation acted intentionally."

It would be nothing but a case of *pretending*. This is made obvious by the fact that Atalig fails to cite a single authority that states that you can do this. We discussed this issue exhaustively, however, in the reply memorandum to our summary judgment motion on punitive

damages. Memo, pp. 6-9. A corporation is a purely legal, or fictional, entity. It can only act through human beings who are associated with it as managers or employees. *Tutton v. Olsen & Ebann,* 232 N.W. 399 (Mich. 1930) involved a corporation found liable for malicious prosecution when its credit manager had the plaintiff arrested and prosecuted for fraud when he failed to make payments for a ring on a conditional sale contract. The judgment was affirmed. "A corporation can but act through its officials and agents." *Id.* at 402. Malicious prosecution requires proof that the defendant acted from malicious motives. "The malice of the corporation consists in the motives which prompt the actions of its representatives." *Id.*

In the present case, Section 8A requires that "the actor desires to cause the **consequences** of his act . . . ." The actor must be an official or agent of the corporation. Specifically, it is the person who did the act – Mr. Jaiphakdee. He had to do the act desiring to cause the consequence of destroying the artifacts. *Someone*, in fact, must both do the act and intend the consequences. Atalig's argument, by imputing the act of person A to the corporation and the knowledge of person B to the corporation, still leaves us short; we need some person who does the act while intending the consequences. Inevitably, it is the state of mind of the real actor that is crucial in determining whether the act was done accidentally, negligently, recklessly, or intentionally.

Summary judgment must be granted as to this claim because the requisite state of mind cannot be proved by the plaintiff.

## VI.
## THERE WAS NO CONVERSION OF THE TOPSOIL BECAUSE IT WAS RETURNED

The Fourth Cause of Action is for conversion of the topsoil  Specifically, Atalig complains that the topsoil on his land was removed. This is essentially the same issue being presented in our motion for summary judgment on the breach of contract claim regarding removal of the topsoil.

The difference is that here the claim is for conversion and not for waste. Conversion requires that there be such a serious interference with Atalig's right to control the land that the defendant may justly be required to pay Atalig for the full value of the topsoil. RESTATEMENT (SECOND) OF TORTS § 222A(1).

The only evidence is that the topsoil was temporarily stockpiled and it was returned to the site before the end of the lease term. Fact L. Since the topsoil was returned, there was no harm. Atalig seeks to create a genuine dispute of material fact here. "But the facts here are that the soil was *taken*. It is gone." Opp., p. 17. Wrong. He offers no citation. Atalig's declaration nowhere states that the soil was not returned. *See* ¶ 71. Thus, the only evidence is that the soil was returned.

The only material fact is whether or not Atalig was deprived of his topsoil. The undisputed evidence is that he was not. The topsoil was stockpiled and returned before the land was turned over. Atalig had his opportunity to present his evidence. He has none. The Court should grant summary judgment as the plaintiff cannot prove that his topsoil was converted.

Date: December 7, 2007.

Respectfully submitted,


_____/s/_____
Rexford C. Kosack, CNMI Bar No. F0140
Glenn A. Jewell, CNMI Bar No. F0176


_____/s/_____
Sean E. Frink, CNMI Bar No. F0212