CARLSMITH BALL LLP

JOHN D. OSBORN
SEAN E. FRINK
Carlsmith Building, Capitol Hill
P.O. Box 5241
Saipan, MP  96950-5241
Tel No. 670.322.3455
Fax No. 670. 322-3368

Attorneys for Defendant
OKP (CNMI) Corporation

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN MARIANA ISLANDS

| | |
|---|---|
| DONGBU INSURANCE COMPANY, LTD.,<br><br>Plaintiff,<br><br>vs.<br><br>OKP (CNMI) CORPORATION, and JOAQUIN Q. ATALIG,<br><br>Defendants. | CIVIL ACTION NO. CV 08-0002<br><br>RESPONSE OF DEFENDANT OKP (CNMI) CORPORATION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; OKP'S STATEMENT OF DISPUTED FACTS; DECLARATION OF SEAN E. FRINK; DECLARATION OF BRIAN CHEN; EXHIBITS<br><br>DATE:    July 10, 2008<br>TIME:    1:30 p.m.<br>JDUGE:   Hon. Alex R. Munson |

Comes now OKP (CNMI) Corporation and hereby files its response to Plaintiff's Motion for Summary Judgment.

CARLSMITH BALL LLP

DATED: Saipan, MP, June 11, 2008

/s/ John D. Osborn
JOHN D. OSBORN
SEAN E. FRINK
Attorneys for Defendant
OKP (CNMI) Corporation

1

TABLE OF CONTENTS

2

Page

3

I.    BACKGROUND ........................................................................................ 1

4

II.   STANDARD OF REVIEW ...................................................................... 3

5

III.  GENERAL INSURANCE COVERAGE PRINCIPLES ........................ 3

6

IV.   EXTRINSIC FACTS/EVIDENCE SHOULD BE CONSIDERED .......... 4

7

V.    NATURAL AND INTENDED CONSEQUENCE IS NOT THE STANDARD FOR
DETERMINING ACCIDENTAL LOSS ................................................. 11

8

      A.   None of the cases refer to "natural and intended consequences" ............... 11

9

      B.   "Natural and Probable Consequences" .................................................... 11

10

VI.   COVERAGE EXISTS UNDER THE CAR POLICY ........................... 14

      A.   "Accidental Loss" .................................................................................. 14

11

      B.   There Is Accidental Loss Under The Car Policy ...................................... 17

12

VII.  COVERAGE EXISTS UNDER THE AUTO POLICY ........................ 18

13

A.    There is coverage arising from the use of the insured bulldozer ..................... 18

14

B.    "Caused by accident" ..................................................................................... 18

15

VIII. EXCLUSIONS GENERALLY ............................................................... 20

16

      A.   Exclusions are strictly construed against the insurer. ............................... 20

17

      B.   Exclusions No. 4(d) of the CAR Policy and V(a) of the Auto Policy are not applicable ........ 21

      C.   Exclusion IX(a) of the Auto Policy and Exclusion 4(b) of the CAR Policy Do Not Apply .... 23

18

IX.   NOTICE TO DONGBU PROPER ........................................................ 26

19

      A.   Notice Under the Polices ........................................................................ 26

20

      B.   Notification was timely ........................................................................... 29

21

      C.   Dongbu waived any defect in Notice ........................................................ 30

22

      D.   No Prejudice to Dongbu ......................................................................... 31

23

X.    CLAIMS ARE IN DIRECT CONNECTION WITH CONSTRUCTION ON SITE .... 34

XI.   CONCLUSION ........................................................................................ 35

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page**

3    <u>**Cases**</u>

4

5    *Adobe Systems Inc. v. St. Paul Fire and Marine Insurance Company,*

6        2007 WL 3256492 .................................................................................................. 3

*Aetna Casualty and Surety Co., Inc. v. Centennial Ins. Co.,*

7        838 F.3d 436, 350 (1988) ...................................................................................... 8

8    *Allstate Ins. Co. v. McCann,* 446 Mich. 277, 645 N.E. 2d 20, 23 (2002) ................................... 16

9    *American Alternative Ins. Corp. v. Superior Court,* 135 Cal. App. 4th 1239, 1247,
    37 Cal. Rptr. 3d 918, 927 (2006) ...................................................................... 16

10   *Argonaut Southwest Ins. Co. vs. Maupin,* 500 S.W. 2d 633, 635 (1973) ................................... 11

*Arrequin vs. Farmers Insurance Company of Idaho, 180 P.3d 498,*

11       500, 501 (2008).................................................................................................... 21

12

13   *Brakeman v. Potomac, Ins. Co.,* 472 Pa. 166, 371 A.2d 193, 197 (1977)................................... 33

*Fagerstedt v. Continental Ins. Co.,* 72 Cal. Rptr. 126, 127, 266 Cal. App.2d 370,

14       372 (1968).............................................................................................................. 8

15   *Federated Mutual Insurance Company v. Grapevine Excavations, Inc.,* 197 F.3d
    720, 726 (2000).................................................................................................... 23

16   *Fidelity and Cas. Co. of New York v. Wrather,* 652 S.W. 2d 245, 259 (1983) ......................... 19

17   *Frogner v. American Community Mutual Insurance Company,* 502 N.W. 2d 350,
    352 (1993)............................................................................................................ 21

18

19   *Great Western Drywall Inc v. Intestate Fire & Casualty Co.,* 74 Cal. Rptr. 3657,
    652 (2008)......................................................................................................... 4, 8

20   *Greenwich Insurance Company v. RPS Products, Inc.,* 882 N.E.2d 1202, 1208
    (2008)................................................................................................................... 21

21   *Haynes v. American Casualty Company, 228 Md. 394,* 179 A.2d 900, 904 (1992) .................. 20

22   *Herrera v. C.A. Seguros Catatumbo,* 844 So. 2d 664, 667 (2003)......................................... 16

23   *Insurance Co. of North America v. McCarthy Bros. Co.,* 123 F. Supp. 2d 373, 377
    (2000)................................................................................................................... 23

24   *Ito v. Macro Energy, Inc.,* 4 N.M.I. 46, 68 (1993) ...................................................................... 4

25   *James v. Burlington Northern Santa Fe Railway Company,* 2007 WL 2461685 ..................... 22

26   *Major Oil Corp. v. Equitable Life Assur. Soc. of U.S.,* 457 F. 2d 596, 603 (1972) .................. 30

27   *McAllister v. Hawkeye - Security Ins. Co.,* 68 Ill. App. 2d 222, 215 N.E.2d 477,
    481 (1966)............................................................................................................ 19

28

1

**TABLE OF AUTHORITIES**
(continued)

2

3
Page

4
*McGroarty v. Great Am. Ins. Co.*, 36 N.Y.S. 2d 358, 329 N.E. 2d 172, 174-175
(1975)..................................................................................................... 15

5
*Meyer v. Pacific Employers Insurance Company*, 233 Cal.App.2d 321, 43 Cal.
6
Rptr. 542, 547 (1965) ......................................................................... 15, 20

7
*Montrose Chemical Corp. of California v. Superior Court*, 6 Cal. App. 4th, 287,
861 P.2d 1153, 1157 (1993) ...................................................................... 7

8
*Nationwide Ins. v. Zavalis*, 52 F.3d 689, 695 (1995) ..................................... 9

9
*Northshire Communications, Inc. d/b/a WEQX (FM) v. AIU Insurance Company*,
174 Vt. 295, 811 A.2d 216, 220, 222 (2002).......................................... 32

10

11
*Olympic Inc vs. Providence Wash. Insur. Co. of Alaska*, 648 P.2d 1008, 1011
(1982)..................................................................................................... 22

12
*Pac Indemnity v. Run-A-Ford Co.*, 161 So.2d 789, 794-795 (1964)................. 8

13
*Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W. 2d 549, 557, 558 (1976) .......... 12

*Ross v. Home Ins. Co.*, 773 A.2d 654, 657 (N.H. 2001) ................................... 5

14
*Shelby Casualty Ins. Co. v. H.T.*, 391 N.J. Supp. 406, 918 A. 2d 659, 661 (2007)........ 16

15
*State Farm Fir & Casualty Company v. Kohen*, 424 N.E.2d 992, 994, 995 (1981) ........ 25

16
*State Farm Mut. Auto Ins. Co. v. Kelly*, 945 S.W. 2d 908, 910 (1997).............. 17

17
*Trinity Universal Ins. Co. v. Cowan*, 945 S.W. 2d 819 (1997) ...................... 13

18
*Tuttle v. Allstate Ins. Co.*, 134 Wash. App. 120, 138 P. 3d 1107, 1111 (2006) ........ 16

*Wessinger v. Fire Ins. Exchange*, 949 S.W. 2d 834, 837 (1997)........................ 13

19
*Winchester v. Prudential Ins. Co. of America*, 975 F. 2d 1479, 1487 (1992) ........... 15

20

21
## Statutes

22

23
4 CMC §7303 .................................................................................................. 29

4 CMC §7505(c) ............................................................................................. 27

24
4 CMC §7505(e) ....................................................................................... 27, 31

25
4 CMC §7505(f) ....................................................................................... 27, 31

26
7 CMC § 3401 ................................................................................................... 5

27

28



1    CARLSMITH BALL LLP
     JOHN D. OSBORN
2    SEAN E. FRINK
     Carlsmith Building, Capitol Hill
3    P.O. Box 5241
     Saipan, MP  96950-5241
4    Tel No. 670.322.3455
     Fax No. 670. 322-3368
5

     Attorneys for Defendant
6    OKP (CNMI) Corporation

7

8

9             UNITED STATES DISTRICT COURT

10                    FOR THE

11           NORTHERN MARIANA ISLANDS

12    DONGBU INSURANCE           CIVIL ACTION NO. CV 08-0002

13    COMPANY, LTD.,
                       RESPONSE OF DEFENDANT OKP
14           Plaintiff,             (CNMI) CORPORATION TO
                       PLAINTIFF'S MOTION FOR SUMMARY
15        vs.                    JUDGMENT

16    OKP (CNMI) CORPORATION,         DATE:    July 10, 2008
                       TIME:    1:30 p.m.
17    and JOAQUIN Q. ATALIG,          JUDGE:  Hon. Alex R. Munson

18

19           Defendants.

20

21

22

23        Comes now OKP (CNMI) Corporation and files its Response to Plaintiff's Motion for

Summary Judgment.

