# Exhibit 8

1 | Ramon K. Quichocho, Esq.
LAW OFFICES OF RAMON K. QUICHOCHO, LLC
2 | 2nd Floor, V.S. Sablan Building, Chalan Piao
P.O. Box 505621
3 | Saipan, MP 96950
Tel. No.: 670.234.8946
4 | Fax: 670.234.8920
Email: rayq@vzpacifica.net

5

*Attorney for Plaintiff Joaquin Q. Atalig*

6

7

8 | **IN THE SUPERIOR COURT**
**OF THE**
9 | **COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

10 | JOAQUIN Q. ATALIG,                    )    CIVIL ACTION NO. 06-0119 (R)
                                          )
11 |              Plaintiff,              )
                                          )
12 |         vs.                          )
                                          )
13 |                                      )    **VERIFIED COMPLAINT AND**
   | OKP (CNMI) CORPORATION, AND DOES     )    **DEMAND FOR JURY TRIAL**
14 | 1-10,                                )
                                          )
15 |              Defendants.             )
                                          )
16 | ─────────────────────────────────── )

17 |         COMES NOW Plaintiff Joaquin Q. Atalig, by and through counsel, Ramon K.

18 | Quichocho, Esq., and for his Complaint against Defendants OKP (CNMI) CORPORATION

19 | ("OKP"), and Does 1-10, alleges as follows:

20

21 | **I.**
**INTRODUCTION**

22 |         1.   This case is about the destruction and desecration of several priceless and original

23 | Latte Stones, other cultural and historical artifacts, and other things of value, in violation of a

24 | Lease Agreement, and in violation of the laws of the Commonwealth of the Northern Mariana

25 | Islands.

26

27 |         2.   More than 3,000 years ago, the early Chamorros painstakingly carved out and created

28 | the Latte Stone.

ENTERED
DATE: _____

(M. 001467550)

ORIGINAL

3. The Latte Stone is such an original art, symbol, and structure, that even with the advantage of modern technology, the modern Chamorros have not carved out a "modern" Latte Stone that even comes close to the original Latte Stones that are present throughout the Mariana Islands.

4. Today, the Latte Stone is so sacred that it has become a living symbol of Chamorro strength, peace, solidarity, pride, respect, dignity, and identity.

5. The Latte Stone has become a permanent and official image of our CNMI flag, crowned with a beautiful mwar which signifies the highest respect and dignity, and untirelessly waiving a friendly "Hafa Adai."

6. The Latte Stone has been used in numerous business logos, in official government and corporate seals, in construction designs, in storybooks, and in many other aspects of life in the CNMI.

7. The Latte Stone, however, has also been a bad experience for a few people who have intentionally or unintentionally disrespected and desecrated the sanctity of the place where a Latte Stone sits, causing some to suffer sicknesses that even modern science cannot cure, and in which the only cure is to "ask for forgiveness."

8. In short, the Latte Stone represents the Chamorro culture, tradition, and beliefs.

9. As of December 2005, several original Latte Stones lay on what is now the real property of Plaintiff Atalig, in Ginalangan, Rota, Lot No. 362 R 01 (sometimes referred to as "Plaintiff Atalig's land").

10. But, in January 2006, when Defendant OKP leased the improvements on Plaintiff Atalig's land, Defendant OKP wiped away a lot of the history, culture, and economic advantage that was on Plaintiff Atalig's land in Ginalangan, Rota, when Defendant OKP used heavy

equipment to clear Plaintiff Atalig's land, to wit, Latte Stone clusters and Japanese structures and other artifacts, without the required permits from the Historic Preservation Office, the Division of Environmental Quality, and other regulatory agencies, and definitely, without the prior written consent of Plaintiff Atalig.  The destruction, desecration, and obliteration of the cultural and historical artifacts and other things of value took less than three months into the Lease term.

11. Historically, the Spanish came and ruled the Chamorros, but the Spanish did not destroy the Latte Stone clusters.  They preserved and respected them.

12. Then, the Germans took over the Mariana Islands from Spain, but the Germans did not destroy the Latte Stone clusters.  They, too, preserved and respected them.

13. After the Germans, the Japanese took control of the Mariana Islands until the end of World War II in 1945, but the Japanese did not destroy the Latte Stone clusters.  Not only did they preserve them, the Japanese erected more structures that have become historical artifacts.

14. As a result of the Japanese occupation, the Japanese built other structures on Plaintiff Atalig's land, which leads to the Ginalangan Defensive Complex.

15. After World War II, the United Nations and the Unites States took over until the Mariana Islands voted to be in political union with the United States, but the United Nations and the United States did not destroy the Latte Stone clusters or the Japanese structures.  They, too, preserved and respected them.

16. For many decades, the Latte Stone clusters, and certain Japanese structures, including but not limited to, a Japanese water tank, washing basin and frame, sat serenely on Plaintiff Atalig's land in Rota.

17. Constitutionally, "[p]laces of importance to the culture, traditions and history of the people of the Northern Mariana Islands shall be protected and preserved...." N.M.I. Const. art. XIV, § 3.

18. Similarly, "[a]rtifacts and other things of cultural or historical significance shall be protected, preserved and maintained in the Commonwealth...." N.M.I. Const. art. XIV, § 3.

19. It is the Historic Preservation Office that must "issue or deny permits, after review by the Review Board, for use, access, and development of land containing cultural and historic properties, and for the taking of any artifact of historic or cultural significance from the Commonwealth for cultural exchange, scientific identification, or donation to a nonprofit organization recognized on the basis of its cultural significance to the Commonwealth[.]" 1 CMC § 2382(g).

20. Therefore, "[i]t is unlawful for any person, partnership, business, corporation or other entity to willfully remove or take any artifact that is of historic or cultural significance to the people of the Commonwealth, or knowingly destroy, remove, disturb, displace, or disfigure any cultural or historic property on public or private land or in the water surrounding the Commonwealth as designated by or eligible for designation by the Historic Preservation Office as a cultural or historic property, unless the activity is pursuant to a permit issued under 1 CMC § 2382(g) and 2 CMC § 4831." 2 CMC § 4841.

21. As such, "[a]ny person who, individually or acting for any business, corporation or other entity, knowingly and willfully violates any provision of this chapter or any valid rule or regulation promulgated under this chapter shall be fined not more than $10,000 per day or imprisoned not more than one year, or both." 2 CMC § 4842.

22. Unfortunately, some of the cultural and historical artifacts that once enjoyed the serenity on Plaintiff Atalig's land were unlawfully damaged, destroyed, and mutilated by Defendants, and are lost and gone forever.

23. Sadly, if only Defendant OKP followed the terms and provisions of the Lease Agreement, if only Defendant OKP obeyed the laws of the CNMI, if only Defendant OKP listened to warnings not to clear the areas where the cultural and historical artifacts lay, if only Defendant OKP had a little respect for the culture, heritage, race, and history of the Chamorro people, Defendant OKP could have avoided the despicable and disgraceful destruction and desecration of the priceless artifacts that were once part of who we are as Chamorros.

## II.
## JURISDICTION AND VENUE

24. This Court has jurisdiction over this matter pursuant to N.M.I. Const. art. IV, § 2, and 1 CMC § 3202.

25. Venue is proper in the Superior Court of the Commonwealth of the Northern Mariana Islands, in Luta.

## III.
## PARTIES

26. Plaintiff Joaquin Q. Atalig is a United States citizen and is residing in the Commonwealth of the Northern Mariana Islands.

27. Defendant OKP (CNMI) CORPORATION ("OKP") is a domestic corporation organized and existing under the laws of the Commonwealth of the Northern Mariana Islands, with its principal places of business located in Saipan and/or Rota, Commonwealth of the Northern Mariana Islands.

