# Exhibit 19C



E-FILED
CNMI SUPERIOR COURT
E-filed: Oct 26 2007 4:24 PM
Clerk Review: Oct 30, 2007
Filing ID: 16823723
Case Number: 06-0119-CV
Rosie Ada

1  REXFORD C. KOSACK
   GLENN A. JEWELL
2  DOUGLAS DALEY
   LAW OFFICES OF REXFORD C. KOSACK
3  Bank of Hawaii Bldg., Third Floor
   P.O. Box 500410
4  Saipan, MP 96950
   Telephone: (670) 322-8800
5  Fax: (670) 322-7800

6  Attorneys for Defendant Brian M. Chen

7  BRUCE L. MAILMAN
   MAYA B. KARA
8  Mailman & Kara, LLC
   PMB 238 PPP, Box 10,000
9  Saipan, MP  96950
   Tel: (670) 233-0081
10 Fax: (670) 233-0090

11 CARLSMITH BALL, LLP
   SEAN E. FRINK
12 Carlsmith Building, Capitol Hill
   P.O. Box 5241
13 Saipan, MP  96950-5241
   Tel: (670) 322-3455
14
   Attorneys for Defendants:
15 OKP (CNMI) Corporation
   Prasada Reddy Goluguri
16 Pramuan Jaiphakdee
   Wilai Promchai
17

18          IN THE SUPERIOR COURT OF THE COMMONWEALTH
               OF THE NORTHERN MARIANA ISLANDS
19

20 JOAQUIN Q. ATALIG,                    )    Civil Action No. 06-0119(R)
                                         )
21              Plaintiff,               )
                                         )
22         vs.                           )
                                         )
23 OKP (CNMI) CORPORATION, BRIAN M.      )
   CHEN, PRASADA REDDY GOLUGURI,         )
24 PRAMUAN JAIPHAKDEE, WILAI PROMCHAI,   )
   and DOES 1-3,                         )
25                                       )    Presiding Judge Robert C. Naraja
              Defendants.                )    Date:   December 10, 2007
26 ──────────────────────────────────────)    Time:  10:00 a.m.

27

28   **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**

     **DEFENDANTS' SUMMARY JUDGMENT MOTION RE: BREACH OF CONTRACT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Introduction**

This motion seeks summary judgment as to Plaintiff's breach of contract claim, which actually consists of ten different claims, stated in the First Cause of Action.

**I.**

**SUMMARY JUDGMENT LAW**

**A.    Summary Judgment is Favored by the Courts**

Since 1986, the United States Supreme Court has favored the use of summary judgment as a means of securing the just, speedy and inexpensive determination of lawsuits.

> Summary judgment procedure is **properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole**, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed. Rule Civ. Proc. 1 . . . .

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (emphasis added).

Summary judgment works to serve the purpose of the rules of civil procedure by piercing the allegations of the complaint to see if there is evidence to support them. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . ." *Id.* at 323-24.

**B.    The Issue Is Not Whether the Plaintiff Can Present *Some* Evidence in Support of Its Claim, But Whether It is *Enough* Evidence For a Jury to Find for the Plaintiff**

How much factual support must there be for a claim to survive summary judgment? At one time, a court had to leave a claim for the jury to determine if a party could produce even a "scintilla of evidence," that is, just *some* evidence in support of an allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). That test has been squarely rejected. Now, "a judge must ask himself . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252. This is the directed verdict standard. *Id.* at 250.

This standard is embodied in Rule 56(c) in the phrase "genuine issue of material fact." The term "material fact" looks to the *substantive law* of the claim. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. The

1

1  term "genuine dispute" looks at the *quantum of evidence* which is the underpinning of the dispute.

2  As just stated, there must be sufficient evidence that "a reasonable jury could return a verdict for the

3  nonmoving party." *Id.*  It is not enough if the evidence is "merely colorable."  Instead, it must be

4  "significantly probative." *Id.* at 249-250.  The touchstone of the test is "whether there is a need for

5  a trial." *Id.* at 250.

6      As in a directed verdict motion, the court is called on in the motion to determine the

7  sufficiency of the plaintiff's evidence.

8      When determining if a genuine factual issue as to actual malice exists in a libel suit
   brought by a public figure, **a trial judge must bear in mind the actual quantum**
9  **and quality of proof necessary to support liability** under *New York Times*.  For
   example, there is no genuine issue if the evidence presented in the opposing
10  affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find
   actual malice by clear and convincing evidence.
11

12  *Id.* at 254 (emphasis added).

13      Thus, it is only when the Plaintiff presents evidence of sufficient caliber and quantity to

14  permit a reasonable jury to find in favor of the Plaintiff that a "genuine issue" arises.

15  **C.    The Defendant May Merely Point Out A Lack of Evidence to Shift the Burden of
      Producing Evidence to the Plaintiff in the Motion**

16

17      An important issue is how the burden of persuasion is divided among the parties when a

18  defendant brings a summary judgment motion that tests the allegations of the complaint.  There is

19  no requirement that the defendant produce evidence, such as affidavits, in support of its motion.  The

20  defendant may proceed in one of two ways: (1) it may submit evidence that disproves an essential

21  element of the plaintiff's claim, or (2) it may choose not to submit evidence, and merely demonstrate

22  that the plaintiff's evidence is insufficient to establish an essential element of its claim. *Celotex,* 477

23  U.S. 317, 323-325.  This motion will test the legal sufficiency of the breach of contract claims based

24  on admitted pleadings, discovery materials, and the Declaration of Brian M. Chen.  We will show

25  that a reasonable jury could not find the existence of a breach of contract in this case.

26                              **UNDISPUTED FACTS**

27      The following "facts" are undisputed for the purpose of this motion only:

28  1. Plaintiff brings his breach of contract action under the Lease Agreement marked as

2

1    Exhibit "F" in the Second Amended Complaint ("SAC"), and which is attached hereto.

2        2. On January 17, 2006, Plaintiff sent the notice of default letter to OKP which is marked

3    as Exhibit "G" in the SAC, and which is attached hereto.

4        3. Plaintiff saw three OKP people around 5:00 in the morning in a pickup truck

5    unloading a deer from the pickup truck and it was not hunting season. Deposition of Joaquin Q.

6    Atalig, pp. 348-352.

7        4. When asked what he saw, Atalig said he saw them "riding in their trucks," "hear them

8    shooting," and "also I saw them unloading." *Id.* at 348, ll. 21-22.

9        5. He heard rifle shots. *Id.* at 353, ll. 1-2. He was asked: "You hear rifle shots?" The

10    answer was: "They drove their truck up to the command post." *Id.* at ll. 6-7.

11        6. The command post at Ginalangan is off the Plaintiff's property. SAC ¶ 15.

12        7. He was asked: "So, do you know if they were actually hunting on your property?" *Id.*

13    at ll. 8-10. He replied: "I'm not sure whether they were hunting on my property, but when I

14    heard the shot, it wasn't public land. It's further to the command post." *Id.* at ll. 11-13.

15        8. He was asked: "Do you have any further information regarding the hunting that

16    somebody else told you about and the OKP people hunting?" He replied: "No." *Id.* at 353, ll.

17    20-23.

18        9. Plaintiff's attorney drafted the Lease Agreement. *Id.* at 1091, ll. 18-21. Declaration of

19    Brian M. Chen, ¶ 7.

20        10. A fuel tank was installed on Plaintiff's premises during the lease term. It was never

21    used. Fuel was never placed in the tank. *Id.* at ¶¶ 4, 5.

22        11. Before the end of the lease term and the return of the premises to Plaintiff, the fuel

23    tank was removed from the premises. No trace remained of it at the end of the lese term. ¶ 6.

24        12. Due to anticipated problems with mud in the area that had been cleared, OKP

25    removed the topsoil and stockpiled it. It put down one to two truckloads of crushed coral. OKP

26    Deposition at 239-40.

27        13. When OKP was about to leave the Atalig property at the end of the lease, it returned

28    the stockpiled topsoil to the cleared area. It added to the cleared area an additional 18 to 20

1  truckloads of high quality topsoil that it had obtained from the airport project. *Id.* at 240.

2                                          **I.**

3  **THE PROMISE TO LEASE FURNITURE TO BE AGREED UPON IN THE FUTURE**

4  **IS AN AGREEMENT TO AGREE AND IS SUBJECT TO A CONDITION**

5  **WHICH HAS NOT OCCURRED**

6  **A.    Plaintiff Claims OKP Failed to Agree on Furniture That It Would Lease**

7          Section 1 of the Lease Agreement describes the premises that are leased by Plaintiff.

8  Primarily, this is Lot No. 362 R 01 and its improvements. Ex. "F" to FAC (attached hereto).

9  Included in Section 1 is the following statement:

10               Moreover, Lessee leases, as part of the agreement, furniture, fixtures,
             appliances, and tools, which are all itemized in **the List of Inventory which will**
11           **be verified and approved by both parties on or before November 30, 2005.**
             The verified and approved List of Inventory shall be incorporated herein and made
12           a part of this Lease by this reference.

13  *Id.* (Emphasis added.)

14         The Second Amended Complaint alleges that OKP breached the Lease because "OKP

15  reneged on the promise to lease furniture, fixtures, appliances, and tools, which forced Plaintiff

16  Atalig to incur storage costs for the furniture, fixtures, appliances, and tools that were not leased

17  by Defendant OKP in violation of Section 1 of the Lease." SAC ¶ 88(a).   The Lease Agreement

18  was executed by the parties on November 2, 2005. SAC ¶ 47.

