# Exhibit 24B

E-FILED
CNMI SUPERIOR COURT
E-filed: Jan 4 2008 10:44AM
Clerk Review: Jan 4 2008 1:00PM
Filing ID: 17893882
Case Number: 06-0119-CV
Dora Decena

IN THE SUPERIOR COURT
OF THE
COMMONWEALTH OF THE NORTHERN MARIANA IS

| | |
|---|---|
| JOAQUIN Q. ATALIG,<br><br>Plaintiff,<br><br>vs.<br><br>OKP (CNMI) CORPORATION, BRIAN M. CHEN, PRASADA REDDY GOLUGURI, PRAMUAN JAIPHAKDEE, WILAI PROMCHAI, COMMONWEALTH PORTS AUTHORITY, and REGINO M. CELIS, in his capacity as Acting Executive Director of the Commonwealth Ports Authority, and DOES 1-3,<br><br>Defendants. | CIVIL CASE NO. 06-0119(R)<br><br>PLAINTIFF'S COUNTER-STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITIONS TO DEFENDANTS' SUBSTANTIVE MOTIONS<br><br>[AFTER THE COURT'S 12/11/07 RULINGS] |

**COUNTER-STATEMENT OF UNDISPUTED FACTS**

**A.     The Plaintiff and the Property**

1.     The Plaintiff here is Joaquin Atalig. He is a businessman on Rota. One of his businesses is a small hotel known as the Sunrise Hotel, located near the Ginalangan Defensive Complex on Rota.

2.     The Sunrise Hotel is located on a large tract of land, of almost 50,000 square meters, known as Lot 362 R 01 ("the Property"). Prior to the construction of the Hotel the Property was used as a farm by the Plaintiff's father, by his uncle, and by the Plaintiff, and other members of Plaintiff's family. Even after the construction of the Hotel parts of the Property

continued to be used for farming because of the rich soil. There were many fruit trees on the property and many fruit trees still remain.

3. The Property has a unique feature - the presence of a number a Latte Stones sites. In particular, there is a Latte Stones Set located near the main road (Route 100) and adjacent to Room 108 of the Hotel. There are the remnants of a Japanese water tank or cistern in about the middle the Property and another Latte Stones Set was located near that Japanese water tank. Another Latte Stones Set was located near an area that was planted with taro. Another Latte Stones Set is located near the neighbor's boundary line. Another Latte Stone Set is located deeper into the Property, near where the Commonwealth Utilities Corporation has a pumping station. Another Latte Stone Set is located still deeper into the property near some fruit trees. And just down the road on other property was another Latte Stones Set.

4. Not all the Latte Stones on the Property were complete with a bottom (haligi) and top (tasa). Many were or are down. The Latte Stones varied in size from about three feet from the ground to the top of the Tasa, to about four feet. Latte Stones are commonly found in "sets", usually of six and arranged in two rows of three. All of the Latte Stones on the Property were in such sets.

5. Other Chamorro historical artifacts were on the Property. At one point in time two Chamorro mortars (lusongs) and pestles (lummocks) were on the Property.

6. In addition to the Chamorro historical artifacts present on the Property, there were artifacts left by the Japanese. As mentioned, there was a Japanese water tank near one of the Latte Stones Sets. Next to that water tank was a Japanese wash basin. Next to that is a Japanese rock house. Two more Japanese water tanks are on the Property. Two more Japanese wash basin are on the Property. At some point in time, a railroad ran through the Property and there

are the remnants of a loading station on the Property. War relics, such as large caliber Japanese guns, can be found on the Property.

7.  Prior to OKP's arrival on the scene, Joaquin Atalig had plans to develop the Property with Dr. Larry Hocog. A key feature for the development was to be the Latte Stones sites. However, family matters delayed the business venture and then a typhoon severely damaged the Hotel. The typhoon had, for example, taken the roof off of the kitchen building and left it a shambles. Atalig then found that he had to spend extensive time on Saipan because of a business project there. And then Brian Chen showed up, looking to lease the Property from Atalig on a short-term basis. A short-term lease of the Property to OKP, during which OKP would repair the typhoon damage at its own cost, seemed like the perfect opportunity for Atalig.

