> policy. Courts may look to such extrinsic evidence in determining whether an insurer has a duty to defend, but an insured cannot assert frivolous defenses merely to establish a duty to defend on the part of the insurer.

Similarly, the court in the coverage case should not engage in what amounts to fact finding of issues that remain pending before the underlying case's court. *Nationwide Ins. v. Zavalis*, 52 F3d 689, 695 (7th Cir. 1995)("not involve them in fact finding that may overlap or interfere with the underlying litigation."). In *Zavalis*, the court properly declined to engage in a fact finding inquiry about exactly what had happened and what had been intended or expected when the insured burned some letters onto a football field and a fire was started that burned out of control and did extensive damage.[6]

Applying those principles to this case, OKP first tendered the defense of the Atalig case in August or September of 2006. Dongbu was to under any duty to investigate beyond that point in time, and in fact, OKP confirmed that it was applying the "eight corners" nearly a year later, in July 2007. Additionally, Dongbu was not required to engage in the meaningless process of asking the insured if they denied the claims being made against them, and of course it was evident from the first meeting of the parties' counsel on or about October 23, 2006 that OKP denied most of what Mr. Atalig was claiming. *See* Clifford Declaration, filed separately.

### III.
### THERE WAS NO ACCIDENT UNDER THE POLICIES

As discussed above, the terms "caused by accident" and "accidental loss" are not

---

[6] This case was remanded and the appellate decision on remand (116 F.3d 1154), is discussed below
[Footnote continued on next page]

ambiguous.  Instead, they should be afforded their plain and obvious meaning, as understood by a layperson.  Additionally, the Court should not consider extrinsic evidence in this case, but should instead rely on the claims in the complaints.

As explained in Dongbu's initial brief, the Second Amended Complaint alleges that OKP was warned not to clear the land and why, and without advance written permission, and yet it did so anyway, all in violation of Commonwealth law.  In fact, the Second Amended Complaint, like the two complaints before it, is rife with allegations of intentional and outrageous conduct by OKP that form the basis for every stated cause of action.  *See especially* Second Amended Complaint, Paragraphs 60-69.

However, even if the Court were to consider extrinsic evidence as urged by OKP, and even if the Court were to simply accept what OKP claims to be the undisputed, judicially established facts, then even then—the underlying occurrence is still not an accident under either policy.

First, the clearing of the Atalig land, including bulldozing debris into the 'do not disturb' area, is fundamentally not an accident as a layperson would consider the term.  Second, review of the case law confirms this point.

**A.  The actions underlying the Atalig claims are not accidental according to the plain meaning of the word.**

_____

[Footnote continued from previous page]

regarding the expected extent of damage.

It is established CNMI law that the terms "caused by accident" in the Auto policy and "accidental loss" in the CAR policy should be afforded [their] plain and ordinary meaning "against the background of a layman's understanding of the entire policy." *Ito*, 4 N.M.I. at 68, *citations omitted*; *and see also Makarka v. Great Am. Ins. Co.*, 14 P.3d 964, 970 (Alaska 2000)(looking in large part to whether a reasonable lay interpretation of the policy would encompass coverage under the circumstances).

Again, even assuming that the Court does look to extrinsic evidence in this case, it is clear that OKP's layperson understanding was that no accident had occurred under either policy.

As a starting point, the CAR and Auto policies should be understood as designed only to cover OKP in direct connection with its expansion of the Rota airport under its contract with CPA, and not as extending to OKP's lease of the Atalig land. OKP never requested any insurance coverage under those policies or any other coverage in connection with its lease of the Atalig land, and in fact OKP never even told Dongbu or Moylan's that it had leased the Atalig land. Declaration of Cecilia A. Anas; Declaration of Brian M. Chen. Hence, in requesting the coverage, OKP never exhibited any intention to obtain any insurance coverage whatsoever in connection with the Atalig land.

When the alleged property damage occurred in late 2005, OKP demonstrated that its lay understanding was that no accident had occurred. OKP never reported any accident to Dongbu, and OKP never reported that anyone was making claims against it in January 2006 in connection with its actions on the Atalig land. In fact, even when Ms. Anas raised the issue to Mr. Chen

when he visited her office on other business *after the lawsuit had been filed and after OKP had already hired counsel to defend it*, and she mentioned that she had read about the lawsuit in the newspaper, Mr. Chen never indicated that OKP was tendering the claim or that it thought an accident had occurred. Anas Declaration. Even when OKP did first provide a copy of the First Amended Complaint to Dongbu (through Moylan's), it indicated that it had already retained defense counsel and that there was no need to do anything in response or to "worry about it." Anas Declaration. OKP's reaction was of course consistent with what an objectively reasonably layperson would believe.

Again, even if the Court relies on the extrinsic evidence submitted by OKP as exhibits to their briefs, here is what it shows about the circumstances surrounding the bulldozing of the land and artifacts on that land:

1. OKP knew that the land contained historical artifacts and that in particular, the area around the Japanese water tank and taro patch were not to be cleared. OKP Exhibit 24B, Paragraph 3 (latte stones and other artifacts all over the property); Paragraph 18 (OKP knew).

2. OKP knew that Commonwealth law required it to obtain permits from HPO and the Coastal Resources Management office before clearing any land on the Atalig land, and OKP knew that the primary purpose of the HPO permit is to prevent the destruction of historically significant artifacts (even if only constructively, as one is presumed to know the law; and in fairness OKP is a large

and sophisticated company).

3.  OKP knew the lease required it to obtain the written permission of the lessor before clearing any land and yet it did not.  Lease, Paragraph 13.1, attached as Exhibit C to Dongbu's motion for summary judgment.

4.  OKP was specifically re-warned not to clear the land by the Japanese water tank and that area was marked off, including by barbed wire, and OKP never had permission to clear the land near the taro patch.  OKP Exhibit 24B, Paragraphs 28-29 (warned not to clear marked off area by Japanese water tank); Paragraph 30 (never had permission to clear by taro patch).

