1    CARLSMITH BALL LLP

2    JOHN D. OSBORN
     SEAN E. FRINK
3    Carlsmith Building, Capitol Hill
     P.O. Box 5241
4    Saipan, MP 96950-5241
     Tel No. 670.322.3455
5    Fax No. 670. 322-3368

6    Attorneys for Defendant
     OKP (CNMI) Corporation
7

8

9                    UNITED STATES DISTRICT COURT

10                              FOR THE

11                   NORTHERN MARIANA ISLANDS

12   DONGBU INSURANCE                        CIVIL ACTION NO. CV 08-0002
     COMPANY, LTD.,
13
            Plaintiff,                       REPLY OF OKP (CNMI) CORPORATION
14                                           TO DONGBU INSURANCE COMPANY,
            vs.                              LTD.'S CONSOLIDATED REPLY IN
15                                           SUPPORT OF IT'S MOTION FOR
                                             SUMMARY JUDGMENT AND IN
16   OKP (CNMI) CORPORATION,                 OPPOSITION TO OKP'S MOTION FOR
     and JOAQUIN Q. ATALIG,                  PARTIAL SUMMARY JUDGMENT
17
            Defendants.                      Date:    July 10, 2008
18                                           Time:    8:00 a.m.
                                             Judge:   Hon. Alex R. Munson
19

20

21

22

23

24

25

26

27

28

     4812-0369-8178.2.060927-00005

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................2

II.   BURDEN OF PROOF ON DUTY TO DEFEND..................................................3

III.  INTERPRETATION OF POLICY LANGUAGE ...............................................4

IV.   EXTRINSIC EVIDENCE SHOULD HAVE BEEN CONSIDERED IN
      DETERMINING DUTY TO DEFEND ..................................................................5

      A.    The Court should look beyond only comparing the allegations of the
            complaint with the terms of the policy .........................................................5

      B.    Consider Extrinsic Facts....................................................................................7

V.    OKP TAKES ISSUE WITH DONGBU'S FACTUAL RECITATION .............9

      A.    Dongbu's Recitation of the Extrinsic Facts Ignores its Knowledge of Its
            Insured's Clear and Continuing Objection to the Truthfulness of Such
            Facts ..................................................................................................................10

      B.    Dongbu Also Misrepresents the Superior Court's January 30, 2008 Order........12

      C.    Dongbu's CRM and HPO Licensing Allegation is Without Authority..............13

VI.   ATALIG CLAIMS ARE COVERED - ACCIDENT...........................................13

      A.    Dongbu's faulty premise ..................................................................................13

      B.    Attempt to Shift Responsibility .......................................................................14

      C.    Foreseeable consequence..................................................................................14

      D.    Maupin and McAllister cases ..........................................................................15

      E.    Dongbu's Extent of Harm Argument ..............................................................16

VII.  DAMAGE CLAIMS ARE NOT OUTSIDE THE SCOPE OF THE CAR POLICY ......16

VIII. EXCLUSIONS IX(A) AND EXCLUSION 4(b) DO NOT APPLY AS THE
      ALLEGEDLY DAMAGED PROPERTY WAS NOT IN OKP'S CARE,
      CUSTODY OR CONTROL OR RENTED TO OKP .........................................18

      A.    There Were No Warnings Given by Atalig .......................................................18

      B.    OKP Only Leased the Improvements, Not the Entire Atalig Property .............18

      C.    OKP's Relevant Alleged Clearing Activities Took Place Off of the
            "Premises" ........................................................................................................19

      D.    The Agreement Did Not Grant OKP Possession, Custody, or Control or
            Rent to OKP the Non-Improved Portions of the Atalig Property: Only a
            License Was Conveyed .....................................................................................19

      E.    The "Care, Custody or Control" Exclusion is Inherently Ambiguous and
            Should Consequently be Strictly Construed Against Dongbu............................21

      F.    The Allegedly Damaged Artifacts Were Not A Necessary Element of the
            Clearing Activities and, Therefore, Were Not in the Care, Custody, or
            Control of OKP..................................................................................................22

IX.   EXCLUSION V(A) OF THE AUTO POLICY AND EXCLUSION 4(D) OF THE
      CAR POLICY ARE NOT APPLICABLE ...........................................................24

1

**TABLE OF CONTENTS**
**(continued)**

2

3     X.      COMPLIANCE WITH NOTICE REQUIREMENT ........................................................24

4             A.      There is a duty to defend under the CAR Policy ....................................24

5             B.      Notice was timely under both the Auto Policy and the CAR Policy..................25

              C.      Time line..............................................................................................27

6             D.      CNMI Insurance Statutes Apply...............................................................28

7             E.      Dongbu must demonstrate prejudice from the alleged lack of timely notice .......29

        XI.    DISCOVERY ..............................................................................................................29

8       XII.   CONCLUSION ...........................................................................................................30

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page

# TABLE OF AUTHORITIES

**Page**

**Cases**

Adobe Systems, Inc. v. St. Paul Fire
    and Marine Ins. Co., 2007 WL 3256492.................................................................4

American Casualty Company v. Timmons, 352 F.2d 563, 567 (6th Cir. 1965)..................21, 22

American Registry of Pathology v. Ohio
    Cas. Ins. Co., 461 F.Supp.2d 61, 66 (D.D.C. 2006)...........................................6

Argonaut Southwest Ins. Co. v. Maupin,
    500 S.W.2d, 633 (Tex. 1973)...........................................................................15

Bank of Saipan v. Superior Court (Connell),
    6 N.M.I. 179, 2001 MP 01, 4 (2001)..................................................................6

Bigelow-Liptak Corp. v. Continental Ins. Co., 417 F.Supp 1276 (E.D. Mich. 1976) ................21

Butler v. Clarendon America Insurance Co.,
    494 F.Supp. 1112, 1122 (2002) ..........................................................6, 10, 30

Charlton v. Champaign Park Dist., 110 Ill.App.3d 554, 557, 442 N.E.2d 915, 918
    (4th Dist. 1982)..................................................................................................20

Chicago & Northern Western Transp. Co. v. City of Winthrop, 257 N.W.2d 302
    (Minn. 1977)......................................................................................................20

Clinical Research of Southern Oregon, P.C. v.
    Kemper Insurance Companies, 191 Or. App. 595, 84 P.3d 147, 150 (2004).......................4

Commercial Capital Systems, Inc. v. Paille, 333 So.2d 293, 295 (La.App. 1976) ....................23

Commonwealth v. Palacios, 4 N.M.I. 330, 3 (1996) ..........................................................6

Cutler-Orosi Unified School
    Dist. Tulure County School Districts Liability/Property Ins. Authority, 31
Cal.App.4th 617, 625 (1994) ..............................................................................6

Dearborn Ins. Co. v. International Surplus Lines Ins. Co., 308 Ill.App.3d 368,
    373, 719 N.E. 2d 1092, 1096 (1999) ...............................................................27

Fidelity and Cas. Co. of New York v. Wrather,
    625 S.W. 2d 245, 247 (1983)..............................................................................6

Financial Pacific Insurance Company v. Zenith
    Insurance Company, 2007 WL 172390 (Cal. App. 2 Dist.)), 3............................4

Gray v. Zurich Insurance Co., (1966)
    65 Cal. 2d 263, 275..............................................................................................4

Gulf Oil Corp. v. James E. Dean Marine Divers, Inc., 323 F.Supp. 679
    (E.La.1971)........................................................................................................21

Gunderson v. Fire Ins. Exchange, 37 Cal.App. 4th 1106 (1995)..........................................8

Harris, Jolliff & Michel, Inc. v Motorists Mut. Ins. Co.,
    (1970) 21 Ohio App 2d 81, 50 Ohio Ops 2d 171, 255 NE.2d 302......................22

Horase Mann Insurance Company v. Barbara B., 4 Cal. 4th 1076, 1087 (1993)....................30

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Leonardi v. Chicago Transit Authority,* 341 Ill.App.3d 1038, 1043 793 N.E.2d
880, 885  (Ill. 1st Dist. 2003)............................................................................................20

4

5

*Makarka v. Great American Ins. Co.,*
14 P.3d 964, 969 (Alaska, 2000) ........................................................................................7

6

*Manglona v. Gov't of CNMI,* 2005 MP 15, 8 (2005) ...........................................................6

7

*McAllister v. Hawkeye-Security Ins. Co.,*
68 Ill. app. 2d 222, 215 N.E. 2d 477 (1966) ..................................................................15

8

*Meisser v. Aetna Casualty and Surety Company,* 98 N.W.2d 919, 921 (Wis. 1959) ...........23

9

*Modern Developments Co. v. Navigations Ins. Co.,*
111 Cal.App. 4th 932, 941-942, 4 Cal. Rptr. 528 (2003) .........................................7

10

*Montrose Chem.,* 6 Cal. 4th at 300,
24 Cal. Rptr. 2d 467, 861 P.2d 1153 ............................................................................3, 4

11

*Morner v. Giuliano,* 856 N.E.2d,
602 (OK. App. 2006) ............................................................................................................16

12

*Nationwide Ins. V. Zavalis,* 62 F3d 689 (1995) ....................................................................16

13

*Nationwide Insurance v. Board*
*of Trustee of University of Illinois,* 116 F.3d 1154 (7th Cir. 1997).............................16

14

*Olympic Inc. v. Providence Wash. Insur. Co. of Alaska,* 648 P.2d 1008, 1011
(1982)......................................................................................................................................24

