# Exhibit "A2"

E-FILED
CNMI SUPERIOR COURT
E-filed: Nov 26 2007 10:24PM
Clerk Review: Nov 27 2007 4:41PM
Filing ID: 17391360
Case Number: 06-0119-CV
Dora Decena



REXFORD C. KOSACK
GLENN A. JEWELL
DOUGLAS DALEY
LAW OFFICES OF REXFORD C. KOSACK
Bank of Hawaii Bldg., Third Floor
P.O. Box 410
Saipan, MP 96950
Telephone: (670) 322-8800
Fax: (670) 322-7800

Attorneys for Defendant Brian M. Chen

CARLSMITH BALL LLP

SEAN E. FRINK, F0212
Carlsmith Building, Capitol Hill
P.O. Box 5241
Saipan, MP 96950-5241
Tel No. 670.322.3455

BRUCE L. MAILMAN (CNMI Bar #F0153)
MAYA B. KARA (CNMI Bar #F0169)
Mailman & Kara, LLC
PMB 238 PPP, Box 10,000
Saipan, MP 96950
Tel:(670)233-0081
Fax: (670)233-0090

Attorneys for Defendants
OKP CNMI Corporation, Prasada
Reddy Goluguri, Pramuan Jaiphakdee, &
Wilai Promchai

IN THE SUPERIOR COURT

OF THE

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| JOAQUIN Q. ATALIG,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>OKP (CNMI) CORPORATION, *et al.*,<br><br>　　　　Defendants. | CIVIL ACTION NO. 06-0434<br><br><br>**OKP CNMI CORPORATION'S &<br>BRIAN M. CHEN'S STATEMENT OF<br>DISPUTED FACTS IN SUPPORT OF<br>THEIR OPPOSITION TO<br>PLAINTIFF'S MOTION FOR PARTIAL<br>SUMMARY JUDGMENT** |

As stated by OKP CNMI Corporation ("OKP") in its May 16, 2006 Opposition to an almost identical motion filed by plaintiff.

> Plaintiff's motion would have the Court believe that there is no genuine issue as to any material fact. In reality, the parties are in complete disagreement as to all material facts. Defendant disputes that it damaged or destroyed the items Plaintiff claims were damaged or destroyed, and disputes that most of the items were even on the leased property. Defendant further disputes that it violated the contract. Moreover, the terms of the contract relied upon by Plaintiff for his motion are not enforceable because they were inserted by Plaintiff through misrepresentation.

Despite extensive discover conducted by the parties in the year and a half since OKP made this statement, nothing has really changed. The parties are still in fundamental disagreement on the facts that are relevant to plaintiff's motion. For this reason alone, plaintiff's motion should be denied.

Following are the relevant facts disputed by OKP and Brian Chen:

1. <u>The Lease Was Altered Through Fraud</u>. In response to paragraphs 1 through 12, 17, & 18 of Section II of Plaintiff's Memorandum, entitled "ALL MATERIAL FACTS ARE UNDISPUTED" ("Plaintiff's Statement of Undisputed Facts"), which discuss the terms of the Lease Agreement, it is OKP and Chen's position that the lease was procured by fraud. Following are the facts as testified by OKP regarding how the Lease was created:

Brian Chen, on behalf of OKP, and plaintiff, on behalf of himself, reached what might be described as an agreement in principle for OKP to lease the former Sunrise Hotel on Rota. Both men recognized that the agreement needed to be reduced to writing. Attorney Perry Inos was hired to prepare a draft. May 16, 2006 Declaration of Brian M. Chen, ¶8.

Inos prepared a draft, which was provided to OKP and plaintiff. May 16, 2006 Declaration of Brian M. Chen, ¶10. They both agreed that certain changes were needed to the draft. May 16, 2006 Declaration of Brian M. Chen, ¶11. The changes included: the stated month

and year were wrong, the reference to an inventory list would need to be deleted, the rent to be paid for an exercised option would be paid in three month increments, the tax section needed to be changed so both parties were responsible for their own taxes, and references to exhibits "B" and "C" would be changed to "A" and "B." May 16, 2006 Declaration of Brian M. Chen, ¶11.

