E-FILED
CNMI SUPERIOR COURT
E-filed: May 16 2006 11:37PM
Clerk Review: May 17 2006 8:32AM
Filing ID: 11289675
Case Number: 06-0119-CV
Elsa Duenas

BRUCE L. MAILMAN (CNMI Bar Assoc. #F0153)
MAYA B. KARA (CNMI Bar Assoc. #F0169)
Mailman & Kara, LLC
PMB 238 PPP, Box 10,000
Saipan, MP 96950
Tel:(670)233-0081
Fax: (670)233-0090

SEAN E. FRINK (CNMI Bar Assoc. #F0212)
The Law Offices of Sean E. Frink, LLC
Second Floor, Tan Marakita, Garapan,
PMB 161, Box 10003
Saipan, MP 96950
Telephone: (670)233-2889
Sean.Frink@Saipan.Com

Attorneys for Defendant
OKP (CNMI) Corporation

# IN THE SUPERIOR COURT

## FOR THE

## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| JOAQUIN Q. ATALIG, | Civil Action No. 06-0119 |
| Plaintiff, | |
| -v- | **DECLARATION OF BRIAN M. CHEN** |
| OKP (CNMI) Corporation, *et al.*, | |
| Defendant. | |

I, Brian M. Chen, a person aged over eighteen years, and being of sound mind, state:

1. I was responsible for making the arrangements for finding a place for OKP (CNMI) Corporation to house, feed and recreate its workers, and also a place for its heavy equipment to be stored and maintained on Rota.

2. In order to make such arrangements, between August and November of 2005, I had numerous conversations and meetings with Mr. Joaquin Q. Atalig ("Mr. Atalig")

Declaration – Pg. 1

regarding the potential for OKP to lease his property in Ginalangan. Almost all of these meetings took place on Saipan, where I understood Mr. Atalig to have resided at the time and where I believe he continues to reside.

3. Mr. Atalig and I discussed at length OKP's requirements for the use of the property. I made clear and Mr. Atalig clearly agreed that OKP needed a property to house and feed its approximately fifty workers, a large cleared space for those workers to play soccer and other sports (as many of the workers are Thai, they especially enjoy playing soccer) and a yard to store, maintain, and repair the heavy equipment. Mr. Atalig clearly understood and agreed that the property would be used for these purposes and that we would be leasing the entire almost 50,000 square meter property.

4. In fact, at different times throughout the discussions, Mr. Atalig sent me letters confirming various aspects of the discussions. Attached to this declaration as Exhibits "A," and "B" are true and correct copies of two letters sent by Mr. Atalig to me regarding meetings and discussions conducted on or about October 6, 2005 and in early November, 2005.

5. Those letters make clear that Mr. Atalig was fully aware and agreed that OKP was going to:

    a. rebuild the old restaurant which had been damaged by a typhoon and had no roof into four rooms for housing employees,

    b. destroy the cooking counter to create a toilet at the old restaurant area,

    c. close the opening between room 109 and the building for privacy,

    d. enclose an outside sink will be connected to the kitchen to create a community shower,

    e. install pipes to accommodate people staying in the rooms created out of the former restaurant.

    f. improve two toilets outside the old restaurant,

Declaration – Pg. 2

g. improve the small A frame structures used for dining

h.. improve the bar building and surrounding facility and used as the main kitchen area for employee meals and an attached employee dining area will be constructed,

i. construct a soccer field, tennis court, basketball court, and other recreation facilities for employees,

j. the entire lot #362 R 01 may be used and will be leased to OKP,

k. convert the restaurant dining area into the main OKP office,

l. add an additional room to room 101 to accommodate two additional bathrooms,

m. improve room 102,

n. extend the roof overhang to cover the entire length of the hotel's sidewalk,

o. reconstruct the larger A frame structure at gate one, and

p. construct a repair shop for heavy equipment more than 100 feet away from the latte stone formation located near room 108.

6. Mr. Atalig's attitude throughout all of our time together was that he was extremely pleased that he would be receiving rent for the property and that OKP would be improving the property during the term of its lease. We spent considerable time together discussing exactly how OKP would use and improve the property. Although OKP would never take him up on the offer (instead, we hired a subcontractor at a cost of more than $60,000 to renovate the buildings) Mr. Atalig went as far as to say that "OKP could tear the entire hotel down for all he cared" or words to that effect since the hotel was not making him any money and he had moved on to Saipan and was starting a hotel there.