24

25    I.      **BACKGROUND**

26        On October 28, 2005 OKP entered into a contract with Commonwealth Ports Authority

27 for a construction project in Rota known as the Rota International Airport Runway and Extension

28 Project.  In connection with that project OKP secured the two subject policies of insurance from

4852-0663-3474.3.060927-00005

Dongbu through Dongbu's General Agent, Moylan's Insurance Underwriters, Inc. The two policies are: Automobile Policy KMA-0912-00) for the period of cover December 15, 2005 to December 14, 2006, and Contractors All Risk Policy KMCR0015-500, for the period of cover January 16, 2006 to January 17, 2007, subject to coverage beginning upon commencement of work or unloading of items insured, notwithstanding the specific coverage date shown in the policy. These policies are binding contracts between the parties wherein OKP is the insured and Dongbu is the insurer.

As part of the overall construction project on or about November 2, 2005, OKP leased from Joaquin Atalig ("Atalig") a portion of this property located in Sinapalo, Rota to be used as a staging area for the project.[1]

On March 23, 2006 Atalig filed his original Complaint in CNMI Superior Court alleging various causes of action against OKP and others for violation of the terms of the lease between OKP and Atalig. On March 24, 2006 newspaper articles appeared in both the Marianas Variety and the Saipan Tribune which reported the lawsuit. Within approximately a week of March 24, 2006, Brian Chen, General Manager of OKP had a conversation with Cecilia A. Anas of Moylan's, the person responsible for OKP's policies and bonds at Moylan's and Ms. Anas acknowledged she had seen the newspaper article(s) and was aware of the lawsuit. Thereafter, until the later part of July, 2006 counsel for OKP filed several motions to strike portions of the original Complaint and to dismiss certain causes of actions. During this period of time OKP did not have any contact from Dongbu regarding the lawsuit and to OKP's knowledge Dongbu did not undertake any investigation of the Atalig claims. Also during this time period counsel for OKP successfully defended against a Motion for Summary Judgment filed by Atalig.

On July 31, 2006, Atalig filed a First Amended Complaint and on August 9, 2006 Brian Chen delivered a copy of the First Amended Complaint to Cecilia A. Anas of Moylan's and asked that Dongbu defend and indemnify OKP; this constitutes a tender of defense of the claims

---

[1] In the underlying suit OKP questions the validity of the lease attached and referred to in the Atalig Complaints. Notwithstanding same, for purposes of this motion, the lease is identified as the operative document.

in the First Amended Complaint.  On September 6, 2006 OKP wrote Dongbu to follow up on the tender of defense and on September 27, 2006 counsel for OKP wrote to Dongbu's authorized agent (Moylan's) to likewise follow up on the tender of defense.  It was not until March 5, 2007 that Dongbu stated its position and by letter of that date counsel for Dongbu responded to counsel for OKP advising Dongbu believed there was no coverage under the Dongbu policies. On April 18, 2007 Atalig filed his Second Amended Complaint and on May 3, 2007, a copy of the Second Amended Complaint was delivered to Dongbu's counsel.

On July 12, 2007 counsel for OKP responded to the March 7, 2007 letter from Dongbu and again demanded Dongbu undertake defense of the Atalig lawsuit.  Dongbu, through counsel, responded on October 12, 2007, again declining to defend the Atalig lawsuit.

Dongbu's ultimate response was to refuse to defend and after almost 18 months filed this declaration judgment action on March 3, 2008.  In due course OKP filed its answer and counterclaim against Dongbu seeking declaratory judgment of Dongbu's obligations under its policies issued to OKP.

OKP contends it has properly notified Dongbu of the Atalig suit, has properly tendered defense of that action and that Dongbu wrongfully refuses to defend or indemnify OKP from the Atalig claims.

## II.    **STANDARD OF REVIEW**

As the Court is well aware of the standards to be applied in deciding a Motion For Summary, Defendant does not believe it is necessary to recite them as part of this Response.

## III.    **GENERAL INSURANCE COVERAGE PRINCIPLES**

In *Adobe Systems Inc. v. St. Paul Fire and Marine Insurance Company*, 2007 WL 3256492, 4-5 the following governing insurance coverage principles are stated:

> A liability insurer owes a duty to defend whenever there is a
> potential for indemnity coverage under the insurance policy.
> (citation omitted).  Where any allegation demonstrates a potential
> for coverage, the insurer must mount and fund the defense of the

1

2

3

4

5

6

entire action, including claims for which there is no possibility of coverage. (citation omitted)  In order to determine whether an insured has made a claim for covered damages, the court must compare the underlying complaints with the terms of the policy. (citation omitted).  If the underlying complaints and any relevant extrinsic facts submitted by the insured do not demonstrate that the underlying claims seek damages that are potentially covered under the policy, the insurance company has no duty to defend.[2] (citations omitted), *Adobe* at 4

7

8

9

10

To interpret the meaning of policy language, courts must first look at the written provisions of the policy.  "If the policy language is clear and explicit, it governs … When interpreting a policy provision, we must give its terms their ordinary and popular sense, unless used by the parties in a technical or a special meaning is given to them by usage." (citation omitted) *Id.* at 5

11

12

13

14

A policy provision is ambiguous if it is susceptible to two or more reasonable constructions. (citation omitted)  Any ambiguous terms are interpreted in favor of finding coverage, consistent with the insured's reasonable expectations. (citation omitted)  Policy language must be interpreted as a reasonable lay person would read it , not as it might be analyzed by an attorney or insurance professional. (citation omitted)

15

16

17

18

See also:  *Great Western Drywall Inc v. Intestate Fire & Casualty Co.*, 74 Cal. Rptr. 3657, 652 (2008) (To afford the insured the greatest possible protection, policy provisions are interpreted broadly, and exclusionary clauses are interpreted narrowly against the insurer.)

19

20

The CNMI Supreme Court in *Ito v. Macro Energy, Inc.*, 4 N.M.I. 46, 68 (1993) in addressing interpretation of an insurance policy said:

21

22

23

A policy will be enforced according to its terms by reading it as a whole. (citation omitted)  The exception to this rule is where there is an ambiguity, in which case <u>the ambiguous term is interpreted in favor of coverage</u>. (citation omitted) (emphasis supplied)

24

## IV.    <u>EXTRINSIC FACTS/EVIDENCE SHOULD BE CONSIDERED</u>

25

26

Dongbu devotes part of its argument for not having a duty to defend based on the "eight

27

28

---

[2] By the same token, if extrinsic relevant facts submitted by the insured demonstrate that the underlying claims are potentially covered under the policy, the insurance company has a duty to defend.

corners rule." Dongbu's argument is that the Court need not look beyond the allegations of the Second Amended Complaint filed by Atalig in the underlying suit.

No CNMI statutes or cases address what facts CNMI Courts are limited to in determining whether an insurer has a duty to defend. Nor does the Restatement speak to this issue. Thus, the Court must look to "the rules of common law ...as generally understood and applied in the United States" to determine the issue. 7 CMC § 3401.

A few states limit the determination to one in which only the facts alleged in the complaint are compared against the language of the policy. This is commonly referred to as the "eight corners" test. A significant majority of the states and territories --thirty-three--, however, do not follow the "eight corners" rule. They instead require insurers, in addition to reviewing the complaint and the insurance policy, to take into account extrinsic facts that they either know of or could have reasonably ascertained. As the New Hampshire Supreme Court explained, this is "to avoid permitting the pleading strategies, whims and vagaries of third party claimants to control the rights of parties to an insurance contract," *Ross v. Home Ins. Co.,* 773 A.2d 654, 657 (N.H. 2001).[3]

---

[3] The Alabama Supreme Court "has rejected the argument that the insurer's obligations to defend must be determined solely from the facts alleged in the complaint in the action against the insured. *Acceptance Ins. Co. v. Brown,* 832 So.2d 1, 14 (Ala. 2001); "The potential for coverage [in Alaska] may be shown either on the face of the complaint or through facts the insurer knew or could have reasonably ascertained that would bring an otherwise uncovered complaint within the policy's coverage. *Makarka ex rel. Makarka v. Great American Ins. Co.,* 14 P.3d 964, 969 (Alaska 2000) and *State of Alaska Dep't of Trans. & Pub. Facilities v. State Farm Fire & Cas. Co.,* 939 P.2d 788, 793 (Alaska 1997); An insurer in Arizona has a duty to investigate extrinsic facts advanced by the insured that suggest potential coverage, *Northern Ins. Co. v. Morgan,* 918 P.2d 1051, 1053 (Ariz. St. App. 1995), *United States Fid. Guar. Co. v. Advance Roofing & Supply Co.,* 788 P.2d 1227, 1331 (Ariz. Ct. App. 1989); An insurance company in Arkansas cannot close its eyes to extrinsic facts it knew or should have known, because they were easily ascertainable, in determining coverage issues, *Commercial Union Ins. Co. v. Henshall,* 553 S.W.2d 274, 277 (Ark. 1977), insurer required to look beyond the tort complaint alleging intentional acts to see whether insured's actions would potentially be covered, *Smith v. St. Paul Guardian Ins. Co.,* 622 F. Supp. 867 (W.D. Ark. 1985); Facts extrinsic to the complaint in California give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. *Waller v. Truck Ins. Exchange, Inc.,* 11 Cal. 4th 1, 19, 900 P.2d 619, 627 (Cal. 1995), *Scottsdale Ins. Co. v. MV Transp.,* 115 P.2d 460, 466 (Cal. 2005); Connecticut rejects strict application of the four corners rule, and instead requires the insurer to provide a defense when it has actual knowledge of facts establishing a reasonable possibility of coverage, *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.,* 876 A.2d 1139, 1146 (Conn. 2005); In Georgia if the insured notifies the insurer of facts that would place the claim within the policy coverage, the insurer is obligated to conduct an investigation into the insured's contentions and base its decision on the duty to defend on "true facts," *Penn-America Ins. Co. v. Disabled Veterans, Inc.,* 490 S.E.2d 374, 376 (Ga. 1997); Where the insured in Hawaii tenders its defense in a lawsuit in which the complaint does not clearly and unambiguously assert a covered claim, the insurer, as a precondition to refusing the tender on the ground that there