28. On information and belief, Defendant OKP was awarded an $8,677,000.00 contract by the Commonwealth Ports Authority to improve the Rota Airport runway. As part of that operation, Defendant OKP leased Plaintiff Atalig's improvements in November 2005. Due to the magnitude of Defendant OKP's project in Rota, Defendant OKP knew that governmental permits are required before any land clearing activities are conducted.

29. Except as described herein, the true names of the defendants sued as Does 1 through 10, inclusive, are unascertained to Plaintiff Atalig which therefore sues these defendants by such fictitious names. Plaintiff Atalig will amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named defendants were involved in the design, implementation, approval, and furtherance of the transactions complained of herein or received benefits from those transactions. These defendants aided or abetted, or participated with the other defendants and others in the wrongful acts and course of conduct, or otherwise caused the damages sought herein and are responsible for the acts, occurrences and events alleged in this Complaint.

30. The named and Doe defendants in this action are sometimes collectively referred to herein as "Defendants."

## IV.
## OPERATIVE FACTS

31. On November 2, 2005, Plaintiff Atalig and Defendant OKP executed a Lease Agreement (the "Lease"), which was filed at the Commonwealth Recorder's Office, as File No. 05-3030, on November 3, 2005. Under the Lease, Plaintiff Atalig is the Lessor, and Defendant OKP is the Lessee. A true and correct copy of the Lease is attached hereto, labeled "Exhibit A," and incorporated herein by this reference as if set forth in full.

32. Plaintiff Atalig leased unto Defendant OKP, and Defendant OKP leased from Plaintiff Atalig, "the improvements described in Section 1" of the Lease. Emphasis added.

33. Pursuant to Section 1 of the Lease, the leased premises "consist of all improvements situated on the real property in Northern Part (Area No. 4) Ginalangan, Municipality of Rota, Commonwealth of the Northern Mariana Islands,…, together with the right to use Lessor's easements and appurtenances in adjoining and adjacent land, highways, roads, streets, lanes, whether public or private, reasonably required for the installation, maintenance, operation and service of sewer, water, gas, power and other utility lines and for driveways and approaches to and from abutting highways or streets for the use and benefit of the above-described improvements and the parcel of real property described below." Emphases added.

34. Defendant OKP also has the right to use the real property, described below, where the leased improvements are situated:

Lot No. 362 R 01, containing an area of 49,998 square meters, more or less, as more particularly described in Cadastral Plat No. 362 R 00, the original of which was registered with the Land Registry as Document No. 6503, on September 12, 1978.

35. The existing improvements and improvements subsequently erected on Lot 362 R 01 during the term of the Lease are collectively referred to in the Lease as the "Premises." See Section 1 of the Lease.

36. The Lease was for a term of thirteen (13) months, commencing on December 1, 2005, and ending on December 31, 2006, unless sooner terminated, with Lessee's option to extend for a period of one year at the monthly rent of $3,000.00. See Sections 2 and 5 of the Lease.

37. Pursuant to Section 6 of the Lease, Defendant OKP may use, improve and develop the Premises or any part thereof for any lawful use or purpose, provided that Defendant OKP does not commit waste, but primarily as office, barracks, equipment repair shop and workstation,

heavy and lightweight equipment parking and storage, and as staging area related to Defendant OKP's business and operation on Rota.  **Emphases added.**

38. Pursuant to Section 13.1 of the Lease, Defendant OKP "shall have the right during the term of this Lease, to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvement on the Premise[s], and correct and change the contour of the Premises pursuant to the plans and drawings attached [to the Lease] as Exhibits "A" and "B", ...only with the prior written consent of Lessor."  Emphasis added.

39. Plaintiff Atalig never gave a written consent and Defendant OKP never asked for a written consent to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvement on the Premises, and correct and change the contour of the Premises pursuant to the plans and drawings attached [to the Lease] as Exhibits "A" and "B."

40. Furthermore, Section 13.1 of the Lease expressly states that "*[a]ny* other alterations and changes require Lessor's consent in writing."

41. Plaintiff Atalig never gave a written consent and Defendant OKP never asked for a written consent to make any other alterations and changes.

42. In or about January 2006, despite being warned not to clear the areas where the cultural and historical artifacts lay, Defendants used heavy equipment to clear the land, without the proper permits from the Government and without permission from Plaintiff Atalig, in order to erect other structures for the use and benefit of Defendant OKP.

43. Similarly, in or about January 2006, despite not having a written consent from Plaintiff Atalig, Defendants tore down the kitchen, laundry, and storage facilities, and used the materials therefrom to build a *palapala*.  In the process, Defendants damaged and destroyed the homemade cooking stove, *ifik* posts, and other valuable items that were stored.

44. Similarly, in or about January 2006, despite not having a written consent from Plaintiff Atalig, Defendants bull-dozed down valuable trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants.

45. Similarly, in or about January 2006, despite not having a written consent from Plaintiff Atalig or an earthmoving permit from the Division of Environmental Quality, Defendants removed soil and other rocks and minerals, including excavating Plaintiff Atalig's land, for Defendant OKP's parking lot.

46. On information and belief, Defendant OKP did not obtain and pay for a permit before clearing the land despite agreeing to "be responsible for the payment of all utilities, assessments, and other public charges arising by reason of the occupancy, use or possession of the Premises." See Section 11 of the Lease.

47. Pursuant to Section 15 of the Lease, Defendant OKP "shall be in default in the prompt and full performance of any other term, covenant, or condition of the Lease, (except as to payment of rent), if such default shall continue for a period of thirty (30) days after notice of such default is given by the Lessor to Lessee, unless the default is of such a nature that the same cannot be cured or corrected within said thirty (30) day period and the Lessee shall have promptly and diligently commenced to cure and correct such default and shall have thereafter continued therewith with reasonable diligence and in good faith, in a manner as to cure and correct the same as promptly and as reasonably practicable under the circumstances, and shall have continued therewith until the default shall have been cured or corrected."

48. On January 17, 2006, Plaintiff Atalig sent a Notice of Default and Violations to Defendant OKP.  A true and correct copy of the January 17, 2006 Notice of Default and

Violations is attached hereto, labeled "Exhibit B," and incorporated herein by this reference as if set forth in full.

49. In a letter dated February 7, 2006, rather than commencing to cure the violations under the Lease, Defendant OKP, through counsel, argued that Defendant OKP "did not violate any of the terms of the lease agreement."  A true and correct copy of the February 7, 2006 letter from Defendant OKP's counsel is attached hereto, labeled "Exhibit C," and incorporated herein by this reference as if set forth in full.

50. On February 21, 2006, Plaintiff Atalig, through counsel, responded to the February 7, 2006 letter from Defendant OKP's counsel.  A true and correct copy of the February 21, 2006 letter from Plaintiff Atalig's counsel is attached hereto, labeled "Exhibit D," and incorporated herein by this reference as if set forth in full.

51. Defendant OKP, or its counsel, has not responded to the February 21, 2006 letter from Plaintiff Atalig's counsel.

## V.
## FIRST CAUSE OF ACTION
### (Breach of Contract)

52. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

53. Plaintiff Atalig has performed all the conditions and agreements required of Plaintiff Atalig under the terms of the Lease.

54. Defendant OKP had a duty to act with reasonable care and diligence in performing the Lease so as not to injure a person or property by its performance.