19         In short, the Lease Agreement was signed by the parties on November 2 and stated that

20  they would add to the lease some furniture and appliances which would be put in a List of

21  Inventory to be approved by both parties on or before November 30.  Plaintiff claims OKP

22  "reneged" on this promise.

23  **B.    Plaintiff Has Failed to Comply With A Condition Precedent to Suit On This Ground**

24         The Lease Agreement specifically provides for notice of default and a thirty day

25  opportunity to cure prior to the Lessor being able to exercise any remedies:

26               16.  LESSOR'S REMEDIES: In the event Lessee breaches this Lease **and**
             **fails to make correction within the time period provided**, the Lessor may
27           exercise any of the remedies available to the Lessor in law or in equity . . . .

28  Exhibit "F" (emphasis added).

                                          4

1    This is classic language of a condition.  RESTATEMENT (SECOND) OF CONTRACTS § 224.

2    The Lessor may exercise his remedies in the event that (1) the Lessee breaches the Lease, and (2)

3    the Lessee fails to make correction within the time period.  The "time period" is described in the

4    section on Default which precedes the section on Remedies.

5              15.  <u>DEFAULT</u>: Lessee shall be in default in the prompt and full
        performance of any other term, covenant, or condition of the Lease, (except as to

6        payment of rent), and if **such default shall continue for a period of thirty (30)**
        **days after notice of such default is given by the Lessor to Lessee**, unless the

7        default is of such a nature that the same cannot be cured or corrected within said
        thirty (3) day period and the Lessee shall have promptly and diligently

8        commenced to cure and correct such default and shall have thereafter continued
        therewith with reasonable diligence and in good faith, in a manner as to cure and

9        correct the same as promptly and as reasonably practicable under the
        circumstances, and shall have continued therewith until the default shall have

10       been cured or corrected.

11   Exhibit "F" (emphasis added).

12         Plaintiff's access to the courts is conditioned upon his first giving OKP a thirty-day notice

13   of the default and opportunity to cure.  Stated differently, it is a condition to OKP's duty to pay

14   damages that Plaintiff give OKP a notice of default and an opportunity to cure.  "Performance of

15   a duty subject to a condition cannot become due unless the condition occurs or its non-

16   occurrence is excused."  RESTATEMENT (SECOND) OF CONTRACTS § 225(1).

17         The Plaintiff obviously understands that giving a notice and opportunity to cure is a

18   condition to his ability to seek legal or equitable remedies.  He pleads that he provided such

19   notice on January 17, 2006 and attaches a true and accurate copy of that notice as Exhibit "G" to

20   the First Amended Complaint.  SAC ¶ 66.  The letter states: "OKP (CNMI) Corporation is

21   hereby given thirty (30) days from the date of this notice to cure the above-noted violation and

22   default which may be cured."  Exhibit "G" to FAC (attached hereto).  The notice lists five

23   alleged breaches – but <u>does not list the failure to agree on the rental of furniture and appliances</u>.

24         Therefore, the condition to bringing this claim to court has not been satisfied.  The Court

25   must grant OKP summary judgment for the claim brought under paragraph 88a.

26   **C.    The Promise Cannot Be Enforced As There is No Agreement Beyond an Agreement**

27   **       to Agree in the Future as to Items to Be Leased**

28         The promise made by the parties was to agree to a List of Inventory of items which would

5

1  be leased by Plaintiff to OKP.  Plaintiff's claim is that this agreement was not reached.  He seeks

2  as damages the cost of storing all of his furniture, fixtures, appliances, and tools.  The obvious

3  issue that arises is, what proof does Plaintiff have that the parties would have agreed to lease all

4  of his items?  The Court cannot supply as a missing term what it believes the parties would have

5  agreed to.

6       The agreement to reach a *future* agreement as to which furniture, fixtures, appliances, and

7  tools would be leased is a classic agreement to agree.  "There is no dispute that neither law nor

8  equity provides a remedy for breach of an agreement to agree in the future.  Such a contract

9  cannot be made the basis of a cause of action.  The court may not imply what the parties will

10 agree upon." *Autry v. Republic Productions, Inc.,* 180 P.2d 888, 893 (Cal. 1947) (citations

11 omitted) (contract of a movie actor during WW II that stated in event of military service the

12 studio and the actor would agree upon their mutual rights and obligations is unenforceable).

13      In *Ablett v. Clauson,* 272 P.2d 753 (Cal. 1954), a five-year lease had a option for a five-

14 year renewal term upon terms to be then agreed upon.  The landlord refused to renew, so the

15 tenant sued to enforce its right to the second term.  The California Supreme Court held the option

16 was too uncertain to make it enforceable.

17      The general rule regarding contracts to agree in the future is stated to be as
   follows: "Although a promise may be sufficiently definite when it contains an
18 option given to the promisor or promisee, yet **if an essential element is reserved
   for the future agreement of both parties, the promise can give rise to no legal
19 obligation until such future agreement.**  Since either party by the terms of the
   promise may refuse to agree to anything to which the other party will agree, it is
20 impossible for the law to affix any obligation to such a promise." (1 Williston,
   Contracts (Rev.ed. 1936) 131, § 45.)  The rule is well established in this state . . . ,
21 and, in conformity with the weight of authority in other states . . . it has been held
   that an option agreement which leaves an essential term to future agreement is not
22 enforceable.

23 *Id.* at 756 (emphasis added) (citations omitted).  *See also Patriotic Scientific Corp. v. Korodi,*

24 1007 U.S. Dist LEXIS 38279 (S.D. Cal. 2007).

25      A requirement of every contract is that its basic terms must be definite and certain.

26 RESTATEMENT (SECOND) OF CONTRACTS § 33.

27      The terms of a contract are reasonably certain if they provide a basis for
   determining the existence of a breach and for giving an appropriate remedy.
28

6

1  § 33(2).

2      Plaintiff and OKP agreed to enter into a lease of furniture and appliances in the future,

3  and at that time they would agree on which items to include in the lease. That agreement was

4  never reached. Without question, the identity of what would be leased is an essential term. It is

5  not a term that this Court could imply into the Lease Agreement. As it is missing, there is no

6  basis for awarding damages. The Plaintiff seeks his cost of storing all his items; yet, that

7  assumes that the parties would have agreed to the lease of all his items. Instead, the parties may

8  have agreed, for example, only to the lease of one lamp. Thus, the storage costs Plaintiff seeks

9  would have been incurred in any event. This demonstrates how futile it is to seek enforcement of

10  an agreement that is missing its essential terms because the parties planned to reach an agreement

11  on those terms at a later date.

12      The Restatement addresses agreements that do not constitute contracts because terms

13  have been left open or because the parties intend to reduce it to "another written form."

14      [I]f either party knows or has reason to know that the other party regards the
        agreement as incomplete and intends that no obligation shall exist until other
15      terms are assented to or until the whole has been reduced to another written form,
        the preliminary negotiations and agreements do not constitute a contract.
16
   § 27, cmt. "b."
17
18      In this case, both parties knew that the agreement to lease furniture and appliances is

   incomplete and that it would not be completed until November 30. Both knew that additional
19
   terms need to be assented to. Both knew that the identity of the objects to be leased would be
20
   included in another writing, the List of Inventory. These things are all specified in Section 1.
21
   Thus, both parties had to understand that theirs was a preliminary agreement and not yet a
22
   contract.
23
24      Therefore, summary judgment must be granted to OKP as to that part of the breach of

   contract claim set forth in paragraph 88(a) (the promise to lease furniture and appliances) for this
25
   second reason.
26
   ///
27
28

7

1

II.

2

**THE PROMISE TO PAY THE SALARIES OF EDITA AND ESTHER IS**

3

**SUBJECT TO A CONDITION THAT HAS NOT OCCURRED AND PLAINTIFF**

4

**HAS SUFFERED NO DAMAGES**

5    **A.    Plaintiff Claims OKP Failed to Pay the Salaries of Edita and Esther As Promised**

6         Section 3 of the Lease Agreement addresses rent.  It states that the rent shall be $37,500

7    and it adds:

8         As further consideration, Lessee covenants and agrees to pay the full-time salaries
          of two employees of Lessor, namely, Edita and Esther, at $4.50 per hour and
9         $3.50 per hour, respectively.

10   Exhibit "A."

11        The Second Amended Complaint alleges that OKP breached the Lease because:

12   "Defendant OKP has failed to pay the full-time salaries of Ms. Carillo and Ms. Langit at the rate

13   of $4.50 per hour and $3.50 per hour, respectively, as agreed, in violation of Section 3 of the

14   Lease."  ¶ 88(b).  The employees named in the Lease, Edita and Esther, are identified by the

15   complaint as Ludivina P. Carillo and Ester M. Langit, respectively.  ¶ 54.

16   **B.    Plaintiff Has Failed to Comply With A Condition Precedent to Suit on this Ground**

17        In the prior discussion we showed how there must be a notice of default and a thirty day

18   cure period for breaches under Sections 15 and 16 of the Lease Agreement.  There is an

19   exception that applies here, though.  When the alleged default is the payment of rent, the cure

20   period is shortened to only fifteen days:

21        Lessee shall be in default in the payment of rent if rent is not paid within
          15 days after it is due and such default shall continue for a period of fifteen (15)
22        days after notice of such default and the default is not cured within the 15 days.