**B.    The Defendants**

8.  OKP (CNMI) Corporation ("OKP") is a corporation organized and existing under the laws of the CNMI. OKP is owned in part by Brian Chen but it is principally owned by OKP Holdings in Singapore. The Singapore parent is referred to as "OKP Holdings". Discovery into the relationship between OKP and OKP Holdings has not been completed and the exact relationship between the companies is not yet fully known to the Plaintiff.

9.  What is known of the relationship between OKP and OKP Holdings is that in about 2005, OKP Holdings was looking for projects in the region. Chen knew of a project for the Commonwealth Ports Authority that was going to be put out to bid. As a result, OKP (CNMI) Corporation came into existence.

10. OKP did bid on the Rota Airport Runway Extension Project and was successful. OKP was awarded an $8,677,000 contract, which was later increased by change orders.

11.     OKP started to prepare to undertake what with change orders turned out to be about a $10 million construction project.

12.     Alan Yee acted as the project manager for OKP on Rota. OKP deposition, p. 153. Yee is not a named defendant.  But he was the project manager for OKP CNMI.

13.     Brian Chen was the resident manager for OKP.  He also owns about 2,000 shares of OKP stock and represented OKP in various matters.

14.     Prasada Reddy Goluguri was an engineer employed by OKP. He reported to Alan Yee. OKP at 153; Goluguri deposition, pp. 39-41, 79.  Goluguri was an employee of Or Kim Peow Contractors (Private) Limited Singapore and was dispatched to the CNMI to work for OKP.

15.     Pramuan Jaiphakdee was a heavy equipment operator for OKP.

16.     Wilai Promchai was also a heavy equipment operator for OKP.

**C.    The Lease Negotiations and the Lease**

17.     As mentioned, OKP had been awarded a large construction contract to expand the runway of the Rota International Airport.  OKP needed to find a base for operations so that it could perform the work.  An OKP representative referred Chen to Atalig's property and Chen went to the Property and saw it for himself.  It was close to the airport, had space where heavy equipment could be parked, had a small hotel that could be used as offices and for some housing, and had a large kitchen that could be used to prepare food for OKP's many men. Atalig was contacted in Saipan about a possible lease of his Hotel and he went to Rota to meet with Chen.

18.     Atalig and Chen met on the Property and discussed the terms for a lease. Atalig and Chen walked through the Hotel and discussed renovations that OKP would like to make. They walked outside of Room 108, and Atalig pointed out at the Latte Stone set near Room 108. He told Chen that there were more Latte Stones by the water tank and more Latte Stones by the taro patch. Chen said that he knew. Atalig deposition, pp. 669-670.

4

19. During the negotiations for a lease, the parties discussed OKP parking its heavy equipment in a large open area off of a side road and near a structure on the Property referred to as the "A-Frame". The side road connects to Route 100 on the airport side of the Hotel. The side road then intersects with a road that was once the bed of a railroad track and sweeps in an arc across the Property. The railroad track road continues on to the Ginalangan Defensive Complex. Another side road connects to the railroad track road and cuts across the Property to connect again with Route 100 near the opposite end of the Hotel. *See* Exhibit "A" to the *Declaration of Joaquin Atalig*, filed herewith ("Atalig Declaration"). Atalig and Chen discussed OKP entering his property at the side road closest to the airport and then parking the heavy equipment in the open area near the A-Frame.

20. The A-Frame was a small, split level residence that included a large dirty kitchen and laundry facility. The kitchen had been enclosed with tin panels. At the time of these lease negotiations, the A-Frame was being used primarily for storage of various personal belongings and Hotel supplies. Based on the conversations with Chen, Atalig expected OKP to use the A-Frame as an equipment repair or work shop. This would be convenient for OKP because all of its heavy equipment would be parked right near the A-Frame and it was a straight shot down an existing road to reach Route 100 and the airport.

21. Chen explained that OKP was interested in building the soccer field for the use of its men when they were not working. Atalig had previously built a golf driving range on the Property, not far from two of the three Japanese water tanks on the Property. From the discussions with Chen, Atalig anticipated that OKP would clear the same area as used for the golf driving range to use as the soccer field.

22. Chen told Atalig that OKP would erect a prefabricated building for use as the barracks for its employees. The Hotel was not large enough. The prefabricated building would

5

be erected near the Hotel kitchen that was a separate building apart from the Hotel and that had suffered in the typhoon. Atalig anticipated that at the end of the lease he would be able to keep the prefabricated building as part of the consideration for the lease.