5.  Despite all of the above, OKP bulldozed and cleared "a very large area" that included "a Latte Stone set, a Japanese water cistern, a Japanese wash basin, a barb wire fence, the Korean fishing net, bamboo, fruit trees, flower trees, a mortar and a pestle.  All were cleared away by OKP."  The bulldozed areas included both the area around the Japanese water tank and the taro patch area.  OKP Exhibit 24B, Paragraphs 33 and 34.[7]

Hence, while one can 'lawyer' this thing in any number of ways, that is not the legal

---

[7] The court in the underlying case was of course clear that its January 30, 2008 order and the underlying statement of facts was not a final determination of the facts, and that evidence could be admitted at trial to counter that version of events.  The point here is simply that even if this Court does not simply rely on the general "eight corners" rule and it looks to extrinsic evidence, at most, it should accept all of the "evidence" submitted by OKP.  It should also be noted that there is sufficient evidence of outrageous conduct in the opinion of that court to allow the jury to decide whether Mr. Atalig is entitled to punitive damages.

standard.  The standard is not to claim the term is ambiguous simply because it is undefined, and then to search for a possible construction, however strained, that attempts to re-work bulldozed property being damaged into some kind of occurrence "caused by accident," or some form of "accidental loss."  Instead, as the CNMI Supreme Court has already accepted as a nearly universal insurance principle, that terms should be construed according to their "plain and ordinary meaning" in the context of how a layman would understand them.  *Id.*

Here, OKP cleared, excavated and bulldozed into the 'do not disturb' areas by the Japanese water tank and taro patch, knowing that the bulldozer would basically plow through, level, damage and destroy any vegetation and anything else on the surface of that land, regardless of whether some form of useful plant, artifacts, a bicycle hidden in the brush or anything else—this is what bulldozers do.  OKP intentionally bulldozed land that it had been warned not to clear and why, and it did so in violation of laws designed to prevent just such an occurrence.  And even absent the warnings and law—it would seem evident that a layperson would find it pretty obvious that whatever gets plowed over by a bulldozer is going to be severely damaged or destroyed.

**B.  Review of the case law cited by the parties further shows that the actions underlying the Atalig claims are not accidental under the two policies.**

The parties cite a wide range of cases regarding what is an accident.  Those cases in turn seem to contain a wide range of standards and the cases articulate the standards in a number of ways.  However, a review of the parties' initial coverage letters and their briefs in this case show that, in essence, both parties are relying on the same standard:  it is admitted that all of the

actions in clearing and working on the Atalig leasehold property were intentional, and the issue is whether the results were reasonably foreseeable. *See for example Martin Marietta Materials Southwest, Ltd. v. St. Paul Guardian Ins.*, 145 F.Supp.2d 794, 800 (N.D.Tex. 2001)(general liability insurer had no duty to defend negligence claims where insured intentionally diverted water and resulting damage downstream "naturally and foreseeably resulted"); *NAS Surety Group v. Precision Wood Products, Inc.*, 271 F.Supp.2d 776, 783 (M.D.N.C. 2003)(collateral damage caused by repair to defective work is foreseeable and thus not an "accident" or an "occurrence"). Both of these cases were cited by Dongbu in its March 5, 2007 coverage letter.  OKP Exhibit 10.

Understandably, OKP sometimes suggests in its briefs that that the issue is whether the specific results were intended.  However, tellingly, OKP repeatedly concedes that the standard is whether the results were foreseeable. *See for example* OKP's brief in support of its motion for summary judgment, page 24, lines 24-25 ("It is clear that the alleged damage to the artifacts which Atalig claims was an unintended and unforeseen consequence."); *and* OKP's response to Dongbu's motion for summary judgment, page 17, lines 13-14 ("It is a situation where he would not reasonably anticipate his bulldozing activities would cause damage; it was not foreseeable.").

    1. The cases cited by OKP tend to support the same legal standard as advocated by Dongbu— foreseeeability of results; but they are distinguishable on their facts.

The case law cited by OKP also recognizes this as the clear majority rule.  For example, OKP has consistently cited *Allstate Insurance Co. v. McCarn*, 645 N.E.2d 20 (2002).  As quoted by OKP at page 19 of its opening brief, the *McCarn* case notes that an occurrence is an accident where "the intended act created a direct risk of harm from which the consequences should

reasonably have been expected from the standpoint of the insured." *McCarn*, 645 N.E.2d at 23.

In *McCarn*, a 16-year-old boy was killed when his friend, another 16-year-old boy, accidentally shot him. The court held that, under the circumstances, the boy did not reasonably foresee that pulling the trigger of an unloaded gun would harm his friend. *Id*. In contrast, in this case, OKP should reasonably have foreseen that if it disregarded the warnings not to clear land and why, and that if it also failed to obtain the required HPO permit, and that if it them bulldozed that land, property damage would result. And even if one looks at it more narrowly, the bulldozer operator certainly knew he was severely damaging or even outright destroying whatever was on the property.[8]

The next case that OKP cites in this section of its opening brief confirms that a "transaction as a whole" test should be applied. *McGroarty v. Great Am. Ins. Co.*, 36 N.Y.S. 2d 358, 329 N.E.2d 172, 364 (N.Y. 1975). The facts in *McGroarty* are also distinguishable, in that a person ran a red light, and then there was an accident. People routinely run red lights with no resulting harm or damage of any kind. True, it is an intentional violation of the law and risky, but nonetheless we have all seen many people run red lights without any resulting automobile accident. Here, OKP knew that it was damaging or destroying property.

---

[8] Additionally, *Allstate Ins. Co. v. McCarn* was remanded (*see Allstate Ins. Co. v. McCarn*, 469 Mich. 954, 671 N.W.2d 54, 2003 Mich. LEXIS 2489 (2003)) and ultimately the Supreme Court of Michigan in *Allstate Ins. Co. v. McCarn*, 471 Mich. 283, 683 N.W.2d 656, 2004 Mich. LEXIS 1697 (2004) was required to clarify the lower case cited by OKP by ruling that it was the ***criminal-acts exception*** provision in the insurance policy that did not preclude coverage because reasonable minds could not differ as to whether a gun believed to be unloaded would not fire a shot.

The third case cited by OKP in this section of its opening brief is even further removed from the facts before this Court. In *Shelby Cas. Ins. Co. v. H.T.*, 391 N.J. Super. 406 (App.Div. 2007), the insurer had sought a declaration that it was not obligated to provide liability coverage under a homeowner's insurance policy it issued to respondent parents with regard to their minor son's liability for sexually assaulting a six-year-old girl. The offending minor was 14 years old at the time of the assault against the victim. The policy contained an exclusion from liability coverage for bodily injury which was expected or intended by one or more insureds, even if the bodily injury was of a different kind, quality or degree than expected or intended. The dispositive issue before that Court was whether the intentional injury exclusion in the insurance policy precluded coverage. *Shelby Cas. Ins. Co.*, 391 N.J. Super. at 410. Ultimately, the Court held:

> We therefore conclude that for a sexual offender under the age of fourteen, the inferred intent doctrine does not apply, and the offender's subjective intent must be determined on a case by case basis.