15

*One Dupont Centre, LLC v. Dupont Auburn, LLC,* 819 N.E. 2d 507, 513-514
(Ind. Ct. App. 2004) ............................................................................................................20

16

*Park University Enterprises, Inc. v. American Casualty Company*
*of Reading, Pa.,* 314 F.3d 1094, 1100, 1101 (2004) ......................................................8

17

18

*Pension Trust Fund for Operating Engineers v. Federal*
*Ins. Co.,* 307 F.3d 944, 949 (2002)....................................................................................4

19

*Presley's Estate v. Russen,* 513 F.Supp. 1339, 1350  (D.N.J.1981)...................................20

20

*River Services Co. v Hartford Acci. & Indem. Co.,*
(1977, ND Ohio) 449 F Supp 622 ....................................................................................21

21

*Showalter v. City of Cheney,* 118 Wash. App. 543, 549, 76. P.3d 782, 785 (Wash.
Div. 3, 2003)........................................................................................................................21

22

*State v. Stignitta,* 74 Conn. App. 607, 615, 813
A.2d 1033, 1038 (Conn. 2003)........................................................................................20

23

*Stevens v. United General Title Ins. Co.,*
801 A.2d 61 (D.C., 2002) ..................................................................................................5

24

25

*Thomas W. Wolley & Sons v. Zurich General Accident & Life Insurance Co.,* -235
La. 289., 103 So.2d 449 (1958) .......................................................................................23

26

*Towne Realty, Inc. v. Zurich Insurance Company,* 193 Wisc. 2d 544, 558-559,
534 N.W.2d 886, 892 (1995)........................................................................................26, 27

27

28

1

2

**TABLE OF AUTHORITIES**
**(continued)**

3

Page

*United States Fire Ins. Co. v Schnabel,* (1972, Alaska)
    504 P.2d 847 ..................................................................................................21

4

*Waterville Estates Ass'n v. Town of Campton,* 122 N.H. 506, 509, 446 A.2d 1167,
    1169 (N.H. 1982)..............................................................................................21

5

6

## Statutes

7

4 CMC § 7505(e)................................................................................................28

8

4 CMC §7505(f) .................................................................................................28

9

7 CMC § 3401 .....................................................................................................6

10

## Treatises

11

*Couch on Insurance* (3 Ed.), §209.9.................................................................8

12

*Holmes' Appelman on Insurance 2d,* Vol. 22, §139.4(c) ..................................29

13

## Other Authorities

14

Restatement, Property, §512...............................................................................20

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.    **INTRODUCTION**

On the cross-motions for summary judgment the parties are in agreement that the issue to be determined at this time is whether Dongbu Insurance Company, Ltd. ("Dongbu") is required to defend OKP (CNMI) Corporation ("OKP") for claims being made in the underlying pending action in the Commonwealth Superior Court under two policies of insurance issued by Dongbu to OKP.

Determination of that question requires the Court to examine the insurance policies, pleadings in the underlying suit, extrinsic facts known or readily available/ascertainable to Dongbu and examine the conduct of the parties prior to the Declaratory Judgment proceeding being filed.

There is no need to set out in detail in this Reply the history of the events leading up to the Declaratory Judgment action being filed. For such detail the Court is referred to pages 3-5 of OKP's Points and Authorities attached to its Motion For Partial Summary Judgment.

It has been and continues to be OKP's position that:

1. The policies it purchased from Dongbu provide coverage for at least some of the claims in the underlying Commonwealth Superior Court action;

2. That OKP has complied with the notice requirements of the policies, but even if it is determined there was a deficiency in notice, under applicable Commonwealth statutes Dongbu has waived any defect in notice;

3. That OKP has tendered defense of the underlying suit to Dongbu and that Dongbu has unjustifiably refused to defend OKP in the underlying suit;

4. That Dongbu has wrongfully failed to undertake any investigation of the claims against OKP, and has improperly limited its inquiry to only a comparison of the claims in the underlying Complaint with the terms of the insurance policy. That extrinsic facts were available

to Dongbu which would lead Dongbu to determine that there was a possibility of coverage and therefore a duty to defend;

     5. That coverage is not excluded by any provision of either Dongbu policy; and

     6. That OKP is entitled a determination declaring that under the terms of the policies of insurance issued to OKP that Dongbu is required to provide a defense to OKP of the underlying Commonwealth Superior Court action.

     OKP would note that Dongbu is not defending the underlying action nor has it offered to provide a defense under a reservation of rights, thereby casting the entire burden of the defense on OKP. (Sean E. Frink Declaration July 3, 2008, ¶5)

     Based on the authorities cited in this Reply as well as the authorities and arguments cited in OKP's Memorandum filed with its Motion For Partial Summary Judgment and its Response to Dongbu's Motion For Summary Judgment, it should be decided by the Court that Dongbu has a duty to defend the Commonwealth Superior Court suit against OKP.

## II.   **BURDEN OF PROOF ON DUTY TO DEFEND**

     It is Dongbu's position that OKP bears the initial burden of proof to establish whether a duty to defend exists. (Dongbu Consolidated Reply and Opposition, page 5, l. 5 ("Reply")) This is a misstatement for the reason that although the initial burden is on the insured, the burden is only to show the possibility of coverage; to state that OKP must establish that Dongbu has a duty to defend is an incorrect statement of the law. OKP's obligation is to show there may be a possibility of coverage of any claim in the underlying action and if it does so, then the burden shifts to Dongbu to show there is no possibility of coverage.

> In resolving the question of whether a duty to defend arises under a policy, the insurer has a higher burden than the insured. "[T]he insured need only show that the underlying claim (may) fall within policy coverage; the insurer must prove it (cannot)." *Montrose Chem.*, 6 Cal. 4th at 300, 24 Cal. Rptr. 2d 467, 861 P.2d 1153. (ital in decision)

1   *Pension Trust Fund for Operating Engineers v. Federal Ins. Co.*, 307 F.3d 944, 949 (2002).
2   An insurer must defend its insured against a suit "which (potentially) seeks
    damages within the coverage of the policy." (*Gray v. Zurich Insurance Co.*,
3   (1966) 65 Cal. 2d 263, 275 (*Gray*).) This obligation to provide a defense is
    eliminated only when the third party complaint ("can by no conceivable theory
4   raise a simple issue which could bring it within the policy coverage,'") (*Montrose
    Chem. Corp. v. Superior Court*, (1993) 6 Cal. 4th 287, 300) "In other words the
5   insured need only show the underlying claim may fall within policy coverage; the
    insurer must prove it (cannot.) (*Ibid.*) Any doubt as to whether the facts give rise
6   to a duty to defend is resolved in the insured's favor. (*Id.*) at pp. 299-300)

7   *Financial Pacific Insurance Company v. Zenith Insurance Company*, 2007 WL 172390 (Cal.
8   App. 2 Dist.)), 3.

9       In footnote 3 at page 6 of Dongbu's Reply there is mention that *Adobe Systems, Inc. v. St.*
10  *Paul Fire and Marine Ins. Co.*, 2007 WL 3256492 is no longer valid law as the decision had
11  been vacated. To put that in proper perspective, the parties in that case agreed to settle their
12  dispute and stipulated that the previous decision could be vacated. *Adobe*, 2008 WL 1743879
13  (N.D. Cal., Apr. 08, 2008). The general principles states in the original *Adobe* decision were not
14  overturned and the general principles of insurance law stated therein remain valid.

15  III.   **INTERPRETATION OF POLICY LANGUAGE**
16      Beginning at page 6 of its Reply Dongbu has a discussion regarding ambiguity. The
17  discussion seems to focus simply on the premise that a term is not ambiguous simply because it
18  isn't defined in the policy, and that terms should be given the plain and ordinary meaning as a
19  layperson would interpret the term to mean. OKP doesn't disagree with that generalization, but
20  Dongbu fails to take the matter further and state how the court determines if a term is ambiguous.
21  The test to be employed is as set out in OKP's Motion For Partial Summary Judgment at page
22  10-11, citing *Clinical Research of Southern Oregon, P.C. v. Kemper Insurance Companies*, 191
23  Or. App. 595, 84 P.3d 147, 150 (2004):
24      We first determine whether the policy defined the term at issue and, if it did not,
        we look to the plain meaning of the term. (citation omitted) If we determine that
25      there are two or more plausible interpretations of the term, we then consider
        whether those interpretations "withstand scrutiny, *i.e.* Continue [] to be
26      reasonable after the interpretations are examined in light of, among other things,
        the particular context of the policy as a whole." (citation omitted) Only if more
27      than one interpretation remains reasonable after such examination will we
28

1    conclude that the policy provision is ambiguous. *Id.* If the provision is

2    ambiguous, we construe it against the insurer as the drafter. *Id.*

3        Neither "caused by accident" as used in the Auto Policy or "accidental loss" as used in

4    the CAR Policy are defined in either policy and Dongbu in its Reply does not offer a definition

5    of either term. In contrast, OKP in its Memorandum as to both its and Dongbu's Motions for

6    Summary Judgment includes case authority that defines both terms; there is no need to repeat the

7    authority and argument on this point as previously set out.