They attempted to meet with Inos in order to have him make the changes. Apparently, Inos was busy with his father's political campaign in Rota and was not available to meet with Chen and plaintiff. May 16, 2006 Declaration of Brian M. Chen, ¶12.

Plaintiff was anxious to resolve the matter in large part because he wanted to receive the lease payment. May 16, 2006 Declaration of Brian M. Chen, ¶12. He recommended that attorney Ray Quichocho be utilized to make the changes. May 16, 2006 Declaration of Brian M. Chen, ¶12. Plaintiff retained Quichocho for this purpose. May 16, 2006 Declaration of Brian M. Chen, ¶12 and October 26, 2007 Declaration of Brian M. Chen, ¶7. OKP was not represented by counsel with respect to the negotiation of the Lease Agreement. May 16, 2006 Declaration of Brian M. Chen, ¶14.

Plaintiff and Chen met with Quichocho to confirm that the desired changes had been made. May 16, 2006 Declaration of Brian M. Chen, ¶14. Quichocho produced a new document, which was provided to Chen and plaintiff. May 16, 2006 Declaration of Brian M. Chen, ¶14.

Chen reviewed the document that Quichocho produced. May 16, 2006 Declaration of Brian M. Chen, ¶15. It appeared to be acceptable as it was the Inos draft with the changes that had been requested. May 16, 2006 Declaration of Brian M. Chen, ¶15.

The next day, Chen and plaintiff met with Quichocho in the morning. May 16, 2006 Declaration of Brian M. Chen, ¶16. Quichocho asked for Chen's draft back and Chen complied. Then, Chen, on behalf of OKP and plaintiff, on behalf of himself, executed the Lease

Agreement. May 16, 2006 Declaration of Brian M. Chen, ¶16. Chen did not review the draft of the Lease Agreement that he signed before he signed it because Quichocho assured him nothing had been changed from the version Chen was given the night before. May 16, 2006 Declaration of Brian M. Chen, ¶16. Quichocho said he would have the document recorded and give Chen a copy afterwards. May 16, 2006 Declaration of Brian M. Chen, ¶16. The next day, Chen received a copy of the file-stamped version of the Lease Agreement. May 16, 2006 Declaration of Brian M. Chen, ¶16.

There are notable differences between the Inos draft ("Original Draft") and signed version ("Quichocho Draft") of the Lease Agreement. These changes are **not** among the changes that OKP and plaintiff had requested that Quichocho make. May 16, 2006 Declaration of Brian M. Chen, ¶11 & 17. These changes include changes to Sections 1, 6, and 13.1 are all provisions that OKP contends were fraudulently introduced into the lease by Atalig.

From the beginning it has been OKP's clear position that the Lease altered through fraud.

> **[D]efendant responds that plaintiff fraudulently changed the terms of his lease with OKP Corporation.**
>
> *Defendant OKP CNMI Corporation's Responses to Plaintiff's First Set of Interrogatories, ¶¶ 2, 3, 4, 8, & 9 (emphasis added).*
>
> **Plaintiff fraudulently changed the terms of the lease between him and OKP (CNMI Corporation.**
>
> Chen asserts the facts set forth in the Declaration of Brian M. Chen filed in this case on May 16, 2006…
>
> *Chen Response to Plaintiff's First Set of Interrogatories to Defendant Brian M. Chen, ¶¶3, 4, & 9 (emphasis added).*

Brian Chen's May 16, 2006 Declaration explained in detail how extensive the fraudulent changes were:

17. Upon subsequent review, made after Mr. Atalig began claiming that OKP had violated the lease, **I do not believe that the version that I apparently signed on November 2, 2005 was the same or even similar to the version that Mr. Quichocho had given me the previous morning. In particular, I believe that the following sections had been changed**:

    a.    **the description of the premises to be leased in Section 1 was significantly changed to delete significant portions of the property;**

    b.    a provision regarding OKP hiring two employees of Mr. Atalig's was added to the new Section 3;

    c.    **a provision regarding OKP not committing waste was added to the new section 6;**

    d.    a provision adding, "including the land" to the new section 12.C. was added;

    e.    substantial changes to OKP's right to renovate the property were made in the new section 13, entitled "Lessee's Right to Build,";