7. I need to make one fact absolutely clear at this point: other than the latte stone cluster in clear view near room 108 of the hotel (which no one contends has been disturbed in

Declaration – Pg. 3

any manner) Mr. Atalig NEVER mentioned any latte stones, other Chamorro artifacts, or Japanese ruins being on his property to me or to anyone else in my presence.

8. In early October, 2005, Mr. Atalig and I met with an attorney agreed to by Mr. Atalig, Mr. Perry Inos, at Mr. Inos' offices in order to have him draft a lease for us. We provided the details of what we wanted to Mr. Inos, and Mr. Inos agreed to draft the lease for us.

9. At the time of our meeting with Mr. Inos and afterwards, Mr. Atalig repeatedly stated that it was extremely urgent that the lease be completed soon as Mr. Atalig desperately needed OKP's initial $19,500 payment. Mr. Atalig mentioned his frustration with Mr. Inos's delay in getting the lease drafted and that the reason for Mr. Inos's delay was because he was assisting his father run for the position of Mayor of Rota.

10. In late October, 2005, Mr. Atalig and I were provided a proposed lease by Mr. Inos, a true and correct copy of which is attached hereto as Exhibit "C."

11. Mr. Atalig and I reviewed the draft lease together over the phone and agreed that it accurately reflected our agreement but also noticed a few minor needed changes. The changes that we agreed needed to be made were: A) the month and year were wrong, B) that the reference to an inventory list would be deleted because no such list existed at the time, C) that rent to be paid if OKP exercised its option to extend would be paid every three months in advance, D) that the tax section needed to be changed to make clear that each party would be responsible for its own respective taxes, and E) references to exhibits "B" and "C" would be changed to "A" and "B."

12. Mr. Atalig informed me soon afterwards that it was difficult to contact Mr. Inos to discuss the lease because he was too busy with the election. Mr. Atalig then stated that it was extremely urgent that he receive the initial $19,500 payment right away and recommended

that he take the lease to another attorney to make the needed changes and recommended that we use his attorney, Ray Quichocho.

13. When it came time to sign the lease, I met with Mr. Atalig and his attorney, Ray Quichocho, at Mr. Quichocho's office on Saipan on the morning of November 1, 2005.

14. At that meeting, Mr. Quichocho gave me a lease that he had drafted and told me that he had made the changes Mr. Atalig and I had agreed needed to be made to the lease drafted by Mr. Inos, but otherwise it remained the same. Neither OKP nor I was represented by an attorney at the meeting or at that time.

15. I took the draft lease back with me to my hotel room that night to read it and did not perceive any changes from Mr. Inos's draft other than that the changes Mr. Atalig and I had agreed needed to be made, as identified in paragraph 11 above, had been made.

16. When I met with Mr. Atalig and Mr. Quichocho the next morning at Mr. Quichocho's offices, Mr. Quichocho asked for my copy of the lease back and asked me to sign a version that he had prepared for signing that morning. He told me that nothing had been changed from the version I had been given the night before. Based upon his assurances, I handed him the version he had given me the previous evening back and signed the version he asked me to sign in front of his wife. He informed me that he would handle recording the lease if I would pay the recordation fee and that he would give me a recorded version of the lease later. He did not give me a copy of the lease that I signed until the next day.

17. Upon subsequent review, made after Mr. Atalig began claiming that OKP had violated the lease, I do not believe that the version that I apparently signed on November 2, 2005 was the same or even similar to the version that Mr. Quichocho and Mr. Atalig had given me the previous morning. In particular, I believe that the following sections had been changed:

a. the description of the premises to be leased in Section 1 was significantly changed to delete significant portions of the property;

b. a provision regarding OKP hiring two employees of Mr. Atalig's was added to the new Section 3;

c. a provision regarding OKP not committing waste was added to the new section 6;

d. a provision adding, "including the land" to the new section 12.C. was added;

e. substantial changes to OKP's right to renovate the property were made in the new section 13, entitled "Lessee's Right to Build,";

f. the old section 13, entitled "Removal of Improvements, Soil, Etc., Not to Constitute Waste" was removed including an explicit statement that removal of sand, soil, vegetation, and other materials from the premises would not constitute waste;

g. new sections 13.1 and 13.2 both add new written consent requirements

h. new section 13.3 adds "at the sole cost of Lessee," and section 13.4 adds numerous additional items that Lessor can to keep at the expiration of the Lease;

i. changes "may" to "shall" and added "calamity for the value and improvements" to the Fire and Casualty section; and

j. the new sections 19 and 20, entitled "Severability" and "Entire Agreement" were substantially modified

18. All of the work that has been performed at Plaintiff's property has been performed solely for the purpose of supporting the performance of OKP (CNMI) Corporation's obligations under its contract with the Commonwealth Ports Authority for the extension of the Rota Airport Runway.