is no possibility of coverage, must conduct a reasonable investigation to ensure that the facts of the case do not obligate it to defend the insured, *Dairy Road Partners v. Island Ins. Co., Ltd.,* 992 P.2d 93, 107 (Haw. 2000); The insurer in Illinois must defend if it possesses knowledge of true but unpleaded facts that, when taken together with the allegations of the complaint, indicate that the claim is potentially within the policy coverage, *National Union Fire Ins. Co. v. Olson Constr.,* 329 Ill. App. 3d 228, 234, 769 N.E.2d 977, 981 (2d Dist. Ill. 2002), *State Farm Fire & Cas. Co. v. Tillerson,* 334 Ill. App.3d 404, 407, 777 N.E.2d 986, 989 (5th Dist. Ill. 2002); The duty to defend in Indiana is determined from the allegations contained in the underlying complaint and from those facts known or reasonably ascertainable by the insurer after reasonable investigation, *Trailer v. Indiana Ins. Co.,* 575 N.E.2d 1021, 1023 (Ind. Ct. App. 1991), *Cincinnati Ins. Co. v. Mallon,* 409 N.E.2d 1100, 1105 (Ind.Ct. App. 1980); In Iowa, a liability insurer should generally consider facts beyond the allegations of the petition in determining whether to tender a defense, *Talen v. Employers Mut. Cas. Co.,* 703 N.W.2d 395, 405 (Iowa 2005); In Kansas, for purposes of whether a defense must be provided "an insurer must look beyond the effect of the pleadings and must consider any facts brought to its attention or any facts which it could reasonably discover in determining whether it has a duty to defend. If those facts give rise to a 'potential of liability,' even if remote, under the policy, the insurer bears a duty to defend... The duty to defend rests primarily on the possibility that coverage exists, and the possibility of coverage must be determined by a good faith analysis of all information the insurer may know or could have reasonably ascertained." *Aselco, Inc. v. Hartford Ins. Group,* 21 P.3d 1011, 1018 (Kan. Ct. App. 2001); In Kentucky, the determination of the duty to defend must be made " by reference to the complaint and known facts," *Lenning v. Commercial Union Ins. Co.,* 260 F.3d 574, 581 (6th Cir. 2001); In Maine, the insurer cannot avoid its duty to defend by establishing, before the underlying action has concluded, that ultimately there will be no duty to defend, *York Ins. Group of Me. v. Lambert,* 740 A.2d 984, 986 (Me. 1999), *Penny v. Capital City Transfer, Inc.,* 707 A.2d 387, 388 (Me. 1998); In Maryland, extrinsic evidence should be considered by the insurer but is must "relate in some manner to a cause of action actually alleged in the complaint," *Moscarillo v. Professional Risk Mgmt. Servs., Inc.,* 921 A.2d 245 (Md. 2007); In Massachusetts, the scope of the insurer's duty to defend is "based not only on the facts alleged in the complaint but also on the facts that are known or readily knowable by the insurer," *Dilbert v. Hanover Ins. Co.,* 825 N.@. 2d 1071, 1075 (Mass. App.Ct. 2005); The duty to defend cannot be limited by the precise language of the pleadings in Michigan, the insurer has the duty to look behind the third party's allegation to analyze whether coverage is possible, *Citizens Ins. Co. v. Pro-Serv. Group,* 730- N.W.2d 682, 289 (Mich. 2007); In Minnesota, "[t]he complaint ...does not control [the duty to defend] when actual facts clearly establish the existence or nonexistence of the duty to defend," *Fluoroware, Inc. v. Chubb Group of Ins. Cos.,* 545 N.W.2d 678, 681 (Minn.Ct.App. 1996); Under Mississippi law an insurer has a duty to defend when it "has knowledge, or could obtain knowledge through a reasonable investigation, of the existence of facts that trigger coverage," *American States Ins. Co., v. Natchez Steam Laundry,* 131 F.3d 551, 553 (5th Cir. 1998); In Missouri, "even if the pleadings do not show coverage, where known or reasonably ascertainable facts become available that show coverage[,] the duty to defend devolves upon the insurer," *King v. Continental Western Ins. Co.,* 123 S.W.3d 259, 264 (Mo.Ct.App. 2003); Coverage under an insurance policy is determined upon the facts giving rise to the claim in Montana, not any legal theories contained in the complaint. *Brabeck v. Employer's Mut. Cas. Co.,* 16 P.3d 355 (Mont. 2000), *Burns v. Underwriters Adjusting Co.,* 765 P.2d 712 (Mont. 1988); "In determining its duty to defend [in Nebraska], an insurer must not only look to the petition or complaint filed against its insured, but must also investigate and ascertain the relevant facts from all available sources," *Peterson v. Ohio Cas. Group.,* 724 N.W.2d 765, 774 (Neb. 2006); An inquiry into the underlying facts of a claim in New Hampshire is required in determining the duty to defend "to avoid permitting the pleading strategies, whims and vagaries of third party claimants to control the rights of parties to an insurance contract," *Ross v., Home Ins. Co.,* 773 A.2d 654, 657 (N.H. 2001); In New Jersey, facts extrinsic to the complaint but known to the insurer may trigger the duty to defend, *SL Indus. Inc. v. American Motorists Ins. Co.,* 128 N.J. 188, 199-200, 607 A.2d 1266, 1272 (NJ 1992); In New Mexico, "[a]n insurance company is required to conduct such investigation into the facts and circumstances underlying the complaint against its insured as is reasonable given the factual information provided by the insured or provided by the circumstances surrounding the claim in order to determine whether it has a duty to defend," *G&G Servs., Inc. v. Agora Syndicate, inc.,* 993 P.2d 751 (N.M.Ct.App. 1999); In New York, extrinsic facts can be used to show that there is a duty to defend, *International Business Machines Corp. v. Liberty Mut. Fire Ins. Co.,* 303 F.3d 419, 426 (2d Cir. 2002), *Petr-All v. Fireman's Ins. Co.,* 188 A.D.2d 139, 141 (4th Dept. N.Y. 1993); Where a North Carolina liability insurer knows or reasonably could ascertain facts that, if proven, would be covered by its policy, it has a duty to defend even if the facts as alleged in the complaint appear to be outside coverage or within an exception to coverage, *Nationwide Mut. Fire Ins. Co. v. Grady,* 502 S.E.2d 648 (N.C. Ct. App. 1998); The United States Court of Appeals for the Eighth Circuit has predicted that the North Dakota Supreme Court would hold that the insurer is required to defend if facts outside the underlying complaint come to

As reflected by footnote 3 the Court is not strictly limited in its determination of duty to defend and duty to indemnify to comparing the four corners of the policy to the four corners of the Complaint. Under appropriate circumstances the court may consider extrinsic facts either known to the insurer, facts which the insurer could have ascertained upon reasonable investigation, or facts which may have previously been determined:

The case of *Montrose Chemical Corp. of California v. Superior Court*, 6 Cal. App. 4th, 287, 861 P.2d 1153, 1157 (1993) supports the foregoing principle regarding extrinsic facts, saying:

> "The determination whether the insurer owes a duty to defend is usually made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint may also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." (citation omitted)

> *Gray* made clear that facts known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy (citation omitted) *Id.* at 1158.

The court concluded that facts extrinsic to the Complaint can generate a duty to defend as well as defeat a duty to defend. The point is that the Court is not always required to the apply the "eight corners" rule.

---

the insurer's attention and "establish a reasonable possibility of coverage," *Pennzoil Co. v. united States Fid. and Guar. Co.,* 50 F.3d 580 (8th Cir. 1995); "In Oklahoma, the insurer's defense duty is determined on the basis of information gleaned from the petition (and other pleadings), from the insured and from other sources available to the insurer at the time the defense is demanded (or tendered)," *First Bank of Turley v. Fid. & Deposit Ins. Co.,* 928 P.2d 298, 3030-04(Okla. 1996); If an insurer in South Dakota possesses knowledge of facts beyond the complaint that implicate potential coverage, than it is obligated to defend, *Stoebner, v. S.D. Farm Bureau Mut. Inc. Co.,* 598 N.W.2d 557, 559 (S.D. 1999); In Washington, readily ascertainable facts outside the complaint should be considered when determining a duty to defend, *Truck Ins. Exch., v. Vanport Homes, inc.,* 58 P.3d 276, 282 (Wash. 2002); In West Virginia, an insurer must look beyond the bare allegations of the third party's pleadings and conduct a reasonable inquiry into the facts in order to ascertain whether the claims asserted may come within the scope of the coverage that the insurer is obligated to provide, *State Auto Mut. Ins. Co., v. Alpha Eng'g Servs., Inc.* 542 S.E.2d 876, 879 (W.Va. 2000); In Guam the duty to defend is triggered by focusing on the facts in the complaint and those known to the insurer "regardless of the technical legal cause of action pleaded by the third party," *National Union fire Ins. Company of Pittsburg v. Guam Housing & Urban Renewal Authority,* 2003 WL 22497996 [22].