55. Defendants breached the Lease with Plaintiff Atalig in the following respects:

a.  Defendants have committed waste by unlawfully damaging, destroying, and/or mutilating historical artifacts, structures, and other valuable relics, including but not limited to, Latte Stone clusters, Japanese structures, water tank, washing basin and frame, and areas surrounding Japanese building(s), in violation of Section 6 of the Lease and in violation of CNMI laws and regulations;

b.  Defendants have committed waste by damaging, destroying, and/or mutilating permanent trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants, in violation of Section 6 of the Lease;

c.  Defendants have committed waste by damaging, destroying, and/or mutilating preexisting buildings/improvements to the land, including but not limited to, laundry, storage, and kitchen facilities, and the stored contents therein, in violation of Section 6 of the Lease;

d.  Defendants have committed waste by placing a fuel tank station on Plaintiff's property without the proper permits, in violation of Section 6 of the Lease;

e.  Defendants have committed waste by moving and/or removing soil and other minerals without the proper permits, in violation of Section 6 of the Lease and in violation of CNMI laws and regulations;

f.  Defendants failed to obtain Plaintiff Atalig's written consent to erect, maintain, alter, remodel, reconstruct, rebuild, replace and remove building and other improvement on the Premises, and correct and change the contour of the Premises, in violation of Section 13.1 of the Lease.

56. Notwithstanding demand to cure the violations, Defendants have failed, neglected, and refused, and still fail, neglect, and refuse to cure the violations and default.

57. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including property damages and loss of prospective economic advantages, and has been damaged in the amount of $5,000,000, or more, to be proven at trial.

58. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $2,000,000, or more, to be proven at trial.

59. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## VI.
## SECOND CAUSE OF ACTION
### (Waste)

60. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

61. At all relevant times, Plaintiff Atalig was the fee simple owner of Lot No. 362 R 01, on which are present priceless cultural and historical artifacts and other things of value.

62. Defendant OKP leased the improvements situated on Lot No. 362 R 01, and occupied Lot No. 362 R 01 since the commencement of the term of the Lease.

63. During the period of such occupation, Defendants greatly injured the improvements and the land, as follows:

    a.  By unlawfully damaging and/or destroying historical artifacts, structures and other valuable relics, including but not limited to, Latte Stone clusters, Japanese structures,

water tank, washing basin and frame, and areas surrounding Japanese building(s), and removing them from Plaintiff Atalig's land;

b. By damaging, destroying and/or cutting permanent trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants, and removing them from Plaintiff Atalig's land;

c. By damaging and/or destroying preexisting buildings/improvements to the land, including but not limited to, the laundry, storage, and kitchen facilities, and leaving the stored items exposed;

d. By placing a fuel tank on Plaintiff Atalig's land; and

e. By moving and/or removing soil, and by digging up soil and other minerals (about 40' x 50'x 8' hole in the ground and lined by concrete, including other excavations), and removing them from Plaintiff Atalig's property.

64. On information and belief, Defendant OKP did not obtain the necessary permits from the Division of Environmental Quality and the Historic Preservation Office before conducting its wasteful and unlawful activities.

65. Although required under the Lease, Defendant OKP failed to obtain the prior written permission of Plaintiff Atalig before conducting its wasteful and unlawful activities.

66. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including but not limited to, diminution in property values and loss of prospective economic advantages, and has been damaged in an amount to be proven at trial.

67. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $2,000,000, or more, to be proven at trial.

68. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## VII.
### THIRD CAUSE OF ACTION
### (Conversion—Historical and Cultural Artifacts)

69. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

70. At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01, on which are present cultural and historical artifacts.

71. Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of historical and cultural artifacts, to wit, Latte Stones, Japanese structures, Japanese washing basin and frame, and Japanese water tank, located on Plaintiff Atalig's land, and converted them to Defendants' own use.

72. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including but not limited to, diminution in property values and loss of prospective economic advantages, and has been damaged in the amount of $2,000,000, or more, to be proven at trial.

73. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $1,000,000, or more, to be proven at trial.

74. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## VIII.
## FOURTH CAUSE OF ACTION
### (Conversion—Soil and Other Minerals)

75. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

76. At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01, on which are present fertile top soil and minerals.

77. Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of soil and other minerals located on Plaintiff Atalig's land, and converted them to Defendants' own use.

78. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including but not limited to, diminution in property values and loss of prospective economic advantages, and has been damaged in the amount of $500,000, or more, to be proven at trial.

79. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $250,000, or more, to be proven at trial.

80. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## IX.
## FIFTH CAUSE OF ACTION
### (Conversion—Permanent Trees)

81. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

82. At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01, on which are present valuable permanent trees.

83. Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of permanent trees, to wit, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants, located on Plaintiff Atalig's land, and converted them to Defendants' own use.

84. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including but not limited to, diminution in property values and loss of prospective economic advantages, and has been damaged in the amount of $500,000, or more, to be proven at trial.

85. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $250,000, or more, to be proven at trial.

86. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## X.
## SIXTH CAUSE OF ACTION
**(Conversion—Preexisting Buildings/Improvements)**

87. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

88. At all relevant times mentioned, Plaintiff Atalig was the owner of Lot No. 362 R 01 on which are present preexisting buildings and improvements.

89. Defendant OKP, by its agents and employees acting within the scope of their employment, took possession of preexisting buildings/improvements, to wit, laundry, storage,

and kitchen facilities, including the stored items, located on Plaintiff Atalig's land, and converted them to Defendants' own use.

90. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered damages, including but not limited to, diminution in property values and loss of prospective economic advantages, and has been damaged in the amount of $500,000, or more, to be proven at trial.

91. Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $250,000, or more, to be proven at trial.

92. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XI.
## SEVENTH CAUSE OF ACTION
### (Negligence—Violation of 1 CMC § 2382(g) and 2 CMC § 4811, *et seq.*)

93. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

94. At all relevant times mentioned, Plaintiff Atalig was the fee simple owner of Lot No. 362 R 01 on which are present historical and cultural artifacts.

95. Defendants willfully removed or took cultural and historic artifacts and/or knowingly destroyed, removed, disturbed, displaced, or disfigured cultural and historical artifacts on Plaintiff Atalig's land without a valid permit from the Historic Preservation Office.

96. Defendants knowingly and willfully violated the historic and cultural preservation laws of the CNMI.

97. As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, including but not limited to, property damages and loss of prospective economic advantages, and has been damaged in the amount of $100,000, or more, to be proven at trial.

98. Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XII.
## EIGHTH CAUSE OF ACTION
### (Negligence—Violation of 2 CMC § 3101, *et seq.*)

99. Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

100.    At all relevant times mentioned, Plaintiff Atalig was the fee simple owner of Lot No. 362 R 01 on which are present historical and cultural artifacts.

101.    Defendants violated the Commonwealth Environmental Protection Act (2 CMC § 3101, *et seq.*) by failing to obtain an earthmoving permit before clearing Plaintiff Atalig's land using heavy equipment, which resulted in the damage, destruction, and mutilation of historical and cultural artifacts.

102.    Defendants knowingly and willfully violated the environmental protection laws of the CNMI, which were designed to protect, among other things, "the environmental quality of places and things of cultural and historical significance to contribute to the protection and preservation thereof, in implementation of N.M.I. Const. art. XIV, § 3." 2 CMC § 3111(a)(4).

103.    As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, including but not limited to, property damages

and loss of prospective economic advantages, and has been damaged in the amount of $100,000, or more, to be proven at trial.

104.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XIII.
## NINTH CAUSE OF ACTION
### (Negligence)

105.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

106.    Defendant OKP had the duty not to commit waste on Plaintiff Atalig's land and to obtain the prior written consent of Plaintiff Atalig before any alterations or changes are done on the leased improvements and the real property.

107.    Defendant OKP breached its duty to Plaintiff Atalig when it violated the laws of the CNMI by damaging and destroying cultural and historical artifacts and other things of value, and when Defendant OKP failed to obtain the prior written consent of Plaintiff Atalig to alter or change the improvements and the real property.

108.    As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, including but not limited to, property damages and loss of prospective economic advantages, and has been damaged in the amount of $2,000,000, or more, to be proven at trial.

109.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XIV.
## TENTH CAUSE OF ACTION
### (Negligent Interference with Prospective Economic Advantage)

110.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

111.    Plaintiff Atalig has in the past engaged in the business of showing tourists and residents the historical and cultural significance of his land which leads to the Japanese bunkers/complexes.