23   Section 15.

24        The remainder of the argument, however, is the same.  The Plaintiff's ability to seek a

25   remedy for the nonpayment of rent is conditioned upon his compliance with this notice condition.

26        16.  LESSOR'S REMEDIES: In the event Lessee breaches this Lease **and
          fails to make correction within the time period provided**, the Lessor may
27        exercise any of the remedies available to the Lessor in law or in equity . . . .

28   Exhibit "F" (emphasis added).

8

1  The promise to pay the salaries of Ludivina Carillo and Ester Langit is found in the

2  section on rent. Thus, Plaintiff had the benefit of the shortened period for notice and cure. But,

3  Exhibit "G," the notice letter, does not list the failure to pay these women their salaries as a

4  default. There is no evidence that Plaintiff complied with this condition precedent to his seeking

5  a remedy at law or in equity. Thus, Plaintiff cannot sue OKP on this ground. Summary

6  judgment should be granted to OKP as to the allegation found in paragraph 88(b).

7  **C.    Plaintiff Has No Actual Damages Due to the Alleged Nonpayment of Salaries**

8  If we assume that OKP failed to pay these women their salaries as stated in the Lease

9  Agreement, the question arises as to whether Plaintiff has suffered any actual damages. Nowhere

10  in the complaint does he allege that he had to pay these salaries when OKP failed to. Nowhere

11  does he allege that the nonpayment cost him anything. The Plaintiff has no evidence that he

12  suffered any actual damages due to the nonpayment of these salaries. Thus, the Plaintiff is

13  entitled to no more than nominal damages. RESTATEMENT (SECOND) OF TORTS § 346(2). We

14  ask for summary judgment that: (1) grants judgment to OKP because Plaintiff failed to comply

15  with a condition precedent to bringing this action, or (2) if the Court finds the condition was met,

16  that the Plaintiff is entitled to only nominal damages.

17  **III.**

18  **PLAINTIFF HAS NO EVIDENCE THAT OKP HUNTED**

19  **FOR DEER AND FRUITBAT ON ATALIG'S PROPERTY**

20  **A.    Plaintiff Claims OKP Illegally Hunted for Deer and Fruitbat on his Property**

21  Section 6 of the Lease Agreement provides:

22  6.    USE OF PREMISES: Lessee may use, improve and develop the
       Premises or any part thereof for any lawful use or purpose provided
23       that Leseee does not commit waste . . . .

24  Exhibit "F."

25  The Second Amended Complaint alleges that OKP breached the lease because:

26  "Defendant OKP, including its agents, representatives, and employees have illegally hunted for

27  deer and fruitbat on Plaintiff Atalig's land in violation of Section 6 of the Lease and in violation

28  of the laws of the CNMI." ¶ 88(c).

9

1  Plaintiff testified in his deposition that he saw three OKP people around 5:00 in the

2  morning in a pickup truck unloading a deer from the pickup truck and it was not hunting season.

3  Fact 3.  When asked what he saw, he replied that he saw them "riding on their trucks," "hear

4  them shooting," and "also I saw them unloading."  Fact 4.  He heard rifle shots.  'You heard rifle

5  shots?  Answer: They drove their truck up to the command post."  Fact 5.  As the command post

6  at Ginalangan is off his property (Fact 6), he was asked: "So, do you know if they were actually

7  hunting on your property or if maybe they were hunting on public property or someone else's

8  property?"  Fact 7.  Atalig replied: "**I'm not sure whether they were hunting on my property**,

9  but when I heard the shot, it wasn't public land.  It's further to the command post."  Fact 7.

10  Thus, the evidence is that Atalig does not have personal knowledge whether OKP was hunting on

11  his property.  The answer leaves the possibility that the hunting could have been on someone

12  else's property.

13  Section 6 of the Lease Agreement addresses only the use of Plaintiff's land.  If OKP had

14  hunted illegally at the Ginalangan Defensive Complex, which is off his property, or upon a

15  neighbor's land, this activity would not breach the lease.  Plaintiff's testimony shows that he has

16  no personal knowledge of where the hunting was carried out; thus, he cannot prove his case.[1]

17  Summary judgment must be granted for Defendant OKP as to the allegation in paragraph 88(c).

18  **IV.**

19  **PLAINTIFF HAS NO EVIDENCE THAT OKP STOLE ROCKS FROM**

20  **THE GINALANGAN DEFENSIVE COMPLEX, AND EVEN IF IT WERE TRUE,**

21  **THIS IS NOT A BREACH OF THE LEASE**

22  **A.    Plaintiff Claims That OKP Stole Rocks From the Ginalangan Defensive Complex to**

23  **Cover Up Damage to the Japanese Water Tank, But Has No Proof**

24  Plaintiff alleges in the Second Amended Complaint:

25  On information and belief, Defendant OKP, including its agents, representatives,
26  and employees have stolen rocks and other materials from the Ginalangan

27  ──────────────────

[1]He was also asked: "Do you have any other information regarding the hunting that

28  somebody else told you about and the OKP people hunting?"  He replied: "No."  Fact 8.

10

1   Defensive Complex in their attempt to cover up the damage and destruction to the
    historical Japanese water tank.  The stolen rocks are laid and stacked up on the
2   Japanese water tank, which Defendant OKP has re-plastered to pretend that there
    is no damage.  As a result, Defendant OKP violated Section 3 of the Lease, and
3   the laws of the CNMI . . . .

4   SAC ¶ 88(d).

5       Under *Celotex*, we assert that the Plaintiff has no evidence that shows that OKP stole

6   rocks or other materials from the Ginalangan Defensive Complex.  No evidence of this activity

7   was uncovered in discovery.  If Plaintiff has no evidence, summary judgment must be granted.

8   **B.      This is Not A Violation of Section 3 of the Lease, as Plaintiff Alleged**

9       Paragraph 88(d) alleges this supposed activity violates Section 3 of the Lease Agreement.

10  Section 3 is the "Rent" section, which has nothing to do at all with this allegation.  Thus, no

11  violation of the Lease is stated.

12  **C.      Plaintiff Failed to Give the Required Default Notice and Opportunity to Cure**

13      As we have already indicated, Section 16 makes it a condition of bringing suit in either

14  law or equity that the Plaintiff first give a notice of default (which is a 15-day notice for a

15  violation of § 3) and an opportunity to cure, as prescribed by Section 15, followed by a failure "to

16  make correction within the time provided."  Exhibit "G" to the First Amended Complaint gives

17  notice as to damage done to artifacts, including the water tank, but it does not give notice about

18  the activity alleged here – the stealing of rocks from the Ginalangan Defensive Complex.  Thus,

19  Plaintiff has failed to comply with a condition precedent to bringing suit.

20  **D.      The Act Alleged Did Not Occur on the Leased Premises**

21      Plaintiff complains that OKP has "stolen rocks and other materials from the Ginalangan

22  Defensive Complex" in paragraph 88(d).  This, however, is not a violation of the Lease

23  Agreement.  Even if one were to assume that this act did occur, the Ginalangan Defensive

24  Complex is not located on Plaintiff's premises.  Plaintiff admits this in the complaint: "As a

25  result of the Japanese occupation, the Japanese built other structures on Plaintiff Atalig's land,

26  which leads to the Ginalangan Defensive Complex."  SAC ¶ 15 (emphasis added).  Plaintiff's

27  land does not include the Complex, but "leads to" the Complex.

28      Plaintiff cannot complain about acts the lessee commits off the leased premises.  He

11

1  cannot complain about acts the lessee does on another's land, even if illegal. Nothing in the

2  Lease Agreement addresses acts done off of Atalig's property. Thus, even if these acts occurred,

3  they would not be the basis for declaring a default of the lease.

4      For these four reasons, summary judgment should be granted to OKP as to breach of

5  contract under the allegations of paragraph 88(d).

6  **V.**

7  **PLAINTIFF CANNOT SUE FOR BREACH OF CONTRACT FOR THE COMMISSION**

8  **OF WASTE ON HIS PROPERTY AS WASTE IS STATED AS A *CONDITION* OF USE,**

9  **NOT A *COVENANT* FOR WHICH HE CAN SEEK DAMAGES**

10  **A.**    **Subparagraphs 88(e), (f), (g), (h) and (I) Allege Waste in Violation of Section 6**

11      The next five subsections follow a pattern of pleading that states that "Defendant OKP,

12  including its agents, representatives, and employees have committed waste" by doing some act

13  "in violation of Sections 1 and 6 of the Lease." The various acts are: (e) damaging historical

14  artifacts, (f) damaging permanent trees, (g) damaging the laundry, storage, and kitchen facilities

15  and their contents, (h) placing a fuel tank station on the property without proper permits, and (I)

16  moving or removing soil without proper permits or authorization. Elsewhere we will address

17  whether some of these claims actually amount to waste, but in this section we will examine

18  whether Sections 1 and 6 of the Lease provide a basis for seeking damages for these allegations.

19      Section 1 is entitled "Premises" and merely describes Lot No. 362 R 01, its

20  improvements, and the future List of Inventory as what is being leased by the Lessor. It cannot

21  be violated as it contains no covenant. It is merely descriptive.