23. Following the viewing of the Property, Atalig and Chen entered into negotiations for specific lease terms. The result of the negotiations was a Lease Agreement, executed on November 2, 2005, by Joaquin Atalig as "Lessor" and Brian Chen on behalf of OKP (CNMI) Corporation as "Lessee" ("the Lease"). The Lease is attached as Exhibit "F" to the Second Amended Complaint ("SAC").

24. In November 2005, OKP entered the Property. Atalig was in Saipan attending to his business interests there at the time.

**The Need for a Heavy Equipment Parking Area**

25. OKP needed to clear away some vegetation from the Property to create a parking area for its equipment, the soccer field and the site for the prefabricated barracks building. Despite the fact the area are for the heavy equipment parking was to be near the A-Frame, the area Alan Yee apparently selected was behind, or west of the Hotel, to park the equipment.

26. Reddy Goluguri asked Ludivina ("Edita") Carillo where OKP could clear behind the Hotel. Reddy had one conversation with her on this subject. Goluguri at 44. At the time of the conversation Edita was an OKP employee. Edita had previously been Atalig's employee for about the past 10 years and was one of the two employees transferred by Atalig to OKP.

27. Edita called from Rota. Atalig was on Saipan. Edita asked Atalig what to tell Goluguri. Atalig understood Edita to be talking about the soccer field. The parking area was, of course, to be near the A-Frame at the other end of the Property. The soccer field was to be in the

area where the golf driving range had been based on the discussions with Chen. The golf driving range area could border on the Japanese water tank that contained a Latte Stones Set, a mortar and pestle, and some Japanese relics if the soccer field was made large enough. Atalig therefore told Edita to tell OKP not to touch that area.

28. Edita told Goluguri not to touch the area near the Japanese water tank. She actually walked with him back to that area, stood in front of the Latte Stones, and indicated with her arms outstretched where not to clear. Carillo at 189-194, 238-239.[1] She even pointed to the Japanese water tank area and told Goluguri "don't touch".

29. The Latte Stones were in part enclosed by a barb wire fence on one sides that Atalig had put up when a cow had been kept in the area to keep the cow out of the Latte Stones. The Latte Stones were also enclosed or marked off by a Korean fishing net that Atalig had strung up, again to keep the cow out. There was also vegetation on either side of the Latte Stones, including bamboo, that marked the area off from the rest of the Property. OKP in its moving papers refers to this area as "Area A."

30. Atalig did not tell Edita to warn OKP about the Latte Stones near the taro patch because that was on the opposite end of the Property from where the soccer field was to be placed. Therefore, Edita did not tell Goluguri not to go into the taro patch area. Edita Deposition at 258. OKP in its moving papers refers to the Latte Stones Set near the taro patch as "Area B."

31. After Goluguri had his conversation with Edita, OKP did not first obtain a permit to clear the Property from the Division of Environmental Quality. Nor did OKP make any application to the Historic Preservation Office. Instead, OKP went ahead with the clearing.

---

[1] Goluguri claims that Edita told him OKP could clear everything, but warned him about a hole on the property. He passed this information on to Alan Yee. Goluguri at 48-50. For Defendants' motions, it must be assumed that Edita's testimony will be accepted by the Jury.

7

32.     The first day of the clearing was uneventful. Attached hereto as "Exhibit C" are true and accurate copies of photographs of the property after it was cleared.

### The Clearing that *Actually* Took Place

33.     OKP did not clear the area where the golf driving range had been. OKP did not clear the area near the A-Frame that was to be used for heavy equipment parking. OKP did not clear an area in the shape of a box 100' by 150' behind the Hotel as they now contend. OKP cleared a very large area that ran all the way from one fence that was located at the back of the Hotel, up to the road that had once been the Japanese railroad track. In between the fence and the road were a Latte Stone set, a Japanese water cistern, a Japanese wash basin, a barb wire fence, the Korean fishing net, bamboo, fruit trees, flower trees, a mortar and a pestle. They were all cleared away by OKP.