*Shelby Cas. Ins. Co. v. H.T.*, 391 N.J. Super. 406, 418 (App.Div. 2007). Hence, *Shelby* is confined to its facts.

The next three cases in this section of OKP's opening brief are also easily distinguished from this case. *Quincy Mutual Fire Ins. Co. v. Abernathy*, 469 N.E.2d 797 (Mass. 1984)(another intentional injury exclusion case where it was unclear whether the minor doing something [rock throwing] reasonably intended harm); *Herrera v. C.A. Seguros Catatumbo*, 844 So.2d 664 (Fl. App. 2003)(unclear whether airline crew reasonably intended any harm to passengers by removing them from aircraft where the crew did not know the passengers would be body

searched); *and Fid. Cas. Co.. v. Wrather*, 652 S.W.2d 245 (Mo. App. 1983)(farmer intended to burn what field by towing tire on fire like he usually did, and as was apparently common, but did not reasonably foresee smoke would result in an accident on the nearby road).

The other cases cited by OKP in the applicable sections of its two briefs are also distinguishable on their facts, although again, many apply the same foreseeability of results standard, even if in different language. *See* OKP's opening brief, pages 19-24; *and* OKP's brief in response to Dongbu's motion for summary judgment, pages 15-20; *and see for example Haynes v. American Cas. Co.*, 179 A2d 900 (Md. App. 1962)(cutting down trees on an adjacent property did not involve the intention to cause any damage at all as opposed to this case where operator knew he would damage land by bulldozing debris piles into it); *Meyer v. Pacific Employers Ins. Co.*, 233 Cal.App.2d 321 (Cal. App. 1965)(well drilling caused vibration to adjoining land, as opposed to damage to land intentionally damaged).

2.  *Maupin and McAllister show there was no accident in this case.*

Both Dongbu and OKP argue that these two cases support their position in this case. In *Argonaut Southwest Ins. Co. v. Maupin,* 500 S.W.2d 633 (Tex. 1973), a construction company entered into a contract to provide filler material from a third-party's land for use in a road improvement project on a state highway. *Id.* at 633-34. It turned out, however, that the third-party did not own the land and the true owners subsequently brought an action against the construction company for trespass. *Id.* at 634. The Texas Supreme Court ruled that the underlying defendant's removal of material from another's land was not an accident. They "did

exactly what they intended to do . . . . The fact that they were unaware of the true owner of the property has no bearing upon whether the trespass was caused by accident." *Id.* at 635-636. OKP responds that "[O]urs is not a trespass case nor is it a case based on intentional acts with intentional results." OKP response to Dongbu's motion for summary judgment, page 12, lines 8-9.

True, this is not a trespass case. The instant case involves OKP destroying property that it had leased and over which it was exercising control, which is addressed further below. However, this case does involve (once again, even accepting OKP's narrow version of the case, *arguendo*) OKP intentionally bulldozing debris piles into an area that had been designated 'do not disturb,' and of course some property damage was inevitable.[9]

In *McAllister v. Hawkeye-Security Ins. Co.*, 215 N.E.2d 477 (Ill. App. 1966), the court concluded that there was an accident where a construction company did some earth moving on the wrong land, in the mistaken belief it was the land on which they were supposed to work. Dongbu submits that this case was probably wrongly decided, but regardless, it is distinguishable from this case in that here OKP bulldozed the debris piles into the very land it intended to bulldoze the debris piles (from the standpoint of the bulldozer operator), which was part of

---

[9] Dongbu also notes that its "natural and probable" or "natural and intended" consequences cases all essentially follow the same pattern as the cases cited by OKP. There are cases outside the broad boundaries, but the vast majority of cases look to whether any damage or harm was reasonably foreseeable. Because the cases cited by OKP in its briefs contain this same language (both as set forth in its briefs and as cited several times above), Dongbu will not engage in an elaborate exploration of the various different articulations of this same basic reasonable foreseeablity standard.

OKP's leased property and land they had been repeatedly warned not to clear, and at least once warned not to clear because of the present of historical artifacts. Hence, the instance case is actually more about whether the extent of the damage done is greater than was intended.

3. The majority approach is that the expected extent of harm is irrelevant.

In *Morner v. Giuliano*, 856 N.E.2d 602 (OH. App. 2006), both the meaning of 'accident' and the intentional acts exclusion were at issue (the latter generally a higher standard for an insurer than cases construing whether an occurrence is an accident under a policy's insuring agreement). *Morner* involved a minor shooting at someone with a BB gun that he knew was loaded. The *Morner* court distinguished *Abernathy* (discussed above and cited by OKP), on the basis that in *Morner*, the minor knew the gun was loaded, and so he reasonably should have known that in shooting at someone he could do serious damage. OKP's oft cited *Mcarn* case is similarly distinguished. In *Morner*, the child knew the gun was loaded, while in *McCarn* the child did not. In the instant case, OKP and its bulldozer operator knew the bulldozer was 'loaded,' that its bulldozing into property would foreseeably destroy anything on the surface of that property.

The *Morner* case also points to a clear majority rule that is on point in this case. In *Morner*, the child only intended to "get a rise" out of the persons he was shooting at, to give them a "stinging sensation" and "leave a welt." He did not intend to do the "far more serious injury that he did in fact cause..." The *Morner* court nonetheless found that the shooting was not an accident and that it was intended or expected from the standpoint of the insured, in that it was

reasonably foreseeable that the child could some harm, even if not the far more severe damage

that resulted.  The *Morner* court noted:

> Nevertheless, under the majority rule in this country, it is apparent that with respect to exclusion for expected or intended injury, or intentional injury exclusion, the exclusion applies "if the insured intended to do a particular act, and intended to do some harm, even if the harm actually done was radically different from that intended."
>
> *Id.* at 609, *citing Allstate Ins. Co. v. Steinemer*, 723 F.2d 873, 875 (11th Cir. 1984).