8        Suffice it to say that OKP has presented authority defining both "caused by accident" and

9    "accident loss" which bring the Atalig claims within coverage of the policies. Even of the court

10   were to give credence to Dongbu's argument regarding interpretation of the terms, there is at a

11   minimum "two or more plausible interpretations" thus making the terms ambiguous (in the

12   context of interpreting language of an insurance policy) and compelling the adoption of the

13   interpretation stated by OKP and construing the terms against Dongbu as the drafter of the

14   policies.

15   IV.  **EXTRINSIC EVIDENCE SHOULD HAVE BEEN CONSIDERED IN
        DETERMINING DUTY TO DEFEND**

16       It is Dongbu's position that in determining whether a duty to defend exists, extrinsic

17   facts/evidence should not be considered. In support of that position Dongbu argues that it need

18   not go any further than to compare the terms of the insurance policies with the allegations in the

19   Atalig Complaint(s). Dongbu relies on what is known as the "eight corners rule."

20       A.   **The Court should look beyond only comparing the allegations of the
             complaint with the terms of the policy.**

21

22       The crux of the "eight corners rule" is that an insurer needs to do nothing more than

23   compare the allegations of the third party complaint to the terms of the insurance policy in

24   making its determination of whether there is a duty to defend. Dongbu cites the case of *Stevens*

25   *v. United General Title Ins. Co.*, 801 A.2d 61 (D.C., 2002) as authority that the majority of

26   jurisdictions follow the eight corner rule. OKP would note that the reference to the "eight

27   corners rule" was in a footnote to the District Court decision and without any supporting

28   authority. OKP would suggest that the *Stevens* Court was in error when stating a majority of

jurisdictions follow the eight corners rule.  OKP directs the Court's attention to the wealth of

authority cited by OKP in both its Motion for Partial Summary Judgment and its Response to

Dongbu's Motion for Summary Judgment for support that the "eight corners rule" is not the

majority rule and that extrinsic facts/evidence should be considered by the Court.  The Court's

attention is directed to pages 12-14 of OKP's Memorandum in Support of Motion For Partial

Summary Judgment where it sets out cases which demonstrate that more than a majority of

jurisdiction require the consideration of available extrinsic evidence.  Furthermore, to require

insurer to consider extrinsic evidence is being accepted in a growing number of jurisdictions:

> An alternative approach, accepted in a growing number of jurisdictions, allows a
> factual exception to the traditional rule that when true facts, not pled but
> reasonably ascertainable, affect the matter of coverage (citation omitted)

*American Registry of Pathology v. Ohio Cas. Ins. Co.*, 461 F.Supp.2d 61, 66 (D.D.C. 2006)[1]

Each of the following cases are cited in Dongbu's Reply and each case states extrinsic

facts/evidence should be taken into consideration in determining duty to defend:

1. *Butler v. Clarendon America Insurance Co.*, 494 F.Supp. 1112, 1122 (2002).

> In California, a liability insurer "owes a broad duty to defend its insured against
> claims that create a potential for indemnity. (citations omitted)  The potential for
> coverage may arise from the underlying complaint, the terms of the policy,
> possible amendments to the complaint, <u>or any other extrinsic evidence known to
> the insurer which would give rise to liability under the policy</u>, even if coverage is
> found lacking. (citation omitted) (emphasis supplied)

2. *Cutler-Orosi Unified School Dist. Tulure County School Districts Liability/Property Ins. Authority*, 31 Cal.App.4th 617, 625 (1994):

> The duty (to defend), if it exists, arises at the outset of the litigation and is
> determined on the basis of the allegations of the complaint <u>as well as extrinsic
> facts bearing on the possible existence of coverage</u>.  (emphasis supplied)

3. *Fidelity and Cas. Co. of New York v. Wrather*, 625 S.W. 2d 245, 247 (1983):

> [i]nsurer "cannot safely ignore actual facts known to it or which could be known
> from reasonable investigations, that is "the facts which were known, or should
> have been reasonably apparent at the commencement of the suit and not the proof
> made therein or the final result reached." (citation omitted)

---

[1] When considering what the common law is as generally understood and applied in the United States pursuant to 7 CMC § 3401 the Commonwealth Supreme Court has repeatedly considered what the modern trend to be as being a significant factor to consider. *See: Commonwealth v. Palacios*, 4 N.M.I. 330, 3 (1996) ("more recent precedents"); *Manglona v. Gov't of CNMI*, 2005 MP 15, 8 (2005) ("deciding to follow the modern trend"); *Bank of Saipan v. Superior Court (Connell)*, 6 N.M.I. 179, 2001 MP 01, 4 (2001) ("recent trend of cases")

1    4. *Makarka v. Great American Ins. Co.*, 14 P.3d 964, 969 (Alaska, 2000). In addressing duty to

2    defend:

3    　　　　The potential for coverage may be shown either on the face of the complaint or
       <u>through facts the insurer knew or could have reasonably ascertained</u> that would
4    　　　　bring an otherwise uncovered complaint within the policy's coverage. (citation
       omitted) (emphasis supplied)

5    5. *Modern Developments Co. v. Navigations Ins. Co.*, 111 Cal.App. 4th 932, 941-942, 4 Cal.

6    Rptr. 528 (2003)

7    　　　　The determination whether the insurer owes a duty to defend usually is made in
       the first instance by comparing the allegations of the complaint in the suit with the
8    　　　　terms of the policy, and it turns on those facts known by the insurer at the
       inception of the suit. <u>Facts extrinsic to the complaint may also give rise to a duty</u>
9    　　　　<u>to defend when they reveal a possibility that the claim may be covered by the</u>
       <u>policy.</u>
10

11   Dongbu's own authority shows that extrinsic facts should be taken into consideration when

12   determining duty to defend. For additional authority on the consideration of extrinsic facts, the

13   Court is directed to OKP's previous filings on the Motions under consideration.

14   　　　　B.    **Consider Extrinsic Facts**

15   　　　　Dongbu argues that it did not need to do anything but look at the Complaint and the

16   insurance policies; the authorities say otherwise. There were numerous facts readily

17   ascertainable bearing on Dongbu's duty to defend if it had made even a cursory investigation.

18   Yet Dongbu did nothing. It conducted no investigation, it didn't interview any OKP personnel

19   about the claims or take any independent steps to ascertain if the Atalig claims were potentially

20   covered. In effect Dongbu struck its head in sand and ignored what could have been easily

21   learned. In fact Dongbu's actions were even more egregious when since at least October, 2006 it

22   knew that "OKP denied most of what Mr. Atalig was claiming." (Dongbu Response, page 13, l.

23   16-19)

24   　　　　Dongbu raises a red herring with its reference to a one sentence remark from OKP's

25   counsel almost a year after the defense was tendered. A couple of observations: (1) that remark

26   was made months after Dongbu's long delayed response to tender of the defense and obviously

27   could not have been any factor in Dongbu's decision to not do any kind of investigation to find

28

1   out what the facts were; (2) regardless of the statement it doesn't change the law: extrinsic facts

2   are properly to be considered in determining a duty to defend.  Dongbu disregarded its duty to

3   investigate when it became aware of the Atalig suit and had decided it wouldn't defend under

4   either policy by March, 2007, so the comment of counsel in July, 2007 had no bearing on

5   Dongbu's decision to decline coverage.

6          Regarding the CAR Policy, OKP counsel's remarks regarding its is applicability was

7   made before recognizing that the January 16, 2006 beginning of the period of cover is modified

8   by the general exclusion that provides liability "shall commence notwithstanding any date to the

9   contrary specified in the Schedule, directly on the commencement of work or after the unloading

10  of the items entered in the Schedule at the site."  (CAR Policy Bates 000018)

11         Counsel for OKP notes that his letter of July 12, 2007 contained a cite to *Park University*

12  *Enterprises, Inc. v. American Casualty Company of Reading, Pa.*, 314 F.3d 1094, 1100, 1101

13  (2004) which refers to the use of extrinsic facts.

14         In support of its argument that it had no duty to investigate, Dongbu cites *Gunderson v.*

15  *Fire Ins. Exchange*, 37 Cal.App. 4th 1106 (1995) saying the standard to be applied is what was

16  reasonably available to the insurer at the time the claim was first tendered (Reply at page 11, line

17  10-11).  What *Gunderson* requires is an "informed decision" and OKP submits that an insurer

18  cannot simply examine the complaint, make no investigation of the matter and then claim it has

19  made an informed decision that there is no duty to defend.  *Gunderson* goes on to say the

20  following about extrinsic facts as part of the decision making process on determining duty to

21  defend:

>    Thus, the issues here are what facts respondent knew at the time appellants
22   tendered the defense of the Ferrando lawsuit, both from the allegations on the face
23   of the third party complaint, and from extrinsic information available to it at the
     time; and whether these (known facts) created a potential for coverage under the
24   terms of the Policy (ital in decision) *Gunderson*, 1114.

25  Information was available which would have created a potential for coverage, but Dongbu did

26  nothing to ascertain its existence.  It now asks this Court to determine there is no duty to defend

27  based in part on its own inaction.

28         Dongbu also cites *Couch on Insurance* (3 Ed.), §209.9 for the proposition that an insured

can't assert a frivolous defense to establish a duty to defend. That section however does say that if the insured can demonstrate a reasonable potential for the existence of coverage, that can be considered by the Court to establish a potential for coverage. *Couch* says that the Court "may look to such extrinsic evidence in determining whether an insurer has a duty to defend ..." If the Court can consider extrinsic facts to determine a potential for coverage, then surely such extrinsic facts should be considered by the insurer in determining its duty to defend.