    f.    **the old section 13, entitled "Removal of Improvements, Soil, Etc., Not to Constitute Waste" was removed including an explicit statement that removal of sand, soil, vegetation, and other materials from the premises would not constitute waste;**

    g.    **new sections 13.1 and 13.2 both add new written consent requirements;**

    h.    new section 13.3 adds "at the sole cost of Lessee," and section 13.4 adds numerous additional items that Lessor can to keep at the expiration of the Lease;

    i.    changes "may" to "shall" and added "calamity for the value and improvements" to the Fire and Casualty section; and

    j.    the new sections 19 and 20, entitled "Severability" and "Entire Agreement" were substantially modified.

19. Throughout all of my negotiations and according to the terms of the lease that I was told I was signing, it was agreed that OKP would not need any further consent from Mr. Atalig to improve and otherwise change any aspect of the property to be leased,

including but not limited to, the buildings and area where the
equipment/recreation yard was to be built.

*Brian M. Chen Declaration, filed 5/16/06, ¶¶ 8-17, and 19 (and exhibits)
(emphasis added).*

Additional evidence supports OKP's position in this regard:

And the document which Brian Chen ultimately signed was
significantly different in its terms from the agreement that was
actually reached between Mr. Atalig and Mr. Chen.

*OKP Deposition, p. 87, ll. 2-5.*

Q. And am I correct that in understanding that OKP's position is
that the lease that Mr. Chen signed does not reflect the negotiations
between Mr. Chen and Mr. Atalig; is that right?

A. That's correct.

*OKP Deposition, p. 87, ll. 20-24.*

**I think there is a fraudulent substitution of the altered lease,
first and foremost.**

*OKP Deposition, p. 94, ll. 16-17 (emphases added). See also, Chen Deposition,
p. 79-85, 287-329 & 420 (emphasis added).*

Additionally, it was plaintiff who hired Quichocho to prepare the lease.

*October 26, 2007 Declaration of Brian M. Chen, ¶7.*

2.  <u>OKP Was Never Warned of the Alleged Existence of the Artifacts; Atalig Instead Authorized the Clearing; and The Artifacts Never Existed</u>.  Plaintiff claims in Paragraph 13 of his Statement of Undisputed Facts that:

Despite being warned not to clear the areas where the cultural and
historical artifacts lay, Defendants used heavy equipment to clear
the land...

Plaintiff does not explain what "cultural and historic" artifacts he is referring to. This is the only reference to artifacts in the entire Statement of Undisputed Facts.

A. *No Warnings Were Ever Given.* In fact, OKP was never warned not to clear any area of the property and, other than the latte set still standing next to room 108 of the hotel (which Atalig does not contend OKP damaged), Atalig never warned OKP of the existence of any historic or cultural artifacts on the property.

> **[P]laintiff failed to inform defendants of the alleged existence of the latte stones and other historical artifacts in question...**
>
> *Defendant OKP CNMI Corporation's Responses to Plaintiff's First Set of Interrogatories, ¶¶2, 3, 4, & 8 (emphasis added).*
>
> **Additionally, plaintiff is fraudulently claiming to have informed defendants of the existence of all or some of the alleged latte stones and other historical artifacts, trees and bushes, and other items that were allegedly destroyed, damaged, or removed.**
>
> *Defendant OKP CNMI Corporation's Responses to Plaintiff's First Set of Interrogatories, ¶9 (emphases added).*
>
> Mr. NUTTING: There's -- more than the failure to warn. The failure to warn -- in any of the written documents that we've seen, there's no mention of the existence of the se artifacts, so there's no need for any protection. Well, there's one --one aspect of failure. Jack Atalig never --failed to warn orally as well throughout this. He knew the clearing was going on the premises; it never came up. Failure -- and failed to warn at that time, orally. Failure to register the artifacts -- artifacts with HPO so they would have additional pieces of protection, if you will. And so, all of that falls in with the category of failure to warn.
>
> *OKP Deposition, p. 51, ll. 11-23. See also, OKP Deposition, pp. 44-45, 47-48, 51, 59-60, 64, 66, 110-111.*
>
> **I need to make one fact absolutely clear at this point: other than the latte stone cluster in clear view near room 108 of the hotel (which no one contends had been disturbed in any manner) Mr. Atalig NEVER mentioned any latte stones, other Chamorro artifacts, or Japanese ruins being on his property to me or anyone else in my presence.**
>
> *Brian M. Chen Declaration, filed 5/16/06, ¶7. See also, Prasada Reddy Goluguri Deposition, p. 42-49 and May 16, 2006 Declaration of Yee, Chee Keong, ¶5.*