19. Throughout all of my negotiations and according to the terms of the lease that I was told I was signing, it was agreed that OKP would not need any further consent from Mr. Atalig to improve and otherwise change any aspect of the property to be leased, including but not limited to, the buildings and area where the equipment/recreation yard was to be built.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 16, 2006 at Saipan, Commonwealth of the Northern Mariana Islands.

Respectfully submitted,

BRIAN M. CHEN

# Exhibit "A"

THIS IS TO MEMORIALIZE OUR MEETING OF OCTOBER 6, 2005, DURING WHICH TIME WE DISCUSSED THE FOLLOWING:

That your company would assume the facility of the Sunrise Hotel and what will be done to the facility and at least the two present employees, namely Edita and Ester, as emphasized:

### PART ONE

1. That the old restaurant will be rebuilt and would have four rooms to be used for housing employees.
2. One room (which is the kitchen area), the sink will left intact – the cooking counter top will be destroyed and replaced with a toilet.
3. There will be no opening between the main building to Room 109 – to be closed so that privacy will be maintained.
4. The outside sink will be connected from the door of the kitchen and will be enclosed and used as a community shower.
5. Several stand pipes will be installed there to accommodate the people staying in the restaurant.
6. The windows of the old restaurant facing the road will be reduced in size to achieve more privacy.
7. The construction/workmanship for the renovation of the continuous concrete beams of the ceiling will be constructed in such a manner to withstand damage/destruction to the roof during typhoons. This method/workmanship should be applicable to all extensions and/or renovations undertaken by your company.
8. The two toilets presently outside the old restaurant will be improved and left as they are.
9. The dining A-frames (all 3 units) will be improved and left as they are (as suits your needs) – to be used for private meetings or other functions.
10. The present bar building and surrounding facility will be improved and used as the main kitchen area for employee meals (major cooking area) and will be attached with an open dining facility by extension with good workmanship for employees dining area.
11. Your company will assume all employees currently working at Sunrise and accommodate them to avoid displacement and problems from Labor/Immigration (the issue of human rights is very critical) and that Edita will be maintained by accommodating her at her on-going salary of $4.50/hour (and her child); and Ester will be accommodated at her salary of $3.50 per hour at regular work hours.
12. Any accumulation of refuse should not be unattended or left on the premises for more than a week - nor should any stagnation of waste water be allowed to remain any longer than a week.
13. Your company is committed to build a soccer field, tennis court, basketball court, and other recreational facility on the premises to improve the health status of employees. The entire lot #362 R 01 may be used and will be assigned to your company for this purpose.

## PART TWO

Hotel Area (Sunrise Building):
1. The present dining area of the hotel will be the main office for the company.
2. The entire roof area of all the buildings must be painted with roof paint to prevent rust damage(s) to the roofing tin from bad weather.
3. The company office of the Sunrise will be used for accounting office – the divider in the office will be moved out to be flush with the counter display (as suggested).
4. Room 101: Should be left as is but to be used at your convenience. An additional room shall be added from Room 101 to accommodate two bathrooms for company use.
5. Room 102 will be improved and will continue to be used for Edita and her son.
6. The roof overhang will be extended outward to cover the entire length of the hotel's sidewalk both front and back and will be of good workmanship and constructed with sturdy support posts.
7. The Sunrise sign will be removed over front entrance and will be replaced with your company signboard.

## PART THREE

1. The larger A-frame (at gate one) will be reconstructed/repaired and made useable.
2. Proposed repair shop for heavy equipment will be aligned with hotel between 1st and 2nd entrance near cluster of coconut trees along the highway not less than 100 feet from latte formation near room 108. It is unlawful by Commonwealth law and Federal law to remove, tamper, damage any historic relics, i.e., ancient latte stones.
3. It was proposed and accepted that the hotel will be managed by present management up until the end of November-December. The lease will take effect when your company staff starts to be placed and the airport project begins in January 2006.
4. In the meantime, your company may begin construction, repair, preparation on other sites – restaurant, kitchen, etc., before the termination of our management by November or December. Your company can start constructing your shop – Sunrise will continue until then.