Further support for the Court's consideration of extrinsic facts/evidence is found in the following authority:

1.  *Great Western Drywall, Inc. v. Intestate Fire & Ca. Co.*, 74 Cal. Rptr. 3d 657, 662 (2008)

    "'[T]he determination of whether the duty to defend arises is made by comparing the terms of the policy with the allegations of the complaint and any known extrinsic facts, and any doubt as to whether the facts create a duty to defend is resolved in favor of the insured.'" (citation omitted)

2.  *Aetna Casualty and Surety Co., Inc. v. Centennial Ins. Co.*, 838 F.3d 436, 350 (1988):

    An insurer's duty to defend must be analyzed and determined on the basis of any potential liability arising from the facts available to the insurer from the Complaint or other sources available to it at the time of the tender of defense. (citation omitted)  The insurer's obligation to defend is not dependent on the facts contained in the complaint alone; the insurer must furnish a defense when it learns of facts from *any* source that creates a possibility of coverage under its policy. (citation omitted) (ital. in decision)

3.  *Pac Indemnity v. Run-A-Ford Co.*, 161 So.2d 789, 794-795 (1964)

    In the case at bar, insurer, by its policy, agreed, 'With respect to such insurance as is afforded by this policy for bodily injury liability,' to defend 'any suit against insured alleging *such injury*.'  We have undertaken to show that the complaint in the action at law, with respect to the insurance afforded by the instant policy, does allege 'such injury.'  We are of opinion that in deciding whether a complaint alleges such injury, the court is not limited to the bare allegations of the complaint in the action against insured but may also look to facts which may be proved by admissible evidence in suit for declaratory relief such as the instant case. (ital. in decision)

4.  *Fagerstedt v. Continental Ins. Co.*, 72 Cal. Rptr. 126, 127, 266 Cal. App.2d 370, 372 (1968).

    Relevant facts in addition to those alleged in appellant's complaint are subject to judicial notice.  The rule has long been established in California 'that in the consideration of a pleading the courts must read the same as if it contained a statement of all matters of which they are required to take judicial notice, even when the pleading contains an express allegation to the contrary.' (citation omitted)

5.    *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 695 (1995):

> Courts will therefore on occasion look beyond the complaint to evidentiary materials that may shed additional light on the duty to defend, so long as doing so does not involve them in factfinding that may overlap or interfere with the underlying litigation.

To OKP's knowledge at no time did Dongbu undertake any reasonable investigation into the allegations of Plaintiff's Complaint(s) to make a determination of its obligations under the policy. Without making any attempt to investigate the claim Dongbu denied coverage and now relies on its own inaction as a basis for refusing to defend and indemnify. Dongbu knew about the filing of the original complaint by virtue of knowledge of its agent, Moylan's, and received copies of the First and Second Amended Complaints and did nothing. Under the circumstances of this case, extrinsic facts/evidence should be considered by the court in its determination of the issuance of duty to defend and duty to indemnify.

Had Dongbu conducted even the most cursory investigation it would have learned that it was OKP's position that: "Atalig never mentioned any latte stones, other Chamorro artifacts, or Japanese ruins being on his property to Brian Chen or anyone else…. (Declaration of Brian M. Chen, ¶7); and that the Lease Atalig refers to in the Complaints and attaches to them, was entered into fraudulently by Atalig. (Declaration of Brian M. Chen, ¶s 13-17)

Had Dongbu conducted even the simplest of investigations by merely reviewing the public filings in the underlying Atalig lawsuit it would have learned of many of the true events surrounding the clearing, the primary act that is at issue in the case, <u>because they have already been determined by the CNMI Superior Court</u>. For instance, Judge Naraja, in his January 30, 2008 *Order Granting in Part and Denying in Part Defendants OKP and Chen's Motion for Partial Summary Judgment and Granting Defendants' Motion to Strike,* (Exhibit 26 the "Naraja Summary Judgment Decision") reviewed the parties undisputed facts and determined what actually happened at the time a portion of the Atalig property was cleared by OKP, the clearing that Atalig claims destroyed his valuable Chamorro and Japanese artifacts. The Naraja Summary Judgment Decision determined the following to be the true manner in which the clearing took

1  place:

2

3      1.      OKP Project Engineer Prasada Reddy Goluguri was allegedly informed by

Atalig's former Hotel Manager Edita Carillo not to disturb an area of the Atalig property.

4

Carillo did not tell Goluguri why not to disturb that area, just not to.

5

6      2.      Goluguri demarcated corners of a 100' x150" box for OKP Heavy Equipment

7  operator Pramuan Jaiphakdee to clear.  The demarcated box did not include the area that Carillo

8  told Goluguri not to clear (this is the same area that Atalig subsequently claimed included the

9  destroyed Chamorro and Japanese artifacts).  Goluguri approved Jaiphakdee to clear within the

10  box after viewing the area that had been demarcated.

11

12  3.      Jaiphakdee then, after clearing the box, **independently** made the decision to push the

cleared debris piles outside of the box and into the "do not disturb" area.

13

14  4.      Jaiphakdee had no knowledge of the existence of the allegedly destroyed artifacts.

15

16  5.      Jaiphakdee's alleged destruction of the artifacts was "negligent at best."

17      There is a fundamental misunderstanding of the Atalig claims by Dongbu.  Dongbu's

18  understanding is that the claims arise from activities related to clearing an area where there were

19  alleged to be cultural and historic artifacts.  In actuality, the claim's arise not from clearing the

20  land, but from moving the debris from the cleared area to an adjacent area.  It is the act of

21  moving the debris to the adjacent area that gave rise to the claim of damage to artifacts.

22      This misunderstanding of the nature of the claim is due to Dongbu's lack of diligence in

23  properly handling the claim once it had become aware of the claim.  To OKP's knowledge

24  Dongbu did nothing to investigate the nature of the claim.  (Declaration of Brian M. Chen, ¶17.)

25  Had Dongbu bothered to investigate the claim or talk with anyone from OKP about what

26  happened, it would have known this claim was at the very least within the possibility of

27  coverage.  Having that knowledge Dongbu would have known it had a duty to defend.

28

This is significant in light of Dongbu's argument that its duty to defend is based solely on the allegations of the underlying complaint in comparison to the language of the insurance policies. This is in contravention of its obligation to take into consideration the existence of extrinsic facts known to it or which could have been ascertained upon investigation and inquiry.

Extrinsic facts/evidence are available from the underlying action which leads to the conclusion there is coverage.

## V.     NATURAL AND INTENDED CONSEQUENCE IS NOT THE STANDARD FOR DETERMINING ACCIDENTAL LOSS

Dongbu cites what it calls the "natural and intended consequences" line of cases in support of its argument there has been no accident. The argument is misplaced because the main thrust of those cases turns on the state of mind of the insured in doing the act which resulted in the damage. This case is about an unforeseen and unexpected consequence resulting in alleged damages and not whether the damages were intended.

The cases cited by Dongbu on this issue are distinguishable for various reasons.

### A.     None of the cases refer to "natural and intended consequences"

First of all, the test set out in the cases cited by Dongbu use a standard based on "natural and probable consequences."; the Court will not find the term "natural and intended consequences" in the *Maupin* case, the *Republic Nat'l Life Ins. Co.* case, the *Cowan* case, or the *Wessinger* case.

### B.     "Natural and Probable Consequences"

In the *Argonaut Southwest Ins. Co. vs. Maupin*, 500 S.W. 2d 633, 635 (1973) case relied on by Dongbu as the "genesis of the 'natural and intended consequences' line of cases" (Dongbu Memorandum of Law, pg 13, line 1-2) the court said:

> 'Where the acts are voluntarily and intended and the injury is the
> natural result of the act, the result was not caused by accident even

though that result may have been unexpected, unforeseen and unintended. There was no insurance against liability for damage caused by mistake or error.' (citation omitted) *Maupin* at 635.

In the *Maupin* case the insured cleared some land, but the authority for doing the clearing came from a tenant on the land, not the owner of the property. Suit was filed on a trespass theory with allegations that Defendant's conduct was intentionally, wrongfully and willfully entering onto Plaintiff's land. The *Maupin* court's decision was based on the theory that the Defendant did exactly what Defendant intended to do. Ours is not a trespass case nor is it a case based on intentional acts with intentional results.

OKP would note that the applicable provision in the insuring agreement in the *Maupin* case provided for indemnity "because of injury to or destruction of property, including the loss of use thereof caused by accident." (emphasis supplied) This indemnity provision is different from the OKP CAR Policy provision which provides for indemnity because of accidental loss of or damage to property.

*Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W. 2d 549, 557, 558 (1976) is cited by Dongbu in support of its "natural and intended consequences" argument. The *Heyward* case actually supports a duty to defend OKP. The basic facts of that case are the insured met a violent death as a result of multiple gunshot wounds and stabbing. The medical examiner ruled the death a homicide and opined the insured was intentionally shot by another. The life insurance carrier refused to pay additional benefits under the accidental death provisions of its policy. The trial court verdict in favor of the insurer was reversed on appeal with the Appellate Court finding that the injuries were caused by intentional acts, but were nevertheless 'accidental'.

In discussing the meaning of accidental the court said:

> We therefore hold that injuries are 'accidental' and within coverage of an insurance policy - whether the policy speaks in terms of 'accidental injuries' or 'injuries effected through accidental means' - if from the viewpoint of the insured, the injuries are not the natural and probable consequence of the actions or occurrences which produced the injury; or in other words, if the injury could not reasonably be anticipated by insured, or would not ordinarily

follow from the occurrence which caused the injury. *Heyward* at 557. (emphasis supplied)

> We therefore hold that injuries are accidental and within the coverage of an insurance policy - whether the policy speaks in terms of 'accidental injuries' or 'injuries effected through accidental means', if from the insured's viewpoint his conduct was not such as to cause him to reasonably believe that it would result in his injury. *Id.* at 557

The *Heyward* court also addressed the purpose of insurance by stating:

> [I]n either case, the purpose of the policy is the same - to insure against such an unexpected and unusual occurrence. *Id.* at 558.