112.    Plaintiff Atalig's land is attractive to residents and visitors alike because it was used by the Japanese as an entrance way to the Japanese bunkers/complexes located in the mountains near Plaintiff Atalig's land.

113.    Plaintiff Atalig and Mr. Sukimi Mita have prepared plans to construct a Japanese shrine and memorial by improving the existing Japanese structures in order to make it more attractive to visitors for business purposes.

114.    The unlawful destruction and obliteration of the historical and cultural artifacts has interfered with the business and economic plans of Plaintiff Atalig and Mr. Sukimi Mita.

115.    Defendants' interference was wrongful and malicious and was done with the conscious disregard of the rights of Plaintiff Atalig.

116.    As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, including but not limited to, property damages, and has been damaged in the amount of $7,000,000, or more, to be proven at trial.

117.    Because of the willful, wanton, vile, outrageous, and malicious nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages in the amount of $3,000,000, or more, to be proven at trial.

118.    Wherefore, Plaintiff prays for the relief as set forth herein.

## XV.
## ELEVENTH CAUSE OF ACTION
### (Intentional and/or Negligent Infliction of Emotional Distress)

119.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

120.    From December 2005, Defendants, knowing that they have no right to damage, destroy, or mutilate cultural and historical artifacts and other structures, or to unlawfully remove soil and minerals, or to unlawfully place a huge fuel tank, or to damage and/or destroy permanent trees, cleared Plaintiff Atalig's land by using heavy equipment without a permit from the proper agencies and without permission from Plaintiff Atalig despite being specifically warned, in advance, about the location and presence of cultural and historical artifacts.

121.    Defendants' actions were extreme and outrageous and done intentionally to inflict severe emotional distress upon Plaintiff Atalig and his family.

122.    Defendants acted with malice and in the conscious disregard of the rights of Plaintiff Atalig.

123.    As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig did suffer severe emotional distress including, but not limited to, sleeplessness, headaches, anguish, grief, shame, humiliation, fear, anger and worry, and has been damaged in the amount of $4,000,000, or more, to be proven at trial.

124.    Because of the malicious, willful, wanton, vile, outrageous, and intentional nature of Defendants' conduct as alleged herein, and their conscious disregard of the rights of Plaintiff Atalig, Defendants are liable for punitive damages, in the amount of $2,000,000, or more, to be determined at trial.

125.    Wherefore, Plaintiff prays for the relief as set forth herein.

# XVI.
## TWELFTH CAUSE OF ACTION
### (Unjust Enrichment)

126.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

127.    Defendants used and benefited from the use of Plaintiff Atalig's land to build certain structures and to remove certain historical and cultural artifacts and permanent trees, without the prior written consent of Plaintiff Atalig.

128.    Defendants used and benefited from the use of certain materials that were taken from the storage, laundry, and kitchen facilities without the prior written consent of Plaintiff Atalig.

129.    Defendants knew that they do not have the prior written permission from Plaintiff Atalig to remove preexisting improvements, historical and cultural artifacts, and permanent trees so that they can build other structures, but ignored the applicable provisions of the Lease, i.e., not to commit waste and to obtain the prior written consent of Plaintiff Atalig for any changes or alterations to the leased improvements.

130.    Defendant OKP has accepted and enjoyed the benefits of the impermissible use of Plaintiff Atalig's land to further Defendant OKP's business in Rota and the CNMI.

131.    The retention of the benefit and enjoyment of the use of Plaintiff Atalig's land without the payment of its value is unfair and unjust.

132.    Defendants have been unjustly enriched at the expense of Plaintiff Atalig.

133.    As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, including but not limited to, property damages, and has been damaged in the amount of $250,000, or more, to be proven at trial.

134.    Wherefore, Plaintiff prays for the relief as set forth herein.

## XVII.
## THIRTEENTH CAUSE OF ACTION
### (Nuisance)

135.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

136.    At all relevant times mentioned, Plaintiff Atalig was the fee simple owner of Lot No. 362 R 01.

137.    Defendants have installed a huge fuel tank with a fuel pump/station on Plaintiff Atalig's land, and on information and belief, without a valid permit from the regulatory agencies.

138.    Defendants' conduct in installing a huge fuel tank without the proper authorizations from regulatory agencies constitutes a nuisance. It is injurious and hazardous to Plaintiff Atalig and those living with him, including contaminating the soil and water resources from any spillage that occurs as a result of the operation of a fuel station.

139.    Plaintiff Atalig gave notice to Defendant OKP to cure the default, but Defendant OKP, through counsel, argued that Defendant OKP did not violate any of the terms of the Lease. Please see attached Exhibits B and C.

140.    As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, including but not limited to, property damages, and has been damaged in the amount of $100,000, or more, to be proven at trial.

141.    As a further direct and proximate result of the nuisance created by Defendants, Plaintiff Atalig's land has been diminished in value in the sum to be proven at trial. Unless the nuisance created by defendants is abated, Plaintiff Atalig's land will continue to diminish in value.

142.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XVIII.
## FOURTEENTH CAUSE OF ACTION
### (Indemnification)

143.    Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

144.    Pursuant to Sections 12 and 12A of the Lease, Defendant OKP "shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of litigation…[o]n the account of or through the use of the demised premise[s] or improvements or any part thereof by Lessee or by any other person acting under the authority, direction, in the interest of, or through the title of the Lessee for any purpose inconsistent with the provisions of this Lease."

145.    The destruction of the historical and cultural artifacts and permanent trees, and the removal of soil and other minerals, and other things of value, have diminished the market value of Plaintiff Atalig's land and constitutes waste which is inconsistent with the provisions of the Lease.

146.    Pursuant to Sections 12 and 12B of the Lease, Defendant OKP "shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of litigation…[a]rising out of, or directly or indirectly due to, any failure of Lessee in any respect promptly and faithfully to satisfy Lessee's obligations under this [L]ease."

147.    Defendant OKP failed to promptly and faithfully satisfy Defendant OKP's obligations under the Lease by failing to obtain Plaintiff Atalig's written consent prior to the unlawful activities, and by destroying invaluable artifacts and other structures and things which constitutes waste.

148.　Pursuant to Sections 12 and 12C of the Lease, Defendant OKP "shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of litigation…[a]rising out of directly or indirectly due to any accident or other occurrence causing injury to any person or persons or property resulting from the use of the premises or any part thereof, including the land."

149.　Defendants' actions caused the injury to Plaintiff Atalig's land by diminishing its value now and in the future.

150.　No such indemnification shall be required with respect to losses or liabilities arising by reason of the affirmative negligence or recklessness of Lessor. See Section 12 of the Lease.

151.　Plaintiff Atalig was not, and is not, negligent, much less affirmatively negligent or reckless, in the performance of Plaintiff Atalig's duties and responsibilities under the Lease.

152.　As a direct and proximate result of Defendants' conduct detailed above and in other respects, Plaintiff Atalig has suffered personal physical injuries and ailments, emotional distress, fear, anguish, sleeplessness, and anxiety, including but not limited to, property damages, loss of prospective economic advantages, and has been damaged in an amount to be proven at trial.

153.　Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XIX.
## FIFTEENTH CAUSE OF ACTION
### (Attorney's Fees)

154.　Plaintiff Atalig hereby re-alleges and incorporates by this reference, as if fully set forth under this cause of action, all the allegations contained in this Complaint.

155.    Pursuant to Section 23 of the Lease Agreement identified above, in the event of a lawsuit by any party to the Lease Agreement "for the recovery of any rent due, or because of any breach of any term, covenant, condition, or provision hereof, the prevailing party shall be entitled to recover from the other party costs of suit and reasonable attorney's fees which shall be fixed by the Court."