22      Section 6 was cited because it mentions the Lessee not committing waste, which is the

23  focus of these five allegations of the complaint. It states:

24          6. <u>USE OF PREMISES</u>: Lessee may use, improve and develop the
Premises or any part thereof for any lawful use or purpose, **provided that Lessee**

25  **does not commit waste** . . . .

26  Exhibit "F" (emphasis added).

27  **B.**    **Plaintiff Cannot Seek Damages for the Failure of A Condition**

28      A covenant is a promise between the parties. The breach of a covenant is a breach of

12

1   contract, and the nonbreaching party has a right to a remedy for the breach.  A condition is an

2   event, not certain to occur, which must occur before performance is due under a contract.

3   RESTATEMENT (SECOND) OF TORTS § 224.  Conditions are not breached.  If a condition does not

4   occur, the performance which is conditional is not due.  This is a significant difference.  The

5   breach of a covenant leads to damages, but the contract continues.  The failure of a condition

6   does not result in damages, but the contract is defeated.

7         If a remedy is predicated on a covenant, it is usually for the violator to respond in
          damages in an action at law, whereas the consequence of a breach of condition
8         upon which the estate is granted is a forfeiture of the estate.

9   *Housing Authority of Mansfield v. Rovig*, 676 S.W.2d 314, 317 (Mo. Ct. App. 1984).

10        The distinction is applied to leases just as it is applied to contracts:

11        Breach of a condition results in automatic termination of the leasehold estate upon
          the happening of the stipulated events.  Breach of a covenant does not
12        automatically terminate the estate, but instead subjects the breaching party to
          liability for monetary damages . . . .
13
    *Parten v. Cannon*, 829 S.W.2d 327, 330 (Tex. Ct. App. 1992).
14
15        Because of this distinction, many cases involve disputes over whether a clause creates a

16  condition or is a covenant.  The primary factor in determining these disputes is the language

17  chosen by the parties.

18        The determination of whether a particular clause or provision of a lease creates a
          covenant or condition **depends upon the intention of the parties as disclosed by
19        the language used** and, in case of ambiguous language, by the subject matter and
          surrounding circumstances.

20  *Housing Authority*, 676 S.W.2d at 317 (emphasis added).

21        The Restatement states that: "An event may be made a condition [] by the agreement of

22  the parties . . . ."  RESTATEMENT (SECOND) OF CONTRACTS § 226.  The comments note:

23        No particular form of language is necessary to make an event a condition,
          although such words as "on condition that," **"provided that"** and "if" are often
24        used for this purpose.

25  Com. "a" (emphasis added).

26        Section 6 of the Lease Agreement states: "Lessee may use, improve and develop the

27  Premises . . . **provided that** Lessee does not commit waste . . . ."  This is language of a

28  condition, not a covenant.

13

1     Words such as "on condition that," "if," and "provided," are words of condition,
2     and in the absence of indication to the contrary, the employment of such words in
     a contract creates conditions precedent.

3 *Fulton County v. Collum Properties, Inc.,* 388 S.E.2d 916, 918 (Ga. Ct. App. 1989) (quoting 6

4 EGL, Contracts, § 83).

5     As indicated by *Housing Authority,* the Court looks to the intention of the parties <u>as</u>

6 <u>disclosed by the language used</u>, and only if that language is ambiguous does the Court look to the

7 subject matter and the surrounding circumstances. This was demonstrated in *Fulton County,*

8 which looked only to the four corners of the contract.

9     "Where the terms of a written contract are clear and unambiguous, the court will
     look to the contract alone to find the intention of the parties." We find the
10    questioned terms of this contract are clear and are not ambiguous. Accordingly,
     we must examine the document on its four corners to determine the intention of
11    the parties.

12 *Id.* (citation omitted).

13     Plaintiff drafted the Lease Agreement. Atalig Deposition, p. 1091, ll. 18-21. Fact 9. He

14 chose to state that he was granting OKP the premises "provided that" OKP did not commit

15 waste. He conditioned his grant of the premises. The language used in the written document is

16 clear and unambiguous. There is no need to go any further to determine the intent of the parties.

17     Plaintiff now alleges that OKP committed waste. Thus, the condition he set for his grant

18 of the premises has failed. The leasehold estate terminated upon the failure of this condition.

19 Plaintiff's remedy was to seek repossession of the premises. He could have filed an unlawful

20 detainer action to seek immediate possession. What Plaintiff could not do is what he is now

21 attempting to do – sue for damages. He may only sue for damages when a covenant is breached.

22     This does not mean that Plaintiff has no remedy for any alleged waste. Clearly, he has

23 available the tort of waste. What he does not have available is an action under the Lease

24 Agreement with its provisions for attorneys' fees and indemnification.

25     Summary judgment should be granted to OKP (CNMI) Corporation on the breach of

26 contract claim which is based on paragraphs 88(e), (f), (g), (h), and (I).

27 ///

28

1

## VI.

2

**OKP DID NOT COMMIT WASTE BY PUTTING A FUEL TANK ON**

3

**PLAINTIFF'S LAND AND REMOVING IT AT THE END OF THE LEASE TERM**

4   **A.    Plaintiff Claims OKP Committed Waste By Putting A Fuel Tank Station on the**

5   **Premises Without Proper Permits**

6   One of the five instances where OKP allegedly breached the contract by committing

7   waste is when it placed a fuel tank station on Plaintiff's property without proper permits.  SAC

8   ¶88(h).  This is claimed to be a breach of Section 6 of the Lease Agreement which provides that:

9   "Lessee may use, improve and develop the Premises or any part thereof for any lawful use or

10  purpose, provided that Lessee does not commit waste . . . ."  We have already discussed whether

11  damages may sought for this alleged violation.  Now we will turn to the question of whether the

12  temporary placement of the fuel tank station on the Premises constituted waste.

13  **B.    A Change to the Premises Constitutes Waste Only if it Results in Permanent**

14  **Damage**

15  The concept of waste is rooted in protecting the reversionary interest of the lessor:

16      Voluntary waste as a concept stems from early English common law concern that
        the interests in land held by reversioners or remaindermen be protected from
17      depredations by life tenants of scarce natural resources (5 Powell, Real Property,
        par 637.  For instance, the cutting of trees or exhaustion of coal supplies were
18      regarded as waste because their effects extended well beyond the term of the
        tenant's temporary interest in the land or premises.  **It is the impingement upon**
19      **the ultimate estate of the landlord which is the keynote to the definition of**
        **waste** (Rasch, New York Landlord and Tenant [2d ed], § 455).

20

21  *Rumiche Corp. v. Eisenreich,* 352 N.E.2d 125, 128 (N.Y. App. Div. 1976) (no waste as no proof

22  of any permanent or lasting injury to the premises).

23  The issue posed by an allegation of waste is whether there is any harm done to the

24  ultimate holder of the estate, the landlord:

25      The tort of waste is defined as an "action or inaction by a possessor of land
        causing unreasonable injury to the holders of other estates in the same land."
26      Black's Law Dictionary 1589 (6th ed. 1990).

27  *Independence Lead Mines Co. v. Hecla Mining Co.,* 137 P.3d 409, 416 (Idaho 2006).  *See also*

28  *Hardie v. Chew Fish Yuen,* 258 Cal. App.2d 301 (Cal. App. 1968) ("[t]o constitute waste, there

1  must be an injury to the inheritance") (citations omitted) (applying California law).

2  **C.    The Fuel Tank Was Removed And No Harm Was Done to the Premises**

3  A fuel tank was installed on Plaintiff's premises during the lease term. It was never filled

4  with any fuel. It was never used. Fact 10. Before the end of the lease term and the return of the

5  premises to Plaintiff, the fuel tank was removed from the premises. No trace remained of the

6  fuel tank at the end of the lease term. Fact 11. There is no evidence that there was any injury to

7  the premises upon their return to the Plaintiff; therefore, Plaintiff did not commit waste and

8  Section 6 of the Contract was not breached.

9  **VII.**

10  **OKP DID NOT COMMIT WASTE BY TEMPORARILY REMOVING**

11  **SOIL ON THE SURFACE OF PLAINTIFF'S LAND, STOCKPILING IT, AND**

12  **THEN RETURNING IT TO THE PROPERTY AT THE END OF THE TERM**

13  **A.    Plaintiff Claims OKP Committed Waste by Moving or Removing Soil Without the**

14  **Proper Permits**

15  Another one of the five instances where OKP allegedly breached the contract by

16  committing waste is when it moved or removed soil without having proper permits. SAC ¶88(i).

17  This alleged breach is also based on Section 6 of the Lease Agreement. This act does not

18  constitute waste, however, as there was no permanent damage to the Premises.

19  As shown above in the section relating to the fuel tank, there must be some harm to the

20  plaintiff's reversionary interest in order for there to be a claim for waste. As also noted, "Use or

21  consumption which is actually beneficial to land, or increases its value, is not actionable."

22  *Hardie*, 258 Cal. App. 2d at 304.

23  **B.    OKP's Acts Did Not Diminish The Value of Plaintiff's Land**

24  OKP is entitled to summary judgment on this claim for two reasons. First, there was no

25  "unreasonable injury" to plaintiff's interest in the land. Second, instead of causing injury to the

26  land, OKP's actions actually increased the value of the land. These points are shown from the

27  following facts: (1) Due to anticipated problems with mud in the area that had been cleared, OKP

28  removed the topsoil and stockpiled it. It put down one to two truckloads of crushed coral. Fact

16

1   12; and, (2) When OKP was about to leave the Atalig property at the end of the lease, it returned

2   the stockpiled topsoil to the cleared area.  It added to the cleared area an additional 18 to 20

3   truckloads of high quality topsoil that it had obtained from the airport project.  Fact 13.