### The Trench Work

34.     OKP first cleared the large area behind the Hotel for heavy equipment parking with a bulldozer. OKP then dug a trench with a backhoe to control rainwater run-off on two sides only of the parking area. OKP then excavated an area by the taro patch, (where a second Latte Stones set was located) as a ponding basin. OKP in fact dug a pit about ten feet deep near where the taro plants and Latte Stone Set had once been. OKP lined the pit or ponding basin with concrete. The two trenches OKP dug at two sides of the parking lot were then connected to the ponding basin.

35.     Prior to the clearing there were two separate latte stone sets, a japanese wash basin, a japanese water tank near one of the latte sets, fruit trees, and a Chamorro mortar and pestle. After the clearing, those items were no longer there.

36. OKP created a compacted coral parking lot for the heavy equipment because the rich earth that had been cultivated behind the Sunrise Hotel for generations would most certainly turn to mud under the wheels of the heavy equipment once it rained. What Atalig needed or what the Lease OKP signed required before such changes to the Property could be made.

### "Dismantling" of the A-Frame

37. The clearing that destroyed the Chamorro and Japanese artifacts is not the only issue in this case. The dirty kitchen was dissasembled.    None of the individual Defendants admit to disassembling the dirty kitchen or to authorizing its destruction. Defendants' Declarations. The concrete bar-b-que was cracked and the ifik posts were broken in half. OKP chose to build a simple workshop near where the heavy equipment was parked. Once the tin panels were removed, the contents of the dirty kitchen were left exposed to the elements and were damaged. Golf ball dispensers that were stored in the A-Frame, for example, were smashed.

38. Near the southern boundary of the Atalig property was an outdoor bar that had been used by the Hotel and the Atalig family for parties. OKP "renovated" the bar into a kitchen to cook for its employees. This renovation was not authorized by Atalig. Atalig at 364-67. The renovation was done with poor workmanship. *Id.* Tin removed from the A-Frame was used in this "construction".

39. Since OKP turned the bar into the kitchen. So, OKP turned Atalig's kitchen into a barracks for its employees. Again, OKP used materials it had removed from the A-Frame to "renovate" the kitchen and turn it into a barracks. The prefabricated building that Atalig had expected was never built.

**Other Liberties Taken**

40. The first of such Lease. Instead, OKP made alternative renovations and changes that were not approved by Atalig. The alterations made particularly in the entrance way of the Hotel were not conducive or detrimental to a hotel operation.

41. OKP also rejected most of Atalig's furniture, fixtures and appliances that it rented under the Lease. This forced Atalig to put these items into storage. Some items were damaged as a result.

42. OKP employees hunted deer.

43. OKP installed a large fuel tank on the Property. Its installation was done without Atalig's prior written consent and without the required governmental permits. The fuel tank also injured the Property because of the environmental concerns and implications a large fuel tank entails.

44. OKP accepted the transfer of the two Atalig employees but did not pay Carillo the wage rate stated in the lease.

**E.    The Damage Is Discovered and OKP Responds**

45. Atalig received a phone call from Rota from Jackie Bussell and was told that there was a problem on his property and that he better come down and see. Atalig flew to Rota and went to the Property. At first, Atalig did not notice what was wrong. The Property had been so completely cleared that it was disorienting. He then realized what OKP had done.

46. On January 17, 2006, Atalig sent the notice of default letter to OKP which is marked as Exhibit "G" to the SAC.

47. Atalig contacted the Historic Preservation Office ("HPO") and DEQ after Atalig realized that Latte Stones and Japanese water tank on the Property had been destroyed. HPO

went to the Property and in the company of OKP toured the parking lot behind the Hotel. Naturally, HPO found no evidence of the destruction of the Lattes Sets.

48. OKP employees took a pick-up truck and dump truck up the road that leads towards the Ginalangan Defensive Complex and returned with it filled with rocks. They then plastered the rocks to the sides of the water tank, and planted grass around the water tank.

49. OKP dismantled and removed the fuel tank at the end of the Lease term. They did this without obtaining Atalig's permission . In response to the assertion by Atalig that the fuel tank presented an environmental issue, OKP responded by claiming that the fuel tank had never been filled.

50. OKP dismantled some of the additions made to the bar. OKP did not repair the damaged A-Frame. Some of the damage to the A-Frame is beyond repair, such as the broken ifik posts.

51. When OKP was about to leave the Property, it dumped about 15 to 20 truckloads of topsoil that it had obtained from the airport project. OKP at 240. The dirt was placed about two inches deep on top of the compacted coral. The dirt added was mostly clay and was not of the quality of the topsoil OKP had removed.