*Morner* should be controlling in this case.  As noted by OKP, absent controlling CNMI

law on point or an applicable Restatement, the weight of the common law should apply.  7 CMC

§ 3401.  It is true that *Morner* and other cases combine two different policy issues in their

discussions, in that they often meld the interpretation of 'accident' in the insuring agreement

provisions with various intentional acts exclusions, but review of the cases and three approaches

discussed by the *Morner* court demonstrate that the same principles are involved.  *See also*

*Nationwide Insurance v. Board of Trustees of the University of Illinois*, 116 F.3d 1154, 1158 (7th

Cir. 1997)(no duty to defend where insured intended only to burn three letters onto a football

field but did $600,000 in damage to the Astroturf).[10]

And to be clear—in the instant case, it was reasonably foreseeable to OKP that when it

bulldozed the land the damage that occurred would occur.  OKP had been warned not to clear the

land and why.  However, even if one were to look at it the issue as self-servingly as OKP argues

---

[10] Also, the Court may note that both parties have cited both types of cases (accident and intentional acts
[Footnote continued on next page]

for, and one were only to consider what the particular bulldozer operator could reasonably have foreseen, he could reasonably have foreseen that bulldozing the property would severely damage anything and everything on it. And the majority approach is even stronger—he only need to know that bulldozing the land would cause some damage, even if the actual resulting damage was "radically different" from what was intended. *Steinemer*, 723 F.2d at 875.

In sum, the clearing of the Atalig land, including bulldozing debris into the 'do not disturb' area, is fundamentally not an accident as a layperson would consider the term. Review of the case law confirms this point. A reasonable person would foresee some damage—that's what bulldozers do when they push debris piles onto land, and the extent of the harm, even if radically different, is not relevant.

## IV.
## OTHER TERMS AND CONDITIONS BAR ANY OBLIGATION TO DEFEND

Dongbu's briefing has focused on the fact that the alleged occurrence is not an accident within the two policies' insuring agreements. However, a number of other terms and conditions also bar any obligation to defend, and most of these are equally clear.

First, the alleged occurrence is outside the scope of the CAR policy in that the damage to Atalig property is not in direct connection with the Rota airport expansion.

Second, the alleged damage occurred to property held in the care, custody and control of

---

[Footnote continued from previous page]

exclusion cases).

OKP, and as such, is excluded from coverage.

Third, the claims arise out of the lease, which is liability assumed under a contract and is therefore excluded from coverage.

**A.  The alleged damage to the Atalig property is outside the scope of the CAR policy.**

The CAR policy insuring agreement limits its scope to events:

> occurring in direct connection with the construction or erection of the items insured under Section [sic] and happening on or in the immediate vicinity of the site during the Period of Cover.

> CAR coverage form, Third Party Liability section, bates number 000023, attached as **Exhibit A** to the Declaration of Tamara L. Hunter.

Regardless of the typographical error that omits "I" from "Section I," it is clear from an overall review of the policy that the intent of the provision is to limit the occurrences to those occurring in direct connection with the material works being constructed as part of the "material damage" at Section I of the policy, as set forth on the schedule at 000002.[11]

Additionally, while OKP claims that the "site" is Rota, the policy actually goes beyond that, when read as a whole according to its plain meaning.  The entire applicable block of the schedule reads:

> Title of Construction:

---

[11] Additionally, the "Period of Cover" is set forth to begin from January 16, 2006 forward (000003), or whenever work begins on the airport expansion project (00018).  OKP claims that the bulldozing of the Atalig land, allegedly in December 2005, would be part of the commencement of work.  At a minimum, there needs to be discovery on this issue to determine the exact relationship between the lease and the work done on that land, and the airport expansion project.

**Rota Int'l. Airport Project**

Site of Construction:

**Rota, Commonwealth of the Northern Mariana Iaslands**

*See* Schedule, 000002.

Hence, the obvious intention of the Contractors All Risk policy is to ensure against

Material Damage (Section I) and Third Party Liability (Section II) occurring in direct connection

with the actual construction or erection of the contract works at the airport runway, and not

activities indirectly connected to that, such as purchasing and mining backfill, leasing property to

use as a barracks and parking lot, eating at restaurants in the evening or any other activities on

Rota that, however naturally occurring as part of OKP performing the work under the CPA

contract, are not in "direct connection" with the work.  Instead, they are in indirect connection,

according to the plain meaning of the word.  This should be dispositive under *Ito*.  Another

federal court put it this way:

> Under Colorado law, insurance contracts "are to be construed
> according to the general rules for construction of contracts." *Marez
> v. Dairyland Ins. Co.*, 638 P. 2d 286, 289 (Colo. banc 1982), since a
> policy of insurance "is not sui generis but is treated in the law in the
> same way as contracts are treated generally and is to be interpreted
> according to the intent of the parties," *id.* at 289. Moreover, "where
> the terms of an insurance contract are plain and unambiguous, the
> court may not rewrite the contract between the parties, nor limit the
> effect of the contract as written," *Gulf Ins. v. State*, 43 Colo. App.
> 360, 607 P. 2d 1016, 1018 (1979), nor may the court "force an
> ambiguity in order to resolve it against an insurer." *Martinez v.
> Hawkeye-Security Ins. Co.*, 195 Colo. 184, 576 P. 2d 1017, 1019
> (1978), or hold the insurer "liable beyond the scope of risks which
> have been clearly covered in the insurance policy," *id.* at 1019. "All
> of the provisions must be read as a whole," *Mid-Century Ins. Co. v.
> Liljestrand*, 620 P. 2d 1064, 1067 (Colo. banc 1980), and where, as
> in the case at bar, the policy bears annexed endorsements, "they must

be considered as a single instrument and they should be construed together in the absence of an internal conflict which cannot be reconciled." *Martinez v. Hawkeye-Security Ins. Co., supra.* Further, "the endorsement[,] being the last expression of intent[,] prevails if the language of [it and the policy] conflicts." Id. at 1019. Finally, the interpretation of an insurance policy, as with any other written contract, is a matter of law to be determined exclusively by the court. *Ohio Casualty Ins. Co. v. Guaranty Nat'l. Ins. Co.*, 197 Colo. 264, 592 P. 2d 397, 398 (1979).

*Wright v. Newman*, 598 F. Supp. 1178, 1193 (W.D. Mo. 1984).

Additionally it is also not enough for OKP to simply claim its an "all risk" policy so the claim must be covered. As explained in *Standard Structural Steel Co. v. Bethlehem Steel Corp., 597 F. Supp. 164, 192 (D.Conn. 1984)* (the label all risk is essentially a "misnomer" and all risk policies are not all loss policies . . . they contain express written exclusions and implied exceptions which have been developed by the courts over the years).