V.    **OKP TAKES ISSUE WITH DONGBU'S FACTUAL RECITATION**

**Dongbu Mischaracterizes the Extrinsic Facts**

Dongbu claims at pages 16 and 17 of its brief that:

[E]ven if the Court relies on the extrinsic evidence submitted by OKP as exhibits to their briefs, here is what it shows about the circumstances surrounding the bulldozing of the land and artifacts on that land:

1.    **OKP knew that the land contained historical artifacts and that in particular, the area around the Japanese water tank and taro patch were not to be cleared.** OKP Exhibit 24B, Paragraph 3 (latte stones and other artifacts all over the property); Paragraph 19 (OKP knew).

2.    **OKP knew that Commonwealth law required it to obtain permits from HPO and the Coastal resources Management office before clearing any land on the Atalig land, and OKP knew that the primary purpose of the HPO permit is to prevent the destruction of historically significant artifacts (even if only constructively, as one is presumed to know the law; and in fairness OKP is a large and sophisticated company).**

3.    **OKP knew the lease required it to obtain the written permission of the lessor before clearing any land and yet it did not.** Lease, Paragraph 13.1, attached as Exhibit C to Dongbu's Motion for Summary Judgment.

4.    **OKP was specifically re-warned not to clear the land by the Japanese water tank and that area was marked off, including by barbed wire, and OKP never had permission to clear the land near the taro patch.** OKP Exhibit 24B, Paragraphs 28-29 (warned not to clear marked off area by Japanese water tank); Paragraph 30 (never had permission to clear by the taro patch).

5.    **Despite all of the above, OKP bulldozed and cleared "a very large area" that included "a Latte Stone set, a Japanese water cistern, a Japanese wash basin, a barb wire fence, the Korean fishing net, bamboo, fruit trees, flower trees, a mortar and a pestle. All were cleared away by OKP." the** bulldozed area around the Japanese water tank and the taro patch area. OKP Exhibit 24B, Paragraphs 33 and 34. [Footnote 7 inserted here.]

[Text of footnote 7]. **The court in the underlying case was of course clear that its January 30, 2008 order and the underlying statement of facts was not a final determination of the facts, and that evidence could be admitted at trial to counter that version of events.** The point here is simply that even if this

1    Court does not simply rely on the general "eight corners" rule and it looks to
     extrinsic evidence, at most, it should accept all of the "evidence" submitted by
2    OKP. **It should also be noted that there is sufficient evidence of outrageous
     conduct in the opinion of that court to allow the jury to decide whether Mr.**
3    **Atalig is entitled to punitive damages.**

4    Dongbu Brief, Pages 16-17 (emphases added).

5    Dongbu's characterization of the facts *is drawn exclusively from Plaintiff Atalig's*

6    *position.* In fact, the document that Dongbu repeatedly cites in support of its recitation of the

7    alleged extrinsic facts, OKP Exhibit 24B, is none other than Atalig's January 4, 2008 Statement

8    of Disputed Facts in Opposition to OKP's Motions for Summary Judgment.[2] As will be
9
     demonstrated, Dongbu is now and has been from the time tender was made, abundantly aware
10
     that OKP vociferously disputes Atalig's allegations regarding these matters. Yet, Dongbu in its
11
     brief presents its extrinsic facts as if they were undisputed.[3] Of course, when there is a legitimate
12
     dispute as to the underlying facts between an insured and a third party, and the insured's version
13
14   of the facts would result in coverage, there is a duty to defend because the potential for coverage
15   would exist.
16
          Where the potential for liability depends on a disputed factual question,
17        the very existence of that dispute would establish a possibility of coverage
          and thus a duty to defend. (citation omitted).
18
19   *Butler v. Clarendon Ameria Ins. Co.*, 494 F.Supp. 2d 1112, 1123 (N.D.Cal. 2007)
20   Additionally, as will also be demonstrated, Dongbu's recitation of alleged extrinsic facts
21   misrepresents the Court's January 30, 2008 ruling.[4]

22        A.    <u>**Dongbu's Recitation of the Extrinsic Facts Ignores its Knowledge of Its**</u>
                <u>**Insured's Clear and Continuing Objection to the Truthfulness of Such Facts**</u>.
23
          Simply stated, Dongbu has known almost from the time of tender that OKP contested
24
25   Atalig's key factual allegations that: (1) OKP was warned of the existence of artifacts on the

---

26   [2] It should be noted that Dongbu's "extrinsic facts" are not in fact extrinsic. Instead they merely reiterate Atalig's
     allegations from the Complaint

27   [3] It is disingenuous for Dongbu to do so in response to OKP's motion, which is based upon the <u>undisputed</u> facts as
     determined by the CNMI Superior Court in its January 30, 2008 ruling. (Exhibit 26 to OKP's Motion, pp. 3-7).
     [4] It should be noted that pursuant to Com.R.Civ.P. 56 OKP accepted certain facts as undisputed for purposes of the
28   motion only. See e.g. OKP Exhibit 20C, footnotes 1, 3, 4, 5 and 6.

1  Atalig Property, (2) that the allegedly destroyed artifacts ever existed on the property, and (3)

2  that the lease agreement relied upon by Atalig in his Complaint was the appropriate version of

3  the Lease.  Dongbu essentially admits its knowledge of OKP contesting these key facts when it

4  states:

5         **[O]f course, it was evident from the first meeting of the parties' counsel on or
       about October 23, 2006 that OKP denied most of what Mr. Atalig was
6         claiming."**

7  Dongbu Opposition Brief, p. 13, ll. 16-19 (emphasis added).

8         OKP's disputing these key facts was nothing new.  It had been OKP's clear and

9  continuing position since the filing of the Atalig lawsuit that these key facts were disputed and as

10  Dongbu acknowledges in its brief, Dongbu was made aware of these disputes from the get go

11  after tender.[5]  OKP's May 16, 2006 Opposition to Atalig's Motion for Summary Judgment, one

12  of the first documents filed in the Atalig litigation, could not have been clearer in this regard.  In

13  the section entitled "The Material Facts Could Not Be More in Dispute" OKP's Opposition set

14  forth its unequivocal opposition to these facts.  Fully supported by sworn declarations from five

15  of its employees OKP's summary judgment opposition made clear that:

16         1. Defendant [OKP] disputed that the lease attached to the [Atalig Declaration] as
       Exhibit "B" is a valid and legally binding contract because Defendant's representative
17         was induced by Plaintiff to execute it through fraudulent misrepresentation.
       2. Defendant disputes that it or any representative of it was ever informed by Plaintiff
18         or any representative of Plaintiff of the alleged existence of the Chamorro and
       Japanese artifacts that Plaintiff alleges were destroyed and or damaged.
19         3. Defendant disputes that any Chamorro artifacts, other than the latte stones aside
       Room 108 of the Hotel, exist on the area of the property that is related to this lawsuit.
20         4. Defendant disputes that it damaged, destroyed or otherwise injured in any way any
       latte stones, other Chamorro artifacts, or any Japanese artifacts (other than a portion of
21         a small rock wall around a cement box that could be the "Japanese water tank" that
       Plaintiff's motion refers to).
22         11.    Defendant denies that written consent from Plaintiff was required in order

23

24

25  [5]  Moreover, OKP's position on these matters has not changed.  *See, e.g.,* OKP's Answer (Exhibit 12 to its Motion)
   and OKP's November 26, 2007 Opposition to Atalig's Motion for Partial Summary Judgment, and supporting
26  Statement of Disputed Facts, Sections 1 and 2, attached to the concurrently filed Declaration of Sean E. Frink as
   Exhibit "A1" and "A2."  Although a copy was not provided with OKP's original motion, they are appropriate for
27  taking judicial notice of as they are adjudicative facts capable of accurate and ready determination by resort to
   sources whose accuracy cannot be questioned under Federal Rule of Evidence 201 and the Court is hereby
28  respectfully requested to do so.

for Defendant to make any of the improvements/changes to the property that defendant
allegedly made.

12.    Defendant asserts that Plaintiff gave his prior approval for Defendant to
make all of the improvements/changes to the property…

OKP's May 16, 2006 Opposition to Plaintiff Atalig's Motion for Summary
Judgment, pgs. 4-6. Attached to the Concurrently filed Frink Declaration as Exhibit
"B."[6]

Dongbu, in fact, evidently obtained copies of OKP's May 16, 2006 Opposition and

supporting documents soon after tender. On October 24, 2006, the day after Dongbu and OKP

counsel met, Dongbu counsel emailed OKP counsel asking for, among other things, "A copy of

the pleadings index in Atalig so I can request copies of the filings." Frink Declaration, Exhibit

"C."

OKP counsel emailed back the next day and provided Dongbu counsel with copies of the

case docket as of September 28, 2006 and the case history search from Lexis/Nexis File-and-

Serve showing all pleadings filed to date. Frink Declaration, Exhibit "C."

Simply stated, Dongbu has long known that OKP disputes the "extrinsic facts" that

Dongbu now presents to the Court as OKP's. For it to argue to the Court otherwise is

disingenuous.

B.    **Dongbu Also Misrepresents the Superior Court's January 30, 2008 Order**.

Dongbu claims in footnote 7, without page citation, that the Superior Court's ruling "was

of course clear" that:

[I]ts January 30, 2008 order and the underlying statement of facts was not a final
determination of the facts, and that evidence could be admitted at trial to counter that
version of events.

Dongbu Opposition, p. 17, footnote 7.