B.   *Atalig Affirmatively Authorized the Clearing*.   Additionally, Atalig gave permission for the clearing.

> Q. Okay. Before Pramuan [Jaiphakdee] did his work with the excavator, who authorized him to do that work?
>
> A. Jack Atalig and Adita Carrillo.

*OKP Deposition, p.186, ll. 10-12*

> Q. And I was asking about authorization for Pramuan [Jaiphakdee] to do the demarcation or whatever he did with the excavator. And you indicated that authorization came from Adita or -- Jack; is that right?
> A. Uh-huh.
> Q. That's a yeah, you --
> A. Yes.
> Q. So that's -- that's OKP's position?
> A. Uh-huh. OKP's position.

*OKP Deposition, p., 190, 11. 14-23.*

> Okay. Atalig knew that the -- OKP was going to clear the property> They knew it -- he knew it even before he executed the -- the lease. So it was always -- it was always understood that they were going to use it as a parking facility. There were also discussions of a baseball diamond, soccer field; and all of these things being constructed on the property. So he knew it was going to happen, and he took no affirmative steps to try to protect supposed historical artifacts. **He even admits advising Carillo as to where OKP-- OKP could clear, and so he knew they were about to clear the property.** And he took absolutely no steps to come out to the property, warn or advise OKP that there were Latte Stones on the property or other cultural artifacts, which were (indiscernible). And he took no steps to -- to protect or mark them.

*OKP Deposition, pp. 136-137, ll. 18-25 and 1-8.*

> At that meeting Mr. Atalig was informed that OKP would need to build a workshop and equipment/recreation yard at the area it is at now. Mr. Atalig was also informed that the former bar/store on his property would be converted into a kitchen. Mr. Atalig said "no problem, do whatever you want" or words to that effect.

May 16, 2006 Declaration of Yee, Chee Keong, ¶3.

*See also,* Goluguri Deposition, pp. 42-51; Ludivina P. "Edita" Carillo Deposition, pp. 189-192; and Defendant OKP CNMI Corporation's Responses to Plaintiff's First Set of Interrogatories, ¶¶3, 4, 6, & 7 ("plaintiff approved of the clearing and other changes to the property in the manner cleared and changed").

    C.    *The Artifacts Never Existed.* Additionally, other than the damaged and repaired water cistern, the apparently alleged destroyed artifacts never existed.

> OKP's position is that it doesn't -- there weren't any artifacts in existence.

*OKP Deposition, p. 65, ll. 16-17.*

> We think that, because of some of the -- we think that -- from the outset, **there was a fraudulent scheme to extort money out of OKP with his fraudulent claims of destruction of non-existent historical artifacts**...co-opting witnesses to commit perjury to support its fraudulent claims as to the existence of historical artifacts...

*OKP Deposition, p. 94-95, ll. 17-21 and 10-12.*

> [P]laintiff has fraudulently claimed the existence of some or all of the latte stones and other historic artifacts...

*Defendant OKP CNMI Corporation's Responses to Plaintiff's First Set of Interrogatories, ¶¶2, 3, 4, 5, 8, & 9 (emphasis added).*

> Upon the findings of HPO's initial survey, follow-up surveys, and document review of the subject property, **no evidence can be found to substantiate the claim that pre-historic cultural resources were damaged or destroyed by the earthmoving activities of OKP Corporation.**

*Report and Findings of HPO Investigation, Rota Lot No. 362-R-01 (OKP Clearing), dated July 19, 2006, p. 3 (emphasis added).*