## PART FOUR

Payment of land lease:
1. It was estimated that the payment for the lease will be $3,000 a month and for the duration of one year with the possible option for additional one year.

# Exhibit "B"

November 12, 2005

OKP (CNMI) Corporation
P.O Box 1001, PMB A-25
Saipan MP 96950

ATTENTION: Mr. Brian Chen
 Authorized Representative

Dear Mr. Chen:

I am writing this letter relative to our discussion over the phone regarding the two employees of Sunrise Hotel, namely: Ludivina "Edita" Carillo - with working title as Sunrise cook, and Ester Langit with working title as waitress/cook assistant. As requested by you for me to get in touch with Ms. Pat Concepcion, I have personally traveled to Saipan and arranged a meeting with her to give her the papers for my two employees. We met at Shirley's (Century Hotel) in Garapan since it was more convenient for her because she was traveling from Capitol Hill. When we met, I gave her the documents with an attempt to clarify some of the questions and concerns on her part, particularly the background of my two employees past employment. I have attempted to express their status on their history with my company and evidence of their backgrounds was limited at the time in writing and other pertinent documents. I took my time and I tried accommodating all concerns as a gesture of good faith, and not negotiate otherwise. My business negotiation with you and your company is truly fair and balanced and a straight-forward business.

First off, I am most grateful for the opportunity to participate and your company becomes part of my business life's history. It was indeed an honor and privilege for me to have met the highly respected owner of the company that will be undertaking the Rota International Airport project. I thank you most sincerely for that opportunity.

Secondly, with all due respect, I was encouraged of your business proposal with my company when first explained: that your company is interested and willing to use the Sunrise facilities for your business accommodations to house senior staff of your company for your intended project at the Rota International Airport, and that you will be erecting a pre-fabricated housing or barracks for your working employees (around 50-60). With my business timing and my activities here in Saipan – to effect the loan I have with the SBA for relocation of my hotel, I found it fitting to discuss further your proposal, of which I, at the time, was encouraged and verbally approved with some minor conditions to resolve should we proceed with this business negotiation.

Thirdly, after reviewing the on site visit with the owner whom you introduced me to (from Singapore and his two sons), we have verbally agreed and committed to effect our negotiation. In this negotiation, the pre-fabricated imported barracks or housing for your company employees is omitted and that you pursue the proposal of housing your 50 or so employees in the typhoon damaged old restaurant and that some modification will be made to suit your purpose. Knowing that the pre-fabricated proposal for housing your employees was in essence the leveraging interest of my company for leasing Sunrise for only one year with additional option, we went into further detail and negotiation that would affect physically the facility which also includes my two employees; namely, Ludivina "Edita" Carillo and Ester Langit. I heavily emphasized the two employees mentioned that these two employees will be accommodated by your company to assume the success of our negotiation; further, it was agreed that my two employees with their working title in my company will be deservedly paid at $4.50 cook and $3.50 for my cook assistant/waitress. There was never

any objection to the salary rate. However, you have informed me that Edita can not be a cook for your employees, but she can be assistant cook – due to ethnic reasoning as to whom she might be serving – which I have no objection.

It was further agreed for the employees protection and will be, that you keep them (Edita and her son) in the same room as she presently is being accommodated and that you will improve the room standard first. With that consideration, I elect to approve the proposal and/or modification and alterations of room 101. Further details are memorialized as we outlined our concern on your leasing the Sunrise Hotel and its' facilities.

It is our serious concern to question what has been agreed and hope that this does not deter the respect, integrity, and formalities of my company participation in your venture. For your company to dig into my company's activities – past or present – is your prerogative. My company has been in existence with its' own history, and among the success that came about to where my company is now, largely depended on the support of people that work with and around it – which we honor highly. With all due respect, we sincerely hope our business commitment will not in any way diminish, alter, or delay your continuous business success and ours. For further information or other concerns regarding our company, please contact Ms. Jackie Bussell, Office Manager of Sunrise Hotel at our fax/phone 532-0478.

Sincerely,

Joaquin Q. Atalig
President/General Manager

Enclosures (2)
    Letter to Department of Labor
    October 6, 2005 Part One – Part Four Memorialization