Dongbu also cites *Wessinger v. Fire Ins. Exchange*, 949 S.W. 2d 834, 837 (1997) in the "natural and intended consequences" argument. As with the *Heyward* case, *Wessinger* supports coverage for OKP. This case involved assault with bodily injury. The court said:

> When a result is not the natural and probable consequence of an act or course of action, it is produced by accidental means. (citation omitted). The natural result of an act is the result which ordinarily follows, may be reasonably anticipated, and ought to be expected. (citation omitted) The standard is objective. A person is held to the natural and probable results of his acts even if he did not subjectively intend or anticipate those consequences. *Wessinger* at 837.

The final case cited by Dongbu on the "natural and intended consequences" argument is *Trinity Universal Ins. Co. v. Cowan*, 945 S.W. 2d 819 (1997). In the *Cowan* case, as Dongbu recites, a photo lab clerk showed revealing photos of a customer to friends. The court found there was no coverage because the photos were made intentionally by the clerk who showed them to his friends. The court in *Cowan* referring to the *Heyward* case said:

> [t]he court of appeals has held that an "accident" includes unforeseen and unexpected consequences of otherwise intentional acts and consequently, that an "occurrence" takes place when the resulting injury or damage was unexpected or unintended, regardless of whether the insured's acts were intended. *Cowan* at 826.

1

2

> *[H]eyward* emphasized that whether an event is accidental is determined by its effect.  Thus the court held than an effect that "cannot be reasonably anticipated from the use of [the means that produced it], an effect which the actor did not intend to produce and which *he cannot be charged with the design of producing* is produced by accidental means."  (citation omitted) *Id.* at 827 (ital. in decision)

3

4

5

6  Here we have an unexpected, unforeseen result which is not a natural and probable consequences

7  of the act that was done; hence, it was "accidental."

8

9

10

11

12  VI.    **COVERAGE EXISTS UNDER THE CAR POLICY**

13  A.    **"Accidental Loss"**

14

Dongbu devotes the majority of its argument that there is no coverage under the CAR

15  Policy by taking the position there has been no "accident" and therefore there is no coverage.

16  Dongbu is incorrect.

17

For the Court's ease of reference the applicable part of the provision from the CAR policy

18  states:

19

20

> The Insurers will indemnify the Insured up to but not exceeding the amounts specified in the Schedule against such sums which the Insured shall become legally liable to pay as damages consequent upon

21

22

> a) accidental bodily injury to or illness of third parties (whether fatal or not),

23

24

> b) accidental loss of or damage to property belonging to third parties

25

26

> occurring in direct connection with the construction or erection of the items insured under Section. and happening on or in the immediate vicinity of the site during the Period of Cover. (emphasis supplied)

27

28

The CAR Policy does not define the term "accidental loss" nor do any of the authorities cited by Dongbu define the term.

"Accidental" has been defined as follows:

> The fact that an act which causes injury is intentional does not take the consequence of that act outside the coverage of a policy which excludes damages unless caused by accident for if the consequence that is the damage or injury is not intentional and is unexpected it is accidental in character.

*Myer v. Pacific Employers Ins. Co*, 233 Cal. App 2d 321, 327, 43 Cal. Rptr. 542, 547 (1965)

Also addressing the same issue:

1. *Winchester v. Prudential Ins. Co. of America*, 975 F. 2d 1479, 1487 (1992)

> We are convinced that the Utah courts currently use the less strict standard of defining "accidental" as a result not reasonably foreseeable even if the means causing the result was foreseeable or even intentional.

2. *McGroarty v. Great Am. Ins. Co.*, 36 N.Y.S. 2d 358, 329 N.E. 2d 172, 174-175 (1975)

> One often contemplates and envisions a sudden or catastrophic event when considering the term accident - an event which is unanticipated and the product of thoughtlessness rather than willfulness. But a broader view must be taken of the term for otherwise how could we classify catastrophic results which are the unintended fruits of willful conduct. Certainly one may intend to run a red light, but not intend that the catastrophic results of collision with another car occur. Calculated risks can result in accidents. Judge Cardozo framed the situation perfectly in *Messersmith vs. American Fid .Co.*, 232 N.Y. 161, 133 N.E. 432 in which he advanced similar illustrations and stated: 'Injuries are accidental or the opposite, for the purpose of indemnity, according to the quality of the results rather than the quality of the causes.'

> We agree also that it is not legally impossible to find accidental results flowing from intentional causes, i.e. that the resulting damage was unintentional although the original act or acts leading to the damage were intentional.

> [b]ut we hold that the relevant context to be considered is the fact that it is a word [accident] employed by an insurer in the contract and should be given the construction most favorable to the insured.

Thus, regardless of the initial intent or lack thereof as it relates to causation, or the period of time involved, <u>if the resulting damage could be viewed as unintentional by the fact finder the total situation could be found to constitute an accident.</u> *Id.* at 175 (emphasis supplied)

3. *Herrera v. C.A. Seguros Catatumbo*, 844 So. 2d 664, 667 (2003)

Recently the Florida Supreme Court held that "where the term 'accident' in a liability policy is not defined, the term, being susceptible of varying interpretations, encompasses not only 'accidental events', but also injuries or damages neither expected nor intended from the standpoint of the insured." (citation omitted) As the Supreme Court explained, under this formulation, "if the resulting damages are unintended, the resulting damage is 'accidental' even though the original acts were intentional.'" (citation omitted)

4. *American Alternative Ins. Corp. v. Superior Court*, 135 Cal. App. 4th 1239, 1247, 37 Cal. Rptr. 3d 918, 927 (2006)

"Accidental" in an insurance policy ordinarily means unintended and unexpected by the insured."

In the most recent case of *Shelby Casualty Ins. Co. v. H.T.*, 391 N.J. Supp. 406, 918 A. 2d 659, 661 (2007) the court addressed the accidental nature of an event and stated:

It is by now well settled that "the accidental nature of an occurrence is determined by analyzing whether the wrongdoer intended or expected to cause an injury. If not, then the resulting injury was 'accidental', even if the act that caused the injury was intentional." (citation omitted) The controlling issue, then, is whether the insured intended or expected to cause harm to the victims. (citation omitted)

In determining whether an event is an accident, it is viewed from the perspective of the insured. *Allstate Ins. Co. v. McCann*, 446 Mich. 277, 645 N.E. 2d 20, 23 (2002). What then is "accidental loss"? In *Tuttle v. Allstate Ins. Co.*, 134 Wash. App. 120, 138 P. 3d 1107, 1111 (2006) the court said

The ordinary meaning of an accidental loss is "when [something] happens without design, intent or obvious motivation

1
2
3
4
5

> The Texas Supreme Court has recognized that a loss is accidental when it is "not the natural and probably consequence of the means which produce it (citation omitted)  In other words, accidental loss is one that does not ordinarily follow and *cannot be reasonably anticipated from the producing act.*  An accidental loss is one the actor did not intend to produce.  (citation omitted) (emphasis supplied) (ital in orig.)

6    *State Farm Mut. Auto Ins. Co. v. Kelly*, 945 S.W. 2d 908, 910 (1997)

7
8
9

> An accidental loss occurs when it is not the natural and probable consequence of the act which produce it, or does not ordinarily flow and cannot be reasonably anticipated from the act. *Id.* at 910.

10
11
12
13
14
15

In this matter we have a situation where the bulldozer operator, Pramuan Jaiphakde, was unaware that artifacts existed in the area into which he pushed the debris from clearing the staging area.  There are no facts which support a conclusion that he was aware artifacts were present, much less that he intended to damage them.  It is a situation where he would not reasonably anticipate his bulldozing activities would cause damage; it was not foreseeable.  We have an unexpected consequence; an accidental loss.

16    B.    **There Is Accidental Loss Under The Car Policy**

17
18
19

What the foregoing authority on defining "accidental loss", even taking into consideration the "natural and probably consequences" cases cited by Dongbu, tells us is that the CAR Policy provides coverage.

20
21
22
23
24
25
26
27
28

While there is no question that the act of clearing the land for the staging area was an intentional act, and moving the debris from clearing the staging area to an adjacent area was also intentional, the alleged result of destroying artifacts on the adjacent area was is not a "natural and probable consequence" of moving the debris to the adjacent area.  Assuming solely for purposes of this motion that artifacts were on the adjacent area and they were damaged, there is nothing to support that such result was intentional, or anything other than unforeseen, unexpected and unintended.  As previously mentioned, Dongbu argues lack of coverage based on the bulldozer operation's state of mind and disregards that the bulldozer operator neither foresaw and/or

1    expected to cause any damage.  The Court is referred to the ruling of Judge Naraja.

2        There is an "accidental loss of or damage to property" within the provisions of the

3    insuring agreement of the CAR Policy.

4    VII.    **COVERAGE EXISTS UNDER THE AUTO POLICY**

5

6    A.    **There is coverage arising from the use of the insured bulldozer**

7        The majority of Dongbu's argument as to why there is no coverage under the Auto Policy

8    seems to be that there is no coverage because there is no automobile accident.  This argument

9    fails for several reasons as set forth below.

10       The insuring agreement of the Auto Policy states:

11

12                **Coverage B.  Property Damage Liability**:  To indemnify the
                 insured for all sums which he shall become legally obligated to pay
                 as damages because of injury to or destruction of property,
13               including the loss of use thereof, caused by accident and arising
                 out of ownership, maintenance or use of the automobile.
14

15   The insuring agreement does not say indemnification exists by reason of an automobile accident,

16   it say there is indemnification for damage **caused by accident**.

17       Reference to the schedule of the property insured includes the bulldozer the OKP

18   employee was operating at the time of the alleged damage.  (Exhibit 6, Schedule of Vehicles,

19   Vehicle No. 6)  For Dongbu to insure that piece of equipment, accept the premium payment from

20   OKP for insuring that piece of equipment and than to say there is no coverage because there was

21   no automobile accident borders on the unconscionable.  If Dongbu didn't intend to provide

22   indemnification arising from the use of the insured bulldozer, then why did Dongbu insure it?