156.    Plaintiff Atalig has incurred legal fees and continues to incur legal fees as a result of Defendant OKP's breach of the Lease and tortious acts.

157.    Wherefore, Plaintiff Atalig prays for the relief as set forth herein.

## XX.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joaquin Q. Atalig prays for judgment against all Defendants, jointly and severally, as follows:

a.   General damages, in an amount to be proven at trial, for the destruction and desecration of several priceless and original Latte Stones, other cultural and historical artifacts, and other things of value;

b.   Punitive damages, in an amount appropriate to punish Defendants and set an example to others, to be proven at trial, because Defendants knew or should have known that the priceless Latte Stones and other cultural and historical artifacts are forever lost once damaged or destroyed, yet Defendants deliberately destroyed and desecrated the artifacts on Plaintiff Atalig's land, despite being forewarned of the presence of artifacts before clearing, which amounts to cultural and historical "terrorism" against the Chamorro people, pure and simple;

c.   An award of restitution to Plaintiff Atalig for the use of the Latte Stones and other valuable artifacts, materials, trees, soil, and minerals, which are forever lost or destroyed, so that

Defendants will not be unjustly enriched at the expense of Plaintiff Atalig in an amount to be proven at trial;

    d.   Pre-judgment interest on amounts owed;

    e.   Post-judgment interests;

    f.   For reasonable attorneys fees and costs as specifically provided by agreement; and

    g.   For such other and further relief to which Plaintiff Atalig is entitled under law or equity as the Court deems just and proper.

**XXI.**
**DEMAND FOR JURY TRIAL**

Plaintiff Joaquin Q. Atalig hereby demands a trial by jury of all issues triable of right by jury.

Respectfully submitted this 22 day of <u>March</u>, 2006.

LAW OFFICES OF RAMON K. QUICHOCHO, LLC

Ramon K. Quichocho
CNMI Bar No. F0243
Attorney for Plaintiff Joaquin Q. Atalig

**VERIFICATION**

I declare under penalty of perjury that I have read the foregoing Complaint and that it is true and correct to the best of my recollection and knowledge and that this declaration is executed on this 22 day of <u>March</u>, 2006, in Saipan, Commonwealth of the Northern Mariana Islands.

JOAQUIN Q. ATALIG
Plaintiff

4-17-2008

27
*Verified Complaint and Demand for Jury Trial*

# EXHIBIT A
## LEASE AGREEMENT

Recording requested by        )
Lessee                        )        FILE NO. _05 - 3030_
                              )
                              )
                              )        '05 NOV -3 A9 :04
                              )           13 / 84
                              )        BOOK
                              )
                              )
_____)
(Space above line for Recorder's use only.)

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is made and entered into as of the _2nd_ day of November, 2005, by and between JOAQUIN Q. ATALIG, hereafter referred to as "Lessor," and OKP (CNMI) CORPORATION, hereafter referred to as "Lessee."

## WITNESSETH:

In consideration of the rent hereinafter reserved and of the covenants herein to be observed and performed, Lessor hereby demises and leases unto Lessee, and Lessee hereby leases from Lessor the improvements described in Section 1.

1. <u>PREMISES</u>:  The Premises consist of all improvements situated on the real property in Northern Part (Area No. 4) Ginalangan, Municipality of Rota, Commonwealth of the Northern Mariana Islands, as more particularly hereinafter described, together with the right to use Lessor's easements and appurtenances in adjoining and adjacent land, highways, roads, streets, lanes, whether public or private, reasonably required for the installation, maintenance, operation and service of sewer, water, gas, power and other utility lines and for driveways and approaches to and from abutting highways or streets for the use and benefit of the above-described improvements and the parcel of real property described below.  Lessee shall also have the right to use the real property described below where the leased improvements are situated:

Lot No. 362 R 01, containing an area of 49,998 square meters, more or less, as more particularly described in Cadastral Plat No. 362 R 00, the original of which was registered with the Land Registry as Document No. 6503 on September 12, 1978.

The existing improvements and improvements subsequently erected thereon during the term of this Lease and the appurtenances and other incidents associated therewith are collectively referred to in this Lease as the "Premises."

Moreover, Lessee leases, as part of the agreement, furniture, fixtures, appliances, and tools, which are all itemized in the List of Inventory which will be verified and approved by both parties on or before November 30, 2005. The verified and approved List of Inventory shall be incorporated herein and made a part of this Lease by this reference.

2.    TERM OF LEASE:   This Lease shall be for a term of thirteen (13) months, commencing on December 1, 2005, and ending on December 31, 2006, unless sooner terminated as herein provided.

3.    RENT: The total rental fee for the term of this Lease is Thirty-Seven Thousand Five Hundred Dollars ($37,500.00), payable as shown below.  As further consideration, Lessee covenants and agrees to pay the full-time salaries of two employees of Lessor, namely, Edita and Esther, at $4.50 per hour and $3.50 per hour, respectively.

4.    PAYMENT SCHEDULE:

4.1 Lessee shall pay Lessor advance rent of Nineteen Thousand Five Hundred Dollars ($19,500.00) upon the execution of this Lease.

4.2 Lessee shall pay the remaining rent of Eighteen Thousand Dollars ($18,000.00) on or before July 1, 2006.

*Lease Agreement*
*Page 2 of 10*

5.    OPTION TO RENEW LEASE:  Lessee has the option to extend the Lease for a period of one year at the monthly rent of Three Thousand Dollars ($3,000.00) and upon the same remaining terms set forth herein, except that rental payments shall be made, in advance, every quarter.  The first quarter rent shall be due and payable on January 1, 2007.  Lessee shall exercise the option by giving Lessor 30 days notice, of its intent to renew the Lease for another year, before the expiration of the Lease.

6.    USE OF PREMISES: Lessee may use, improve and develop the Premises or any part thereof for any lawful use or purpose, provided that Lessee does not commit waste, but primarily as office, barracks, equipment repair shop and workstation, heavy and lightweight equipment parking and storage, and as staging area related to Lessee's business and operation on Rota.

7.    LESSOR'S WARRANTY OF TITLE:   Lessor represents, warrants, and covenants that he is the sole, true owner in fee simple of all the leasehold premises and have the right to lease the same to the Lessee and that the Premises are free and clear of all liens, claims and encumbrances, excepting recorded easements for water, sewer, power, telephone, roadways, and other public utilities, and the Lessor has good and marketable title.

8.    LESSOR'S WARRANTY OF QUIET ENJOYMENT:  Upon Lessee paying the rent for the Premises and observing and performing all of the covenants, conditions and provisions on Lessee's part to be observed and performed hereunder, Lessor shall place Lessee in quiet possession of the Premises for the entire term hereof subject to all the provisions of this Lease.

9.    ASSIGN ABILITY AND SUBLEASING:  Lessee may not assign or sublease the premises without the consent of Lessor.  Lessor may not unreasonably withhold consent.

10.    <u>TAXES</u>:

10.1    <u>Lessee To Pay Taxes During Lease</u>.  Lessee shall pay and discharge all taxes, assessment, rates, charges, license fees, municipal liens, levies, excises, or imposts, whether general or special, or ordinary or extraordinary, of every name, nature and kind whatsoever, including all governmental charges of whatsoever name, nature, or kind, which may be levied, assured, charged, or imposed, or which may become a lien or charge on or against the premises, or any part thereof, the leasehold of Lessee herein, the premises described herein, any buildings, or any other improvements now or hereafter thereon, or on or against Lessee's estate hereby created which may be a subject of taxation, or on or against Lessor by reason of its ownership of the fee underlying this Lease, during the entire term thereof, excepting only those taxes hereinafter specifically excepted.  All taxes and charges under this Section shall be prorated at the expiration of the term hereof.