4        From these facts, it is clear OKP did not injure the land, but instead enhanced its value.

5   Thus, there is no evidence to support the claim of waste and summary judgment should be

6   granted on the breach of contract claim stated in paragraph 88(i).

7                                              **VIII.**

8   **PUNITIVE DAMAGES ARE NOT AVAILABLE FOR BREACH OF CONTRACT**

9   **CLAIMS UNLESS THE FACTS ALSO STATE AN INTENTIONAL TORT**

10       Plaintiff seeks punitive damages for breach of contract.  SAC ¶ 91.  In another motion we

11   sought summary judgment as to all punitive damages claims on the grounds that the Plaintiff is

12   unable to show that the Defendants acted in an outrageous manner.  In this motion addressing the

13   breach of contract claim, we raise a different defense – that punitive damages are not available

14   for a pure breach of contract claim.

15       In *Pangelinan v. Itaman*, 4 N.M.I. 114, 118-119 (1994), the Commonwealth Supreme

16   Court ruled:

17       RESTATEMENT [SECOND] OF CONTRACTS § 355 specifies that a plaintiff may not
18       recover punitive damages for breach of contract "unless the conduct constituting
         the breach is also a tort for which punitive damages are recoverable."

19       The Plaintiff's First Cause of Action, which purports to allege a breach of contract cause

20   of action, is divided into ten separate claims, several of which do not state a tort for which

21   punitive damages are recoverable:

22   •     ¶ 88(a) – reneging on promise to lease furniture and appliances,

23   •     ¶ 88(b) – failing to pay the full-time salaries of two employees, and

24   •     ¶ 88(j) – failing to obtain written consent of lessor before erecting improvements.

25   Each of these claims is purely contract in nature and the facts alleged do not constitute separate

26   torts.  Therefore, summary judgment should be granted to OKP on the punitive damage claims of

27   paragraph 88(a), (b), and (j).

28   ///

                                                 17

1           **CONCLUSION**

2       Defendant OKP should be granted summary judgment as to the First Cause of Action

3   (breach of contract) because:

4   1.      ¶ 88(a) – failing to agree on furniture to be leased

5           a.      Plaintiff failed to satisfy the condition of giving a notice of default and a 30-day

6                   cure period to Defendant, so he cannot seek a legal remedy,

7           b.      Plaintiff cannot sue on an agreement to agree in the future,

8   2.      ¶ 88(b) – failing to pay the salaries of two employees

9           a.      Plaintiff failed to satisfy the condition of giving a notice of default and a 30-day

10                  cure period to Defendant, so he cannot seek a legal remedy,

11          b.      Plaintiff is only entitled to nominal damages as he has suffered no actual loss,

12  3.      ¶ 88(c) – illegally hunting for deer and fruitbat on Premises

13          a.      Plaintiff has no evidence that the hunting occurred on the Premises as prohibited

14                  by § 6 of the Lease Agreement,

15  4.      ¶ 88(d) – stealing rocks from the Ginalangan Defensive Complex

16          a.      Plaintiff pleads this as a violation of § 3 (rent), but it is not,

17          b.      Plaintiff failed to satisfy the condition of giving a notice of default and a 30-day

18                  cure period to Defendant, so he cannot seek a legal remedy,

19          c.      The alleged act did not occur on the Premises as required by § 6 of the Lease

20                  Agreement,

21  5.      ¶ 88(e), (f), (f), (h), and (I) – waste was committed in violation of § 6 by various acts

22          a.      Section 6 states that the Plaintiff may use the Premises "provided that" Lessee

23                  does not commit waste, which states a condition, and Plaintiff cannot seek

24                  damages for the failure of a condition (as opposed to the breach of a covenant), so

25                  each of these allegations permits only the termination of the lease,

26  6.      ¶ 88(h) – waste was committed by putting a fuel tank on the Premises

27          a.      Waste requires a showing of permanent damage, and the evidence is that there

28                  was no permanent damage as the tank was never used and it was removed,

18

7.    ¶ 88(I) – waste was committed by removing soil from the Premises

    a.    There was no permanent damage as the evidence shows the soil was returned, and actually the value of the property was enhanced by OKP adding more topsoil,

8.    ¶ 88(a), (b) and (j) – request for punitive damages on purely contract claims

    a.    Punitive damages may not be recovered for contract claims unless the conduct constituting the breach is also a tort for which punitives may be recovered.

Dated: October 26, 2007

                                  Respectfully submitted,


                                    /s/
                                  Rexford C. Kosack, CNMI Bar No. F0140


                                  /s/
                                  Sean E. Frink, CNMI Bar No. F00212

19

# EXHIBIT F



Recording requested by                    )        FILE NO. 05 - 3030
Lessee                                    )
                                          )
                                          )        '05  NOV -3  A9 :04
                                          )               13 / 84
                                          )        BOOK_____ PAGE____
                                          )
                                          )
_____
        (Space above line for Recorder's use only.)

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is made and entered into as of the _2nd._

day of November, 2005, by and between JOAQUIN Q. ATALIG, hereafter referred to as

"Lessor," and OKP (CNMI) CORPORATION, hereafter referred to as "Lessee."

### WITNESSETH:

In consideration of the rent hereinafter reserved and of the covenants herein to be

observed and performed, Lessor hereby demises and leases unto Lessee, and Lessee hereby

leases from Lessor the improvements described in Section 1.

1.      PREMISES:  The Premises consist of all improvements situated on the real

property in Northern Part (Area No. 4) Ginalangan, Municipality of Rota, Commonwealth of the

Northern Mariana Islands, as more particularly hereinafter described, together with the right to

use Lessor's easements and appurtenances in adjoining and adjacent land, highways, roads,

streets, lanes, whether public or private, reasonably required for the installation, maintenance,

operation and service of sewer, water, gas, power and other utility lines and for driveways and

approaches to and from abutting highways or streets for the use and benefit of the above-

described improvements and the parcel of real property described below.  Lessee shall also have

the right to use the real property described below where the leased improvements are situated:

*Lease Agreement*
*Page 1 of 10*

Lot No. 362 R 01, containing an area of 49,998 square meters, more or less, as more particularly described in Cadastral Plat No. 362 R 00, the original of which was registered with the Land Registry as Document No. 6503 on September 12, 1978.

The existing improvements and improvements subsequently erected thereon during the term of this Lease and the appurtenances and other incidents associated therewith are collectively referred to in this Lease as the "Premises."

Moreover, Lessee leases, as part of the agreement, furniture, fixtures, appliances, and tools, which are all itemized in the List of Inventory which will be verified and approved by both parties on or before November 30, 2005. The verified and approved List of Inventory shall be incorporated herein and made a part of this Lease by this reference.

2.    TERM OF LEASE:  This Lease shall be for a term of thirteen (13) months, commencing on December 1, 2005, and ending on December 31, 2006, unless sooner terminated as herein provided.

3.    RENT: The total rental fee for the term of this Lease is Thirty-Seven Thousand Five Hundred Dollars ($37,500.00), payable as shown below.  As further consideration, Lessee covenants and agrees to pay the full-time salaries of two employees of Lessor, namely, Edita and Esther, at $4.50 per hour and $3.50 per hour, respectively.

4.    PAYMENT SCHEDULE:

4.1 Lessee shall pay Lessor advance rent of Nineteen Thousand Five Hundred Dollars ($19,500.00) upon the execution of this Lease.

4.2 Lessee shall pay the remaining rent of Eighteen Thousand Dollars ($18,000.00) on or before July 1, 2006.

*Lease Agreement*
*Page 2 of 10*

5.    OPTION TO RENEW LEASE: Lessee has the option to extend the Lease for a period of one year at the monthly rent of Three Thousand Dollars ($3,000.00) and upon the same remaining terms set forth herein, except that rental payments shall be made, in advance, every quarter. The first quarter rent shall be due and payable on January 1, 2007. Lessee shall exercise the option by giving Lessor 30 days notice, of its intent to renew the Lease for another year, before the expiration of the Lease.

6.    USE OF PREMISES: Lessee may use, improve and develop the Premises or any part thereof for any lawful use or purpose, provided that Lessee does not commit waste, but primarily as office, barracks, equipment repair shop and workstation, heavy and lightweight equipment parking and storage, and as staging area related to Lessee's business and operation on Rota.

7.    LESSOR'S WARRANTY OF TITLE:    Lessor represents, warrants, and covenants that he is the sole, true owner in fee simple of all the leasehold premises and have the right to lease the same to the Lessee and that the Premises are free and clear of all liens, claims and encumbrances, excepting recorded easements for water, sewer, power, telephone, roadways, and other public utilities, and the Lessor has good and marketable title.

8.    LESSOR'S WARRANTY OF QUIET ENJOYMENT: Upon Lessee paying the rent for the Premises and observing and performing all of the covenants, conditions and provisions on Lessee's part to be observed and performed hereunder, Lessor shall place Lessee in quiet possession of the Premises for the entire term hereof subject to all the provisions of this Lease.

9.    ASSIGN ABILITY AND SUBLEASING: Lessee may not assign or sublease the premises without the consent of Lessor. Lessor may not unreasonably withhold consent.