### F.   Additional Facts Relevant to Breach of Contract

52. Atalig never gave consent and OKP never asked for consent to erect, maintain, alter, remodel, reconstruct, rebuild, replace, and remove buildings and other improvement on the Premises, and correct and change the contour of the Premises pursuant to the plans and drawings attached [to the Lease] as Exhibits "A" and "B." *See* Declaration of Joaquin Q. Atalig in Support of Plaintiff's Motion for Partial Summary Judgment (the "May Declaration of Plaintiff Atalig") at ¶ 37, which was filed on May 3, 2006.

53. Atalig never gave a written consent and Defendant OKP never asked for a written consent to make any other alterations and changes. May Declaration of Plaintiff Atalig ¶ 39.

54. In or about late December 2005, or early January 2006, despite being warned not to clear the areas where the cultural and historical artifacts lay, Defendants used heavy equipment to clear the land, without the proper permits from the Government and without permission from Atalig, in order to erect other structures for the use and benefit of Defendant OKP. *See* May Declaration of Plaintiff Atalig ¶ 40.

55. Similarly, in or about January 2006, despite not having a written consent fromAtalig, OKP tore down the kitchen, laundry, and storage facilities, and used the materials therefrom to build a *palapala*. In the process, Defendants damaged and destroyed the homemade cooking stove, *ifik* posts, and other valuable items that were stored. May Declaration of Plaintiff Atalig ¶ 44.

56. Similarly, in or about late December, 2005, or early January 2006, despite not having a written consent from Atalig, OKP bulldozed down valuable trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, beetlenut trees, shrubs, manicured flowers, and other plants. May Declaration of Plaintiff Atalig ¶ 45; DEQ Notice of Violation; HPO Warning Letter.

57. Similarly, despite not having a written consent from Atalig or an earthmoving permit from the Division of Environmental Quality, Defendants removed soil, rocks and minerals, including excavating Atalig's land, for OKP's parking lot. May Declaration of Plaintiff Atalig ¶ 46; DEQ Notice of Violation.

**F.    Additional Facts Relevant to Negligence, Waste and Punitive Damages**.

58. The Latte Stones near the Japanese water tank were protected and marked-off in part by a barb-wire fence and in part by a Korean fishing net.

59.     OKP did not obtain and pay for a Division of Environmental Quality permit before clearing the land despite agreeing to "be responsible for the payment of all utilities, assessments, and other public charges arising by reason of the occupancy, use or possession of the Premises."  Lease § 11; DEQ Notice of Violation.

60.     OKP did not obtain and pay for a Historic Preservation Office permit before clearing the land despite agreeing to "be responsible for the payment of all utilities, assessments, and other public charges arising by reason of the occupancy, use or possession of the Premises." Lease § 11; HPO Warning Letter.

61.     On February 14, 2006, the Rota Historic Preservation staff prepared an "After the Fact" Inspection and Assessment Report (the "HPO After the Damage Inspection Report") regarding OKP's unpermitted activities on Atalig's land

62.     February 17, 2006, Mr. Eloy M. Ayuyu, HPO Tech. II, made an incident report regarding the unpermitted earthmoving and construction activities by OKP.

63.     On March 23, 2006, OKP submitted an "after-the-fact" Earthmoving and Erosion Control Commercial Permit Application Form to DEQ (the "OKP's After the Damage DEQ Permit Application").

64.     On April 7, 2006, HPO Tech. II Eloy M. Ayuyu submitted a review of the "after-the-fact" assessment of Defendant OKP's damage and destruction of Plaintiff Atalig's property.

65.     On April 7, 2006, Defendant OKP submitted an "after-the-fact" Application for Historic Preservation Review (the "OKP's After the Damage HPO Permit Application").

Dated: November 13, 2007     Respectfully submitted

O"CONNOR BERMAN DOTTS & BANES

By:     /s/
    Michael W. Dotts, Esq., F150

LAW OFFICES OF RAMON K. QUICHOCHO, LLC

Dated: November 13, 2007     By:     /s/
    Ramon K. Quichcho, Esq., F0243

K:\3300\3390-01-J.Q. Atalig\Draft 080102\Plaintiff's Counter Statement wamendments renumbered1-R-080102.doc

14