Besides, it is too big a stretch for OKP to now claim otherwise. OKP has already demonstrated what they intended and believed. OKP never asked for any coverage in connection with the Atalig lease, and OKP never even mentioned that it had already leased that land at the time it worked with Ms. Anas to obtain the insurance coverage required by the CPA contract. Anas Declaration. Then, OKP continued to demonstrate its intentions and beliefs in that it never informed Dongbu of the alleged damage in 2005 or in January 2006 or at any other time until at least August 2006. And OKP certainly never requested that its attorneys' fees be paid, let alone requesting advance written consent as required by the policy.[12]

---

[12] It is interesting to note however that OKP originally reported something different and in its brief
[Footnote continued on next page]

Finally, there is an endorsement for Existing Structures and/or Surrounding Property at

000010.  This endorsement makes its clear that even if one were to conclude the "site" includes

the Atalig leased property, and even if one were to conclude that the bulldozing of the land was

done in "direct connection" with the construction or erection of items insured under Section I,

that the limits of indemnity (with no separate defense obligation in the CAR policy), shall be

limited to the limits for "Surrounding Properties" at Section III.  There is no Section III to cover

surrounding properties and other property damage on the site (other than contract works at

Section I) precisely because the insured, OKP, never requested such collateral and additional

coverage.  Hence, there is no applicable indemnity, and of course, this endorsement also helps to

understand how the CAR policy is designed to work as a whole.

**B. The alleged damage occurred to property held in the care, custody and control of OKP, and as such, is excluded from coverage.**

Exclusion IX(a) of the Auto Policy excludes "injury to or destruction of property owned

by, *rented to*, in charge of or transported by the insured." Auto policy at 000049, attached as

**Exhibit B** to the Hunter Declaration (emphasis added).

---

[Footnote continued from previous page]

explained that it purchased the subject two policies of insurance from Dongbu with the expectation that such policies would provide coverage for claims which might arise in connection to "work it was doing on the Rota International Airport Project." *See* OKP Motion for Summary Judgment, Summary of Argument, page 5, lines 6-9.  In essence it must be noted that OKP is actually conceding that the alleged accident did not occur at the airport construction site and that work is only indirectly connected to the construction project at the airport.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

A similar exclusion in the CAR Policy pertinent to the third party liability section explains that Dongbu will not indemnify OKP in respect to liability consequent upon "loss of or damage to property belonging to or held in care, custody or control of the Contractor(s), the Principal(s) or any other firm connected with the project which or part of which is insured" under the policy. 000024.

Again, under *Ito*, the Court should apply plain meaning of these terms, and just because they are not defined does not mean they are ambiguous. Lawyers will disagree, but frankly, reasonable laypersons would not dispute that the land and everything on it was "rented" to OKP, or that the property was in the "care, custody or control" of OKP. OKP entered into the lease and then entered the property, subject to all terms and conditions of the lease, and now OKP is being sued for breach of a number of those provisions. Similarly, OKP obviously exercised control over the property when it disregarded warnings not to clear certain areas and bulldozed them.

In response, OKP argues that Mr. Atalig's claims must be for damage to personal property, and that such property was not covered by the lease agreement between Atalig and OKP, and therefore the exclusions do not apply. *See* OKP Motion for Summary Judgment, page 36, lines 6-7. OKP then attempts to make a distinction between OKP's real property lease with Mr. Atalig and specifically whether the artifacts were rented to or in charge of OKP under the lease. OKP cites *State Farm Fire & Casualty Company v. Kohen*, 424 N.E.2d 992, 994, 995 (1981). OKP argues that because OKP was required to obtain permits or written consent under the lease, that fact is inconsistent with OKP having an "ownership-like status" and therefore the

exclusions are inapplicable.  OKP's arguments fall short.

First, Atalig leased the real property at issue for thirteen months.  The leased premises included the improvements and the real property upon which the artifacts were located.  *See* Lease Agreement, page 1, PREMISES.  Under the lease, OKP enjoyed ownership-like status in full:

> Lessee may use, improve and develop the Premises or any part thereof for any lawful purpose, provided that the Lessee does not commit waste, but primarily as office, barracks, equipment repair shop and workstation, heavy and lightweight equipment parking and storage, and as a staging area related to Lessee's business and operation on Rota.

OKP's right to build was limited for some things by the having to first obtain Atalig's written consent, *see* Lease Agreement, page 5 LESSEE'S RIGHT TO BUILD, but once the lease went into effect, contrary to OKP's circular argument, *for thirteen months* OKP did enjoy ownership-like status.

Second, *State Farm Fire & Casualty Company v. Kohen*, 424 N.E.2d 992 (1981) actually supports Dongbu's position.  The ultimate holding in that case held that under the exclusion clause in an automobile policy for property damage in the charge of an insured, the plaintiff insurer did not have a duty to defend or indemnify defendant insured with respect to the negligence count in a suit brought by the vehicle's owner.  *State Farm Fire & Casualty Co. v. Kohen*, 98 Ill. App. 3d 860, 864 (Ill. App. Ct. 3d Dist. 1981).[13]  While analyzing the issue, that

---

[13] In *Kohen*, the Defendant purchased a used 1977 Corvette, registered and obtained a certificate of title and license for it in Illinois, and insured it with State Farm.  Defendant's coverage included liability and
[Footnote continued on next page]

Court ultimately reasoned:

> The justification for the exclusion of this kind of exposure from automobile liability insurance was given in *Parry v. Maryland Casualty Co.* (1930), 228 App. Div. 393, 395, 240 N.Y.S. 105, 107: "The limitations relate to property in which the assured has either a general or a special interest. As to such property, both the frequency of accident and the opportunities for fraud create a high hazard and make the risk undesirable, at least at the rate charged for the ordinary coverage."

*State Farm Fire & Casualty Co. v. Kohen*, 98 Ill. App. 3d 860, 862-863 (Ill. App. Ct. 3d Dist.

1981).