Contrary to Dongbu's claim, the Court's January 30, 2008 ruling was not "of course

---

[6]  The filings contained in Exhibit "B" were specifically referenced in paragraph 20 of OKP's May 23, 2008
Statement of Undisputed Facts. Although copies were not provided, they are appropriate for taking judicial notice
of as they are adjudicative facts capable of accurate and ready determination by resort to sources whose accuracy
cannot be questioned under Federal Rule of Evidence 201 and the Court is hereby respectfully requested to do so.
As will be explained

clear" about what Dongbu claims. In fact, it stated nothing of the sort. The January 30, 2008 Order makes no such statement, which makes abundant sense, because the ruling granted summary judgment to OKP on numerous causes of action based upon the facts that were established in OKP's statement of undisputed facts and Atalig's failure to dispute. As noted by the Court in its ruling, "Atalig has not demonstrated any genuine disputed questions of fact." January 20, 2008 Ruling, p. 7, ll. 7-8. Of course, the rules are clear that the causes of action are dead because the relevant facts have been established. Atalig could hardly go back and resurrect those causes of action at trial by changing his story. Therefore, Dongbu's statement that the January 20, 2008 opinion states otherwise and that "the underlying statement of facts was not a final determination of the facts, and that evidence could be admitted at trial to counter that version of events" is clearly incorrect.

C.    **Dongbu's CRM and HPO Licensing Allegation is Without Authority**.

Finally, in paragraph 2 of its facts recitation, Dongbu again makes claims without citation to any authority, this time about OKP's alleged knowledge of CNMI law regarding CRM and HPO permitting. OKP is unaware of any evidence provided to the Court in the underlying litigation to support such claims. Moreover, Dongbu's unsubstantiated claims in this regard are particularly inappropriate given the fact that all of the causes of action related to CRM and HPO licensing have been dismissed by the Superior Court.

VI.    **ATALIG CLAIMS ARE COVERED - ACCIDENT**

A.    **Dongbu's faulty premise**

Dongbu argues that OKP intentionally bulldozed land it had been warned not to clear and consequently the alleged damage was not an "accidental loss" or "caused by accident." Again, it is observed that Dongbu offers no definition for the terms "accidental loss" or "caused by accident." Instead Dongbu states there was no "accident" because OKP had been warned of the presence of artifacts and instructed not to clear the area where the artifacts were allegedly

1    located.

2         The problem with Dongbu's position on the issue is that it is based on an incorrect

3    premise. OKP has disputed from the very beginning that anyone told it there were artifacts in the

4    area where the debris from clearing the staging area was moved. Had Dongbu bothered to talk to

5    anyone at OKP about that matter when it became aware of the claim it would have been readily

6    apparent that OKP disputed knowledge of the artifacts; even the barest investigation by Dongbu

7    would have revealed that. That fact is precisely the reason why an insurer cannot simply ignore

8    readily ascertainable extrinsic facts. Yet Dongbu made no attempt to discuss the claim with

9    anyone at OKP to find out from OKP's viewpoint what had happened. Instead, it chose to do

10    nothing and then some seven months later, it declined coverage.

11    B.    **Attempt to Shift Responsibility**

12         Rather than fulfill its obligations under its policies, Dongbu attempts to justify its lack of

13    action on the premise that someone from OKP did not go running to Dongbu or its General

14    Agent when it first became aware of a potential claim.

15         Whether there was an "accidental loss" or a loss "caused by accident" should not be

16    viewed from OKP's perception of the events, as Dongbu argues, but rather from the standpoint of

17    whether the damage alleged was "caused by accident" or was an "accidental loss" as those terms

18    are used in Dongbu's policies. That of course turns on what happened and not on whether OKP

19    perceived or didn't perceive those events as being an "accident."

20         Dongbu repeatedly stresses that undefined terms are given their plain and ordinary

21    meaning yet never does offer the Court a definition of "caused by accident" or "accidental loss."

22    OKP would refer the Court to its Memoranda for both its Its and Dongbu's Summary Judgment

23    Motions for a detailed discussion of the terms "caused by accident" and "accidental loss."

24    C.    **Foreseeable consequence**

25         Without repeating the cases cited by OKP in its previously filed Memoranda, a major

26    question is whether the moving of debris from the cleared staging area to the land where the

27    artifacts were allegedly located would result in damage that was foreseeable. In attempting to

28

1  distinguish the cases relied on by OKP on the issue of foreseeable, Dongbu continues to rely on

2  the faulty premise that OKP had been told not to clear land  and that doing so would result in

3  damaging or destroying property.  As OKP has repeatedly stated, it disputes such warnings were

4  ever given or that there were artifacts on the land where debris from clearing the staging area

5  was moved.  Whether or not OKP had been told about the artifacts will be an issue for

6  determination at trial and that puts the matter of foreseeability in issue.

7         Dongbu attempts to distinguish the cases cited by OKP on "caused by accident" and

8  "accidental loss."  However, each such case relied on by OKP addresses the issue of foreseeable

9  results and holds that an event with unforeseen or unexpected results is an accident or is

10  accidental.  If one were to accept Dongbu's argument that whether there was an accident should

11  be reviewed from what a layman would perceive as an accident, if that lay person was unaware

12  his actions would have an unforeseen or unexpected result, it is easy to say that individual would

13  view the damage to be the result of an "accident", "accidental", "caused by accident" or an

14  "accidental loss".

15         D.    **Maupin and McAllister cases**

16         1. *Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d, 633 (Tex. 1973)

17         Dongbu states that OKP has cited *Argonaut Southwest Ins. Co. v. Maupin,* 500 S.W.2d

18  633 (Tex. 1973) in support of its position in this case.  That is an incorrect statement.  OKP's

19  reference to *Maupin* is on pages 11-12 of OKP's Reponse to Dongbu's Motion For summary

20  Judgment and the discussion by OKP is why *Maupin* doesn't apply to this case.  As OKP stated

21  *Maupin* was a case involving intentional acts with intentional results, and that is not our case.

22  Again, Dongbu relies on the faulty premise and disputed fact that OKP know of the existence of

23  the artifacts and bulldozed the area anyway.

24         2. *McAllister v. Hawkeye-Security Ins. Co.,* 68 Ill. app. 2d 222, 215 N.E. 2d 477 (1966)

25         *McAllister* does in fact support OKP's position that the alleged damage was "caused by

26  accident" as that term is used in the Auto Policy.  This case involves an unintended result from

27  an intentional act.  The *McAllister* court said:

28

1   In the case at bar, we likewise believe that the damage to the Foss' land was not
2   intentionally caused by Plaintiff , but rather, was the unintentional result of an
    intended act directed at other property.  Since there was no intent to damage Foss'
3   land, the resulting harm was 'caused by accident.' *McAllister* at 481

4       Dongbu attempts to distinguish the case by saying the case was probably wrongfully
5   decided and again relies on the faulty premise that OKP had knowledge of the presence of the
6   artifacts.

7       E.      **Dongbu's Extent of Harm Argument**

8       Dongbu's reliance on *Morner v. Giuliano*, 856 N.E.2d, 602 (OK. App. 2006) is
9   misplaced.  *Morner* is easily distinguishable for several reason.  First of all, the insurer
10  intervened and sought declaratory judgment relief based on an exclusion in its policy for
11  "expected or intended" injury and "willful and malicious" conduct.  No such provisions appear
12  in the Dongbu policies.  Second, the facts revealed the minor intended to fire the BB gun at
13  individuals and intended to do some harm.  The court said the policy exclusion for "expected or
14  intended" injuries applies if the insured intended to do a particular act and intended to do some
15  harm, even if the harm actually done was radically different from what was intended.  Not only
16  is the *Morner* case factually distinguishable, Dongbu's reliance on it is again based on the faulty
17  premise that OKP knew of the artifacts and had been told clear the area where those artifacts
18  were allegedly located.

19      Dongbu also refers *Nationwide Insurance v. Board of Trustee of University of Illinois*,
20  116 F.3d 1154 (7th Cir. 1997) which is a companion case to *Nationwide Ins. V. Zavalis*, 62 F3d
21  689 (1995).  In that case *Zavalis* and some friends intended to burn some initials into Astroturf at
22  the University football stadium.  The court in the *Board of Trustee* case found that *Zavalis* and
23  his friends intended to cause damage, although not the kind that ultimately resulted.  Dongbu
24  again relies on the oft mentioned mistaken premise to suggest an argument that it was
25  foreseeable to OKP that damage would occur and therefore no accident and no coverage.

26  VII.    **DAMAGE CLAIMS ARE NOT OUTSIDE THE SCOPE OF THE CAR POLICY**

27      In discussing the scope of the CAR Policy we begin with the familiar principle that
28  contracts of insurance are interpreted as any contract generally and any ambiguity in the contract

1    is resolved against the insurer as the drafter of the policy.

2         Dongbu takes the position that notwithstanding what it seems to be a typographical error

3    in the Third Party Liability Section that it is clear the intent is to limit the scope to events

4    occurring in direct connection with material works under the "Material Damage" provisions of

5    the policy.  Whether the scope of the CAR Policy is limited to Material Damage is not clear and

6    therefore an ambiguity created by Dongbu exists and such ambiguity is to be resolved in favor of

7    coverage.