The non-existence of the artifacts is extensively further supported by the following additional evidence:

      i.      October 26, 2007 Declaration of Lon E. Bulgrin, author of the *Letter Report For An Archaeological Investigation of Lot 362 R 01 on the Island of Rota, Commonwealth of the Northern Mariana Islands* (attached to the Declaration as Exhibit "A"), ¶¶3-4;

> **The Report does not conclude that the low density Precontact site located near the Japanese Cistern likely previously contained a latte set.** In fact, it is more likely that the low density Precontact site located near the Japanese Cistern previously did not contain a latte set. This is because had the site previously included a latte set, my site investigation would have discovered other indictors such as…(emphasis added);

      ii.      October 7, 2006 Declaration of Joaquin M. Ogo, ¶¶5-6 ;

> I hunted and sometimes spent nights in the area of the water tank, I am very familiar with the area …I never saw any latte stones on what is the Atalig property… If they had existed on the property, I would have seen them.

      iii.      October 25, 2007 Declaration of Esther Langit, ¶9;

> During my time of employment at Sunrise Hotel, I never saw any latte stones or any other large stones near the "Japanese" water tank…I was familiar with this area…no one ever spoke to me or told me about any latte stones on the property…

      iv.      May 16, 2006 Declaration of Yee, Chee Keong, ¶5;

> Mr. Atalig never mentioned the presence of any latte stones or other Chamorro or Japanese artifacts on the site to me or anyone else that I am aware of and I have never seen any such items;

      v.      May 16, 2006 Declaration of Prasada Reddy Goluguri, ¶8;

> At no time have I ever seen any Japanese or Chamorro artifacts in the area that was cleared);

      vi.      May 16, 2006 Declaration of Pramuan Jaiphakdee, ¶4;

> Nor were there any Chamorro or Japanese artifacts [in the area that I cleared];

      vii.      May 31, 2006 Amended Declaration of Antonio M. Mesgnon, ¶¶4-5;

> I am familiar with the Atalig land ... and have hunted in the area many times over the years ...I have never seen nor been made aware of any latte stones or other Chamorro artifacts on the Atalig land;

viii.   May 17, 2007 Declaration of Cleto V. Dalawampu, ¶¶1, 9, & 14;

> From 1986 to 1988 I was employed ...by Joaquin Q. Atalig ... as a farmer ...There were no latte stones or any other artifacts in the area of the rest house...I observed no additional artifacts of any sort on the farm nor did Jack or any of his relatives ever tell me about latte stones or other ancient Chamorro artifacts on the property.

ix.   December 26, 2006 Declarations of Sumiko Tsukayama, ¶8 ("I have never heard of any large, Chamorro stones around Tsuru's house, and I have known about the stones of the native people since these days"); Tsuruko Sakiyama (Maiden name "Hisada"), ¶13 ("I have absolutely no memory of seeing a large rock or boulder in the area around the Liyo houses. There was nothing surrounding the water tank."; Yoshi Kamiya, ¶6 ("Around this place there were no large stones, nor did I ever hear of any large stones existing here. There was nothing special around the tank."); Mitsuko Toguchi, ¶9 ("If there had been a big stone, Tsuru Sakiyama had been living on her father's land for a long time, and I think she would know because it was her father's land."); and Shizuko Murata, ¶13 ("Before the war, we called the Chamorro stones, "ruins" or "Strange stones." Around the Hirada and Shiroma homes, there were none of these stones. I never heard anything about them from my father either.").

3.   <u>The Clearing Did Not Take Place in January, 2006</u>. In Paragraphs 13, 15, & 16, of Plaintiff's Statement of Undisputed Facts, Atalig claims that the clearing took place in January, 2006. OKP and Atalig's own witnesses testified that the clearing, in fact, took place on December 23 and 24, 2005.

> Q. Roughly, can you put a time as to when that default -- or the alleged destruction -- occurred?

> A. The alleged destruction occurred?
>
> Q. Yeah. When the -- when the Latte Stones were destroyed and when the water tank was damaged. What was the date?
>
> A. The alleged destruction. I guess, to qualify, we don't believe that any -- there was any Latte Stones that were destroyed, but we, in terms of the clearing of the property, we believe that occurred on approximately the 23rd or the 24th of December.
>
> Q. All right. December 2005?
>
> A. Yes.