23

24

25   B.    **"Caused by accident"**

26       As stated above, the insuring agreement does not condition indemnification on the

27   damage arising from an automobile accident.  The policy says "**caused by accident**"; it doesn't

28

The policy does not define "caused by accident" and Dongbu does not cite any authority defining that term. As with the undefined term "accidental loss" from the CAR Policy, it is the Court's function to determine what meaning should be given to the term or whether the term is ambiguous and therefore construed against Dongbu and in favor of coverage for OKP.

"Caused by accident" has been interpreted by different jurisdictions to mean unintended damage even though the act may have been intentional; an unintended result of an intended act. The Court is directed to the following authority:

1.    *Fidelity and Cas. Co. of New York v. Wrather*, 652 S.W. 2d 245, 259 (1983). In that case the policy stated it would "pay damages which an insured becomes legally liable to pay because ... b. damage to or destruction of property including loss of use, <u>caused by accident</u> resulting from the ownership, maintenance or use of your car; ..." (emphasis supplied). The insured started a fire in a wheat field to burn off stubble. The fire created smoke which obscured the vision of motorists on an adjacent highway with a resultant accident. The insurer declined coverage on the basis that starting the fire was an intentional act and therefore the damage was not "cause by accident." The court in finding coverage stated:

> [t]he term "caused by accident" as used in the policies of liability insurance, is satisfied where the insured did not intend that damage result from his act although the act itself was intentional and did so result.

2.    *McAllister v. Hawkeye - Security Ins. Co.*, 68 Ill. App. 2d 222, 215 N.E.2d 477, 481 (1966) a claim was made for damage resulting from earth moving activities. The insured's policy provided coverage for "[d]amages because of injury to or destruction of property, ... <u>caused by accident</u> and arising out of the ownership, maintenance or use of the insured's equipment." The defense was tendered to the insurer which refused coverage. In a subsequent declaratory judgment proceeding the insurance company took the position that its insured's acts were deliberate, voluntary and intentional and therefore the ensuing loss was not the result of an accident. The court found that while the insured intended to move earth, he didn't intend to do

damage to a third party's land; that the damage was unforeseen and unexpected in the course of an intentional act.  In finding coverage the court stated:

> In the case at bar, we likewise believe that the damage to the Foss' land was not intentionally caused by plaintiff, but rather, was the unintentional result of an intended act directed at other property. Since there was no intent to damage Foss' land, the resulting harm was 'caused by accident.'

3.    *Haynes v. American Casualty Company*, 228 Md. 394, 179 A.2d 900, 904 (1992) said:

> In our view, to hold that recovery under such a provision (caused by accident) is limited to those situations where not only the result was unintentional, but also where the means were accidental, would place too narrow an interpretation upon the phrase.  As the conflicting findings in other jurisdictions and as the language itself would indicate, the phrase is somewhat ambiguous.  We have made it clear that where an insurance company, in attempting to limit coverage, employs ambiguous language, the ambiguity will be resolved against it as the one who drafted the instrument, as is true in the construction of contracts generally.

4.    *Meyer v. Pacific Employers Insurance Company*, 233 Cal.App.2d 321, 43 Cal. Rptr. 542, 547 (1965) stated:

> The fact that an act which causes an injury is intentional does not take the consequence of that act outside of coverage of a policy which excludes damage unless caused by accident for if the consequence that is the damage or injury is not intentional and is unexpected it is accidental in character.  (citation omitted)

The events which gave rise to the damage claims in the underlying lawsuit come within the definition of "caused by accident" in the Auto Policy.  The bulldozer operator cleared the staging area and moved the debris to an adjacent area not knowing the area contained artifacts which Atalig alleges existed.  This constitutes a damage claim "caused by accident" and is therefore a covered event under the Auto Policy.

VIII.    **EXCLUSIONS GENERALLY**

A.    **Exclusions are strictly construed against the insurer**.

1    In disclaiming coverage under both the CAR Policy and the Auto Policy Dongbu argues

2    that various exclusions preclude coverage.  It is Dongbu's burden to show that an exclusion is

3    applicable and further exclusionary clauses are to be strictly construed against the insurer with

4    any ambiguity to be resolved against the insurer.  Authority supporting this principle is set forth

5    below:

6    1. *Frogner v. American Community Mutual Insurance Company*, 502 N.W. 2d 350, 352 (1993):

7

8        Exclusionary clauses are to be strictly construed against the
    insured.  (citation omitted)

9    2. *Arreguin vs. Farmers Insurance Company of Idaho*, 180 P.3d 498, 500, 501 (2008)

10

11        A provision that seeks to exclude the insurer's coverage must be
    strictly construed in favor of the insured.  (citation omitted).  The

12        "burden is on the insurer to use clear and precise language if it
    wishes to restrict the scope of its coverage." (citation omitted)

13

14        Furthermore, a provision excluding coverage is strictly construed
    in favor of the insured and the insurer has the burden to use clear

15        and precise language if it is restricting the scope of its coverage.
    (citation omitted)

16

17    3. *Greenwich Insurance Company v. RPS Products, Inc.*, 882 N.E.2d 1202, 1208 (2008)

18        Where an exclusionary clause is relied upon to deny coverage, its
    applicability must be clear and free from doubt because any doubts

19        as to coverage will be resolved in favor of the insured.  (citation
    omitted)

20

21    B.    **Exclusions No. 4(d) of the CAR Policy and V(a) of the Auto Policy are not applicable**

22    Exclusion 4(d) of the CAR Policy and V(a) of the Auto Policy are essentially the same

23    and therefore OKP will address the exclusions jointly.

24    Exclusion 4(d) of the CAR Policy reads:

25    The insurer will not indemnify the Insured in respect of

26        4.  liability consequent upon

27

28            d)  any agreement by the insured to pay any sum by
        way of indemnity or otherwise unless such liability

1
2

would have attached also in the absence of such agreement.

3

Exclusion V(a) of the Auto Policy reads:

4

This Policy Does Not Apply:

5

### V.  Under Coverage A, B and C

6
7

(a) to liability assumed by the Insured under any contract or agreement.

8
9
10

Dongbu misinterprets the meaning of these exclusionary provisions.  These provisions refer to hold harmless or indemnification agreements and do not exclude coverage in this instance.

11
12

In *Olympic Inc vs. Providence Wash. Insur. Co. of Alaska*, 648 P.2d 1008, 1011 (1982) a similarly worded exclusion was examined.  The court said:

13
14
15

"Liability assumed by the insured under any contract" refers to liability incurred when one promises to indemnify or hold harmless another, and does not refer to liability that results from breach of contract.  (citations omitted)

16
17
18

Because "liability assumed by contract" refers to a particular type of contract - a hold harmless or indemnification agreement - and not to a liability that results from breach of contract, the contractual liability exclusion applies only to hold harmless agreements (citation omitted) *Id.* at 1011.

19
20
21

Citing with approval the *Olympic Inc.* case, the court in *James v. Burlington Northern Santa Fe Railway Company*, 2007 WL 2461685 said:

22
23
24
25
26
27

Yet another exclusion provides, "[Coverage A] does not apply to bodily injury or property damage for which the insured is obligated to pay damages by reason of assumption of liability in a contract or agreement."  This contractual liability exclusion "functions to relieve the insurer of responsibility for any 'extra' liability the insured undertakes by contract beyond the liability imposed by law for negligence."  (citation omitted)  The contractual liability exclusion limits Coverage A to bodily injury or property damage liability "which the law imposes upon all insured alike."  (citation omitted)

28

See *also*: *Federated Mutual Insurance Company v. Grapevine Excavations, Inc.*, 197 F.3d 720, 726 (2000) regarding interpretation of the contractual liability exclusion (This exclusion operates to deny coverage when the insured assumes responsibility for the conduct of a third party.)

In *Insurance Co. of North America v. McCarthy Bros. Co.*, 123 F. Supp. 2d 373, 377 (2000) the court in interpreting a similar exclusionary provision said "[t]he exclusion at issue merely 'operates to deny coverage when the insured assumes responsibility for the conduct of a third party.'" (citation omitted) In this action OKP is sued as a result of its own conduct rather than as an indeminitor of a third party and therefore this exclusion does not apply.

It is noted that with regard to both exclusionary provisions Dongbu cites no authority to support its position. Referring to Exclusion No. 4(d) all Dongbu says is the provision "excludes claims in connection with liability assumed under a contract, and here, as discussed above, all of the claims of OKP arise out of the obligations it assumed under the Lease, a contract." (Dongbu Memorandum, page 18, lines 2-4) Referring to Exclusion V(a) Dongbu says only "the provision" excludes claims in connection with 'liability assumed by the insured under any contract or agreement.'" (Dongbu Memorandum, page 21, lines 11-12)

Neither provision is applicable to exclude coverage of the Atalig claims.

C.     **Exclusion IX(a) of the Auto Policy and Exclusion 4(b) of the CAR Policy Do Not Apply**

Exclusion IX(a) of the Auto Policy reads: This Policy Does Not Apply:

> **IX.  Under Coverage B,**
>
> > (a)  to injury to or destruction of property owned by, rented to, in charge of or transported by the insured.

The comparable exclusion in the CAR Policy is in the **Third Party Liability, Special Exclusions to Section** which reads:

> The insurers will not indemnify the Insured in respect of
>
> 4.  liability consequent upon

b) loss of or damage to property belonging to or held in care, custody or control of the Contractor(s), the Principal(s) or any other firm connected with the project which or part of which is insured under Section, or an employee or workman of one of the aforesaid;

An examination of the Atalig Complaint, whether it be the original Complaint, the First Amended Complaint or the Second Amended Complaint alleges claims for damage to property which was not covered by the lease agreement between Atalig and OKP. Indeed the claims are that OKP committed acts of waste or conversion either without the specific written consent of Atalig or without obtaining the required permits before beginning clearing of the property where these acts are alleged to have occurred.