10.2    <u>Exceptions</u>.  Anything in this section to the contrary notwithstanding, Lessee shall not be required to pay any estate, gift, inheritance, succession, franchise, income, or excess profits taxes which may be payable by Lessor or Lessor's legal representative, successors, or assigns, nor shall Lessee be required to pay any tax that might become due on account of ownership of property other than the premises herein which may become a lien on the premises or collectible out of the same.

10.3    <u>Tax Contest</u>.  Lessee shall have the right to contest the validity of any tax or special assessment payable by him which Lessee deems to have been illegally or improperly levied or assessed against the premises, and for that purpose shall have the right to institute such proceedings or proceedings in the name of Lessor as Lessee may deem necessary, provided that

the expense incurred by reason thereof shall be paid by Lessee, and provided, further, that it is necessary to use the name of Lessor in carrying on such proceeding.

11.    UTILITIES AND CHARGES:  Lessee shall be responsible for the payment of all utilities, assessments, and other public charges arising by reason of the occupancy, use or possession of the Premises.

12.    INDEMNIFICATION OF LESSOR BY LESSEE:  Lessee shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of litigation arising prior to the expiration of the term hereof and delivery to Lessor of possession of the premises and use of the land:

A.  On  the  account  of  or  through  the  use  of  the  demised  premised  or improvements or any part thereof by Lessee or by any other person acting under the authority, direction, in the interest of, or through the title of the Lessee for any purpose inconsistent with the provisions of this Lease;

B.  Arising out of, or directly or indirectly due to, any failure of Lessee in any respect promptly and faithfully to satisfy Lessee's obligations under this lease; or

C.  Arising out of directly or indirectly due to any accident or other occurrence causing injury to any person or persons or property resulting from the use of the premises or any part thereof, including the land.

No such indemnification shall be required with respect to losses or liabilities arising by reason of the affirmative negligence or recklessness of Lessor.

13.    LESSEE'S RIGHT TO BUILD:

13.1    Alteration/Building, etc.  The Lessee shall have the right during the term of this Lease, to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove

building and other improvement on the Premise, and correct and change the contour of the Premises pursuant to the plans and drawings attached hereto as Exhibits "A" and "B", and incorporated herein as part of this agreement by reference, only with the prior written consent of Lessor. Any other alterations and changes require Lessor's consent in writing.

     13.2   Equipment and Fixtures.  Lessee shall have the right at any time during Lessee's occupancy of the Premises to remove any and all equipment and fixtures owned or placed by Lessee or its sublessee upon the Premises only with the prior written consent of Lessor, except that any water heater or air conditioner installed shall become Lessor's equipment after the expiration of the Lease.

     13.3   Any items on the Inventory List on Exhibit "A" shall be replaced or repaired, at the sole cost of Lessee, if the item is broken, lost, missing or damaged, except for natural wear and tear.

     13.4   Permanent Improvements.  Upon the expiration of the Lease term, Lessee shall be entitled to remove those temporary improvements that Lessee installed, which can be removed without causing harm or damage to the Premises, except fixtures, air conditioners, and water heaters. All other improvements shall become the property of the Lessor.

     13.5   Soccer Field.  Lessee is authorized to setup, build, or construct a soccer field on the premises.

     13.6   Lessee is hereby authorized to enter the premises on November 1, 2005, to commence repair and other work on the premises. Lessee shall not disturb the customers and staff of Lessor, who may remain on the premises up to November 30, 2005.

     14.   FIRE AND CASUALTY INSURANCE:  Lessee, at Lessee's option and at its own expense, shall keep all improvements erected on the Premises insured against loss or

damage by fire or other casualty or calamity for the value of all improvements. Any insurance proceeds payable with respect to any loss to any improvements on the Premises shall belong to Lessor and Lessee shall have no right, claim or interest therein.

15.    DEFAULT: Lessee shall be in default in the prompt and full performance of any other term, covenant, or condition of the Lease, (except as to payment of rent), and if such default shall continue for a period of thirty (30) days after notice of such default is given by the Lessor to Lessee, unless the default is of such a nature that the same cannot be cured or corrected within said thirty (30) day period and the Lessee shall have promptly and diligently commenced to cure and correct such default and shall have thereafter continued therewith with reasonable diligence and in good faith, in a manner as to cure and correct the same as promptly and as reasonably practicable under the circumstances, and shall have continued therewith until the default shall have been cured or corrected.

Lessee shall be in default in the payment of rent if rent is not paid within 15 days after it is due and such default shall continue for a period of fifteen (15) days after notice of such default and the default is not cured within the 15 days.

16.    LESSOR'S REMEDIES: In the event Lessee breaches this Lease and fails to make correction within the time provided, the Lessor may exercise any of the remedies available to the Lessor at law or in equity, including the right of re-entry without being liable for trespass, and all such remedies shall be cumulative and nonexclusive of any one or more such remedies, and exercise of one remedy shall not be deemed to be an exclusive election of the remedy or remedies exercised or waiver of the remedies not exercised.

17.    ESTOPPEL CERTIFICATES: Lessor shall, at any time from time to time, upon not less than ten days prior notice from Lessee, execute, acknowledge, and deliver to Lessee a

statement in writing certifying that the Lease is unmodified (or in full force and effect as modified and stating the modification(s)) and that there are no defaults existing, or if there is any claimed modification or default, stating the nature and extent thereof. It is expressly understood and agreed that any such statement delivered pursuant to this section may be relied upon by third parties.

18.    NOTICE:  All notices, demands or requests shall be given to each party at their respective addresses, as noted below.  Each party shall have the right, from time to time, to designate in writing a different address by notice given in conformance with this section.

LESSOR:                                    LESSEE:

Joaquin Q. Atalig                          OKP (CNMI) CORPORATION
P.O. Box 965                               P.O. Box 10001, PMB A-25
Rota, MP  96951                            Saipan, MP  96950.

19. SEVERABILITY:  This Lease embodies the entire agreement between the parties.  If any provision herein is declared invalid by a court of competent jurisdiction, it shall be considered deleted from this Lease, and shall not invalidate the remaining provisions of this Lease which shall remain in full force and effect.

20.    ENTIRE AGREEMENT:  This Lease contains the entire agreements of the parties with respect to the matters covered herein as of the date of execution hereof and no other agreement, statement, or promise made by any party or to any employee, officer or agent of any party prior in time to the date of the execution of this Lease shall be binding or valid.

21.    MODIFICATION:  This Lease is not subject to modification except in writing, signed by the parties herein.

22.    BINDING EFFECT:  This Lease shall inure to the benefit of and bind the Lessor and the Lessee, their respective heirs, successors and assigns, jointly and severally.

23.    ATTORNEYS' FEES:  In the event of any suit by any party to this Lease for the recovery of any rent due, or because of any breach of any term, covenant, condition, or provision hereof, the prevailing party shall be entitled to recover from the other party costs of suit and reasonable attorney's fees which shall be fixed by the Court.

IN WITNESS WHEREOF, the parties have affixed their signatures below on the dates next to their respective signatures.

_____
JOAQUIN Q. ATALIG
LESSOR

OKP (CNMI) CORPORATION
LESSEE
By: _____
Duly Authorized Representative

11.2.05
_____
Date

11/2/05
_____
Date

## ACKNOWLEDGMENT OF RECEIPT

I, Joaquin Q. Atalig, received the total sum of Nineteen Thousand Five Hundred Dollars ($19,500.00), paid by Check No. 115, from OKP (CNMI) CORPORATION, as payment for rent under Section 4.1 of the Lease.

_____
JOAQUIN Q. ATALIG
Lessor

11.2.05
_____
Date

*Lease Agreement*
*Page 9 of 10*

| | |
|---|---|
| **COMMONWEALTH OF THE**        ) | |
| **NORTHERN MARIANA ISLANDS**   ) | |
|                                ) | **ss: ACKNOWLEDGMENT** |
| <u>**SAIPAN, MP 96950**</u>    ) | |

ON THIS ___ day of _____, 2005, before me, a Notary Public in and for the Commonwealth of the Northern Mariana Islands, personally appeared **JOAQUIN Q. ATALIG**, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the purposes therein set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year first above written.