10.    TAXES:

10.1    Lessee To Pay Taxes During Lease.  Lessee shall pay and discharge all taxes, assessment, rates, charges, license fees, municipal liens, levies, excises, or imposts, whether general or special, or ordinary or extraordinary, of every name, nature and kind whatsoever, including all governmental charges of whatsoever name, nature, or kind, which may be levied, assured, charged, or imposed, or which may become a lien or charge on or against the premises, or any part thereof, the leasehold of Lessee herein, the premises described herein, any buildings, or any other improvements now or hereafter thereon, or on or against Lessee's estate hereby created which may be a subject of taxation, or on or against Lessor by reason of its ownership of the fee underlying this Lease, during the entire term thereof, excepting only those taxes hereinafter specifically excepted.   All taxes and charges under this Section shall be prorated at the expiration of the term hereof.

10.2    Exceptions.   Anything in this section to the contrary notwithstanding, Lessee shall not be required to pay any estate, gift, inheritance, succession, franchise, income, or excess profits taxes which may be payable by Lessor or Lessor's legal representative, successors, or assigns, nor shall Lessee be required to pay any tax that might become due on account of ownership of property other than the premises herein which may become a lien on the premises or collectible out of the same.

10.3    Tax Contest.  Lessee shall have the right to contest the validity of any tax or special assessment payable by him which Lessee deems to have been illegally or improperly levied or assessed against the premises, and for that purpose shall have the right to institute such proceedings or proceedings in the name of Lessor as Lessee may deem necessary, provided that

the expense incurred by reason thereof shall be paid by Lessee, and provided, further, that it is necessary to use the name of Lessor in carrying on such proceeding.

11.     UTILITIES AND CHARGES: Lessee shall be responsible for the payment of all utilities, assessments, and other public charges arising by reason of the occupancy, use or possession of the Premises.

12.     INDEMNIFICATION OF LESSOR BY LESSEE: Lessee shall, at all times during the Lease Term, indemnify Lessor against all liability, loss, cost, damage, or expense of litigation arising prior to the expiration of the term hereof and delivery to Lessor of possession of the premises and use of the land:

A. On the account of or through the use of the demised premised or improvements or any part thereof by Lessee or by any other person acting under the authority, direction, in the interest of, or through the title of the Lessee for any purpose inconsistent with the provisions of this Lease;

B. Arising out of, or directly or indirectly due to, any failure of Lessee in any respect promptly and faithfully to satisfy Lessee's obligations under this lease; or

C. Arising out of directly or indirectly due to any accident or other occurrence causing injury to any person or persons or property resulting from the use of the premises or any part thereof, including the land.

No such indemnification shall be required with respect to losses or liabilities arising by reason of the affirmative negligence or recklessness of Lessor.

13.     LESSEE'S RIGHT TO BUILD:

13.1     Alteration/Building, etc.  The Lessee shall have the right during the term of this Lease, to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove

building and other improvement on the Premise, and correct and change the contour of the Premises pursuant to the plans and drawings attached hereto as Exhibits "A" and "B", and incorporated herein as part of this agreement by reference, only with the prior written consent of Lessor. Any other alterations and changes require Lessor's consent in writing.

13.2    Equipment and Fixtures.  Lessee shall have the right at any time during Lessee's occupancy of the Premises to remove any and all equipment and fixtures owned or placed by Lessee or its sublessee upon the Premises only with the prior written consent of Lessor, except that any water heater or air conditioner installed shall become Lessor's equipment after the expiration of the Lease.

13.3    Any items on the Inventory List on Exhibit "A" shall be replaced or repaired, at the sole cost of Lessee, if the item is broken, lost, missing or damaged, except for natural wear and tear.

13.4    Permanent Improvements.  Upon the expiration of the Lease term, Lessee shall be entitled to remove those temporary improvements that Lessee installed, which can be removed without causing harm or damage to the Premises, except fixtures, air conditioners, and water heaters.  All other improvements shall become the property of the Lessor.

13.5    Soccer Field.  Lessee is authorized to setup, build, or construct a soccer field on the premises.

13.6    Lessee is hereby authorized to enter the premises on November 1, 2005, to commence repair and other work on the premises.  Lessee shall not disturb the customers and staff of Lessor, who may remain on the premises up to November 30, 2005.

14.    FIRE AND CASUALTY INSURANCE:  Lessee, at Lessee's option and at its own expense, shall keep all improvements erected on the Premises insured against loss or

damage by fire or other casualty or calamity for the value of all improvements. Any insurance proceeds payable with respect to any loss to any improvements on the Premises shall belong to Lessor and Lessee shall have no right, claim or interest therein.

15.    DEFAULT: Lessee shall be in default in the prompt and full performance of any other term, covenant, or condition of the Lease, (except as to payment of rent), and if such default shall continue for a period of thirty (30) days after notice of such default is given by the Lessor to Lessee, unless the default is of such a nature that the same cannot be cured or corrected within said thirty (30) day period and the Lessee shall have promptly and diligently commenced to cure and correct such default and shall have thereafter continued therewith with reasonable diligence and in good faith, in a manner as to cure and correct the same as promptly and as reasonably practicable under the circumstances, and shall have continued therewith until the default shall have been cured or corrected.

Lessee shall be in default in the payment of rent if rent is not paid within 15 days after it is due and such default shall continue for a period of fifteen (15) days after notice of such default and the default is not cured within the 15 days.

16.    LESSOR'S REMEDIES: In the event Lessee breaches this Lease and fails to make correction within the time provided, the Lessor may exercise any of the remedies available to the Lessor at law or in equity, including the right of re-entry without being liable for trespass, and all such remedies shall be cumulative and nonexclusive of any one or more such remedies, and exercise of one remedy shall not be deemed to be an exclusive election of the remedy or remedies exercised or waiver of the remedies not exercised.

17.    ESTOPPEL CERTIFICATES: Lessor shall, at any time from time to time, upon not less than ten days prior notice from Lessee, execute, acknowledge, and deliver to Lessee a

statement in writing certifying that the Lease is unmodified (or in full force and effect as modified and stating the modification(s)) and that there are no defaults existing, or if there is any claimed modification or default, stating the nature and extent thereof. It is expressly understood and agreed that any such statement delivered pursuant to this section may be relied upon by third parties.

18.    NOTICE:  All notices, demands or requests shall be given to each party at their respective addresses, as noted below.  Each party shall have the right, from time to time, to designate in writing a different address by notice given in conformance with this section.

LESSOR:                                     LESSEE:

Joaquin Q. Atalig                          OKP (CNMI) CORPORATION
P.O. Box 965                               P.O. Box 10001, PMB A-25
Rota, MP 96951                             Saipan, MP 96950.

19. SEVERABILITY:  This Lease embodies the entire agreement between the parties.  If any provision herein is declared invalid by a court of competent jurisdiction, it shall be considered deleted from this Lease, and shall not invalidate the remaining provisions of this Lease which shall remain in full force and effect.

20.    ENTIRE AGREEMENT:  This Lease contains the entire agreements of the parties with respect to the matters covered herein as of the date of execution hereof and no other agreement, statement, or promise made by any party or to any employee, officer or agent of any party prior in time to the date of the execution of this Lease shall be binding or valid.

21.    MODIFICATION:  This Lease is not subject to modification except in writing, signed by the parties herein.

22.    BINDING EFFECT:  This Lease shall inure to the benefit of and bind the Lessor and the Lessee, their respective heirs, successors and assigns, jointly and severally.

23.    ATTORNEYS' FEES:  In the event of any suit by any party to this Lease for the recovery of any rent due, or because of any breach of any term, covenant, condition, or provision hereof, the prevailing party shall be entitled to recover from the other party costs of suit and reasonable attorney's fees which shall be fixed by the Court.

IN WITNESS WHEREOF, the parties have affixed their signatures below on the dates next to their respective signatures.

JOAQUIN Q. ATALIG
LESSOR

OKP (CNMI) CORPORATION
LESSEE
By:
Duly Authorized Representative

11 . 2 . 05
Date

11 / 2 / 05
Date

## ACKNOWLEDGMENT OF RECEIPT

I, Joaquin Q. Atalig, received the total sum of Nineteen Thousand Five Hundred Dollars ($19,500.00), paid by Check No. 115, from OKP (CNMI) CORPORATION, as payment for rent under Section 4.1 of the Lease.

JOAQUIN Q. ATALIG
Lessor

11 . 2 . 05
Date

COMMONWEALTH OF THE                )
    NORTHERN MARIANA ISLANDS    )
                                                              )       ss: ACKNOWLEDGMENT
SAIPAN, MP 96950                           )

ON THIS ⟨2nd⟩ day of ⟨November⟩ 2005, before me, a Notary Public in and for the Commonwealth of the Northern Mariana Islands, personally appeared **JOAQUIN Q. ATALIG**, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the purposes therein set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year first above written.



NOTARY PUBLIC
FRANCES CANTORIA QUICHOCHO
Notary Public
Commonwealth of the Northern Mariana Islands
My Commission expires ⟨3/17/07⟩

COMMONWEALTH OF THE                )
    NORTHERN MARIANA ISLANDS    )
                                                              )       ss: ACKNOWLEDGMENT
SAIPAN, MP 96950                           )

ON THIS ⟨2nd⟩ day of ⟨November⟩ 2005, before me, a Notary Public in and for the Commonwealth of the Northern Mariana Islands, personally appeared **BRIAN M. CHEN**, Resident Manager of OKP (CNMI) CORPORATION, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the purposes therein set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year first above written.