This holding and reasoning from *State Farm Fire & Casualty Co. v. Kohen* support the

fact that Dongbu does not owe OKP the duty to defend against Atalig's case. OKP was in

control of the property that it argues was damaged by one of its vehicles. However, the

insurance policy excludes from coverage property for which OKP was renting and was in charge

of – accordingly, the policy does not apply to those claims for damages and Dongbu has no duty

---

[Footnote continued from previous page]

collision insurance. After having driven the car for approximately 5 months, Defendant totally demolished it in a collision. State Farm paid more than $ 8,000 to Defendant pursuant to the collision coverage, whereupon Defendant assigned his certificate of title to the insurer. Upon examining the car, State Farm discovered that the car's hidden identification number did not correspond to the serial number visible through the windshield. Defendant had used the latter number to obtain the Illinois title and license and the insurance. It was then learned that the car was owned by another person, Deborah Kent. The car had been stolen in Houston, Texas, in March 1978. In 1979, Kent filed a two-count suit against Defendant and charged him with conversion of her car and its negligent operation. Upon demand by Defendant to defend the suit, State Farm denied coverage, but agreed to defend under a reservation of rights. State Farm then filed the instant declaratory judgment action to determine whether it had the duty to defend and indemnify Defendant in accordance with his liability insurance.

[Footnote continued on next page]

to defend.[14]

**C. Third, the claims arise out of the lease, which is liability assumed under a contract and is therefore excluded from coverage.**

OKP argues that Exclusion V(a) of the Auto policy does not apply because the purpose of such provision is to exclude coverage liability where the insured assumes the responsibility for the acts of a third party, usually in situations under an indemnity or hold harmless agreement. Exclusion V(a) is simple enough and excludes from property damage coverage "the liability assumed by the insured under any contract or agreement." 000048.

Dongbu agrees with OKP's general legal position, but OKP did in fact enter into a contract here where it assumed liability and potential liability for third persons and the actions of third persons. A number of provisions in the lease agreement OKP entered into with Atalig are directly applicable. One is Paragraph No. 12 of the lease, which provides in relevant part that OKP will indemnify Atalig against all liability, loss, cost damage or expense of litigation: (i) on the account of or through the use of the demised, premised or improvements by OKP or any

---

[Footnote continued from previous page]

*State Farm Fire & Casualty Co. v. Kohen*, 98 Ill. App. 3d 860, 861 (Ill. App. Ct. 3d Dist. 1981).

[14] *See also, Dryden Oil Co. v. Travelers Indem. Co.*, 91 F.3d 278, 284 (1st Cir. Mass. 1996)(a primary function served by Owned or Leased Premises Exclusion "is to prevent the insured from using a liability insurance policy as if it provided property insurance")(*citing* Kenneth S. Abraham, Environmental Liability Insurance Law 163 (1991)(it likewise insulates against "the 'moral hazard' problem where an insured has less incentive to take precaution owing to the existence of insurance")(*citing* Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 10.03[b], at 441 (8th ed. 1995) (*quoting United States v. Conservation Chem. Co.*, 653 F. Supp. 152, 199 (W.D. Mo. 1986) (internal quotation marks omitted)).

person acting under the authority direction in the interest of OKP; (ii) arising out of or directly or indirectly due to any failure of OKP to satisfy its obligations to Atalig; and (iii) arising out of directly or indirectly due to any accident or other occurrence causing injury to any property resulting from the use of the premises or any part thereof, including the land.  A second is found at Paragraph 23 of the lease agreement and provides that the prevailing party shall recover from the other party costs and reasonable attorneys' fees to any suit brought to recover rent or because of any breach of any term covenant condition or provision of the lease.

These two conditions in the Atalig lease are exactly the type of risk Exclusion V(a) was designed to prevent Dongbu from being forced to assume, whether unknowingly as part of an undisclosed lease already entered into (like here), or at some future point, and all without any additional premium to cover for those unknown and unknowable risks.  More broadly, if an insured could enter into contracts to expand his potential liability under insurance policies, all without disclosure of such contracts, then the insurance system would be unworkable in that insurers could not rationally assign premiums to the appropriate risk groups.  Put another way, insurers have a right to quantify and limit their risks.

## V.
## OKP FAILED TO COMPLY WITH THE POLICIES' NOTICE REQUIREMENTS

OKP failed to comply with the notice provisions of the two policies and OKP's failure is not excused under the circumstances.

**A.  OKP failed to comply with the policies' notice requirements.**

As a starting point, the parties have been talking about the duty to defend under the two

1    policies.  This has been a shorthand usage, since the Auto policy does generally require Dongbu

2    to defend any potentially covered claim, and the CAR policy does generally require Dongbu to

3    pay OKP's reasonable defense costs with the advance written consent of Dongbu.

4         However, it is important to note that the CAR policy does not actually contain any terms

5    creating a duty to defend.  Instead, the policy is clear that it is instead only that Dongbu must

6    reimburse OKP for any reasonable defense costs it incurs with the advance written consent of

7    Dongbu, and subject to all other terms and conditions in the policy.  Condition 5 of the policy

8    form, 000019.  *See* 7C Appleman, Insurance Law and Practice, §4682 (1979 & Supp. 1995)(the

9    duty to defend is contractual and if there is no contract to defend then there is no duty to defend).

10   As explained in *Chief Indus. v. Great N. Ins. Co.,* 268 Neb. 450, 461 (Neb. 200):

> Coverage under an insurance policy or contract is generally understood to consist of
> two separate and distinct obligations: the duty to defend any suit filed against the
> insured party and the duty to pay, on behalf of the insured, sums for which the
> insured shall become legally obligated to pay because of injury caused to a third
> party by acts of the insured. *R.W. v. Schrein*, 263 Neb. 708, 642 N.W.2d 505 (2002).
> We have observed that generally, an insurer's duty to defend is broader than its duty
> to indemnify. *See Ohio Cas. Inc. Co. v. Carman Cartage Co.*, 262 Neb. 930, 636
> N.W.2d 862 (2001).  However, we have also stated that because contract terms
> govern the duty, an insurance policy may relieve the insurer of any duty to defend.
> *Id.* Because the duty to defend and the duty to indemnify are separate and distinct
> obligations, it is possible, if perhaps not commonplace, for an insurer to limit its
> duty to defend without simultaneously limiting its duty to indemnify. *See American
> States Ins. Co. v. Dastar Corp.*, 318 F.3d 881 (9th Cir. 2003).