8         Authority has previously been cited that addresses coverage determination from what the

9    insured expects when it purchases a policy.  In this matter, Moylan's was presented the

10   specifications for the Rota Airport project and requested to provide the coverage required by the

11   specifications.  (See Exhibit D attached to Sean E. Frink Declaration of July 3, 2008).  When an

12   insured presents to the insurer the insurance requirements for the project, the expectation is that

13   appropriate policies will be issued.  The CAR Policy combines both the Material Damage and

14   Third Party Liability in one policy, but the coverage is separate.  What we have here is a claim

15   for third party liability under Section II of the policy and not Section I related to Material

16   Damage.

17        The CAR Policy provides coverage for losses occurring in direct connection with the

18   construction and happening on or in the immediate vicinity of the site.  The CAR Policy defines

19   the site of construction as **Rota, Commonwealth of the Northern Mariana Islands** and title of

20   the project as **Rota Int'l Airport Project**.  How can it be legitimately argued by Dongbu that the

21   events surrounding the clearing of the staging area are not directly connected with the Rota

22   Runway Project?

23        The CAR Policy does not define the term "directly connected" with the construction or

24   the term "immediate vicinity" of the site.  Such being that case, an ambiguity as to those terms

25   exist and again ambiguity would be resolved against Dongbu and in favor of coverage.

26        As it relates to the endorsement for Existing Structures and/or Surrounding Property, that

27   argument addresses the issue of indemnity which is not the issue before the Court.  We are

28   concerned with duty to defend and not duty to indemnify.  Whether there might ultimately be a

1    question of indemnification, it is unrelated to the duty to defend.

2    VIII.    **EXCLUSIONS IX(A) AND EXCLUSION 4(b) DO NOT APPLY AS THE ALLEGEDLY DAMAGED PROPERTY WAS NOT IN OKP'S CARE, CUSTODY OR CONTROL OR RENTED TO OKP**

3

4    Dongbu argues that the Auto Policy provision that excludes:

5    injury to or destruction of property owned by, *rented to*, in charge of or
6    transported by the insured

7    and the CAR policy provision that excludes indemnity upon:

8    loss of or damage to property belonging to or held in care, custody or control of
     the Contractor(s)…"
9

10   are operative and exclude coverage in this case. *Dongbu Reply*, pp. 30-31 (emphasis in

     Dongbu original). Dongbu's Reply explains that these exclusions apply because: "the land and
11

12   everything on it was 'rented' to OKP" and that "OKP obviously exercised control over the

13   property when it disregarded warnings not to clear certain areas and bulldozed them." *Dongbu*

14   *Reply*, pp. 31, ll. 9-14. Once again, Dongbu misstates the facts and ignores relevant law.

15       A.    **There Were No Warnings Given by Atalig**.

16       As explained earlier, it is and always has been OKP's position that Atalig never warned it

17   not to clear certain areas of his property. Dongbu has been well aware of this fact almost since

18   the time of tender. For it to continue to argue only Atalig's version of the facts can only be

19   explained as a complete disregard of its obligations to its insured.
20

21       B.    **OKP Only Leased the Improvements, Not the Entire Atalig Property**.

22   Contrary to Dongbu's argument that OKP leased "the land and everything on it," Atalig's

23   Complaints *all make clear that it is his position that OKP leased only the improvements located*

24   *on his property*. Citing the OKP-Atalig lease, Atalig states in his First Amended Complaint (the

25   same allegations are made in the other two iterations of the Atalig Complaint) that:

26   OKP leased from Plaintiff Atalig 'the <u>improvements</u> described in Section 1' of the Lease.

27   [T]he leased premises 'consist of all <u>improvements</u> situated on the real property …
28   <u>together with the right to use Lessor's easements and appurtenances in adjoining and</u>

1  adjacent land, highways, roads, and streets, lanes …

2  OKP also has the *right to use* the real property, described below, where the leased improvements are situated…

3

4  The existing improvements and improvements subsequently erected on [the Atalig Property] during the term of the Lease are collectively referred to in the Lease as the "Premises."

5

6  *Atalig First Amended Complaint* (the "Atalig FAC"), ¶53-56 (Underlined emphases in original).

7

C.  **OKP's Relevant Alleged Clearing Activities Took Place Off of the "Premises"**

8

9  Dongbu's Reply attempts to disregard the fact that OKP only leased the improvements

10  because it is clear that the location of the allegedly destroyed historical artifacts was not within

11  the "Premises," as the complaints make clear that relevant clearing took place in an unimproved

12  section of the Atalig land.  After all, the artifacts were alleged to be out on the land, not within

13  any of the buildings or other improvements on the Atalig property.  *Atalig FAC,* ¶65.

14

15  Additionally, the Complaints make clear that Atalig does not consider the allegedly

16  destroyed historical artifacts to be improvements that were leased to OKP.  This is clear because,

17  among other reasons, the Complaints divide the causes of action into "artifact" claims and

18  "improvement" claims.  For instance, the Third Cause of Action is for "Conversion --Historical

19  and Cultural Artifacts" and the Sixth Cause of Action is for "Conversion--Preexisting

20  Buildings/Improvements." *Atalig FAC*, pp. 21 and 24.  The FAC similarly divides the Breach of

21  Contract and Waste causes of action into claims related to artifacts and claims related to

22  "buildings/improvements." *Atalig FAC,* pp. 17-20.

23

24  D.  **The Agreement Did Not Grant OKP Possession, Custody, or Control or Rent to OKP the Non-Improved Portions of the Atalig Property: Only a License Was Conveyed**.

25

26  It is clear that while Atalig claims that OKP was leased only the improvements on the

27  Atalig land he also alleges that it was also granted the "right to use the real property…where the

28

improvements are situated." *Atalig FAC*, ¶55. The FAC and subsequent Atalig correspondence make clear that it was and is Atalig's position that such right amounts to a real estate license, not any sort of ownership or possessory interest and that OKP was not granted any possession, custody, or control over the unimproved portion of the property. For instance, on August 1, 2006, Mr. Atalig's attorney Ramon K. Quichocho wrote OKP attorney Bruce Mailman regarding discovery issues and stated that :

> Although 'entry upon land for inspection and other purposes' is formal discovery IF the land is under the <u>possession or control</u> of your Client, Mr. Atalig only gave a right to use (*a license*) the land, therefore, *your Client does not possess or control Mr. Atalig's land. Mr. Atalig still controls his land.* …the Lease Agreement that clearly states that OKP is only leasing the <u>improvements</u>.

Quichocho August 1, 2006 Letter, (underlined emphases in original, italicized emphases added). Exhibit "E" to Frink Declaration.

This letter, written a day after the Atalig FAC was filed and a week or so before the August, 2006 defense tender to Dongbu, is entirely consistent with Atalig's positions as set forth in the Atalig FAC regarding the terms of the Lease and relevant law.

This is because a real property license is simply the authority to enter the land of another and perform a specified act or series of acts without obtaining any interest in the land. *See, e.g., State v. Stignitta,* 74 Conn. App. 607, 615, 813 A.2d 1033, 1038 (Conn. 2003); *Leonardi v. Chicago Transit Authority,* 341 Ill.App.3d 1038, 1043 793 N.E.2d 880, 885 (Ill. 1st Dist. 2003); *One Dupont Centre, LLC v. Dupont Auburn, LLC,* 819 N.E. 2d 507, 513-514 (Ind. Ct. App. 2004). A license is not an encumbrance on the land, it is actually a justification for acts done under the license, a sort of immunity from trespass. *Chicago & Northern Western Transp. Co. v. City of Winthrop,* 257 N.W.2d 302 (Minn. 1977) (citing the Restatement, Property, §512). When a license is granted, the property owner retains legal ownership of the property. *Presley's Estate v. Russen,* 513 F.Supp. 1339, 1350 (D.N.J.1981); *Charlton v. Champaign Park Dist.,* 110 Ill.App.3d 554, 557, 442 N.E.2d 915, 918 (4th Dist. 1982). Furthermore, a license does not

constitute an interest in land. *Waterville Estates Ass'n v. Town of Campton,* 122 N.H. 506, 509, 446 A.2d 1167, 1169 (N.H. 1982); *Showalter v. City of Cheney,* 118 Wash. App. 543, 549, 76. P.3d 782, 785 (Wash. Div. 3, 2003).

As explained,

> …Customarily when one speaks of something being in the 'care, custody, or control' of another, reference is had to a legal relationship akin to that of ownership, tenancy or bailment.

*American Casualty Company v. Timmons,* 352 F.2d 563, 567 (6th Cir. 1965). OKP was not the owner, tenant or bailor of the unimproved portion of the property, the portion on which the artifacts were allegedly damaged. Rather, it was a mere licensee.

E.    **The "Care, Custody or Control" Exclusion is Inherently Ambiguous and Should Consequently be Strictly Construed Against Dongbu**.

Numerous courts have taken the view that the "care, custody or control" exclusion in policies of manufacturer's and contractor's or similar liability insurance is inherently ambiguous.

Referring to the "care, custody or control" exclusion in a policy of manufacturer's and contractor's liability insurance, the court held in *River Services Co. v Hartford Acci. & Indem. Co.,* (1977, ND Ohio) 449 F Supp 622 that by its very nature, the language of the exclusion is inherently ambiguous because it does not specifically set forth what is to be excluded from coverage. As noted, "rather than constituting a phrase of established legal significance in the insurance field, the "care, custody or control" exclusion has been viewed with increasing disfavor as a phrase of uncertain legal implications often operating, to the dismay of the insured, to substantially decrease an insured's expected coverage through the  broad application of a non-specific exclusion." *Citing, Bigelow-Liptak Corp. v. Continental Ins. Co.,* 417 F.Supp 1276 (E.D. Mich. 1976); *Gulf Oil Corp.* v. *James E. Dean Marine Divers, Inc.,* 323 F.Supp. 679 (E.La.1971).