OKP Deposition, pp. 161-162, ll. 14-14 & 1. See also, Goluguri Deposition, pp. 30, 32, 44, 80, 84 and Carillo Deposition, pp. 188-189, 239-240, 252-253.

    4.    <u>OKP Did Not Damage the Dirty Kitchen</u>. Plaintiff claims in Paragraph 14 that "in or about January 2006, despite not having a written consent from Plaintiff Atalig, Defendants tore down the kitchen, laundry, and storage facilities, and used the materials therefrom to build a *pala pala*. In the process, Defendants damaged and destroyed the homemade cooking stove, *ifik* posts, and other valuable items that were stored."

OKP testimony disputes that it damaged the A-frame building which plaintiff is apparently referring at least in part to in Paragraph 14. Additionally, to the extent that plaintiff intends to refer to the laundry building, which is situated directly next to the A-frame, and which is also known as the "dirty kitchen" OKP testimony explains that it offered to rebuild the dirty kitchen in order to cure the alleged damage but plaintiff never responded:

> Q.    All right. Then the structure next to the dirty kitchen referred to as a A-frame. Is it OKP's position that it was not damaged?
>
> A.    Yeah, it's --
>
> MR. FRINK: Objection, vague as to damage.
>
> MR. NUTTING: It was OK's (sic) position that the structure was damaged when it came on to the property, when it took possession of the property.

Page 12 of 17

BY MR. DOTTS:

Q. Okay. SO OKP's position is that any damage that existed to the A-frame existed prior to OKP's entering the property; is that correct?

A. That's correct.

Q. And OKP, therefore, denies causing any damage to the A-frame?

A That's correct. And again, any -- and I think OKP offered to sure any damage that they wanted to identify, and Mr. Atalig and Mr. Quichocho never came forward and said please do this.. . .

Q. All right. did OKP Affirmatively offer to rebuild the dirty kitchen?

A. Look at my notes. I would say, I believe, yes. I don't have that correspondence, but I believe the affirmative offer to make -- to rebuild the dirty kitchen was made Mr. Atalig by OKP.

*OKP Deposition, pp. 172-173, ll. 1-25 & 1-2.*

5. <u>OKP Did Not Bulldoze the Trees</u>. Plaintiff claims in Paragraph 15 that "in or about January 2006, despite not having a written consent from Plaintiff Atalig, Defendants bulldozed down valuable trees, including but not limited to, flame trees, coconut trees, cotton trees, iron trees, bamboo trees, betelenut trees, shrubs, manicured flowers, and other plants." OKP testified that did not cause such damage:

Q. All right. "The destruction of trees and plants used in agriculture and the destruction of structures such as buildings, wells, foundations and walls during the performance of the work at or near this property. What information do you have about the destruction of trees and other plants in agriculture?

A. I don't think there were any. There were some trees -- no -- no -- nothing used in agriculture on the property. My information and OKP's position is that there were various small trees, shrubbery, bushes. Nothing, no organized or intentionally planted plants or tress on the premises. There were a number of coconut trees that were sporadically placed around the property. Those were moved when the -- when the -- when it was cleared.

Q. All right. What -- what about fruit-bearing trees? (Indiscernible) fruit trees? I don't know if I'm saying that right?

A. I haven't -- from the workers I've spoken to, they didn't describe any fruit-bearing trees like peach trees or anything like that.

**Q. So -- so OKP's position is other than the coconut trees, which were sporadically spread throughout the property, they did not destroy any fruit trees; is that correct?**

**A. That's correct.**

*OKP Deposition, p. 198-199, ll. 20-25 & 1-22. (emphasis added).*

The area that I cleared consisted of dried bush and vegetation. There were no trees, rocks (other than very small rocks that could not have been latte stones or other artifacts and a few -- maybe three-- very small trees about three to five feet tall that could not have been fruit trees), or boulders in the area that I cleared.

*May 16, 2006 Declaration of Pramuan Jaiphakdee, ¶4.*

Neither in clearing the property nor in pushing debris did I see any barbed wire fencing or netting of any kind in the area of the clearing or removal.

*November 26, 2007 Declaration of Pramuan Jaiphakdee, ¶5.*

"At no time did I see any trees in the area that was cleared."