Clearly there is no claim by Atalig that OKP owned or transported property. Regarding whether OKP rented or was in charge of the property which is the subject of the damage claims, it is equally clear those property items were not rented to or that OKP was in charge of them, because of the lease requires that Atalig's written consent was required to:

...erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvements on the Premise[s], and correct and change the contour of the Premises ... (¶38, Original Complaint; ¶61, First Amended Complaint; ¶56, Second Amended Complaint).

The Lease included in all three versions of the Complaints sets forth what OKP was leasing, and it was not the Atalig real property. According to the Complaints and Lease OKP leased:

1. Premises: The Premises consist of all *improvements* situated on the real property ...together with the right to use Lessor's easements and appurtenances in adjoining and adjacent land. highways, roads, streets, lanes .... Lessee shall also have the *right to use* the real property described below where the leased improvements are situated: (italicized emphases added).

The lease provisions setting forth what portion of the property was being leased, the improvements only, and requiring Atalig's prior written consent prior to OKP undertaking

certain actions and Atalig's related claims in the Complaints are inconsistent with Dongbu's position that the allegedly damaged property, ancient Chamorro and Japanese artifacts, was "rented to" or "in charge of" OKP.

In *State Farm Fire & Casualty Company v. Kohen*, 424 N.E.2d 992, 994, 995 (1981) the court examined an exclusionary clause very similar to Exclusion IX(a) of the Auto Policy. The clause in the *State Farm* case read:

> THERE IS NO COVERAGE:  For any damages
>
> b.  To property owned by rented to, in charge of, or transported by an Insured.  But coverage applies to a rented residence or private garage damaged by a car use insure.

The court interpreting this exclusion stated:

> Typically, liability coverage includes damage to property owned by someone other than the insured.  The purpose of the clause in issue is to exclude from liability coverage damage to property of the insured.

The court went to say:

> [w]e find that the ordinary meaning of "in charge of" is possession of the property and some degree of control of or dominion over it so as to give the insured an ownership-like status and an insurable interest in the property.

The Atalig lease requirements that OKP have his written consent is inconsistent with OKP having an "ownership-like status" and therefore Exclusion IX(a) is inapplicable.

Dongbu cites the case of *State Farm Fire & Ca. Co. v. Kohen*, 424, N.E.2d 992, 994-995, (1981) as authority supporting its argument that Exclusion IX(a) applies.  The *Kohen* Court in construing the exclusionary clause in that case said:

> The purpose of the clause in issue is to exclude from liability coverage damage to <u>property of the insured</u>.  *Kohen* at 994 (emphasis supplied)
>
> (exclusion) applied not only to property owned by the insured, but also to property which has a "status which is logically treated the

1

same as ownership for purposes of the policy." (citation omitted)
*Id.* at 994

2

3

[w]e find that the ordinary meaning of "in charge of" is possession
of the property over it so as to give the insured an ownership-like
status and an insurable interest in the property. *Id* at 995

4

5

There is nothing before the Court to suggest that OKP had an ownership-like interest and/or an

6

insurable interest so as to make either exclusionary provision applicable.

7

Similarly, for Exclusion 4(b) of the CAR Policy to be applicable there must be this

8

"ownership-like status."  The authority cited to show that Exclusion IX(a) is inapplicable also

9

supports the inapplicability of Exclusion 4(b).

10

11

IX.    **NOTICE TO DONGBU PROPER**

12

A.    **Notice Under the Polices**

13

Dongbu argues that under both the CAR Policy and the Auto Policy that OKP did not

14

comply with provisions related to notification and this constitutes another basis for Dongbu

15

declining coverage.  OKP addresses both provisions below.

16

Both the Auto Policy and the CAR Policy have provisions regarding notification by the

17

insured to the insurer.  Those provisions state:

18

19

The Auto Policy - Conditions

20

21

**2. Notice of Accident - Coverage A, B and C**:  When an accident occurs written
notice shall be given by or on behalf of the insured to the Company or to any of
its authorized representative as soon as practicable.  Such notice shall contain
particulars sufficient to identify the insured and also reasonably obtainable
information regarding the time, place and circumstances of the accident, the
names and addresses of the injured and of available witnesses.

22

23

24

25

**3. Notice of Claim of Suit - Coverage A and B**:  If claim is made or suit is
brought against the insured, the insured shall immediately forward to the company
every demand, notice, summons or other process received by him or his
representative.

26

27

The Car Policy - Conditions

28

4852-0663-3474.3.060927-00005

-26.-

The applicable notification provision of the CAR Policy states:

> 5. In the event of any occurrence which might give rise to a claim under this Policy, the Insured shall
>
> a) immediately notify the Insurers by telephone or telegram as well as in writing, giving an indication as to the nature and extent of loss or damage;
>
> The Insurers shall not in any case be liable for loss, damage or liability of which no notice has been received by the Insurers within 14 days of its occurrence.
>
> Upon notification being given to the Insurers under this condition, the Insured may carry out the repairs or replacement of any minor damage; in all other cases a representative of the Insurers shall have the opportunity of inspecting the loss or damage before any repairs or alterations are effected. If a representative of the Insurers does not carry out the inspection within a period of time which could be considered adequate under the circumstances, the Insured is entitled to proceed with the repairs or replacement.

When addressing the issue of notification to Dongbu of the claims and suit made by Atalig, the following CNMI statutes from the Insurance Code must be taken into consideration:

1. 4 CMC §7505(c) *Notice of Loss.* Failure to give notice of loss covered by marine or fire insurance within any period provided for by the policy or otherwise does not exonerate the insurer if the notice is given within a reasonable time after the insured has or should have first-hand knowledge of the loss. In all other classes of insurance, the insured shall have at least 20 days after the event within which to give notice of loss. No requirement of notice within a lesser period is valid.

2. 4 CMC §7505(e) *Waiver of Defects in Notice or Preliminary Proof.* All defects in a notice of loss, or in a preliminary proof thereof, which the insured might remedy, and which the insurer omits to specify to the insured, without unnecessary delay, as grounds of objection, are waived.

3. 4 CMC §7505(f) *Waiver of Delay.* Delay in the presentation to an insurer of notice, or preliminary proof of loss, is waived if caused by an act of the insurer, or if the insurer omits to make objection promptly and specifically upon that ground. (emphasis supplied)

These provisions become significant in this case as Dongbu relies heavily in its allegations that OKP failed to give timely notice of the Atalig claim or to tender defense of the

Atalig suit in a timely manner. The undisputed facts are that timely notice of the claim and subsequent tender of defense was made. Additionally, Dongbu by its inaction after being notified of the claim and subsequent suit has waived any defense of failure to give notification.

In considering the notification issue, it must be kept in mind that the Atalig suit involves three (3) different Complaints:

1. Original Complaint filed March 23, 2006; Exhibit 8;

2. Verified First Amended Complaint filed July 31, 2006; Exhibit 9;

3. Second Amended Complaint filed April 18, 2007; Exhibit 11.

Original Complaint

The original Complaint was filed on March 23, 2006. On March 24, 2006 articles regarding the lawsuit appeared in both the Marianas Variety and the Saipan Tribune (See Exhibits 2 and 3). Within a week or so of March 24, 2006, Brian Chen visited the offices of Moylan's Insurance on an unrelated matter; Moylan's is the authorized agent for Dongbu in the CNMI and the agent that placed the Auto Policy and CAR Policy with Dongbu. On that occasion Brian Chen had a conversation with Cecilia A. Anas, Surety Division Manager, of Moylan's Insurance Underwriters, Inc. who advised that she had seen at least one of the March 24, 2006 newspaper articles and she remarked it looked like a ridiculous lawsuit. At that point in time Dongbu's agent had knowledge of the pending lawsuit.

First Amended Complaint

When the First Amended Complaint was filed on July 31, 2006, a copy was delivered by Brian Chen of OKP to Cecilia A. Anas, Surety Division Manager of Moylan's Insurance Underwriters, Inc. on August 9, 2006 and defense and indemnification was requested. Ms. Anas advised Mr. Chen that she would discuss the matter with Dongbu. Delivery of the First

Amended Complaint to Ms. Anas clearly meets the notification and tender requirements of both the Auto Policy and the CAR Policy.

Second Amended Complaint

Additionally, when the Second Amended Complaint was filed on April 18, 2007 a copy was delivered to Thomas Clifford on May 3, 2007, the attorney for Dongbu who was handling this matter. Dongbu received timely notice of the Second Amended Complaint and the defense was therefore tendered timely.

B.     **Notification was timely**

Unquestionably, timely notification and tender of defense was made under both the Auto Policy and CAR Policy as far as the First Amended Complaint and Second Amended Complaint are concerned. Regarding knowledge by Moylan's of the filing of the original Complaint, knowledge of Moylan's as General Agent[4] for Dongbu is knowledge of Moylan's and as such the notification of suit provision of the policy has been satisfied and such knowledge triggers the duty of Dongbu to fulfill its obligations under the policies to OKP.

In the CNMI a General Agent under the Insurance Code is defined as follows:

> 4 CMC §7303 **General Agents, Subagents, Adjusters, and Solicitors Defined**.
>
> (a) *General Agent*.
>
>> (1) "General Agent" means any person appointed under 4 CNMI §7301(b)(1)(D) and authorized by the insurer to perform any of the following acts in the Commonwealth:
>>
>> (A) Solicit application for insurance;
>>
>> (B) Effectuate and countersign insurance contracts;

---

[4] Both the Auto Policy and CAR Policy state Moylan's is the General Agent for Dongbu Insurance Co., Ltd.

(C) Collect premiums on insurance applied for or effectuated;

(D) Appoint subagents and solicitors;

(E) Any other lawful acts pursuant to this decision.