_____
NOTARY PUBLIC
FRANCES CANTORIA QUICHOCHO
Notary Public
Commonwealth of the Northern Mariana Islands
My Commission expires: 3/17/07

| | |
|---|---|
| **COMMONWEALTH OF THE**        ) | |
| **NORTHERN MARIANA ISLANDS**   ) | |
|                                ) | **ss: ACKNOWLEDGMENT** |
| <u>**SAIPAN, MP 96950**</u>    ) | |

ON THIS ___ day of _____, 2005, before me, a Notary Public in and for the Commonwealth of the Northern Mariana Islands, personally appeared **BRIAN M. CHEN, Resident Manager of OKP (CNMI) CORPORATION**, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the purposes therein set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year first above written.

_____
NOTARY PUBLIC
FRANCES CANTORIA QUICHOCHO
Notary Public
Commonwealth of the Northern Mariana Islands
My Commission expires: 3/17/07

*Lease Agreement*
*Page 10 of 10*



FLOOR PLAN-BLDG. "B" and "C"
BUILDING (EXISTING CONDITION)

BLDG. "C"
(*ROOF IS DAMAGED
AND NO ROOFED)

CONC. SINK

25'-8"
11'-8"
43'-10"
3'-5"
16'-0"

BLDG. "B"
UNIT 109

MEN'S TOILET
WOMEN'S TOILET
TAB
STD. ROOM

ROCK WALL FENCE
CONC. SINK

11'-4"
25'-6"

EXHIBIT
A

FLOOR PLAN-BLDG. "D" BAR
(EXISTING CONDITION)

KITCHEN AREA
BAR COUNTER
LOUNGE AREA

22'-6"
29'-6"



FLOOR PLAN—BLDG. "C"
(NEW LAYOUT)

NOTE: PROVIDE NEW TIN ROOF ON WOODEN FRAME, NEW DOORS, NEW WINDOWS, NEW WOODEN PARTITIONS, NEW TOILETS & SHOWERS, ETC. REPAIR FLOORS AND INSTALL NEW TILES, PAINTING, ELECTRICAL AND PLUMBING, COMPLETE IN PLACE.

ROOM NO.4
ROOM NO.2
ROOM NO.1
ROOM NO.3
FOYER
SHOWER AREA
TOILET AREA
BLDG. "B" (EXISTING)



FLOOR PLAN—BLDG. "A" HOTEL
(EXISTING CONDITION)

EXHIBIT
"B"



FLOOR PLAN—BLDG. "A"
(NEW LAYOUT)

UNIT 108

UNIT 107

UNIT 106

UNIT 105

EXISTING TIN ROOF LINE

CONCRETE WALK

NEW EXTEND TIN ROOF
CANOPY/ROOF

CONCRETE WALK

SERVICE DOOR

KITCHENETTE/DINETTE

TRANSACTION COUNTER

HALL AREA

OFFICE

STAFF ROOM

NEW WOODEN PARTITION

ADMINISTRATION

MAIN ENTRY

EXIST. LOW CMU WALL TO REMAIN
ADD WOODEN PARTITION THRU CEILING

NEW TOILET/SHOWER

NEW 6" CMU WALL

NEW TOILET

NEW DOOR

SERVICE DOOR

NEW EXTEND TIN ROOF
CANOPY/ROOF

LAV.

URINAL

14'-8"

14'-7"

14'-4"

14'-6"

14'-7"

11'-3"

26'-3"

14'-6"

6'-0"

30'-8"

14'-0"

2'-9"

6'-0"

14'-3"

3'-0"

4'-6"

14'-8"

9'-0"

22'-0"

# EXHIBIT B
**JANUARY 17, 2006, NOTICE OF DEFAULT AND VIOLATIONS**

# JOAQUIN Q. ATALIG
## P.O. BOX 965 • ROTA, MP • 96951

January 17, 2006

Mr. Brian M. Chen
Resident Manager
OKP (CNMI), CORPATION
P.O. Box 10001, PMB A-25
Saipan, MP 96950

      Re: NOTICE OF DEFAULT AND VIOLATIONS re Lease Agreement for improvements on Lot No. 362 R 01.

Dear Mr. Chen:

A recent site inspection of my property in Rota, which your company OKP (CNMI) Corporation is leasing, revealed that OKP (CNMI) Corporation has defaulted on certain provisions of the Lease Agreement with me (1) by damaging and/or destroying historical artifacts, structures and other valuable relics, including but not limited to, latte stone clusters, a large Japanese memorial, a Japanese shrine, water tank, washing basin and frame, and areas surrounding Japanese building(s), (2) by damaging and/or destroying permanent trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants, (3) by damaging and/or destroying preexisting buildings/improvements to the land, including but not limited to, the laundry, storage, and kitchen facilities, (4) by placing a fuel tank on my property, and (5) by moving and/or removing soil, without my prior written consent, all in violation of sections 6 and 13 of the Lease Agreement. On information and belief, OKP (CNMI) Corporation may also be in violation of CNMI and Federal laws. As OKP (CNMI) Corporation knows or should know, OKP (CNMI) Corporation is obligated to comply with CNMI and United States laws.

Needless to say, OKP (CNMI) Corporation has caused me tremendous loss, embarrassment, and damages (past, present, and future) due to the intentional violations of the Lease Agreement and OKP (CNMI) Corporation's unlawful activities.

Therefore, OKP (CNMI) Corporation is hereby put on notice, pursuant to section 15 of the Lease Agreement, that OKP (CNMI) Corporation has violated and defaulted on the Lease Agreement. OKP (CNMI) Corporation is hereby given thirty (30) days from the date of this notice to cure the above-noted violations and default which may be cured. Failure to comply with this notice may result in the immediate termination of the Lease Agreement pursuant to section 16 of the Lease Agreement.



*Ltr. to Mr. Chen re: Notice of Default and ... iolations.*
*Page 2 of 2*

Moreover, OKP (CNMI) Corporation is also hereby put on notice, pursuant to section 15 of the Lease Agreement, that the destruction of the historical artifacts, structures, and other valuable relics, and the destruction of permanent trees are of such a nature that the same cannot be cured or corrected within thirty (30) days, thus, OKP (CNMI) Corporation is in automatic default of the Lease Agreement.

As usual, I am open to further discussions in order to come to a reasonable and proper settlement and resolution of this matter, rather than terminating the Lease Agreement at this time or resorting to a lawsuit in the first instance. Therefore, please give me a call as soon as possible in order to resolve this matter quickly and amicably.

Thank you for your anticipated cooperation.

Sincerely,

/s/

JOAQUIN Q. ATALIG

# EXHIBIT C
**FEBRUARY 7, 2006 LETTER FROM OKP COUNSEL**

# TORRES BROTHERS, LLC.

### ATTORNEYS AT LAW

BANK OF GUAM BUILDING, THIRD FLOOR
P.O. BOX 501856
SAIPAN, MP 96950
TEL: (670) 233-5504/6  FAX: (670) 233-5510

Victorino DLG. Torres, Esq.
Joaquin DLG. Torres, Esq.
Vincent DLG. Torres, Esq.

February 07, 2006

Joaquin Q. Atalig
P.O.Box 965
Rota, MP 96950

RE:    *OKP Corporation/Notice of Default*

Dear Mr. Atalig:

This is to inform you that my firm represents OKP Corporation. I humbly inform you that I've received your letter dated January 17, 2006 and have discussed its' contents with my clients. I have also reviewed your contract with OKP and I regret to inform you that your claims in your January letter is not substantiated for the following reasons:

(1) Section 6 of the Lease Agreement specifically states that:

> Lessee may use, improve and develop the Premises or any part thereof for any lawful use or purpose, provided that the Lessee does not commit waste, but primarily as office, barracks, equipment repair shop and workstation, heavy and lightweight equipment parking and storage . . ..