NOTARY PUBLIC
FRANCES CANTORIA QUICHOCHO
Notary Public
Commonwealth of the Northern Mariana Islands
My Commission expires: ⟨3/17/07⟩

*Lease Agreement*
*Page 10 of 10*



FLOOR PLAN—BLDG. "B" and "C"
BUILDING (EXISTING CONDITION)



FLOOR PLAN—BLDG. "D" BAR
(EXISTING CONDITION)



NOTE: PROVIDE NEW TIN ROOF ON WOODEN FRAME, NEW DOORS,
NEW WINDOWS, NEW WOODEN PARTITIONS, NEW TOILETS &
SHOWERS, ETC. REPAIR FLOORS AND INSTALL NEW TILES,
PAINTING,ELECTRICAL AND PLUMBING, COMPLETE IN PLACE.

FLOOR PLAN—BLDG. "C"
(NEW LAYOUT)



FLOOR PLAN—BLDG. "A" HOTEL
(EXISTING CONDITION)

EXHIBIT
"B"



FLOOR PLAN—BLDG. "A"
(NEW LAYOUT)

# EXHIBIT G



# J A Q U I N  Q .  A T A L I
P.O. BOX 965 • ROTA, MP • 96951

January 17, 2006

Mr. Brian M. Chen
Resident Manager
OKP (CNMI), CORPATION
P.O. Box 10001, PMB A-25
Saipan, MP 96950

      Re: NOTICE OF DEFAULT AND VIOLATIONS re Lease Agreement for improvements on Lot No. 362 R 01.

Dear Mr. Chen:

A recent site inspection of my property in Rota, which your company OKP (CNMI) Corporation is leasing, revealed that OKP (CNMI) Corporation has defaulted on certain provisions of the Lease Agreement with me (1) by damaging and/or destroying historical artifacts, structures and other valuable relics, including but not limited to, latte stone clusters, a large Japanese memorial, a Japanese shrine, water tank, washing basin and frame, and areas surrounding Japanese building(s), (2) by damaging and/or destroying permanent trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants, (3) by damaging and/or destroying preexisting buildings/improvements to the land, including but not limited to, the laundry, storage, and kitchen facilities, (4) by placing a fuel tank on my property, and (5) by moving and/or removing soil, without my prior written consent, all in violation of sections 6 and 13 of the Lease Agreement. On information and belief, OKP (CNMI) Corporation may also be in violation of CNMI and Federal laws. As OKP (CNMI) Corporation knows or should know, OKP (CNMI) Corporation is obligated to comply with CNMI and United States laws.

Needless to say, OKP (CNMI) Corporation has caused me tremendous loss, embarrassment, and damages (past, present, and future) due to the intentional violations of the Lease Agreement and OKP (CNMI) Corporation's unlawful activities.

Therefore, OKP (CNMI) Corporation is hereby put on notice, pursuant to section 15 of the Lease Agreement, that OKP (CNMI) Corporation has violated and defaulted on the Lease Agreement. OKP (CNMI) Corporation is hereby given thirty (30) days from the date of this notice to cure the above-noted violations and default which may be cured. Failure to comply with this notice may result in the immediate termination of the Lease Agreement pursuant to section 16 of the Lease Agreement.



*Ltr. to Mr. Chen re: Notice of Default*  *Violations.*
*Page 2 of 2*

Moreover, OKP (CNMI) Corporation is also hereby put on notice, pursuant to section 15 of the Lease Agreement, that the destruction of the historical artifacts, structures, and other valuable relics, and the destruction of permanent trees are of such a nature that the same cannot be cured or corrected within thirty (30) days, thus, OKP (CNMI) Corporation is in automatic default of the Lease Agreement.

As usual, I am open to further discussions in order to come to a reasonable and proper settlement and resolution of this matter, rather than terminating the Lease Agreement at this time, or resorting to a lawsuit in the first instance. Therefore, please give me a call as soon as possible in order to resolve this matter quickly and amicably.

Thank you for your anticipated cooperation.

Sincerely,

/s/

JOAQUIN Q. ATALIG

Page 256

IN THE SUPERIOR COURT

OF THE

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

JOAQUIN Q. ATALIG,                )
                                  )
        Plaintiff,                )
                                  )
    vs.                           ) CIVIL ACTION NO. 06-0119(R)
                                  )
OKP (CNMI) CORPORATION, ET AL,    )
                                  )
        Defendants.               )
_____   )

***CONFIDENTIAL***

DEPOSITION OF JOAQUIN Q. ATALIG

VOLUME II

Date:           MONDAY, AUGUST 6, 2007

Location:       CARLSMITH BALL CONFERENCE ROOM
                CARLSMITH BUILDING, CAPITOL HILL
                SAIPAN, MP

TRANSCRIBER:    JOSEPH B. ARMSTRONG, CSR-4241

TRANSCRIBED BY:
SHELLY A. SCOTT & ASSOCIATES
503 MARIGOLD AVENUE
CORONA DEL MAR, CA 92625
(949) 719-9898
SASDEPOS@AOL.COM

Page 353

1    going on?  Do you hear rifle shots?

2         A    Yeah, even daytime.

3         Q    Even daytime.  So you're saying the day before

4    or a different --

5         A    Maybe about a month before.

6         Q    You heard rifle shots?

7         A    They drove their truck up to the command post.

8         Q    Okay.  So do you know if they were actually

9    hunting on your property or if maybe they were hunting

10   on public property or someone else's property?

11        A    I'm not sure whether they were hunting on my

12   property, but when I heard the shot, it wasn't public

13   land.  It's further to the command post.

14        Q    Okay.  Do you have any other information

15   regarding the hunting that somebody else told you about

16   and the OKP people hunting?

17        A    No.

18        Q    Okay.

19        A    But I can find that out from people.

20        Q    Do you know who these people were that were

21   actually hunting?  Were they my clients, or are they

22   somebody else?

23        A    I'm not sure, sir.

24        Q    Okay.  If you saw Reddy Goluguri, would you

25   recognize him?

Page 354

1      A    Oh, yes, right away I would recognize.

2      Q    Okay.  Is that because you've spoken with him

3    in the past?

4      A    He was the one I was introduced to to talk to.

5      Q    Okay.

6      A    About the (unintelligible) or anything around

7    that area.

8      Q    Okay.  How about Pramuan Jaiphakdee, would you

9    recognize him if you saw him?

10      A    I don't know.

11      Q    Okay.  How about Wilai Promchai, would you

12    recognize him if you saw him?

13      A    I don't know unless you mention his name.

14      Q    Okay.  Do you know if you've ever met either

15    one of those gentlemen, Promchai or Jaiphakdee?

16      A    I will know if I see them.

17      Q    Okay.  So you're not sure whether you've met

18    them before?

19      A    Yes, sir.

20      Q    Okay.  We'll keep going for a couple of more

21    minutes.  We're at one hour and 52 minutes.  If that's

22    okay, we'll go for another seven or eight minutes and

23    we'll take a break; okay?

24           When you -- you said you built a lean-to sort

25    of over the wash basin to go into the water tank;

Page 355

1    correct?  Did you consult with HPO at all before you did

2    that?

3         A    No.

4         Q    Okay.  Or CRN, any government people?  You

5    just did it?

6         A    Actually, it's just having a person

7    (unintelligible).

8         Q    Okay, I'm just --

9         A    No, I didn't consult, no, sir.

10        Q    Okay.  How about -- do you know whether --

11   whether your brother-in-law did when he created the

12   catchment for the chipped water tank?

13        A    I don't know.  I don't know whether there was.

14        Q    Okay.  How about when you did the improvements

15   to the rock wall?

16        A    No.

17        Q    When he enclosed it for the pigs, did he talk

18   to anybody from HPO or anything like that?

19        A    No.

20        Q    Okay.  How about when you built the fence

21   around the area?

22        A    Nobody.

23        Q    Okay.  And when I say the area, the area that

24   we see in --

25        A    The property line.

Page 348

```
 1    built.  The laundry and the dirty kitchen was taken

 2    apart.  Right?  All those things happened.  And I don't

 3    think anybody's denying that, okay.  So why are you

 4    saying that the employees personally did this instead of

 5    doing in on behalf of OKP (CNMI), as the employees of

 6    OKP (CNMI)?

 7         A    Maybe -- maybe employer has an employee of OKP

 8    (CNMI), but I'm not sure OKP (CNMI) would build such a

 9    (unintelligible) building.

10         Q    Okay.  But you don't have anybody telling you

11    that the employees did this on their own?

12         A    No.

13         Q    Okay.  How about hunting?  There's allegations

14    that there was some illegal hunting done on your

15    property; right?

16         A    Um-hum.

17         Q    Tell me what you know about that.

18         A    I saw them.

19         Q    What did you see?

20         A    Riding on their trucks and chasing the dog,

21    making it bark, and I hear them shooting, making some of

22    the shots.  And also I saw them unloading.  I saw

23    unloading deer --

24         Q    Okay.

25         A    -- from the shade here to in here.
```

Page 349

```
1        Q    Okay.

2        A    I was just walking toward my banana

3   plantation.

4        Q    Okay.  So am I correct that your son has a

5   property nearby to this property?  He's got a house

6   nearby?

7        A    Yes, sir.

8        Q    Okay.  And is that where you were staying at

9   the time that you saw this?

10       A    Yes, sir.

11       Q    Okay.  Could you -- is it -- would that house

12  appear on this map at all, Exhibit C, or is it off the

13  map?

14       A    I think it would appear.

15       Q    Okay.  Why don't you draw that in where it

16  would be.  And which son is this; Carl?

17       A    Carl.

18       Q    Okay.  And is Carl's house actually on your

19  property, or is that a separate piece of property?

20       A    It's totally separate.  I think it's -- my

21  property -- if I'm correct, my property ended here.

22       Q    Okay.  Next to the barracks building

23  basically?

24       A    Yes.  You see the same prints here?

25       Q    Yeah.
```

1      A    Yeah, right here.  And then Carl starts here.

2      Q    Okay.  And you've written -- for the record,

3  you've written "Carl's house" with an arrow towards the

4  box.  And that's Route 100.  You would follow Route 100

5  all the around to Songsong, it's in that direction?