21        The CAR policy expressly states that OKP must give Dongbu immediate notice and that

22   Dongbu "shall not in any case be liable for loss, damage or liability of which no notice has been

23   received by [Dongbu] within 14 days of the occurrence."  This language could not be plainer, and

here OKP failed to give any notice of the occurrence for months, even though OKP was on notice of the alleged occurrence at least since the January 2006 demand letter. Hence, Dongbu cannot be liable for any "loss, damage or liability."[15] Additionally, OKP has incurred all of the defense costs to date without any advance written consent of Dongbu, and in fact, it has never even requested such reimbursement to date.

Similarly, the Auto policy requires immediate written notice of any "accident," and it is undisputed that OKP never gave Dongbu any written notice of the claim until at least August. The earlier discussion between Ms. Anas and Mr. Chen cannot be considered notice, since there was no indication at that time from Mr. Chen or anyone else at OKP that it was tendering the claim. Anas Declaration; Chen Declaration. To the contrary, it is clear that OKP had already hired its own counsel to defend the Atalig lawsuit.

**B. OKP's late notice is not excused under the circumstances.**

OKP boldly claims it did not provide late notice, and that Dongbu has waived any claim that OKP did.

### 1. OKP provided late notice.

Here is the relevant timeline:

1. December 2005- damage allegedly occurs.

2. January 2006- Mr. Atalig sends a demand letter to OKP.

---

[15] The CNMI Insurance Code provision at 4 CMC § 7505(c) requiring a minimum of twenty days is thus irrelevant, since months passed, and not some period between fourteen and twenty days.

3. March 2006- Mr. Chen visits Ms. Anas on other business and she brings up the lawsuit. Contrary to any form of notice of a *claim under the policies*, Mr. Chen never states or suggests that Dongbu should do anything, or that OKP believes the claims implicate the Dongbu policies. Hence, the practical effect of this meeting was the exact opposite of notice—Dongbu's agent reasonably and correctly got the impression that OKP was not tendering the claim.

4. August to September 2006- At least *eight* months after the alleged occurrence, *seven* months after receiving the default notice from Mr. Atalig, and after about *six months of defending the lawsuit with its own counsel*, OKP finally affects some kind of tender, but the matter is initially confused because: a) the August 14 facsimile is only an authorization to release insurance records to the counsel that OKP indicates in the facsimile that it has hired to represent it in the lawsuit (Clifford Declaration, Exhibit A); and b) Mr. Chen tells Ms. Anas not to worry about it and there was no need to do anything about the papers that had been forwarded. Hence, the tender was actually in September 2006, when counsel for OKP clarified that OKP was tendering defense of the claim.

5. October 23, 2006- the first meeting of the parties' counsel. Dongbu's counsel indicates that late notice is obviously an issue since the counsel have already been defending OKP all this time, that Dongbu is not waiving any of its rights under the policies and Dongbu is not asking OKP to waive any of its rights under the

policies, that Dongbu will attempt to resolve the matter by agreement, but that if that is not possible, Dongbu will initiate a coverage action.

6.  March 5, 2007- Dongbu's coverage letter is sent to OKP.

7.  July 12, 2007- OKP response letter is sent to Dongbu.

8.  October 12, 2007- Dongbu's response letter is sent to OKP, and seeks confirmation that only the Auto policy and the Atalig claims are at issue.

9.  December 4, 2007- OKP's response letter is sent to Dongbu, and indicates that unless additional information is discovered, only the Auto policy applies to the Atalig claim.  (Additional discussions followed among counsel regarding possible resolutions to avoid a coverage action.)

10. January 11, 2008- Dongbu files the coverage action.  (The complaint is subsequently amended when OKP changes it mind and confirms to Dongbu that OKP now takes the position the CAR policy may also apply.)

Hence, the response of Dongbu must be understood in the larger context of the many months that it took OKP to decide to tender a claim, OKP's confusion about whether it was actually affecting a tender in August and September 2006, OKP's active defense by its own retained counsel during all this time, the fact that the parties' counsel met the very next month after the notice and Dongbu indicated that notice was an issue, the fact that OKP took about as long to respond as Dongbu had, and then the fact that OKP relied on the "eight corners" rule (affirming no investigation was required) and it indicated the CAR policy did not apply.

2.  The Insurance Code provisions are inapplicable.

OKP cites to three provisions in the CNMI Insurance Code.  None are applicable.  4 CMC § 7505(c) merely goes to notice periods, and as noted above, the minimum period was exceeded by OPK by many months.  4 CMC § 7505(e) goes to waiver of defects in the notice that the insured could remedy.  Given that the initial meeting was not any form of notice of a claim under the policies, as discussed above, that provision is not implicated.

4 CMC § 7505(f) merely provides that late notice is waived if the insurer fails to promptly and specifically make an objection on that grounds.  There is no requirement for written notice, and so the clear verbal notice at the October 2006 meeting of counsel should suffice under the statute, and that was only a month after the late tender.[16]  Additionally, there is nothing in the Code provision at § 7505(f) that prohibits an insurer from contracting with an insured for a shorter notice period.  In contrast, § 7505(c) expressly prohibits a shorter notice period than twenty days.  Hence, under standard rules of statutory construction (inclusion of the prohibition in one section, and then not in another), there is no prohibition on an insurer from contracting for a fixed, non waivable period.  Here, the CAR policy has a twenty day period and then Auto policy requires immediate notice.  Finally, OKP should be legally and equitably estopped from relying on the statutory or common law waiver of late notice authority where it failed to give any

_____

[16] Additionally, the first *written* notice that Dongbu can locate was on March 5, 2007, and that was also reasonably prompt under the circumstances, and especially since the alleged occurrence happened in December 2005, meaning the time between occurrence and the September tender was nine months, while the time from tender to written response was only six months.  Again, however, there is nothing in the

[Footnote continued on next page]

notice for many months and instead hired counsel and actively defended the case.

                3. There is no basis to apply the notice prejudice rule in this case.

First, the notice prejudice rule does not apply to the CNMI. This Court is free to hold that, under the particular circumstances in this case, as set forth above, the rule should not be applied. *See American Motorists Ins. Co. v. General Host Corp.*, 919 F. Supp. 1506 (D. Kan. 1996) (applying New York law)(failure to give proper notification relieves insurer duty to defend even if insurer has independent knowledge of occurrence and even if insurer is not prejudiced by lack of compliance with notice provision).