Where real property is involved, as in the case at bar, the court said in *United States Fire Ins. Co v Schnabel,* (1972, Alaska) 504 P.2d 847,  and *Harris, Jolliff & Michel, Inc. v Motorists*

*Mut. Ins. Co.*, (1970) 21 Ohio App 2d 81, 50 Ohio Ops 2d 171, 255 NE.2d 302, clauses in a liability insurance policy excluding coverage for damage to property in the "care, custody or control" of the insured is particularly ambiguous because it is not clear whether the word "property" refers only to that portion of the property which is damaged or to the property as a whole. The clause also is ambiguous, the court said, because the meaning of the words "care," "custody," and "control" is not clear.

F.     **The Allegedly Damaged Artifacts Were Not A Necessary Element of the Clearing Activities and, Therefore, Were Not in the Care, Custody, or Control of OKP**.

Numerous courts have addressed facts similar to the case at bar, whereby the insured is performing work on area or object "a" on the property of a non-insured, area or object "a" is adjacent to area or object "b" and within the non-insured's property, and the work on area or object a carries over and causes damage to area or object "b". Numerous such cases have found that the most important determinant of applicability of the 'care, custody, or control' exclusion is whether the property damaged was necessary to the insured's work as opposed to incidental thereto and consequently found the exclusion not to apply.

In a case involving an excavation contractor that exposed an electric duct which subsequently collapsed, the Sixth Circuit Court of Appeals explained that

…Where the property damaged is merely incidental to the property upon which the work is being performed by the Insured, the [care, custody, or control] exclusion is not applicable…

and that:

…Customarily when one speaks of something being in the 'care, custody, or control' of another, reference is had to a legal relationship akin to that of ownership, tenancy or bailment.

*American Casualty Company v. Timmons,* 352 F.2d 563, 567 (6th Cir. 1965).

Similarly, in a case of a janitorial service that accidentally removed and destroyed 16,000 real estate transfer slips from a customer's property, the court stated in interpreting the care,

1  custody, and control exclusion that:

2
3
> damaged property or premises merely incidental or adjacent to the contracted object upon which work is being performed by the insured is not within the 'care, custody, or control' of the insured even though he might be permitted access thereto during the performance of his contract.

4
5
6
> *Commercial Capital Systems, Inc. v. Paille,* 333 So.2d 293, 295 (La.App. 1976)(citing *Thomas W. Wolley & Sons v. Zurich General Accident & Life Insurance Co.,* -235 La. 289., 103 So.2d 449 (1958).

7      Similarly, in a case involving a plastering contractor's work that splashed on windows

8  that were not a part of the contract and his subsequent cleaning of those windows that caused

9  damages to windows, the court stated that "[W]here the property damages is merely incidental to

10  the work property upon which the work is being performed by the insured, the exclusion is not

11  applicable (Citing cases). *Meisser v. Aetna Casualty and Surety Company,* 98 N.W.2d 919, 921

12  (Wis. 1959).

13
14      In our case, OKP intended to clear an area that no one contends contained artifacts.

15  Instead, it was a livestock grazing area that contained small rocks and shrubs.  However, the

16  heavy equipment operator, after clearing the area which did not contain artifacts, accidentally

17  pushed the debris into another area, the area where the artifacts allegedly were.  Everyone agrees

18  that the heavy equipment operator had no knowledge of the existence of any such artifacts and

19  that he was asked to only clear the non-artifact area.  *See, e.g. the Superior Court's* January 30,

20  2008 Ruling, pp. 3-7, and the parties' briefing in support thereof (OKP Exhibits 26,  and 20, 23,

21
22  23, and 25.  OKP claims and has claimed since the beginning of this case that it had absolutely

23  no knowledge of the existence of any such artifacts and that it was never warned of such.  *See,*

24  *e.g.* OKP Exhibits A-1, A-2 and B to Frink Declaration. Dongbu cannot claim that OKP

25  exercised care, custody or control over artifacts that it had no knowledge of and that it <u>never</u>

26  were aware existed.  Indeed, to date, there is no proof that they existed except for the Atalig

27  family members and friends who say that they saw them.  The pushing of the debris into the

28

1    other area was merely incidental to the work that OKP intended to perform and not an act of

2    "care, custody or control" over the allegedly destroyed artifacts.

3  IX.    **EXCLUSION V(A) OF THE AUTO POLICY AND EXCLUSION 4(D) OF THE**
4         **CAR POLICY ARE NOT APPLICABLE**

5         Dongbu misinterprets the meaning of Exclusion V(a) of the Auto Policy and Exclusion

6    4(d) of the CAR Policy. Both exclusions are set out in their entirety in both OKP's

7    Memorandum in support of its Motion (Memorandum at page 35) and in OKP's Memorandum of

8    attached to its Response to Dongbu's Motion For Summary Judgment (Response Memorandum

9    at pages 21-22); there is no need to recite them again.

10        OKP has provided the Court with clear authority showing that these types of exclusions

11   apply in those instances where the insured has assumed responsibility for the acts of third parties,

12   usually under indemnity or hold harmless agreement.[7] The Court is referred to pages 37-38 of

13   OKP's Memorandum filed in support of its Motion For Partial Summary Judgment and pages 21-

14   23 of OKP's Memorandum filed in Response to Dongbu's Motion. There is no need to set out all

15   of that authority in this Reply, but OKP does include the following previously recited authority

16   as an example of how such a contractual liability exclusion is interpreted:

17       "Liability assumed by the insured under contract" refers to liability incurred
         when one promises to indemnify or hold harmless another, and does not refer to
18       liability that results from breach of contract. (citation omitted)

19       Because "liability assumed under contract" refers to a particular type of contract
20       - a hold harmless or indemnification agreement - and not to a liability that results
         from breach of contract, the contractual liability exclusion applies only to hold
21       harmless agreements, (citation omitted)

22   *Olympic Inc. v. Providence Wash. Insur. Co. of Alaska*, 648 P.2d 1008, 1011 (1982). These

23   exclusions are inapplicable to this case and Dongbu offers no authority to the contrary.

24  X.    **COMPLIANCE WITH NOTICE REQUIREMENT**

25       A.    **There is a duty to defend under the CAR Policy**

26       Dongbu notes "the CAR Policy does not actually contain any terms creating a duty to

27   defend" (Dongbu Response, page 36, l. 4-5.) and its obligation is only to reimburse OKP for

---

28  [7] The Court is reminded that Atalig's indemnity claim has been dismissed by the Superior Court.

defense costs incurred with the advance written consent of Dongbu. The provision being referred to is in the Third Party Liability Section of the CAR Policy insuring agreement and it states:

> In response of a claim for compensation to which the indemnity provided herein applies, the Insurers will in addition indemnify the Insured against
> a) all costs and expenses of litigation recovered by any claimant from the insured, and
>
> b) all costs and expenses incurred with the written consent of the Insurers, provided always that the liability of the Insurers under this section shall not exceed the limits of indemnity stated in the Schedule.

This section needs to be read in conjunction with the provision entitled **Special Conditions Applying to Section _____:**

> 1. No admission, offer, promise, payment or indemnity shall be made or given by or on behalf of the Insured without the written consent of the Insurers who shall be entitled, if they so desire, to take over and conduct in the name of the Insured the defense or settlement of any claim or to prosecute for their own benefit in the name of the Insured any claim for indemnity or damages or otherwise and shall have full discretion in the conduct of any proceedings or in the settlement of any claim and the Insured shall give all such information and assistance as the Insurers may require.

This is a duty to defend provision.

If the Court were to adopt Dongbu's argument that it has no duty to defend and its obligation is to only reimburse its insured for costs of defense incurred in advance with Dongbu's written consent, you have the incredibly unfathomable scenario of an insured with a covered claim tendering a defense to Dongbu who refuses to defend and in addition refuses to give consent to its insured to incur any expenses, whether it be costs of defense or any other related cost or expense.

Dongbu has continually emphasized in its Response that the understanding of a lay person is a primary consideration in interpreting the terms of a policy. An ordinary layman who purchased insurance would expect that if a claim was made he would have a defense provided by his insurer. At the very least the Special Condition provision is ambiguous and ambiguities in an insurance policy are to be resolved against an insurer.

    B.    <u>**Notice was timely under both the Auto Policy and the CAR Policy**</u>

1    In both Memoranda filed previously by OKP it has addressed the issue of the timeliness

2    of its notice to Dongbu.  There is no need to rehash the authorities and arguments already made

3    by OKP on that point.