*May 16, 2006 Declaration of Prasada Reddy Goluguri, 8¶.*

The area that was cleared for the workshop and equipment/recreation yard was a piece of livestock grazing land. No trees were on the site other than a few small trees, numbering no more than five and no more than five feet in height. The trees primarily consisted of baby coconut trees that were not dispersed in any pattern as if they were planted by hand. There were not any betelnut or flame trees that I can recall and I am not familiar with what cotton trees and iron trees look like so I do not know.

*May 16, 2006 Declaration of Yee, Chee Keong, ¶4.*

6. <u>OKP Did Not Remove Soil, Rocks, and Minerals</u>. Plaintiff claims in Paragraph 16 of his Statement of Undisputed Facts that "in or about January 2006, despite not having

written consent from Plaintiff Atalig or an earthmoving permit from the Division of Environmental Quality, Defendants removed soil, rocks, and minerals, including excavating Plaintiff Atalig's land, for Defendant OKP's parking lot." OKP testified that it did not remove soil, rocks, and minerals from Atalig's land and the clearing that was done was for a soccer and recreation yard and vehicle staging area both:

> Q. All right. What did you learn about the mud?
>
> A. Well, I think that I might have been in error when I spoke previously about the not removing the topsoil initially from the -- during the clearing. So there was -- the area was cleared. Topsoil was stockpiled off into one corner outside of the clear area -- the cleared area. It was about eight foot high, by a 40 by 40 foot mound...
>
> Q. The -- the topsoil was stockpiled at the end before OKP left, did they take the stockpile -- stockpiled topsoil and reapply it to the property?
>
> A. They did, with additional topsoil.
>
> Q. Okay. How much additional topsoil did they --
>
> A. Fifteen to twenty dump trucks full, which was taken from the airport site with permission of CPA, as I understand it -- high quality topsoil. **And when OKP left the property, the depth of the topsoil was even greater than it was when they took possession.**
>
> *OKP Deposition, p. 238, ll. 21-25, p. 239, ll. 1-3, 22-25, p. 240, ll. 1-6. (emphasis added).*

> Q. All right. I've been told that the topsoil was stockpiled somewhere on the property. Is that right?
>
> A. Yes, sir.
>
> Q. Roughly, where was the topsoil stockpiled?
>
> A. Somewhere here, sir.
>
> *Goluguri Deposition, p. 85, ll. 19-23.*

> Q. The soccer field may be like a recreational area for the OKP workers; is that right?
>
> A. uh-huh.
>
> Q. That's a yes?
>
> A. Yes. sorry.

*OKP Deposition, pp. 207-208, ln. 25 & 1-4.*

> Q. Okay. Tell me about that conversation [with Edita Carillo] What happened?
>
> A. I told her that we are going to clear some of the area for a recreation and a vehicle and equipment parking area....

*Prasada Reddy Goluguri Deposition, pp. 44, ll. 12-16.*

7. <u>The Atalig Property Was Not Designated by HPO as A Cultural Or Historic Property</u>. The evidence is that the Atalig property has **not** been designated by HPO as a cultural or historic property:

> I was the resident Department Head for the Department of Community and Cultural Affairs in Rota in the 1980s. One of my former staff... informed me that the were Lattes Stones and other cultural and historical artifacts on Mr. Ataligs property that should be registered. Since Mr. Atalig had planted many permanent trees and crops, I wanted him to continue farming his land rather than condemn the land. **As a result, I did not register the Latte Stones, the ancient Chamorro mortar and pestle, and the Japanese artifacts** because if I did, Mr, Atalig will not be able to farm his property.

May 3, 2006 Declaration of Leon Taisacan, ¶¶3, 4, & 16. See also, Deposition of Leon I. Taisacan, pp. 138-139; May 3, 2006 Declaration of Leon I. Taisacan, ¶16; Deposition of Joaquin Q. Atalig, p. 472.

Date: November 26, 2007.

        Respectfully submitted,

/s/
Rexford C. Kosack, CNMI Bar No. F0140
Glenn A. Jewell, CNMI Bar No. F0176


/s/
Sean E. Frink, CNMI Bar No. F00212