The designation of Moylan's as General Agent for Dongbu and knowledge by Moylan's of the original suit filed by Atalig is notice to Dongbu.

> The general rule of agency that the principal is chargeable with, and is bound by, the knowledge of or notice to his or her agent received while the agent is acting within the scope of his or her authority, and which is in reference to a matter over which his or her authority extends, is fully applicable to agents of insurance companies. The general rule of insurance law is that the knowledge of or notice to an insurance agent as to a matter within the scope of his or her authority, is chargeable to the insurer. The agent's knowledge is in law the knowledge of the insurer, therefore, even if such knowledge on the part of the agent is not in fact communicated to the insurer.

44A Am.Jur. 2d Insurance, §1553

This general principle is supported by the following authority:

1. *Couch on Insurance (3Ed.)*, §49:2 Effect of Agent's Failure to Inform Insurer.

> Although the rule which imputes the agent's knowledge to the principal is predicated upon the assumption that the agent will communicate such matters to its principal, it is immaterial whether the agent actually does so, for in either case it is held that the knowledge of the agent is the knowledge of the insurer.

2. *Major Oil Corp. v. Equitable Life Assur. Soc. of U.S.*, 457 F. 2d 596, 603 (1972):

> Equitable concedes that the general rule is that knowledge obtained by an agent of the insurer while acting within the scope of his authority is imputed to the insurer, whether such is actually communicated or not.

C.   **Dongbu waived any defect in Notice**

Notwithstanding OKP's compliance with the suit notification requirements of the Auto

Policy and CAR Policy, Dongbu has waived any reliance on lack of notice because of its failure to comply with 4 CMC §7505(e) which states:

> 4 CMC §7505(e) *Waiver of Defects in Notice or Preliminary Proof.* All defects in notice of loss, or in a preliminary proof thereof, which the insured might remedy and which the insurer omits to specify to the insured, without unnecessary delay, as grounds for objection, are waived.
>
> and

failure to comply with 4 CMC §7505(f) which states:

> 4 CMC §7505(f) *Waiver of Delay.* Delay in the presentation to an insurer of notice, or preliminary proof of loss, is waived if caused by an act of the insurer, or if the insurer omits to make objection promptly and specifically upon that ground.

In considering the applicability of these two statutes Dongbu finds itself in the awkward situation of saying that a delay in notification of the filing of the original complaint for approximately 4 months (from late March to early August, 2006) and tendering defense of the First Amended Complaint in early August, 2006 voids coverage, yet failure of Dongbu to respond to the tender of the defense until March, 2007 (a period of approximately 7 months) does not violate either statute. Any lack of notice has been waived by Dongbu by its failure under 4 CMC §7505(e) to specify the grounds of its objections without unnecessary delay and under 4 CMC §7505(f) to object promptly and specifically about delay in presentation of notice.

D. **No Prejudice to Dongbu**

Also to be considered is that Dongbu cannot demonstrate that it has been prejudiced by any delay in notification; it should be emphasized that OKP disputes there has been any delay in lack of notification. Dongbu does not make any allegation that delay in notification has been prejudicial. Dongbu's First Amended Complaint alleges:

> 32. The Auto Policy declarations page requires "immediate" notice of claims be provided to the claims adjusting company indicated. The Auto Policy's Condition 3 provides that "the insured shall immediately forward to the [insurer] every demand,

notice, summons or other process" received.  The Atalig claim was filed in March 2006 and OKP had knowledge of the lawsuit at least since early April 2006.  OKP first provided notice to Dongbu of the claim approximately four months later, in early August 2006.  That is not "immediate" notice.  (¶35, Dongbu First Amended Complaint)

42.  General Condition No. 5 requires immediate notice of claims, and expressly bars any coverage under the CAR Policy where the insured does not provide notice to the insurer within 14 days of the insured being aware of the claim.[5]  (¶42.  First Amended Complaint)

Conspicuously absent from the allegations regarding delay in notice is any allegation that Dongbu has been prejudiced by any alleged delay.

The requirement that an insurer show it has been prejudiced by a lack or delay in notice as a basis to disclaim coverage is the rule in the majority of jurisdictions:

In the overwhelming majority of states, an insurer may not raise the failure of an insured to give notice as a valid defense to its obligation to provide coverage under an insurance policy, unless the insurer can demonstrate prejudice from the insured's failure to comply with the policy's notice provisions.

*Homes' Appelman on Insurance 2d.*, Vol, 22, §139.4(c).

Factors the courts consider in determining whether the insurer has been prejudiced by lack or delay in notice include: (1) the availability of witnesses, (2) the ability to discover other information, (3) the existence of official reports concerning the occurrence, (4) the preparation and preservation of demonstrative and illustrative evidence, and (5) the ability of experts to reconstruct the occurrence.  *Id*, §139.4(c)(l).

Case authority in accord with the requirement the insurer prove prejudice is found in the following cases:

1. *Northshire Communications, Inc. d/b/a WEQX (FM) v. AIU Insurance Company*, 174 Vt.

---

[5] The 14 days requirement in the policy is unenforceable as 4 CMC §7505(c) says an insured shall have at least 20 days to give notice of loss and no requirement of notice for a lesser period is valid.

1  295, 811 A.2d 216, 220, 222 (2002):

2
3  In 1997, this Court departed from nearly sixty years of precedent and adopted a modern view of prompt-notice provisions in insurance contracts by holding that an insured's failure to provide prompt notice does not automatically defeat liability insurance coverage. (citation omitted).  While noting the value and importance of prompt-notice provisions, we recognized that the forfeiture of coverage for breach of these provisions is unfair to insureds when that breach does not prejudice the insurer's position relative to the coverage claim. (citation omitted).  Pursuant to the holding in *White Caps*, an insurer that seeks to be relieved of its obligations under a liability policy because of a breach of the prompt-notice provision must prove that the breach resulted in <u>substantial</u> prejudice to its position in the underlying action. (citation omitted) (emphasis supplied)
4
5
6
7
8
9
10

11    In this case Dongbu has not made any claim of prejudice from lack or delay in

12  notification, much less providing any evidence of prejudice.  Further, even after being notified of

13  the claim Dongbu undertook no effort to investigate the matter.  Under that circumstance

14  Dongbu is even precluded from asserting prejudice:

15
16  The insurer did not assert that it had made any investigative effort to identify potential witnesses to the accident, that any particular witness was unavailable or had suffered memory loss, that any evidence had been lost or was unavailable, or that it had actually made any significant investigation of the incident following the notice of the claim.  '"An insured cannot assert prejudice with regard to its ability to conduct an investigation that it never even tried to conduct."'  *Id.*, 222.
17
18
19
20

21  2. *Brakeman v. Potomac, Ins. Co.*, 472 Pa. 166, 371 A.2d 193, 197 (1977).

22    In holding that an insurer that seeks to disclaim coverage on the basis of late notice must

23  show prejudice the *Brakeman* court said:

24
25  In short, the function of a notice requirement is to protect the insurance company's interests from being prejudiced.  Where the insurance company's interests have not been harmed by late notice, even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation.
26
27
28

Allowing an insurance company, which has collected full premiums for coverage, to refuse compensation to an accident victim or insured on the ground of late notice, where it has not shown timely notice would have put the company in a more favorable position is unduly severe and inequitable. Moreover, we do not think such a result comports with the reasonable expectations of those who purchase insurance policies. *Id.* 197-198.

[W]e therefore hold that where an insurance company seeks to be relieved of its obligations under a liability insurance policy on the ground of late notice, the insurance company will be required to prove that the notice provision was in fact breached and that the breach resulted in prejudice to its position. *Id.,* 198

The majority view being that for an insurance company to refuse to provide coverage on the basis of lack or delay in notification it must show prejudice, no claim of prejudice having been made by Dongbu, the claims regarding lack of coverage on that basis must fail.

In reality, the lack/delay of notification claim is academic as Dongbu did receive notice of the original complaint by knowledge on the part of its agent and then tendering of the defense when the First Amended Complaint was filed.

Notification under either policy was timely and in any event Dongbu has neither pled or argued it has been prejudiced by the alleged untimely notice.

## X.    **CLAIMS ARE IN DIRECT CONNECTION WITH CONSTRUCTION ON SITE**

The applicable provision from the Third Party Liability section regarding property damage provides that the policy covers:

b) accidental loss of or damage to property belonging to third parties

(sic) occurring in direct connection with the construction or erection of the items insured under Section. and happening on or in the immediate vicinity of the site during the Period of Cover.

When examining the language "occurring in direct connection with the construction or erection

of the items insured under Section and happening on or in the immediate vicinity of the site during the Period of Cover", the "Section" provision/number is not included thereby rendering that provision ambiguous and unenforceable.

Regarding whether the events occurred on or in the immediate vicinity of the site, the Declaration Page recites: Site of Construction: **Rota, Commonwealth of the Northern Marianas**.

The claims arose from events on the site as "site" is described in the policy.

The CAR Policy does not define what constitutes "occurring in direct connection with the construction …" The policy identifies the "Title of Construction" as **Rota Int'l Airport Project**. Common sense dictates that leasing the property which was to act as a staging area for the project and clearing that area would constitute an event "occurring in direct connection with the construction." It is part of the overall construction project. The term being undefined, it should be interpreted as a reasonable person would understand the term and any ambiguity is resolved against Dongbu as the drafter of the policy.

XI.    **CONCLUSION**

Plaintiff has not met its burden to show there are no material facts in dispute and that it is entitled to a determination as a matter of law that it has no duty to defend. Based on the arguments and authorities stated herein OKP (CNMI) Corporation respectfully requests the Court to deny Dongbu's Motion For Summary Judgment.

1

2                                    CARLSMITH BALL LLP

3

4    DATED: Saipan, MP, June 11, 2008.        _/s/ John D. Osborn_
5                                             JOHN D. OSBORN
                                              SEAN E. FRINK
6                                             Attorneys for Defendant
                                              OKP (CNMI) Corporation
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28