The section above does not mention that OKP cannot remove trees, buildings, structures, soil, or any of the items you mentioned on your January letter. As a matter of fact, the plain reading of the language above permits OKP to use the property in any way as long as it is lawful and does not commit waste.

(2) Section 13.1 specifically states that:

> Alterations/Building, etc. The Lessee shall have the right during the term of this Lease, to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvement on the premises . . ..

It is clear that my client have the rights to remove or do anything with the existing structures and to build other such building. If there is any ambiguity in that section, then it will be held against the drafter, YOU.

(3) Let me also inform you that if there is any ambiguity in the contract or if sections conflict each other, the courts have always held against the drafter of the contract. Especially if the drafter had the advise of an Attorney and the other party did not have the advise from an attorney. In other words, you had your attorney present when the lease agreement was signed and my client did not have the benefit of any advise from any attorney. Any ambiguity, such as those rights given to my clients, will be held in favor of my clients.

(4) Lastly, you did not mention to my clients the existence of historical artifacts, latte stones, or Japanese Memorial. You never mentioned either in writing or orally their existence on the leased premises. The first time that my clients heard that these items are on the property is when they read your January letter. It is our contention that if these items were in fact preset, it was your duty to inform your tenants of such items.

For the foregoing reasons, it is ourtcontention and position that OKP Corporation did not violate any of the terms of the lease agreement. Therefore, unless you can specify what actions OKP did that directly violated any of the terms in the Lease Agreement, OKP has not defaulted and section 15 is not applicable at this point.

It is unfortunate that you have taken an unnecessary position that is contrary to the only Lessee's that choose to give you business. It this ailing economy, we suggest that you work with OKP instead of against them.

Thank you for your time and attention to this matter. Let me know if there is any other matter that you want dealt with. With this, we hope that you support OKP in its project because there are more business in the future we can be beneficial to both OKP and yourself.

Please do not hesitate to call me if you have any other question or comments.

Si Yu'us Ma'ase,

Joaquin DLG. Torres
Attorney for OKP Corporation

# EXHIBIT D
FEBRUARY 21, 2006 LETTER FROM ATALIG COUNSEL



# LAW OFFICES OF
# RAMON K. QUICHOCHO, LLC
2ⁿᵈ Floor • V.S. Sablan Building • Chalan Piao
P.O. Box 505621 • Saipan, MP • 96950
Phone: 670.234.8946
Fax: 670.234.8920
E-mail: rayq@vzpacifica.net

February 21, 2006


Joaquin DLG. Torres, Esq.
TORRES BROTHERS, LLC.
Attorneys at Law
Bank of Guam Building, Third Floor, Garapan
P.O. Box 501856
Saipan, MP 96950

  Re: OKP (CNMI) Corporation/Notice of Default.

Dear Jack:

I represent Mr. Joaquin Q. Atalig. This letter is in response to your letter to my Client dated February 7, 2006.

First, you are mistaken that the language in the Lease Agreement "permits OKP to use the property in any way as long as it is lawful and does not commit waste." Emphasis added. Pursuant to the Lease Agreement, "[t]he Premises consist of all improvements situated on the real property…together with the right to use Lessor's easements and appurtenances in adjoining and adjacent land, highways, roads, streets, lanes, whether public or private, reasonably required for the installation, maintenance, operation and service of sewer, water, gas, power and other utility lines and for driveways and approaches to and from abutting highways or streets for the use and benefit of the above-described improvements and the parcel of real property described below," not just any part of the property.

Although you are correct that Section 6 of the Lease Agreement "does not mention that OKP cannot remove trees, buildings, structures, soil, or any of the items" mentioned in Mr. Atalig's January letter, the Lease Agreement does not permit the removal of trees, buildings, structures, soil, or any of the items mentioned in Mr. Atalig's January letter, from Mr. Atalig's property.

Furthermore, such removal and destruction as mentioned in Mr. Atalig's January letter constitutes waste and is unlawful because OKP (CNMI) CORPORATION has damaged and/or destroyed recorded historical artifacts, structures, other valuable relics, plants, and trees. Additionally, my Client did not consent to the damage and/or destruction that was committed by your client on my Client's property.



MAILED ON
2-22-06
2:35 P



Second, you are mistaken that your "client [has] the rights to remove or do anything with the existing structures and to build other such building." You cited section 13.1 of the Lease Agreement to support your position. You, however, failed to acknowledge the necessity of my Client's written consent in the event that any erection, maintenance, alteration, remodeling, reconstruction, rebuilding, replacement, and removal of any buildings and other improvement on the <u>Premise</u>. Specifically, section 13.1 states

> The Lessee shall have the right during the term of this Lease, to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove building and other improvement on the Premise, and correct and change the contour of the Premises pursuant to the plans and drawings attached hereto as Exhibits "A" and "B", and incorporated herein as part of this agreement by reference, <u>only with the prior written consent of Lessor. Any other alterations and changes require Lessor's consent in writing.</u>

Section 13.1 of the Lease Agreement (emphases added). If you are saying that your client has a written consent from my Client, please provide such document as soon as possible so that I can advise my Client accordingly. Clearly, there is no ambiguity in section 13.1 of the Lease Agreement. Similarly, there are no conflicting provisions in the Lease Agreement. If you should maintain that there is ambiguity in section 13.1 of the Lease Agreement, please let me know which specific word, phrase, or sentence you consider to be ambiguous. Similarly, if you should maintain that there are conflicting provisions in the Lease Agreement, please let me know the specific provisions that you say are in conflict.

Third, you are mistaken that my Client did not mention to your clients the existence of historical artifacts. For your information, during negotiations, your client was made aware of the historical artifacts. In any case, your client knows or should have known[1] that before any land-clearing activities are done, different permits from the regulatory agencies are required. As we all know, "ignorance of the law is not a valid excuse." The problem is that your client did not disclose its intent to ravage and destroy my Client's property unlawfully and without my Client's knowledge or written permission.

Fourth, you are mistaken that OKP did not violate any of the terms of the Lease Agreement. Please see Mr. Atalig's January 17, 2006 Notice of Default and Violations. Since OKP failed to take responsibility, much less cure the default and violations as provided for in the Lease Agreement, OKP has forced my Client to take further legal action to protect his rights and property if OKP continues to arrogantly ignore its responsibilities under the Lease Agreement.

Fifth, you are mistaken that my Client has "taken an unnecessary position that is contrary to <u>the only Lessee's</u> (sic) that choose to give you business." Emphasis added. You certainly did not have to take such cheap shot against a well-respected citizen of Rota, especially, when your facts are false. It is very unprofessional and disrespectful. Although I understand that you are

---

[1] Of course, your client cannot now claim ignorance of the law when it received a multi-million dollar contract from the CNMI Government to improve the runway in Rota. I am sure that your client is, at all relevant times, aware of the legal requirements before any major land-clearing activities are conducted.

advocating for your client, it is no excuse to forget your heritage and responsibility to our *Man Amko'*.

In other words, rather than blame my Client for OKP's wrongdoings, why do not we try to resolve this matter amicably. Furthermore, although my Client appreciates the business relationship with your client, your client is also receiving the benefits of my Client's property and improvements, but the fact remains that your client violated the Lease Agreement and Commonwealth laws, and thus, is in serious default of the Lease Agreement.

Therefore, if you are willing to explore an amicable resolution to this matter, please feel free to call me. If I do not hear from you within 10 days, I will assume that you and/or OKP are not willing to settle this matter short of litigation.

If you should have any questions, please feel free to contact me. Thank you.

Sincerely,

RAMON K. QUICHOCHO, ESQ.

Cc:    Client