6      A    Um-hum.

7      Q    Okay.  So when was this that you saw the

8  hunting going on?

9      A    I think last year before I went to the States.

10     Q    Okay.  And did you know who it was that was

11  doing the hunting?

12     A    I saw the OKP people.

13     Q    Okay.  Anybody in particular?  Did -- were

14  they -- how many people were there?

15     A    On the truck?

16     Q    Um-hum.

17     A    Three.

18     Q    Okay.  Was it a pickup truck?  What kind of

19  truck?

20     A    It's a pickup truck.  It's sort of a maroon

21  truck or white truck.

22     Q    Okay.

23     A    It wasn't really daylight.

24     Q    Okay.  Was it nighttime?

25     A    Nighttime?  It was the morning time.

Page 351

```
 1        Q     So what time of day?

 2        A     I don't know, maybe 5:00 in the morning.

 3        Q     In the morning.  So early in the morning.

 4   Okay.  Before the sun came up?

 5        A     I think so.

 6        Q     Okay.  And where were you when you saw them?

 7        A     Actually, in the morning I was taking my walk

 8   here.

 9        Q     A walk along Route 100?

10        A     Um-hum.

11        Q     Okay.  And you looked over, and you saw a

12   truck driving?

13        A     Coming from somewhere here.

14        Q     Okay.  Coming, and which way were -- where was

15   it heading?

16        A     Here.

17        Q     Heading to the barracks.

18        A     It was heading -- and it doesn't last too long

19   because --

20        Q     Okay.

21        A     -- there is a road here, and they unload.

22        Q     Okay.  So did you actually see them unload the

23   deer?

24        A     I saw the deer.

25        Q     Okay.  And you saw that from the roadway?
```

Page 352

1    A    Yeah.

2    Q    Okay.  How many people were there unloading

3    the figure of the deer?

4    A    I don't know.  They crowded the truck, but

5    it's about maybe more than three.

6    Q    Okay.  Did you see them -- could you hear them

7    saying anything?

8    A    I heard probably some kind of noise, but I

9    know I wouldn't understand.

10    Q    Okay.  And prior -- just so I understand.

11    What you actually saw from the roadway was a truck

12    driving up to the barracks and the unloading of a figure

13    of a deer?

14    A    Um-hum.

15    Q    And you're sure it was a deer?

16    A    The way I look at it, yes.

17    Q    Okay.  And was it hunting season or out of

18    hunting season?

19    A    No.

20    Q    What?

21    A    It's not hunting season.

22    Q    It was not hunting season.  But you don't know

23    exactly when this was?

24    A    I forgot exactly when was that.

25    Q    Okay.  And prior to that, did you hear hunting

1    REXFORD C. KOSACK
     GLENN A. JEWELL
2    DOUGLAS DALEY
     LAW OFFICES OF REXFORD C. KOSACK
3    Bank of Hawaii Bldg., Third Floor
     P.O. Box 500410
4    Saipan, MP 96950
     Telephone: (670) 322-8800
5    Fax: (670) 322-7800

6    Attorneys for Defendant Brian M. Chen

7

               IN THE SUPERIOR COURT OF THE COMMONWEALTH
8                   OF THE NORTHERN MARIANA ISLANDS

9
     JOAQUIN Q. ATALIG,                    )    Civil Action No. 06-0119(R)
10                                         )
                   Plaintiff,              )
11                                         )
          vs.                              )
12                                         )
     OKP (CNMI) CORPORATION, BRIAN M.      )    **DECLARATION OF BRIAN M.**
13   CHEN, PRASADA REDDY GOLUGURI,         )    **CHEN IN SUPPORT OF**
     PRAMUAN JAIPHAKDEE, WILAI PROMCHAI,   )    **MOTION FOR SUMMARY**
14   and DOES 1-3,                         )    **JUDGMENT**
                                           )
15                 Defendants.             )
                                           )
16
          I, Brian M. Chen, hereby declare:
17
          1. I am over the age of 21 years.
18
          2. I am a resident of Guam.
19
          3. I am competent to testify to and have personal knowledge of the matters contained
20
     herein.
21
          4. OKP (CNMI) Corporation built a platform, a berm, and an overhead cover for a fuel
22
     tank on Joaquin Atalig's property. It placed the steel fuel tank onto the platform.
23
          5. OKP applied for a permit to use the fuel tank. The permit was never issued. Fuel was
24
     never placed into the fuel tank. The fuel tank was never used.
25
          6. Prior to the end of the lease term, the fuel tank was removed. The overhead cover,
26
     berm, and platform were all removed. No trace remained of these items at the end of the lease
27
     term.
28
          7. Ramon Quichocho prepared the final Lease Agreement between OKP and Joaquin

1  Atalig.  Mr. Quichocho represented Mr. Atalig, not OKP.

2      I declare the foregoing to be true under penalty of perjury on the island of Saipan,

3  Commonwealth of the Northern Mariana Islands on October 26, 2007.

4

5  Brian M. Chen

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<pre>
 1                    IN THE SUPERIOR COURT
 2                          OF THE
            COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
 3
 4
 5    JOAQUIN Q. ATALIG,            )
                                    )
 6                                  )
                                    )
              Plaintiff,            )
 7                                  )   Civil Case No.06-0119
         vs.                        )
 8                                  )
      OKP (CNMI)CORPORATION,        )
 9    BRIAN M. CHEN, PRASADA REDDY  )
      GOLUGURI, PRAMUAN JAIPHAKDEE, )
10    WILAI PROMCHAI, COMMONWEALTH  )
      PORTS AUTHORITY, and REGINO M.)
11    CELLS, in his capacity as     )
      Acting Executive Director     )
12    of the Commonwealth Ports     )
      Authority, and DOES 1-3,      )
13                                  )
              Defendants.           )
14    _____)
15
16
17
18                DEPOSITION OF STEVEN J. NUTTING
19                  Wednesday, August 22, 2007
                      Friday, August 24, 2007
20                    Saturday, August 25, 2007
21
22
23    Western Deposition & Transcription, LLC
      1400 16th Street, Suite 400
24    Denver, CO   80202   USA
      303.292.9400
25
26
</pre>

239

```
 1    stockpiled off into one corner outside of the clear
 2    area -- the cleared area.  It was about eight foot high,
 3    a 40 by 40 foot mound.  And there was an area where it
 4    appeared that there wasn't any mud with vehicles getting
 5    stuck or anything like that, but there was an area where
 6    it appeared that it could create muddy runoff in the
 7    future, and a load of coral or two was put in that area.
 8        Q    Okay.  Do you know where the load of coral or
 9    two came from?
10        A    I believe it came from the New Shintani
11    Corporation.
12        Q    New Shintani Corporation?
13        A    Yeah.
14        Q    How do you spell Shintani?
15        A    S-h-i-n-t-a-n-i.
16        Q    Is that a company on Rota?
17        A    Yes.
18        Q    Did any quarry -- or any coral come from
19    Mr. Atalig's property for this purpose?
20        A    I don't believe so.  No one told me that it
21    has.
22        Q    The -- the topsoil was stockpiled at the end
23    before OKP left, did they take the stockpile --
24    stockpiled topsoil and reapply it to the property?
25        A    They did, with additional topsoil.
```

240

```
 1        Q     Okay.  How much additional topsoil did they --

 2        A     Fifteen to twenty dump trucks full, which was

 3   taken from the airport site with permission of CPA, as I

 4   understand it -- high quality topsoil.  And when OKP

 5   left the property, the depth of topsoil was even greater

 6   than it was when they took possession.

 7        Q     All right.  So 15 to 20 dump trucks of

 8   topsoil, and all this topsoil was obtained at the

 9   airport project site?

10        A     As I understand it.

11        Q     And was this topsoil that was -- I forget the

12   word you used -- also stockpiled when they were doing

13   the -- the airport project?

14        A     I don't know.  I don't know if that was

15   stockpiled topsoil or what, but I know that was taken

16   away from the project.

17        Q     All right.  And we do know -- we do know some

18   coral was laid down while OKP was on the premises.  Do

19   you remember how much coral?

20        A     I think there was two truckloads.

21        Q     Okay.  And do you know roughly the area where

22   the -- where the coral was put down?

23        A     I do not.

24        Q     And is it correct that the roller was used to

25   flatten out, maybe compact the -- the coral?
```