Second, even if the notice prejudice rule is applied, Dongbu can show prejudice or there is a presumption of prejudice under the circumstances. *Bankers Ins. Co. v. Macias*, 475 So. 2d 1216, 1218 (Fla. 1985)(a notice of accident in most insurance policies is a condition precedent to a claim and while such a condition can be avoided by a party alleging and showing that the insurance carrier was not prejudiced by noncompliance with the condition – the burden should be on the party seeking an avoidance of a condition precedent); *Miller v. Dilts*, 463 N.E.2d 257, 265-67 (Ind. 1984) (holding that insurers were entitled to summary judgment because insured's late notice caused prejudice to insurers as a matter of law).[17]

_____

[Footnote continued from previous page]

Code requiring written notice.

[17] Dongbu further asks this Court to consider a line of cases from Illinois which looks at the reasons for the delay as another factor to consider when deciding whether to enforce the notice requirements. *See*

[Footnote continued on next page]

Additionally, OKP complains that Dongbu relies on OKP having voluntarily undertaken the defense in violation of the Auto Policy, which gives Dongbu both the right and the duty to defend the insured. OKP inquires whether it should have just allowed a default to be entered against it. Respectfully, that just doesn't make any sense under the circumstances in this case. Here, it is OKP that failed to give notice of the loss in December 2005, to submit a proof of loss within sixty days (Condition 1(c), 000045) and to give notice of the claim in January 2006, and it is OKP that first hired its own counsel to defend it for months before OKP tendered the claim to Dongbu.

In sum, it is OKP that was unreasonably late in providing notice, and that already had its own counsel actively defending it in the Atalig lawsuit for months before making any inquiries to Dongbu. Dongbu's response was reasonable under the circumstances, and OKP has waived, both legally and in equity, any right to rely on delay as a defense to its late notice. Additionally, prejudice can be presumed under the circumstances or, at a minimum, there are fact issues to be discovered regarding whether Dongbu can show prejudice.

## VI.

## OTHER ISSUES WHERE DISCOVERY MAY BE NEEDED

---

[Footnote continued from previous page]

*Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 358 Ill. App. 3d 880, 888 (Ill. App. Ct. 1st Dist. 2004), when an insured fails to comply with a notice provision, the insurer may be relieved of its duty to defend the insured under the policy because notice provisions are valid prerequisites to coverage and not mere technical requirements which the insured is free to overlook or ignore with impunity.

There are a number of other policy terms and conditions that may apply to bar or limit coverage in whole or in part. However, these are not directly relevant to the issue before the Court, which is solely whether Dongbu has a duty to defend OKP in the Atalig lawsuit.

The parties agree, generally, that a number of these issues may require discovery, and that such discovery can be problematic while the underlying Atalig lawsuit is pending. For example, if the Court rules that prejudice is an issue regarding late notice, then Dongbu would need to conduct discovery regarding prejudice. Clifford Declaration (Rule 56(f) sections).

OKP has put two issues before the Court, though, on its motion for summary judgment, and so Dongbu addresses those two briefly in turn.

**A. Intentional acts.**

The policies and insurance Code have provisions excluding willful, willfully negligent or intentional acts, albeit with slightly different language. Regardless, it is impossible to determine whether these provisions will apply, and if so, to what extent, until the underlying case is completed and those facts are either conclusively established in that case or can then be discovered into in this coverage case. Hence, Dongbu agrees with OKP that these provisions would not bar, entirely, a duty to defend under the Auto policy or the duty to pay reasonable defense costs under the CAR policy, at least at this stage.

**B. Punitive damages.**

OKP acknowledges that punitive damages are excluded under the CAR Policy, but OKP claims that the lack of an exclusion means that punitive damages are covered under the Auto

policy.

There is a split in authority as to whether punitive damages assessed against an insured are recoverable under the terms of a liability policy but, "under the better position, punitives are not covered despite policy language requiring the insurer to pay all sums which the insured is legally obligated to pay as damages." *Couch on Insurance* (3Ed.) § 172.33 View that Recovery Not Permitted. *Couch* explains:   "Where the public policy with respect to punitive damages is to punish a defendant, with the objective being to set an amount proportionate to the actual damages sustained, the magnitude and flagrancy of the offense, the importance of the principle violated, and the wealth of a defendant, such public policy prohibits coverage of punitive damages by insurance." *Id.*

OKP fails to explain how or why the absence of an exclusion means that Dongbu can be liable for any outrageous conduct, evil motive or reckless indifference of one of its employees. OKP claims its employees were merely negligent, but Mr. Atalig's punitive damages claim has not been dismissed.  Hence, at least so far, this means that the jury in the underlying case may rule that OKP is liable for punitive damages.

There is also no need for the Court to rule on this issue at this time.  The parties agree that regardless of whether the Auto policy must cover punitive damages liability, that is not a complete defense to the duty to defend as a matter of law.

## VII.
## CONCLUSION

Based on the foregoing, Dongbu respectfully requests this Court to rule that it has no duty

to defend OKP in the underlying Atalig lawsuit as a matter of law and under the undisputed material facts.

The CAR policy does not apply as a matter of law:

1. OKP has failed to meet its burden to show an "accidental loss" within the scope of the policy's insuring agreement, and this is true regardless of whether the Court looks to extrinsic evidence.

2. The loss is not in "direct connection" with the contract works.

3. The loss was to property in the care, custody and control of OKP.

4. The loss arises exclusively out of liability assumed under a contract.

5. OKP failed to comply with the policy's notice requirements and OKP failed to obtain the advance written consent of Dongbu to incur defense costs, and those failures are not excused under the undisputed circumstances in this case.

The Auto policy does not apply as a matter of law:

1. OKP has failed to meet its burden to show an occurrence "caused by an accident" within the scope of the policy's insuring agreement, and this is true regardless of whether the Court looks to extrinsic evidence.

2. The loss was to property rented by OKP.

3. The loss arises exclusively out of liability assumed under a contract.

4. OKP failed to comply with the policy's notice requirements and OKP voluntarily assumed its own defense, and those failures are not excused under the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

undisputed circumstances in this case.

Alternatively, if the Court does not agree with the above, then Dongbu requests the opportunity to conduct discovery at the appropriate time on any fact issues not resolved in the underlying Atalig case, as set forth more particularly in the Rule 56(f) section of the Clifford Declaration.

Wherefore, Dongbu prays for entry of judgment in its favor, and for such other and further relief to which it is entitled under law or in equity.

Respectfully submitted this 25th day of June, 2008.

Thomas E. Clifford
Counsel for Dongbu Insurance Company, Ltd.