4    In its argument that notice was not timely Dongbu states that in the conversation in

5    March, 2006 between Brian Chen and Ms. Anas that:

> "Mr. Chen never states or suggests that Dongbu should do anything, or
> that OKP believes the claims implicate the Dongbu policies.  Hence, the
> practical effect of this meeting was the exact opposite of notice - Dongbu's
> agent reasonably and correctly got the impression that OKP was not
> tendering the claim." (Dongbu Response, page 38, l. 2-7.)  Two points:

(1)  On the issue of notice, notice by Moylan's as General Agent for Dongbu is notice to Dongbu

regardless of whether Moylan's may have told Dongbu about the suit being filed; and

(2)  Dongbu again seeks to shirk its responsibilities by arguing that because Brian Chen may not

have used some "magic words" about tendering the defense in March, 2006 that it is relieved of

its obligation to defend suit or at the very least take some action to determine if the claims were

covered.  Dongbu and Moylan's are the insurance professionals and having notice of the suit are

not permitted to sit on the side lines and do nothing.  At the very least it would seem

Moylan's/Dongbu would have asked OKP if it was tendering the defense or if OKP wanted

Dongbu to become involved.

Formal tender of the defense of a claim is not required.  Knowledge by an insurer of the

pendency of a claim is sufficient to constitute tendering of the defense.

1.  *Towne Realty, Inc. v. Zurich Insurance Company*, 193 Wisc. 2d 544, 558-559, 534 N.W.2d

886, 892 (1995)

> We are persuaded by those jurisdictions that hold notice of the claim is sufficient
> to tender a defense.  There are two reasons we conclude this to be the better rule.
> First, the insured is frequently less sophisticated and knowledgeable with regard
> to the intricacies of an insurance company's duty to defend than is the insurer
> which has a staff of professionals available to assist it in discharging its obligation
> to defend.  Because the insurance company is in a better position to understand its
> obligations to invoke the insurer's duty to determine coverage and its obligation to
> defend, notice of the claim should be sufficient to invoke the insured duty to
> determine coverage and its obligation to defend  Further this rule is consistent
> with the assumption that when an insured is owed a defense under the terms of its
> policy, the insured desires the benefit of the policy for which the insured has paid

a premium. Finally, this rule protects the insured by placing the burden of ensuring that there is a clear communication between the parties upon the insurer, who is in a better position to undertake this task. Thus, for the foregoing reasons, we conclude that if the insurer has notice of the claim and does not obtain a clear and express waiver of its duty to defend, the insurer remains obligated to defend the insured for those claims that fall within the terms of the policy.

2. *Dearborn Ins. Co. v. International Surplus Lines Ins. Co.*, 308 Ill.App.3d 368, 373, 719 N.E. 2d 1092, 1096 (1999).

Illinois no longer requires a formal tender to trigger an insurer's duty to defend. Rather, as in California, an insurer's duty to defend arises when the insurer has actual notice of the suit against the insured.

It is undisputed that Moylan's as General Agent for Dongbu had notice of the Atalig suit within several days of suit being filed and such notice is imputed to Dongbu. Based on the *Towne Realty* and *Dearborn* cases, such knowledge constitutes a tender of the defense in March, 2006 or at the very latest in the later part of July, 2006 when Brian Chen delivered a copy of the First Amended Complaint to Ms. Anas at Moylan's.

C.    **Time line**

As far as Dongbu's recitation of a time line is concerned, it should be kept in mind that:

1. The original complaint was filed March 23, 2006;

2. Within a few days thereafter Dongbu's General Agent was aware of the suit;

3. From the time suit was filed in late March, 2006 until late July, 2006, OKP's attorneys filed a series of motions successfully challenging portions of the original complaint;

4. On July 31, 2006 the First Amended Complaint was filed; and

5. On August 9, 2006 a copy of the First Amended Complaint was delivered to Dongbu's General Agent.

(See OKP Memorandum, pages 26-27; Sean E. Frink Declaration of May 22, 2008).

Contrary to what Dongbu states in its Response (Dongbu Response page 38, l. 8-19), it was not 6 months from the time suit was filed that OKP's attorney represented its interests, it was at most 4 months and within approximately 10 days of the First Amended Complaint being filed a copy was delivered to Moylan's as General Agent for Dongbu. Even with Dongbu being on

1   notice of the suit in March and getting a copy the First Amended Complaint in early August,

2   2006 and a letter from OKP's counsel in September, 2006, it is not until March of 2007 that

3   Dongbu advises OKP it declines to defend the Atalig suit. During that entire period of time no

4   one from Dongbu ever contacted anyone at OKP in an attempt to determine the basis of the

5   claims even though it knew OKP "denied most of what Mr. Atalig was claiming." (Dongbu

6   Response page 13, l. 16-19)

7       Notice and tender were timely.

8   D.      **CNMI Insurance Statutes Apply**

9       4 CMC § 7505(e) and 4 CMC §7505(f) apply and consequently even if there was any

10  defect in notice, which OKP denies, same has been waived by Dongbu.

11      Dongbu's argument that at a meeting between its counsel and OKP's counsel where Mr.

12  Clifford announced Dongbu wasn't waiving any of its rights and that notice was "an issue" is not

13  sufficient to avoid waiver of any defect in notice. Both statutes require the insurer to specify to

14  the insured without unnecessary delay (4 CMC §7505(e)) or promptly and specifically (4 CMC

15  §7505(f)) any alleged defect in notice. Assuming for purposes of this argument that these

16  statutes go only to the issue of notice, without consideration of any other reason the insurer may

17  use to decline its duty to defend, Dongbu did not specify without unnecessary delay or promptly

18  and specifically that there was a defect in notice as a basis to decline coverage. The First

19  Amended Complaint was given to Moylan's on August 9, 2006. Counsel for Dongbu says a

20  meeting with OKP counsel occurred on October 23, 2006 and at that meeting he repeatedly

21  stated Dongbu wasn't waiving any of its rights and that "notice was obviously an issue" (Thomas

22  E. Clifford Declaration of June 25, 2008, page 2, l. 1-5). It was not until March of 2007 that

23  Dongbu specified notification as a basis to decline coverage. Further, counsel's comments

24  regarding notice being an issue is not a rejection of coverage but is at most simply a statement

25  that Dongbu is looking into that issue.

26      Dongbu has waived any right to decline coverage on the basis of any alleged defect in

27  notice.

28

E.      **Dongbu must demonstrate prejudice from the alleged lack of timely notice**

The CNMI courts have not addressed the question of whether an insurer must show prejudice to decline coverage on the basis of faulty notice and therefore Dongbu's statement that the notice prejudice rule does not apply in the CNMI (Dongbu Response, page 41, l. 3) is somewhat misleading.

Nevertheless, a majority of states require an insurer demonstrate prejudice in order to raise failure of notice as a defense.  As stated in *Holmes' Appelman on Insurance 2d*, Vol. 22, §139.4(c):

> In the overwhelming majority of states, an insurer may not raise the failure of an insured to give notice as a valid defense to its obligation to provide coverage under an insurance policy, unless the insurer can demonstrate prejudice from the insured's failure to comply with the policy's notice provisions.

Dongbu states:  "Second, even if the notice prejudice rule is applied, Dongbu can show prejudice or there is a presumption of prejudice.  (Dongbu Response, page 41, l. 10-11).  First of all, Dongbu does not specify any prejudice it has suffered and second, the presumption of prejudice argument is contrary to the majority of states which require a showing of prejudice.  Interestingly, when Dongbu states " ...there are fact issues to be discovered regarding whether Dongbu can show prejudice" (Dongbu Response, page 42, l. 15-16) this concedes that Dongbu cannot point to anything to show any alleged defect in notice has prejudiced Dongbu.

Notice by OKP was timely, but if deemed not timely, such defect has been waived by Dongbu and in any event Dongbu has not and cannot demonstrate it has been prejudiced.

XI.     **DISCOVERY**

Dongbu concludes its consolidated Reply/Opposition with a section with a statement that there are a number of issues which may require discovery.  While Dongbu believes those may be issues for discovery, OKP believes that discovery is not necessary for the Court to determine the duty to defend issue.

Although OKP believes that the duty to defend can be determined at this time, Dongbu's statement that discovery may be necessary to determine coverage issues is in effect a concession that there is a possibility of coverage and therefore a duty to defend. See: *Horase Mann*

*Insurance Company v. Barbara B.*, 4 Cal. 4th 1076, 1087 (1993) stating:

> If the parties to a declaratory relief action dispute whether the insured's misconduct should be reviewed as essentially a part of a proven sexual molestation, or instead as independent of it and so potentially within the policy coverage, then factual issues exist precluding summary judgment in the insurer's favor.  Indeed, the duty to defend is then established (citation omitted)

Citing with approval the *Horase Mann* case the Court is referred to *Butler v. Clarendon Ameria Ins. Co.*, 494 F.Supp. 2d 1112, 1123 (N.D.Cal. 2007) cited by Dongbu at pages 5-6 of its Consolidated Response which reaffirms that the existence of disputed facts establish a possibility of coverage and a duty to defend:

> Where the potential for liability depends on a disputed factual question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend.  (citation omitted).

The standard for duty to defend is whether there is any possibility of coverage.  The need for need to establish facts going to the issue of coverage means that there is a possibility of coverage and therefore the duty to defend exists.

XII.    **CONCLUSION**

Based on the authority and arguments presented in OKP's Motion for Partial Summary Judgment and Response to OKP's Motion for Partial Summary Judgment and Response to Dongbu's Motion for Summary Judgment the Court is respectfully requested to determine as a matter of law that no genuine issues of material fact as it relates to duty to defend and that as a matter of law Dongbu is required to defend OKP in the underlying Superior Court action.

CARLSMITH BALL LLP

DATED: Saipan, MP, July 3, 2008.

/s/ John D. Osborn
JOHN D. OSBORN
SEAN E. FRINK
Attorneys for Defendant
OKP (CNMI) Corporation